IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| C.J., a minor, by and through her next friend and guardian, BETTY JEAN MURPHY JAMES, | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| BETTY JEAN MURPHY JAMES, as Administrator of the Estate of Latoya James | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION |
| | ) | FILE NO.: 2:22-CV-00078-LGW-BWC |
| v. | ) | |
| | ) | |
| MICHAEL BLAQUIERE, in his individual capacity, as Camden County Deputy Sheriff | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| DOWNY CASEY, in his individual capacity, as a Camden County Deputy Sheriff | ) ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN/JANE DOES, in their individual capacities, as Camden County Deputies | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**<u>DEFENDANTS MICHAEL BLAQUIERE AND DOWNY CASEY'S BRIEF
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

COME NOW Michael Blaquiere and Downy Casey, in their individual capacities, ("Defendants") and pursuant to Federal Rule of Civil Procedure Rule 56 and Local Rule 7.1, file their motion for summary judgment and memorandum of law in support, showing the Court as follows:

## I.  INTRODUCTION

This case stems from the tragic shooting of Latoya James on May 4, 2021, that occurred while Camden County Sherrif's Office ("CCSO") deputies were executing a search warrant on the residence of a known drug dealer, Varshan Brown, for controlled substances and items used in the distribution and sales of narcotics. Brown was also reported to have weapons inside the residence, and a lengthy history of violence, including aggravated assault against law enforcement officers. In their complaint, plaintiffs allege that defendants approached the residence under the cover of darkness, knocked on the front door to announce their presence, and waited approximately 2.5 seconds before breaching the front door. Upon breaching the door of the residence, defendants encountered a fully clothed Brown and James in a bedroom towards the front of the residence. Brown, who was armed with a .45 caliber handgun, positioned himself behind James with his arm around her body to use James as a human shield, and immediately began firing at defendants. The defendants returned fire, aiming specifically at Brown. Unfortunately, James was shot and killed during this exchange.

Plaintiffs now bring Fourth Amendment claims pursuant to § 1983 against defendants, alleging they violated James's constitutional rights to be free from unreasonable forcible entry and excessive force. As discussed in detail below, defendants are entitled to qualified immunity as to plaintiff's Fourth Amendment claims.

## II.  STATEMENT OF UNDISPUTED FACTS

Defendants rely upon and incorporate herein their Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment.

# III.   ARGUMENT AND CITATION TO AUTHORITY

## A.   Standard for Summary Judgment

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. See Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). The moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp.2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

When, as here, the nonmoving party would have the burden of proof at trial, the moving party may obtain summary judgment by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, courts must consider all reasonable inferences which can be drawn from the record in the light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011). However, to rebut the moving party's claims, the nonmoving party must provide evidence "beyond

the pleadings." <u>Celotex</u>, 477 U.S. at 324 ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . . ."); <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 594 (11th Cir. 1995).

**B.      Plaintiffs' § 1983 Claims Are Barred by Qualified Immunity.**

Plaintiffs' § 1983 claims against defendants are barred by qualified immunity. The unreasonable entry claim fails because James did not have a reasonable expectation of privacy in the residence and, even if she did, the entry was justified by exigent circumstances. The excessive force claim fails because defendants reasonably returned fire at a man trying to kill them. Finally, both claims are barred by qualified immunity because there is no prior case law clearly establishing that either the officers' entry or their use of force was unreasonable under the circumstances.

Pursuant to § 1983, plaintiffs bring Fourth Amendment claims for unreasonable search and seizure and excessive force. (Counts I and II.) Qualified immunity "shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable officer would have known." <u>Mullenix v. Luna,</u> 136 S. Ct. 305, 308 (2015). Significantly, the immunity is "from suit rather than a mere defense to liability." <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 525 (1985). As such, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." <u>Hunter v. Bryant</u>, 502 U.S. 224, 227 (1991).

To claim qualified immunity, defendants must first show that they were performing discretionary functions. <u>Barnes v. Zaccari</u>, 669 F.3d 1295, 1303 (11th Cir. 2012). Here, there can be no question that defendants were acting within their discretionary authority as deputies with CCSO in executing a search warrant of Brown's residence. Therefore, there is no dispute that

defendants were acting within their discretionary authority for purposes of qualified immunity. King v. Pridmore, 961 F.3d 1135, 1147 (11th Cir. 2020). Plaintiffs, in turn, bear the burden of demonstrating that defendants are not entitled to qualified immunity. Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004). To meet their burden, plaintiffs must show that: (1) each defendant violated James's constitutional rights, and (2) each defendant's conduct was prohibited by clearly established law. Plumhoff v. Rickard, 134 S. Ct. 2012, 2020 (2014). As shown below, plaintiffs cannot meet their burden on both of these prongs. Therefore, defendants are entitled to qualified immunity.

**C.    § 1983 Unreasonable Entry (Count 1)**

**1.    James did not have a reasonable expectation of privacy in Brown's residence.**

"[A]n individual's Fourth Amendment rights are *not* infringed—or even implicated—by a search of a thing or place in which he has no reasonable expectation of privacy." United States v. Ross, 963 F.3d 1056, 1062 (11th Cir. 2020). While the Fourth Amendment generally protects against unreasonable searches of an individual's person and home, the extent to which this protection applies may depend on where the individual is located. Minnesota v. Carter, 525 U.S. 83, 83 (1998). In order to claim the protection of the Fourth Amendment, an individual "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Id. at 88. The Fourth Amendment protects people, not places, and in some circumstances a person may have a legitimate expectation of privacy in the house of someone else. Id. at 89. Thus, for example, the Supreme Court has held "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the

householder may not." Id. at 90. However, even being an overnight guest does not guarantee a reasonable expectation of privacy. See United States v. Bushay, 859 F.Supp.2d 1335, 1349–50 (N.D. Ga. 2012) (holding that mere presence in an apartment is not sufficient to confer standing and that occupant who was not the owner or lessee of the apartment must demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy); see also United States v. Jones, 184 F. App'x 943, 945 (11th Cir. 2006) (a criminal defendant's alleged interest in the premises as an occasional houseguest or mere visitor on the day of the search and as a place to store a small number of items, was neither significant, nor current); see also United States v. Sweeting, 933 F.2d 962, 964 (11th Cir.1991) (defendants failed to establish standing in residence where they maintained that residence was rented by their mother as a residence for their grandmother even though they had temporary access along with other members of the family and had some personal effects there); see also United States v. Garcia, 741 F.2d 363, 366 (11th Cir. 1984) ("[o]n the other hand, mere presence in the apartment would not be enough to give [defendant] standing, for the precedents binding on this court require that an occupant other than the owner or lessee of an apartment demonstrate a significant and current interest in the searched premises in order to establish an expectation of privacy."); see also United States v. Sneed, 732 F.2d 886 (11th Cir. 1984) (no expectation of privacy demonstrated when defendant only alleged that he was present on searched premises as a guest).

Nor is there a reasonable expectation of privacy where an individual is in a residence solely for the purpose of completing a business transaction. See Carter, 525 U.S. at 90 (defendants who were only in another's apartment for a short time, solely for the purpose of packaging cocaine, had no legitimate expectation of privacy in the apartment); see also Mays v. Davenport, 560 F. App'x 958, 963 (11th Cir. 2014) (individual did not have a legitimate expectation of privacy in another's

motel room where their primary reason to be in the motel room was to acquire and smoke crack cocaine).

In their complaint, plaintiffs allege that James was visiting her cousin, Varshan Brown, at the residence where the subject incident took place. (Complaint, Introduction.) In their responses to defendants' written discovery, plaintiffs state they were unaware of the purpose of James's visit to Brown's residence the morning of May 4, 2021. (Defendants' Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment ("SMF"), ¶ 19.) During the deposition of James's mother, plaintiff Betty Jean Murphy James, she testified that she did not know why James was at Brown's residence that morning, how she got there, how long she had been there, if James had ever visited Brown's residence prior to the subject incident, or what James's plans were for that day. (SMF, ¶ 20.) Nor is there any evidence in the record to show that James lived at the residence, occasionally stayed at the residence, maintained a private room at the residence, was an overnight guest of the residence, or had any property interest in the residence whatsoever. Plaintiff only knew that James and Brown were "close cousins." (SMF, ¶ 21.) In addition, while CCSO deputies were cutting James's shirt off in order to render first aid to James immediately following the shooting, a clear plastic baggie containing a "white powdery substance, believed to be cocaine," fell out of James's bra area. (SMF, ¶ 22.) A CCSO deputy also noted that "another plastic baggie with a white power [sic] substance and straw were present on the bed" next to where James's body was located. (SMF, ¶ 23.)

Therefore, there is no evidence in the record to even suggest that James had a reasonable expectation of privacy inside Brown's home at the time defendants were executing the search warrant. There is no evidence James owned, lived in, rented, stayed in, or was otherwise an overnight guest of Brown's residence where the subject incident took place. Plaintiff Betty Jean

Murphy James admittedly is unfamiliar with any prior visits James might have had at the residence, nor does she know why James was present in the residence the morning of the subject incident or how long she had been there. Following the shooting, CCSO deputies found evidence of suspected criminal activity on, and in the immediate vicinity of, James's person by way of a "white powdery substance" believed to be cocaine. (SMF, ¶ 22-23.) Similar to the defendants in <u>Mays</u>, had James's primary reason for being at the residence been to acquire cocaine, she would not have had a reasonable expectation of privacy inside the home. 560 F. App'x at 963.

In sum, James did not have a reasonable expectation of privacy in the residence, thus, any "breach" or search which may have occurred did not violate her Fourth Amendment rights.

**2. The entry was reasonable given the exigent circumstances.**

Plaintiffs assert defendants made an unjustified forcible entry into the residence by waiting roughly 2.5 seconds after their knock and announce before breaching the front door of the residence during their execution of a search warrant for the home. (<u>See</u> Complaint, ¶¶ 34–41.) The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures." U.S. Const. amend. IV; <u>Whittier v. Kobayashi</u>, 581 F.3d 1304 1308 (11th Cir. 2009) (emphasis added). Here, the deputies' entry into the home approximately 2.5 seconds after knocking and announcing their presence was reasonable given the exigent circumstances facing the deputies, including the potential destruction of evidence and imminent threat to their safety.

In <u>Wilson v. Arkansas</u>, 514 U.S. 927, 929 (1995), the Supreme Court held the Fourth Amendment reasonableness inquiry incorporated the common law requirement that officers, when executing a search warrant, must knock on a door and announce their identity before attempting a forcible entry into a home. <u>Kobayashi</u>, 581 F.3d at 1308. The Court, however, recognized "[t]he

Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests," and noted the knock-and-announce requirement could give way "under circumstances presenting a threat of physical violence," or "where police officers have reason to believe that evidence would likely be destroyed if advance notice were given," Id. (quoting Wilson, 514 U.S. at 934, 936).

Still, The Eleventh Circuit has held that while the Fourth Amendment does not explicitly set forth a knock-and-announce principle, the Amendment "incorporates the important common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." United States v. Segura-Baltazar, 448 F.3d 1281, 1289 (11th Cir. 2006). Courts have held that there are no particular words or phrases officers must speak before entering. Storck v. City of Coral Springs, 354 F.3d 1307, 1318 (11th Cir. 2003) ("the Fourth Amendment normally requires little more notice than a knock on the door prior to a forced entry pursuant to a lawfully issued warrant"). Therefore, the focus of the knock-and-announce is not what "magic words" are spoken by police or whether the police rang the doorbell, rather it is "how these words and other actions of the police will be perceived by the occupant." United States v. Coleman, No. 1:07-CR-233-ODE-RGV, 2010 WL 11507843 at *13 (N.D. Ga. Feb. 24, 2010) (citation and internal marks omitted). "The proper trigger point, therefore, is when those inside should have been alerted that the police wanted entry to execute a warrant." Id.

Here, defendants were made aware through prior surveillance of the home that it was equipped with security cameras and that monitors were inside the house. (SMF, ¶ 3.) Upon defendants arrival at the residence at roughly 5:00 a.m. the morning of May 4, 2021, defendants saw that the porch light was on and also saw a flashing light coming from what they believed to

be a security camera located on the front porch—this specific camera was not previously accounted for by defendants during their surveillance of the residence. (SMF, ¶ 10.) As soon as defendants witnessed this flash, they heard another CCSO officer call out, "hey, they know we are here." (SMF, ¶ 11.) Casey, as the first deputy in the stack set to breach the residence, also testified that he could hear running inside of the residence as the deputies were walking up the steps to the front porch. (SMF, ¶ 12.) As defendants approached the front door, Blaquiere shouted "Sheriff's Office-Search Warrant-Come to the Door" before knocking on the front door. (SMF, ¶ 13.) CCSO deputies breached the front door within 3 seconds of Blaquiere's initial knock. (SMF, ¶ 14.). Once defendants entered the residence, they encountered Brown and James standing in the bedroom, CCSO deputies continued to shout "Sherriff's Office Search Warrant" and instructed the individuals to get on the ground. (SMF, ¶ 14.) Defendants could see Brown with one arm around James "like [he] was hugging her" with his firearm sticking around her body before he raised his firearm and began shooting at defendants. (SMF, ¶ 15.) In response to the deadly threat presented by Brown, defendants returned fire, aiming at Brown. (SMF, ¶ 16.) Neither defendant fired blindly, defendants testified they were shooting at Brown (SMF, ¶ 16.)

Looking at the "trigger point" of defendants breach of the residence, it is clear that defendants made their presence and purpose known before forcing their way inside. See Coleman, No. 1:07-CR-233-ODE-RGV, 2010 WL 11507843 at *13. Defendants saw the flash of the security camera before entering and Casey reported hearing footsteps as they approached the front door, while Blaquiere shouted who they were and that they had a search warrant. Upon entering the residence, defendants encountered Brown and James standing in the bedroom before Brown made the decision to fire on them. Defendants' forcible entry of the residence was reasonable given that defendants made it abundantly clear they were present to execute a search warrant and knocked

before entering the residence. This is made clear by the fact that both Brown and James were awake and ready to ambush defendants when they entered the home.

However, given the facts known to defendants prior to the subject incident, coupled with situation presented to them while they executing the search warrant, sufficient exigent circumstances existed for defendants to do without the Fourth Amendment's knock-and-announce requirement. In their complaint, plaintiffs cite to the Seventh Circuit's opinion in United States v. Leichtnam, 948 F.2d 370 (7th Cir. 1991), for the proposition that "[a] knock and announcement must be loud enough to be heard, and it must be followed by a pause long enough for someone to answer or come to the door." (Complaint, Introduction.)

Although Leichtnam is not controlling, the facts are somewhat similar to the case at hand. In Leichtnam, the five officers announced "Police" outside of the residents' home and knocked on a screen door at the entrance to the home. The officers waited 20 to 30 seconds before ramming through it. The Seventh Circuit held that the officers made enough noise outside of the home that everyone inside "was apparently aware that the police had been standing outside knocking and wanted in; they were simply ignoring the officers." Id. at 374. "Though no one inside made any sound or movement to indicate his or her presence or to find out what the police wanted, they had all been awakened, and two of them were out of bed and standing up when the police came in." Id.

The Supreme Court has held that an interval of 15 to 20 seconds until forcible entry was reasonable "given exigency of possible destruction of evidence, regardless of fact that resident was in shower at time of knock and regardless of whether resident would have had time to answer door if he had heard knock; facts known to officers at time determined reasonableness of wait time, and

entry was not justified based on implied refusal of entry but rather on exigency." United States v. Banks, 540 U.S. 31, 38 (2003).[1]

The standards bearing on whether officers can legitimately enter after knocking are the same as those for requiring or dispensing with knock and announce altogether. Id. at 31. The obligation to knock and announce before entering gives way when officers have reasonable grounds to expect futility or to suspect that an exigency, such as evidence destruction, will arise instantly upon knocking. Id. However, the Supreme Court has declined to provide a bright line rule for what it considers to be a "reasonable" amount of time between a knock-announce and breach, instead emphasizing the fact-specific nature of the reasonableness inquiry. Id. at 36. Still, the Supreme Court has highlighted the importance of allowing an occupant a reasonable amount of time to answer the door:

> One point in making an officer knock and announce, then, is to give a person inside the chance to save his door. That is why, in the case with no reason to suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well be longer when police make a forced entry, since they ought to be more certain the occupant has had time to answer the door. It is hard to be more

---

[1] In Banks, the Supreme Court considered a collection of cases concerning exigent circumstances. See, e.g., United States v. Goodson, 165 F.3d 610, 612, 614 (8th Cir. 1999) (holding a 20-second wait after a loud announcement at a one-story ranch reasonable); United States v. Spikes, 158 F.3d 913, 925–27 (6th Cir. 1998) (holding a 15-to-30-second wait in midmorning after a loud announcement reasonable); United States v. Spriggs, 996 F.2d 320, 322–23 (D.C. Cir. 1993) (holding a 15-second wait after a reasonably audible announcement at 7:45 a.m. on a weekday reasonable); United States v. Garcia, 983 F.2d 1160, 1168 (1st Cir. 1993) (holding a 10-second wait after a loud announcement reasonable); United States v. Jones, 133 F.3d 358, 361–362 (5th Cir. 1998) (per curiam) (relying specifically on the concept of exigency, holding a 15-to-20-second wait reasonable); see also United States v. Chavez-Miranda, 306 F.3d 973, 981–82, n. 7 (9th Cir. 2002) ("Banks appears to be a departure from our prior decisions .... [W]e have found a 10 to 20 second wait to be reasonable in similar circumstances, albeit when the police heard sounds after the knock and announcement"); United States v. Jenkins, 175 F.3d 1208, 1215 (10th Cir. 1999) (holding a 14-to-20-second wait at 10 a.m. reasonable); United States v. Markling, 7 F.3d 1309, 1318–19 (7th Cir. 1993) (holding a 7-second wait at a small motel room reasonable when officers acted on a specific tip that the suspect was likely to dispose of the drugs).

> definite than that, without turning the notion of a reasonable time
> under all the circumstances into a set of sub-rules[.]

Id. at 41.

As discussed above, under most circumstances, the Fourth Amendment requires officers to "knock and announce" before forcibly entering a home to execute a search warrant. Wilson, 514 U.S. at 934. However, officers can enter without knocking and announcing if they have "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards v. Wisconsin, 520 U.S. 385, 394 (1997).

Thus, the relevant inquiry is "whether the officer had 'arguable reasonable suspicion' that a sufficient exigency existed to justify a no-knock entry." Santana v. Miami-Dade Cnty., 688 F. App'x 763, 768 (11th Cir. 2017) (quoting Kobayashi, 581 F.3d at 1308). Courts are to "analyze whether a reasonable officer could have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify a no-knock entry." Kobayashi, 581 F.3d at 1308. "[The] Court must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." Whittier v. Bruna, 343 F. App'x 505, 508 (11th Cir. 2009) (quoting Brent v. Ashley, 247 F.3d 1294, 1304 (11th Cir. 2001)). Notably, the required showing on this point is "not high." Richards, 520 U.S. at 394.

Whether a no-knock entry violates the Fourth Amendment does not turn on whether the search warrant itself authorizes a no-knock entry. What matters is whether the officers executing the search warrant had arguable reasonable suspicion of a sufficient exigency. Richards, 520 U.S. at 396 n.7 ("a magistrate's decision not to authorize a no-knock entry should not be interpreted to

remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed.").

The Eleventh Circuit often recognizes sufficient exigent circumstances justifying a no-knock entry when the officers have specific knowledge that the suspect, or someone else inside of the home, has or is likely to have a weapon. See, Santana, 688 F. App'x at 768 (officer had been told that the suspect drug dealer had ready access to a gun); Kobayashi, 581 F.3d at 1306 (the SWAT team had knowledge that the suspect carried a concealed handgun and kept a shotgun in his bedroom); see also United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995) (recognizing that "[g]uns and violence go hand-in-hand with illegal drug operations"); but see Smith on behalf of Est. of Smith v. Ford, 488 F. Supp. 3d 1314 (M.D. Ga. 2020) (finding no exigent circumstances where the record lacked any evidence that defendants had specific knowledge of decedent or anyone else in the home having a weapon, noting "any suspicion of exigent circumstances must be specific to the case, not a general suspicion based on general or stereotypical inferences.").

And as the Sixth Circuit recognized in United States v. Spikes, there is no bright line as to when an entry is reasonable under any given set of circumstances: "we decline their invitation to create a bright-line rule for every case, i.e., that waiting less than five seconds is per se unreasonable while waiting more than five seconds is per se reasonable under the Fourth Amendment." 158 F.3d 913, 926 (6th Cir. 1998). Spikes also provides valuable insight as to the factors a federal court will consider when determining whether or no law enforcement allowed a reasonable amount of time to lapse between the knock-announcement and forced entry.[2]

---

[2] Also in Spikes, the Sixth Circuit considered the evidence that provides the basis for the search warrant itself (holding that a search for drugs lessens the length of time law enforcement must ordinarily wait outside before entering a residence due to the added risk of the destruction of evidence), information known about the residence to be searched (holding the existence of police scanning equipment, lookouts, guns, and armed guards plays a factor in determining

As discussed above, defendants knew that Brown maintained surveillance equipment at the residence, including security cameras and monitors. (SMF, ¶ 3.) As his residence was the subject of the search warrant, defendants conducted a criminal history search on Brown prior to the search and were familiar with Brown's violent and extensive criminal history prior to the subject incident, including but not limited to prior charges and/or convictions for aggravated assault, battery, multiple charges for possession of a firearm by a convicted felon, trafficking in cocaine, marijuana, methamphetamine, battery/simple battery family violence, purchase, possession, distribution, or sale of marijuana, willful obstruction of law enforcement, probation violation, aggravated assault on a law enforcement officer, and possession of cocaine. (SMF, ¶ 4.) In addition, Casey was personally aware of a prior incident involving Brown where his son was believed to have shot him in the back after Brown had beaten his son's mother. (SMF, ¶ 5.) Defendants were also made aware, by way of confidential informants, that Brown was known to keep weapons on his person and in the residence. (SMF, ¶ 5.)

When applying for the search warrant, Blaquiere indicated that the search was for the existence of controlled substances including but not limited to cocaine and THC, items used in the distribution and sales of narcotics, and electronic devices used to facilitate transactions in controlled substances. (SMF, ¶ 6.) Blaquiere also requested the magistrate judge include a "No Knock" provision for the safety of law enforcement based on the aforementioned facts known to him. (SMF, ¶ 7.) The magistrate judge approved of the search warrant for Brown's residence but did not include the requested "No Knock" provision. (SMF, ¶ 8.)

---

reasonableness: "the officers did not need to wait long enough for a barrage of bullets from within before concluding that they had given the occupants enough time to respond to their request for entry[]"), the time of day, and the methods used by law enforcement to alert those inside of their presence. Id. at 927.

Based on the undisputed facts, defendants had at least arguable reasonable suspicion that sufficient exigency existed to justify a no-knock entry of the residence. To recap, defendants were aware: (1) the residence was equipped with surveillance technology in the form of security cameras and monitors; (2) that Brown had a violent and extensive criminal history, including prior charges and/or convictions for drug trafficking, possession of a firearm by a convicted felon, battery, aggravated assault, and aggravated assault against a law enforcement officer; and (3) that Brown was reported to keep weapons on his person and in the subject residence. This information must be paired with the exigent circumstances that arose at the scene: the flash from what defendants believed to be a previously unaccounted-for security camera and the sounds of footsteps running through the house, both of which indicated that the occupants likely knew of the deputies' presence and might be destroying evidence, preparing to ambush defendants, or both. These circumstances did not require defendants to "wait long enough for a barrage of bullets from within before concluding that they had given the occupants enough time to respond to their request for entry." See Spikes, 158 F.3d at 927. Indeed, a barrage of bullets is precisely what the defendants encountered upon entering the residence as Brown was clearly prepared for the defendants' entry by using James as a human shield. And while the warrant they were issued did not specifically authorize a no-knock entry, "even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in." Banks, 540 U.S. at 36.

Given the possibility of the destruction of evidence, the potential for (and eventual) gunfire, and the alerting of the residence's surveillance equipment, defendants did not violate the Fourth Amendment's knock-and-announce requirement by waiting less than three seconds before entering

the residence. Accordingly, defendants did not violate James's constitutional rights and plaintiffs' § 1983 unlawful entry claim fails as a matter of law.

### 3.    No clearly established law

Even if defendants had violated James's constitutional rights under the Fourth Amendment when entering the residence, plaintiffs cannot meet their burden of proving that defendants violated *clearly established* law. To meet their burden, plaintiffs must show that the law was "clearly established" at the time of defendants' supposed misconduct. See Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir. 2012).

To determine whether the law was clearly established, "[c]ase law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000). Put otherwise, "[q]ualified immunity affords protection to all but the plainly incompetent or those who knowingly violate the law." Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008). In all cases where qualified immunity is at issue, courts must determine whether the law was clearly established by looking at whether the state of the law at the time of the action gave "fair and clear warning" to a reasonable person that their actions were unconstitutional. Hope v. Pelzer, 536 U.S. 730, 746 (2002); see also United States v. Lanier, 520 U.S. 259, 265 (1997) ("To make the warning fair, so far as possible the line should be clear."). In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the United States Supreme Court, the Eleventh Circuit Court of Appeals, or the Georgia Supreme Court. Jenkins v. Talladega City Bd. of Educ., 115 F.3d 821, 823 n.4 (11th Cir. 1997).

Qualified immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 343 (1986). Thus, even if defendants were mistaken in believing that their actions were justified, they were not "plainly incompetent." See Stanton v. Sims, 134 S. Ct. 3, 7 (2013); Brinegar v. United States, 338 U.S. 160, 175 (1949) (stating that law enforcement officers are "prudent men, not legal technicians").

As discussed above, the Supreme Court has declined to provide a bright line rule for what it considers to be a "reasonable" amount of time between a knock-announce and breach, instead emphasizing the fact-specific nature of the reasonableness inquiry. Nor are defendants aware of any bright line promulgated by the Eleventh Circuit or Georgia Supreme Court in this regard. To overcome their burden, plaintiffs must at the very least identify controlling authority which would have put deputies on notice that it was plainly unconstitutional to wait less than 3 seconds before breaching a residence during the execution of a search under the circumstances presented to defendants here. They cannot do so. Accordingly, even if defendants had violated James's rights (which is denied), they did not violate clearly established law. Defendants therefore remain entitled to qualified immunity and move for summary judgment as a matter of law.

**D.      § 1983 Excessive Force (Count II)**

**1.      The defendants' force was reasonable.**

Plaintiffs allege defendants used "unnecessary, excessive, and deadly force on Latoya James, an unarmed woman." (Complaint, ¶ 47.) They argue defendants' actions were "objectively unreasonable in light of the facts and circumstances confronting them." (Id.) Further, plaintiffs claim defendants entered the residence and shot James without any justification, in violation of her Fourth Amendment rights. (Id. at ¶¶ 48–53.)

The Fourth Amendment's prohibition against unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an arrest. Graham v. Connor, 490 U.S. at 394–95. Thus, the issue is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, **without regard to their underlying intention or motivation**." Id. at 397 (emphasis added). In determining whether the force utilized to effect a seizure was "objectively reasonable," the court must evaluate a number of factors, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. In applying these factors, the Graham Court provided the following guidance:

> The 'reasonableness' of a particular use of force must be judged from the **perspective of a reasonable officer on the scene**, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, supra, 392 U.S. at 20-22, 88 S. Ct. at 1879-1881. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers', Johnson v. Glick, 481 F.2d at 1033, violates the Fourth Amendment. **The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.**

Id. at 396–97 (emphasis added). Here, it appears plaintiffs have taken the position that defendants forcibly entered the home and began shooting, killing James. This, of course, is much different from what is actually shown in the evidence in the record. For purposes of this analysis, the defendants' perspectives are the only ones that matter.

Given the facts at hand, the Eleventh Circuit's recent holding in Davis v. Waller, 44 F.4th 1305 (11th Cir. 2022), is particularly helpful in examining plaintiffs' excessive force claims. In

<u>Davis</u>, plaintiff was taken hostage by a fleeing felon in rural Georgia. <u>Id.</u> at 1309. The felon forced plaintiff at gunpoint to drive an 80,000 plus pound timber truck to escape from pursuing officers— eventually forcing plaintiff to drive towards seven law enforcement officers gathered at the scene, showing no signs of stopping. <u>Id.</u> As the truck struck several police vehicles lining the road, several of the officers opened fire on the cab of the truck, even though they allegedly knew plaintiff was an innocent hostage being forced to drive. <u>Id.</u> The felon was also in possession of a rifle that he had fired at least once before the use of deadly force. <u>Id.</u> at 1314. The plaintiff had similarly brought Fourth Amendment claims against the officers for excessive use of force in violation of his Fourth Amendment rights, the officers moved for summary judgment based on qualified immunity, and the district court granted the officers' motion. <u>Id.</u> at 1309.

In the affirming the district court's decision, the Eleventh Circuit held that because plaintiff and the felon posed "an imminent risk of serious physical harm or death to the officers and to the public, we are satisfied that Defendants' decisions to shoot at a moving, 84,000-pound logging truck were reasonable." <u>Id.</u> at 1313. Further explaining, the Court noted that "[o]ur law has repeatedly held that "a police officer may use deadly force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm." <u>Id.</u> (quoting <u>Singletary v. Vargas</u>, 804 F.3d 1174, 1181 (11th Cir. 2015)) (cleaned up). Therefore, "[the Court] concluded that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril." <u>Id.</u> (citation and quotation marks omitted). Based on the extraordinary facts found in <u>Davis</u>, the Eleventh Circuit held that "any reasonable officer would reasonably believe that his own life was in imminent danger and that [plaintiff] and [the felon], in control of the logging truck, jeopardized others if [the felon] managed to escape." <u>Id.</u> In so holding, the Eleventh Circuit rejected plaintiff's

arguments that the officers should have employed less than lethal tactics or first provided a warning before using lethal force. <u>Id.</u> at 1315–16 ("[o]fficers are required to give a warning before using deadly force if a warning *is feasible* . . . . [also] [t]here is no precedent in this Circuit which says that the Constitution requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.") (citations and quotation marks omitted) (cleaned up and emphasis added).[3]

Here, defendants and the other deputies on the scene faced an imminent risk of serious physical harm or death once Brown began shooting at them. Similar to the incredible hostage situation described in <u>Davis</u>, it was objectively reasonable for defendants to return fire, despite the fact that Brown was using James as a human shield in the process. While it is undoubtedly tragic that James was shot and killed during this exchange, defendants were justified in responding with deadly force to the life-threatening situation created by Brown. Defendants were not required wait until Brown released James from his grasp or James managed to free herself. Indeed, in <u>Davis</u>, the plaintiff was shot a total of nine times by the time the use of force had ended. <u>Id.</u> at 1311. Defendants were not required to pursue less than lethal means to extinguish the threat of Brown, nor was it feasible for them to give a warning before using deadly force. And certainly, they were not required to let Brown murder them without returning fire.

### 2.   No clearly established law

As with plaintiffs' unlawful entry claim, they must come forward with some prior case law clearly establishing that the use of lethal force under the circumstances facing defendants was

---

[3] The Eleventh Circuit rejected the plaintiff's suggestion that deadly force may never be used against an innocent victim: "we can find no case asserting that proposition so categorically. And we decline to do so today. Each case turns on its peculiar facts and circumstances. The application of deadly force may be reasonable when it prevents an even graver and more imminent danger to the officers and to the public." <u>Id.</u> at 1315.

unconstitutional. (See Part III.C.3 *supra*.) Defendants are unaware of any prior published case law from the Eleventh Circuit, Supreme Court, or the Georgia Supreme Court holding that officers violate the constitution when they return fire to a criminal suspect who has already fired upon them. As the Eleventh Circuit recently held in <u>Davis v. Waller</u>, it has "concluded 'that it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" 44 F.4th at 1313.

It is not even a close question in this case.[4] The officers are entitled to qualified immunity on plaintiff's Fourth Amendment excessive force claim as a matter of law.

**E.     State Law Claims for Wrongful Death and for the Estate (Counts 4 and 5).**

Plaintiffs' claims under state law for wrongful death pursuant to O.C.G.A. § 51-4-1 and claims of the estate pursuant to O.C.G.A. § 51-4-5(b) are derivative to the constitutional tort claims, and therefore must be dismissed with those claims. <u>Dion v. Y.S.G. Enters., Inc.</u>, 296 Ga. 185, 766 S.E.2d 48, 51 (Ga.2014) ("Under Georgia law a suit for wrongful death is derivative to the decedent's right of action. A survivor cannot recover for the decedent's wrongful death if the decedent could not have recovered in his or her own right."). Here, there is no independent state law claims brought by plaintiffs other than the derivative claims for damages described in this section. Therefore, because plaintiffs' § 1983 claims fail, Counts 4 and 5 of their complaint must also fail.

*[Continued on following page.]*

---

[4] Plaintiffs' own purported law enforcement expert admitted that it is reasonable for officers to fire at a weapon that is firing at them. (SMF, ¶ 17.) Their expert also testified that Casey was justified in using lethal force given the totality of the circumstances surrounding the shooting. (<u>Id.</u>)

## IV.    <u>CONCLUSION</u>

For the reasons set for above, defendants respectfully request that this Court grant their

motion for summary judgment as to all of plaintiffs' remaining claims.

This 27th day of November, 2023.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Steven L. Grunberg*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
Steven Grunberg
Georgia Bar No. 146397
sgrunberg@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (Telephone)
(770) 937-9960 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically submitted the foregoing **<u>DEFENDANTS MICHAEL BLAQUIERE AND DOWNY CASEY'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants.  Counsel of record are:

Reginald A. Greene, Esq.
GREENE LEGAL GROUP LLC
One Georgia Center, Suite 605
600 West Peachtree Street, NW
Atlanta, Georgia 30308
rgreene@greenlegalgroup.com

Mario A. Pacella, Esq.
STROM LAW FIRM, LLC
600 West Peachtree Steet, Suite 604
Atlanta, Georgia 30308
mpacella@stromlaw.com

Bakari T. Sellers, Esq.
STROM LAW FIRM, LLC
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
bsellers@stromlaw.com

Harry M. Daniels, Esq.
THE LAW OFFICES OF HARRY M. DANIELS, LLC
4751 Best Road, Suite 490
Atlanta, Georgia 30337
daniels@harrymdaniels.com

This 27th day of November, 2023.

/s/ Steven L. Grunberg
Steven Grunberg
Georgia Bar No. 146397
sgrunberg@fmglaw.com

*Attorneys for Defendants*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
 Suite 1600
Atlanta, Georgia 30339-5948
T:  (770) 818-0000
F:  (770) 937-9960