IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| C.J., a minor, by and through her next friend and guardian, BETTY JEAN MURPHY JAMES, | ) ) ) ) ) | |
| and | ) ) | |
| BETTY JEAN MURPHY JAMES, as Administrator of the Estate of Latoya James | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION FILE NO.: 2:22-CV-00078-LGW-BWC |
| v. | ) ) | |
| MICHAEL BLAQUIERE, in his individual capacity, as Camden County Deputy Sheriff | ) ) ) ) ) | |
| and | ) ) | |
| DOWNY CASEY, in his individual capacity, as a Camden County Deputy Sheriff | ) ) ) ) ) | |
| and | ) ) | |
| JOHN/JANE DOES, in their individual capacities, as Camden County Deputies | ) ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS MICHAEL BLAQUIERE AND DOWNY CASEY'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT CHARLES STEPHENSON AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

COME NOW Michael Blaquiere and Downy Casey, in their individual capacities, ("Defendants"), and respectfully move the Court to exclude the opinions of plaintiff's expert witness, Charles Stephenson, pursuant to Federal Rule of Evidence 702, the Supreme Court's decisions in

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Fed. R. Civ. P. 26(a)(2)(B), 26(a)(2)(C). In support of the instant motion, defendants rely on this incorporated memorandum of law in support and the complete record in the above-styled case. For the reasons set forth below, defendants respectfully request that their motion be granted.

## I.    **INTRODUCTION**

This case stems from the tragic shooting of Latoya James on May 4, 2021, that occurred while Camden County Sherrif's Office ("CCSO") deputies were executing a search warrant on the residence of a known drug dealer, Varshan Brown, for controlled substances and items used in the distribution and sales of narcotics. The evidence on summary judgment shows that James did not have a reasonable expectation of privacy in the home, exigent circumstances justified the officers' entry, and their use of lethal force once Brown began to shoot at them was reasonable and justified as a matter of law.

Plaintiffs have retained a law enforcement expert, Charles Stephenson, to opine that the officers violated James's constitutional rights. However, such legal conclusions touch on ultimate issues in the case and will not be helpful to the jury. Furthermore, Mr. Stephenson's methodology is extremely suspect. He utilizes statements regarding industry standards developed *after* the subject incident by which to judge defendants' actions, and he completely and intentionally misreads one defendant's deposition testimony to force a factual conclusion that simply is not supported by the record. Finally, Mr. Stephenson has not even been involved in law enforcement for over 40 years and he is not a leader or excerpt on the subjects for which he offers opinions. Accordingly, the Court should exclude Mr. Stephenson's testimony as unreliable, irrelevant, and unqualified.

## II.     FACTS AND PROCEDURAL BACKGROUND

Plaintiff identifies Mr. Stephenson as an expert in the fields of lethal and non-lethal use of force. (Stephenson Dep. 7:7-15 (Doc. 39-8).) The scope of his engagement was:

> to examine the "totality of circumstances" relating to the service of a search warrant on 5/4/2021, at 12103 Hwy. 17, in Woodbine County [sic], Georgia; by the Camden County, Georgia Sheriff's Office (CCSO) that resulted in the Lethal Use of Force by CCSO Deputies Downey Casey, and Michael Blaquiere in the death of Latoya James and gunshot wounding of Varshan Brown.

(Stephenson Report (attached hereto as "Exhibit A"), p. 2.)

Mr. Stephenson's law enforcement career began in 1966 when he started as a patrol officer with the Tulsa, Oklahoma Police Department. (Stephenson Dep. 19:15-25.) He then left the Tulsa Police Department to become a field agent with the Federal Bureau of Investigations in 1971 at its Kansas City Division. (Id. 26:3-5; 28:18-22.) He retired from the FBI in 1983. (Id.)

Since then, Mr. Stephenson has been a concealed carry instructor for the state of Kansas, qualifying non-law enforcement officers such as private investigators for concealed carry permits. (Stephenson Dep. 9:22-10:18.) Mr. Stephenson has not instructed law enforcement officers in the use of lethal and non-lethal force since 1983— two years before the Supreme Court's decision in Tennessee v. Garner, 471 U.S. 1 (1985) regarding the use of deadly force, and six years before the United States Supreme Court rendered its opinion with respect to the governing "reasonableness" standard, Graham v. Connor, 490 U.S. 386 (1989). (See Stephenson Dep. 11:10-21.) Indeed, he has provided "no formal education—no formal presentation process" to law enforcement officers regarding lethal use of force snice he retired from the FBI in 1983. (Id. 12:8-22.) Nor has Mr. Stephenson been certified by a state-certifying agency as a law enforcement instructor since that time. (Id. 13:17-19.) He is a member of the American Association of Chiefs of Police, but he has

never held an official position in that organization. (Id. 34:9-14.) While he has self-published a few articles regarding law enforcement[1], none of those concerned the practice of serving warrants or the distinctions between no-knock warrants and knock-and-announce warrants, and none were peer-reviewed. (Id. 35:8-11; 37:17-20.) In the past four years, Mr. Stephenson has not given any talks or presentations specifically regarding law enforcement practices. (Id. 38:11-14.)

Notwithstanding his absence from law enforcement or any meaningful contributions to that field for the past forty years, plaintiffs have retained Mr. Stephenson to opine the following:[2]

1. The defendants, in their pre-raid briefing, did not review certain authorities such as Graham v. Connor, Tennessee v. Garner, CCSO polices and procedures, and other authoritative federal and state case law regarding the use of force by law enforcement officers.

2. The pre-raid briefing documents did not reflect exigent circumstances that would justify a "dynamic entry" into the home less than three seconds after the knock and announce was completed.

3. The pre-raid briefing documents did not reflect that "all reasonable options were considered to protect the Deputies and/or innocent civilians that might be in the residence."

4. The three-second interval between the knock and announce and the dynamic entry were "aligned" with a no-knock warrant rather than a "knock and announce" warrant, and did not comply with federal case law and best practices recommendations.

5. The "indiscriminate" firing into the room by Deputy Blaquiere "without a clearly defined target" was objectively unreasonable.

6. The dynamic entry was "objectively unreasonable" under the Fourth Amendment to the

---

[1] Available at: https://www.jurispro.com/expert/charles-stephenson-1912#publications.
[2] These opinions are not numbered in Mr. Stephenson's report. They are listed at the conclusion of his report. (Ex. A, pp. 19-21.) Defendants number them here for ease of reference.

U.S .Constitution.

7. Deputy Blaquiere's use of force was "objectively unreasonable" under the Fourth Amendment to the U.S. Constitution."

(Stephenson Report pp. 19-22; Stephenson Dep. 61:4-8.)

### III. ARGUMENT AND CITATION TO AUTHORITY

**A.  Standard of Review**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. This rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. The district court is obligated to act as a gatekeeper to the admission of expert testimony. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). Thus, the district court generally engages in a three-part inquiry derived from Rule 702 to determine the admissibility of expert testimony. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003). Specifically, the district court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony

assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Quiet Tech. DC-8, Inc., 326 F.3d at 1340-41 (citing City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir. 1998)).

While courts have "considerable leeway" in determining which tests or factors to employ, the United States Supreme Court has suggested that a trial court consider "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." Daubert, 509 U.S. 579, 593-95 (1993). When confronted with non-scientific testimony, however, Daubert's four factors are generally inapplicable. Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). As such, the Advisory Committee Notes for Rule 702 provide the following guidance for other factors to consider when assessing the admissibility of non-scientific testimony:

> (1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;
>
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (3) Whether the expert has adequately accounted for obvious alternative explanations;
>
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and
>
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702 advisory committee's notes (cleaned up).

While Daubert does not require certainty, it does require reliability. Hendrix ex rel G.P. v. Evenflo Co., 609 F.3d 1183, 1198, n.10 (11th Cir. 2010). As for the "helpfulness" requirement, Rule 702 requires that evidence of testimony "help the trier of fact to understand or determine a fact in issue." Daubert, 509 U.S. at 591. The "helpfulness" requirement is two-fold – expert testimony must be relevant to an issue in the case and is considered helpful "if it concerns matters that are beyond the understanding of the average layperson. United States v. Frazier, 387 F.3d 1244,1262 (11th Cir. 2004) (*en banc*) (emphasis added.) "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-63 (emphasis added.) Further, expert testimony which involves a "larger analytical leap" between the facts and the opinions reached is not considered helpful. McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004).

Daubert's burdens are in place for a reason—the dangers of an unreliable expert witness testifying as to unreliable or unsupported opinions which are the product of unsound methodology and not helpful to the trier of fact. "[T]he expert's opinion 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" Frazier, 387 F.2d at 1260 (cleaned up.) Therefore, the "importance of Daubert's gatekeeping requirement cannot be overstated." Id. The Court must "keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." Allison McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999).

In addition to satisfying these elements, the testimony must also meet the other applicable rules of evidence, including the test for relevance. See F.R.E. 704.

**B.     Mr. Stephenson is Not Qualified to Opine on Use of Force or Dynamic Entries.**

As an initial matter, Mr. Stephenson simply is not qualified to render the opinions offered in this case. An expert is qualified when he is able "to testify competently regarding the matters he intends to address." Rivera v. Ring, 810 F. App'x 859, 863 (11th Cir. 2020). "[D]etermining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'" Banuchi v. City of Homestead, 606 F. Supp. 3d 1262, 1272 (S.D. Fla. 2022). In Rivera, the Eleventh Circuit Court of Appeals held that a law-enforcement expert was qualified in the sub-area of police-trained dogs by virtue of his knowledge, skill, experience, training, or education where the expert held "multiple degrees in public administration and law enforcement, was a law enforcement officer for decades, and has taught and trained new officers in Florida since 1984." Id. "Further," the expert had "taught classes at universities on the use of force and published five peer-reviewed articles and a textbook on the use of force" Id.

Here, Mr. Stephenson has *none* of these qualifying accomplishments. He does not hold multiple degrees in public administration; he was only a law enforcement officer for twelve years—not decades; he has not trained any law enforcement officers in over 40 years, since before both Tennessee v. Garner and Graham v. Connor were decided; he has not taught classes on the use of force or making dynamic entries; and he has not published any textbooks or peer-reviewed articles. Mr. Stephenson simply does not have the qualifications necessary to mark him as an expert in the fields of use of force or serving warrants, and the Court should exclude his testimony from trial or consideration on summary judgment.

**C. Mr. Stephenson's Opinions Regarding the Pre-Raid Briefing Are Not Relevant or Helpful (Opinions 1 through 3).**

The first three of Mr. Stephenson's opinions appear to relate to the sufficiency of the pre-raid briefing. He opines that (1) the pre-raid briefing did not include a review of Graham v. Connor, Tennessee v. Garner, CCSO policies, and other relevant authorities regarding the service of warrants (Stephenson Report pp. 19-20); (2) the pre-raid briefing documents did not reflect exigent circumstances to justify a dynamic entry in less than three seconds; and (3) the pre-raid documents did not indicate that "all reasonable options" were considered before making the dynamic entry. (Stephenson Report pp. 19-20.) These opinions should be excluded because they will not assist the trier of fact in determining either of the legal questions posed by plaintiff's complaint: whether the officer's violated Ms. James's Fourth Amendment rights in either their entry into the home or their use of lethal force.

As to the scope of the pre-raid briefing (Opinion 1), defendants are unaware of any law or other authority creating a cause of action for failing to read Graham v. Connor, Tennessee v. Garner, or other similar authorities before serving a warrant or, for that matter, undertaking any other law enforcement endeavor. The defendants simply had no duty to review the documents Mr. Stephenson says they should have reviewed before serving the subject warrant. Furthermore, it is uncontested that both officers were properly qualified, trained, and POST certified (Stephenson Dep. 124:8-12), and therefore were already aware of the relevant legal standards and requirements. When asked at his deposition the source of this purported review requirement, Mr. Stephenson simply said he believed various law enforcement agencies have the Graham factors posted somewhere in the briefing room. (Stephenson Dep. 127:23-128:6.)[3] Mr. Stephenson's first

---

[3] It's unclear how Mr. Stephenson would have any personal knowledge of this, as he has not been a law enforcement officer since Graham v. Conner was decided.

- 9 -

opinion, then, is based on a standard he himself created from whole cloth, and does not speak to any of the legal or factual issues the jury will be tasked to consider at trial.

Similarly, Mr. Stephenson's second critique of the pre-raid briefing for ostensibly failing to note the exigent circumstances that would justify an expedited entry (Opinion 2) is also unhelpful to the jury. First and foremost, whether or not the factually uncontested circumstances facing the officers as they approached the home amounted to "exigent circumstances" will be a question for the Court. The Eleventh Circuit often recognizes sufficient exigent circumstances justifying a no-knock entry when the officers have specific knowledge that the suspect, or someone else inside of the home, has or is likely to have a weapon. See, e.g., Santana, 688 F. App'x at 768 (officer had been told that the suspect drug dealer had ready access to a gun); Whittier, 581 F.3d at 1306 (the SWAT team had knowledge that the suspect carried a concealed handgun and kept a shotgun in his bedroom); see also United States v. Hromada, 49 F.3d 685, 689 (11th Cir. 1995) (recognizing that "[g]uns and violence go hand-in-hand with illegal drug operations"); but see Smith on behalf of Est. of Smith v. Ford, 488 F. Supp. 3d 1314 (M.D. Ga. 2020) (finding no exigent circumstances where the record lacked any evidence that defendants had specific knowledge of decedent or anyone else in the home having a weapon, noting "any suspicion of exigent circumstances must be specific to the case, not a general suspicion based on general or stereotypical inferences.").

Importantly, such exigencies can appear *after* a warrant is issued and the pre-raid briefing occurs. Even the Supreme Court has recognized that "if circumstances support a reasonable suspicion of exigency *when the officers arrive at the door*, they may go straight in." U.S. v. Banks, 540 U.S. 31, 36 (2003). Thus, Mr. Stephenson's opinion with respect to exigencies is unhelpful as an improper legal conclusion *and* because he improperly limits that consideration to records

created *before* the officers arrived at the home and realized, through a previously unaccounted for surveillance camera and the sounds of footsteps running through they home, that they were in danger of being attacked or that evidence could soon be destroyed if they did not enter the home quickly.

Third, while Mr. Stephenson opines that the officers should or could have considered alternatives to entering the home in the manner they did (Opinion 3), this opinion is unhelpful because the Fourth Amendment of the Constitution only requires that the officers act reasonably, it *does not* require them to "pursue the most prudent course of conduct as judged by 20/20 hindsight vision." Cole v. Bone, 993 F.2d 1328, 1334 (8th Cir. 1993) (citing Graham, 490 U.S. at 396.) Indeed, the Eastern District of Tennessee has once already rejected Mr. Stephenson's attempts to fault officers for not following his preferred course of action over other alternatives. In Williams v. City of Chattanooga, Mr. Stephenson opined that officers' second volley of gunfire was unreasonable because "after the first volley the officers should have waited in cover, confirmed whether or not the threat had subsided, and approached in a more organized manner." Williams v. City of Chattanooga, No. 1:16-CV-477, 2018 WL 11463007, at *8 (E.D. Tenn. Apr. 18, 2018). The district court rejected this opinion, noting "'[t]here may be more than one reasonable response to a given situation, and when this is so, the Fourth Amendment does not require officers to use 'the most prudent course of action' to handle it." Id.[4] The relevant question is whether the entry was reasonable under the circumstances—not whether it was the *most* reasonable.

Accordingly, these opinions offered by Mr. Stephenson will not be helpful to the jury and should be excluded from trial and the Court's consideration on summary judgment.

---

[4] While this order only refers to "plaintiff's expert," Mr. Stephenson confirmed he was the expert at his deposition. (Stephenson Dep. 52:15-53:13; see also Stephenson Report p. 103.)

**D.      Mr. Stephenson's Conclusion that the "Dynamic Entry" Violated CCSO Procedures, Best Practices, and Federal Case Law (Opinion 4) is Unhelpful to the Jury.**

Mr. Stephenson next opines that the "dynamic entry" in this case was not "in compliance with CCSO Policies and Procedures, Federal case law regarding Use of Force and Best Practice recommendation of the National Tactical Officer's Association and Other Police Organizations." (Stephenson Report p. 20.) There are several problems with this opinion. The opinion will not be helpful to the jury because defendants cannot be liable for violating CCSO policies, whether they violated federal law is a question for the Court, and the "best practices" recommendations he refers to post-date the incident.

**1.      The entry did not violate CCSO policies, and such consideration is irrelevant.**

While Mr. Stephenson believes the defendants' conduct violated CCSO policies, he cannot articulate how, or his explanation is at best circular. For instance, he believes the officers violated CCSO policies because a forced entry under three seconds is unreasonable under the circumstances. (Stephenson Dep. 70:4-15.) However, Mr. Stephenson never shows where the CCSO policy prohibits entries under three seconds. Furthermore, his basis for stating that the entry violated the CCSO policy is based on a sourceless "industry standard" that officers must wait ten to fifteen seconds before entering after knocking and announcing. (Id. 70:18-71:19.) While he goes on to state that various authorities stand for this proposition, he admits that not a single one of them actually set the 10-15 second threshold as a bare minimum that must be followed in all circumstances. (Id. 74:3-17.)

In any event, it is irrelevant whether or not defendants complied with CCSO's policies. Violation of a local policy or procedure is not the standard for determining whether constitutional rights were violated. Myrick v. Fulton Cnty., Georgia, 69 F.4th 1277, 1303 n.28 (11th Cir. 2023) ("But violation of a local policy or procedure does not automatically mean that May's

constitutional rights were violated. […] Simply because something is in violation of a policy, or even illegal, does not make it unconstitutional.").

Accordingly, Mr. Stephenson should not be allowed to opine that defendants violated CCSO policy where he cannot articulate how they violated any CCSO policy and such opinion would be irrelevant to the jury's consideration.

### 2. Whether the entry violated "federal law" is a question for the Court.

Simply put, "Questions regarding the reasonableness of a search or seizure based on established facts must be decided by the trial judge and not the jury." Ziegler v. Martin Cnty. Sch. Dist., 831 F.3d 1309, 1319 (11th Cir. 2016). Mr. Stephenson thus cannot opine on questions of law—i.e., whether the entry was consistent with "federal law." Indeed, other courts have repeatedly rejected Mr. Stephenson's attempts to opine on questions of law. In Bloodworth v. Kansas City Bd. of Police Commissioners, No. 21-00194-CV-W-BP, 2022 WL 17588490, at *9 n. 10 (W.D. Mo. Nov. 15, 2022), Mr. Stephenson opined, among other things, that some officers' actions during a search were unreasonable. The court refused to consider this testimony because "[E]xpert testimony on legal matters is not admissible. Matters of law are for the trial judge, and it is the judge's job to instruct the jury on them." Id. Similarly, in Jacobsen v. Cass Cnty., Missouri, No. 4:18-CV-00557-NKL, 2019 WL 3779524, at *2 (W.D. Mo. Aug. 12, 2019), a district court excluded Mr. Stephenson's opinion that an officer's use of force was objectively unreasonable because "[e]xpert testimony on a legal matter, such as the objective reasonableness of Klinefelter's conduct, is inadmissible." Id.

Likewise here, Mr. Stephenson cannot opine as to whether defendants' conduct conformed to the Constitution or federal law, and his opinion must be excluded.

### 3. The "best practices" on which Mr. Stephenson bases his opinion postdate this incident.

In this case, the key question will not be whether or not the defendants' conduct was reasonable in hindsight. Instead, their conduct can only be judged from the prevailing law and standards at the time of the incident on May 4, 2021. But in judging defendants' conduct, Mr. Stephens incorporates "industry standards" that postdate the incident. His methodology is thus unreliable, and his opinions will not be helpful to the jury.

For instance, one of Mr. Stephenson's sources for the prevailing "industry standard" with respect to service of warrants is the National Tactical Officers Association's Position Statement on No-Knock Warrant Service. (Stephenson Report p. 20; NTOA Position Statement.) Pretermitting whether a single organization can singlehandedly alter the prevailing norms in an industry with one position statement, this position statement is completely irrelevant here because it post-dates the incident. The NTOA issued its statement on February 25, 2022, but this incident occurred on May 4, 2021—nearly a year before. Mr. Stephenson even acknowledged that the "reasonableness" of the officers' conduct would be governed by the state of the law at the time of the incident, and that the proffered NTOA statement post-dates the incident. (Stephenson Dep. 105:24-16.) Thus, his reliance on a position statement that post-dates the incident is inexplicable.

Similarly, Mr. Stephenson's opinions rely on a CNN article he found on Google entitled, "there's a growing consensus in law enforcement over non-knock warrants. The risks outweigh the rewards." (See Stephenson Report pp. 86-92.) This article is not authoritative in any sense—it is not peer reviewed and Mr. Stephenson does not know whether the author is qualified to speak on the issues discussed in the article. (Stephenson Dep. 102:19-25.) In any event, it too post-dates the incident, as it was published on February 12, 2022. (Id. 103:19-25.)

Accordingly, Mr. Stephenson's opinions as to the "industry standards" should be excluded because his sources as to what informs those standards post-date the incident, and thus cannot be used to judge the officers' conduct in hindsight.

E.  **Mr. Stephenson's Opinion That Deputy Blaquiere "Indiscriminately" Fired Into the Residence is Factually Inaccurate (Opinions 5 and 7.[5])**

Mr. Stephenson next opines that Deputy Blaquiere's use of force was not "objectively reasonable" because he fired "his rifle without a clearly defined target in a volatile, fa[s]t moving situation . . ." (Stephenson Report pp. 21, 22.) However, this opinion must be excluded because it is based on a faulty factual analysis and it reaches an ultimate conclusion.[6]

   **1. This opinion is not based on an accurate reading of the record.**

First, the record simply does not support Mr. Stephenson's conclusion that Deputy Blaquiere fired indiscriminately into the home. Mr. Stephenson appears to base this assumption on his faulty reading of Deputy Blaquiere's post-incident narrative, in which he stated that after he made entry into the home:

> Myself and Investigatory Casey made entry into the residence, investigatory Casey first and myself behind. I observed an open door way immediately to the left upon entry. I then again announced Sheriff's Office search warrant room to the left after stepping into the residence. Investigatory Casey was in front of me and I heard him give verbal commands to get down on the ground and I then also shouted get on the ground. There was a cabinet type of furniture in the right corner by the door **with a glass door and I could see the reflection of what looked to be a person standing up and moving**.

(Blaquiere Narrative, Def-00005 ¶ 3 (available at Stephenson Report p. 30-31) (emphasis added).)

Deputy Blaquiere then wrote that after he heard shots being fired,

---

[5] Opinions 5 and 7 are essentially the same.
[6] Mr. Stephenson concedes that Deputy Casey's use of force was reasonable. (Stephenson Dep. 149:1-14.)

- 15 -

> I then felt something come by my body and could feel the pressure on my face from the firearm discharging from inside the room. From the left side of the door way **I could see partially into the room** and observed a dark gray in color pistol in someone's hand pointed at the doorway where we were standing. . . . I observed the pistol fire again towards myself and Investigatory Casey. … I then fired my rifle towards the pistol approximately 2 to 3 times.

(Id., Def-0006, ¶ 4 (Stephenson Report p. 31) (emphasis added).)

In an extremely forced and implausible reading of Deputy Blaquiere's statement, Mr. Stephenson takes the position that from these statements, he could not determine whether Deputy Blaquiere was aiming at the *reflection of a pistol* when he shot in the room, or if he was aiming at the *pistol itself.* (Stephenson Dep. 117:3-11.) However, even on their own, Deputy Blaquiere's statements show that he saw the reflection of a *person*, and later looked directly into the room and saw *a pistol shooting at him*, and he then "fired my rifle towards the pistol," *not* the reflection of a pistol.

Notwithstanding the plain meaning of Deputy Blaquiere's narrative statements, Mr. Stephenson takes them to mean that Blaquiere aimed and fired at a *glass cabinet* in the room, *not* the pistol that was shooting at him. (Stephenson Dep. 121:24-122:3.) This puzzling interpretation raises more questions than it does answers—after all, if Blaquiere was aiming at a piece of furniture in the room and not its occupants, how could his bullets have even struck Ms. James?

In any event, Deputy Blaquiere's deposition testimony clears up any ambiguity there may have been in the narrative:

> Q: And you fired blindly; did you not?
>
> [Objection]
>
> A: I did not fire blindly. I fired at the firearm.
>
> Q: You fired at the firearm?

> A: Yes, sir, **I was trying to shoot the firearm out of the hand.**
>
> […]
>
> Q: And so you—did it matter to you that there may have been someone else in the room?
>
> A: It did matter, that's why I fired at the firearm, not at the mass that I had in front of me, I fired at my threat, which was the firearm **and I tried to shoot at the actual pistol in hand.**

(Blaquiere Dep. 45:18-46:16 (emphasis added).) Clearly, Deputy Blaquiere was aiming "at the actual pistol" that Varshan Brown was attempting to murder him with—not a reflection. Thus, Mr. Stephenson's opinion with respect to Deputy Blaquiere's use of force is unreliable, as it is premised on a faulty—and forced—reading of his narrative statement.

And accepting the fact, as clarified in Deputy Blaquiere's deposition testimony, that Deputy Blaquiere was aiming at "the actual pistol" in Varshan Brown's hand as opposed to a reflection of said pistol, Mr. Stephenson would be forced to opine that the use of force was reasonable. Indeed, he admitted as much at his deposition:

> Q: Then let's take the totality of the circumstances as you have reviewed them in this record. And I want you to assume that when Deputy Blaquiere says, I shot at the gun that was shooting at me, he means exactly that. He saw, with a direct line of sight, a gun pointed at him and shooting at him, and he fired at that gun.
>   With the rest of the circumstances in this case, would that be a reasonable use of lethal force?
>
> A: You're asking me to assume. You're asking me to assume that that's what Deputy Blaquiere did.
>
> Q: Yes. I'm asking you hypothetically.
>
> A: Then under that limited set of circumstances, **he saw a weapon that was firing at him and returned fire at the weapon, it would be—it could be reasonable under that narrowly-defined set of circumstances.**

(Stephenson Dep. 123:9-124:2 (emphasis added).)

Thus, Mr. Stephenson's opinion with respect to the reasonableness of Deputy Blaquiere's use of force must be excluded because it is not based on the facts in the record and, if forced to accept the facts as they actually appear in the record, Mr. Stephenson concedes the use of force was reasonable.

**2. This opinion is an improper legal conclusion.**

Additionally, as with Mr. Stephenson's other opinions, the conclusion that Deputy Blaquiere's use of force was not "objectively reasonable" is an improper legal conclusion that must be excluded. "An expert witness may testify as to his opinion on an ultimate issue of fact, but he 'may not testify as to his opinion regarding ultimate legal conclusions.'" Umana-Fowler v. NCL (Bahamas) Ltd., 49 F. Supp. 3d 1120, 1122 (S.D. Fla. 2014). Whether or not the use of force was objectively reasonable is a question of law for the Court, and Mr. Stephenson's opinion on this issue should be excluded.

**F.  Mr. Stephenson's Concluding Opinion is Simply a Legal Conclusion (Opinion 6).**

In "Conclusion," Mr. Stephenson opines that the dynamic entry was an "'objectively unreasonable' use of force as defined in Graham v. Conner, the laws of the State of Georgia, the Policies and Procedures of the CCSO and the Fourth Amendment to the U.S. Constitution. (Stephenson Report, p. 21.)

Once again, as shown multiple times above, Mr. Stephenson cannot opine on the constitutionality or legality of the entry and/or use of force in this case, and his opinions on this topic must be excluded.

**IV.  CONCLUSION**

Mr. Stephenson seeks to do what only the Court can do: render legal conclusions on the reasonableness of defendants' conduct. And to the extent his opinions are not legal conclusions,

they are irrelevant and unhelpful to the jury, or they are unreliable and based on an misreading of the record. And ultimately, these opinions are beyond the scope of Mr. Stephenson's qualifications and expertise. For the reasons set for above, defendants respectfully request that this Court grant this motion and exclude Mr. Stephenson's expert report and deposition testimony from consideration on defendants' motion for summary judgment and, if necessary, the Court should exclude his testimony from trial.

This 27th day of November, 2023.

Respectfully submitted,

**FREEMAN MATHIS & GARY, LLP**

*/s/ Steven L. Grunberg*
Sun S. Choy
Georgia Bar No. 025148
schoy@fmglaw.com
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com
Steven Grunberg
Georgia Bar No. 146397
sgrunberg@fmglaw.com

*Attorneys for Defendants*

100 Galleria Parkway
Suite 1600
Atlanta, GA  30339-5948
(770) 818-0000 (Telephone)
(770) 937-9960 (Facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing **DEFENDANTS MICHAEL BLAQUIERE AND DOWNY CASEY'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT CHARLES STEPHENSON AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT** to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants. Counsel of record are:

| | |
|---|---|
| Reginald A. Greene, Esq.<br>GREENE LEGAL GROUP LLC<br>One Georgia Center, Suite 605<br>600 West Peachtree Steet, NW<br>Atlanta, Georgia 30308<br>rgreene@greenlegalgroup.com | Mario A. Pacella, Esq.<br>STROM LAW FIRM, LLC<br>600 West Peachtree Steet, Suite 604<br>Atlanta, Georgia 30308<br>mpacella@stromlaw.com |
| Bakari T. Sellers, Esq. (Pro Hac Pending)<br>STROM LAW FIRM, LLC<br>6923 N. Trenholm Road, Suite 200<br>Columbia, South Carolina 29206<br>bsellers@stromlaw.com | Harry M. Daniels, Esq. (Pro-Hac Pending)<br>THE LAW OFFICES OF HARRY M. DANIELS, LLC<br>4751 Best Road, Suite 490<br>Atlanta, Georgia 30337<br>daniels@harrymdaniels.com |

This 27th day of November, 2023.

*/s/ Wesley C. Jackson*
Wesley C. Jackson
Georgia Bar No. 336891
wjackson@fmglaw.com

*Attorneys for Defendants*

FREEMAN MATHIS & GARY, LLP
100 Galleria Parkway
 Suite 1600
Atlanta, Georgia 30339-5948
T: (770) 818-0000
F: (770) 937-9960