# EXHIBIT A

Final Incident Review

Re:

C.J. a Minor, by and through her best friend and guardian Betty, Betty Jean Murphy James as Administrator of the estate of Latoya James

V.

Jim Proctor, Michael Blaquiere, Downey Casey

Camden County Sheriff's Office, Camden County, Georgia

Use of Force

By

Charles P. Stephenson

The Orion Group

Dba

Crime Scene Plus

7/27/2023



1

**Purpose :**

The purpose of this inquiry is to examine the "totality of circumstances" relating to the service of a search warrant on 5/4/2021, at 12103 Hwy 17, in Woodbine County, Georgia; by the Camden County,  Georgia, Sheriff's Office (CCSO) that resulted in the Lethal Use of Force by CCSO Deputies Downey Casey, and Michael Blaquiere in the death of Latoya James and gunshot wounding of Varshan Brown.

**Scope:**

The scope of the inquiry will focus on investigative/evidentiary information complied by the Georgia Bureau of Investigation and the Camden County, Georgia, Sheriff's Office. No independent investigation or interview of witnesses was conducted.

**Objectives:**

To determine if:

(1)   The Operations Plan and pre- warrant service briefings to the Deputies were reasonable in scope and content to (a) define the service parameters of a "knock and announce" warrant, (b) review CCSO Policies and Procedures on Use of Force,(c) review of the "objectively reasonable" Use of Force by Law Enforcement Officers codified in Graham V. Conner ,490 U.S. 386 (1089), Tennessee V. Garner  471 U.S. 1 (1985) and Georgia

State Law and the Fourth Amendment to the U.S. Constitution that guarantees all citizens the right against unreasonable search and seizure.

(2) All reasonable alternatives and less intrusive methods were considered to accomplish the objectives of the search warrant while minimizing risk of injury to Law Enforcement Officers and/or other innocent bystanders or occupants of the residence.

(3) The time lapse between when the Officers knocked on the front door and announced, "Sheriff's Office" "Search Warrant," and made a "dynamic entry" by use of a battering ram was "objectively reasonable."

(4) CCSO Deputy Blaquiere's use of lethal force of firing numerous rounds into the bedroom of the residence rifle without having a clearly defined target was an objectively reasonable Use of Force.

(5) The totality of circumstances for service of a knock and announce warrant followed National Tactical Officers Association best practice recommendations.

(6) CCSO Deputies Casey and Blaquiere met the training and certification standards for Law Enforcement Officers in the State of Georgia at the time of the incident.

(7) The lethal Use of Force by Blaquiere and Casey was" objectively reasonable" as codified in Graham v. Conner ( 490 U.S. 386, 1989, Tennessee V. Garner ( 471 U.S. 1 1985 ) and complied with the Laws of the State of Georgia.

## Summary of the Incident:

CCSO Deputies Downey and Blaquiere were members of a Law
Enforcement group assigned to execute a search warrant at the
residence of Varshan Brown . Additional members included
CCSO Deputies Matt Turner, Shannon Manning, Chris Sears,
Brian Barber, Shan Billington, Rob Duckworth, Josh Harmon ,
Rusty Prescott, James Galloway, Erica Rafferty, Brandon Todd,
Logan Bec, Dale Williams, Nathan Daniels and GBI Special Agent
James Feller.

### Entry Team assignments:

Billington- Assigned as Breacher, Downey assigned as first in
with ballistic shield followed by Blaquiere, Turner, Duckworth,
Harmon assigned to follow in sequence with Chaney being
seventh in the entry stack.

After the CCSO Entry Team positioned themselves near the
front door of the residence; Deputy Blaquiere announced:

 " Sheriff's Office search warrant," knocked on door, stated the
door was locked and gave command to "breech up."

Deputy Billington breached the door with the "Ram" ; Deputy
Downey equipped with a ballistic shield was first to enter
through doorway, Deputy Blaquiere second.

An open door was encountered to the left of Downey after
entry.  Deputy Downey placed his ballistic shield in front of his
body and doorway entry to the bedroom. Deputy Downey saw
Brown facing him holding a gun with  James facing Brown with

her right hand around his waist. Deputy Downey issued commands of "hands up," Brown reacted by bringing the gun up and pointing it at Downey. Downey sensed projectiles hitting his shield and going past his legs and returned fire with his Glock . 40 caliber handgun he was holding in his right hand.

Blaquiere standing behind and to left of Downey observed through a reflection on a glass portion of a piece of furniture on the opposite side of room of the doorway a figure in a white shirt moving. Blaquiere saw a hand holding a gun. Saw gun fire in the direction of the doorway. Blaquiere then fired his rifle numerous times in the direction of the hand holding the gun.

When the firing ceased Blaquiere moved where he could see inside the room and saw Brown lying on the floor holding a gun in his hand. When Brown started to roll over and point the gun in the direction of the doorway, Blaquiere fired more rounds into his Browns torso until he ceased movement.

When Officers entered the room they saw Brown and James lying on the floor beside the bed. Blaquiere removed a gun with an elongated magazine from the immediate vicinity of Brown and placed it on a table while other Officers rendered medical aid to Brown and James.

## Witness Statements:

**CCSO Deputies Matt Turner and Josh Harmon on advice of counsel declined to provide statements.**

**CCSO Brandon Todd on advice of PB Attorney declined to provide statement.**

**GBI Agent James Feller :**

5/4/21 Provided interview with GBI Agent J. K. Nipper Bates number 822391 six pages exhibit ten.

- 5/3/21 Requested by CCSO to assist in execution of search warrant.
- Received briefing and copy of OPS plan 5/3/21 from Blaquiere
- Advised during briefing weapons may be in residence and may be cameras located on porch of residence. Officers had noticed red lights on the porch during previous "trash pull;" Brown may have fully automatic AK rifles and handguns based on CCSO informant intel; Brown only person expected to be in residence; high vehicle traffic due to drug trafficking.
- Entry team dressed in CCSO uniforms, equipped with ballistic entry shield marked Sheriff's Office approached residence in unmarked vehicles with exception of one marked CCSO K-9 Tahoe. On arrival no blue light was activated.
- 5/4/21 arrived on scene 4:40 A.M.

- Went to rear of residence with CCSO Deputies Russell Prescott and Shana Manning.
- Heard  Search warrant … Sheriff's Office … Search warrant … Does know not Deputy made announcements… heard multiple times; after door breached heard … Get on ground…. Get on ground the 8 to 9 shots.

## CCSO Major Kevin Chaney interview GBI Agent Nipper bates number 822431 Exhibit 12:

- Attended briefing by Blaquiere on 5/3/21  1:00 PM and reviewed PPS plan. Browns history of violence, drugs and weapons discussed. Additional briefing all team members occurred same date at 4:00 A.M.
- Team arrived at 4:45 A.M.; a porch light was on; dark outside; no light on inside residence; kitchen light may have been on; does not know if any blue lights were activated at time of arrival.
- Entry team approached residence; Blaquiere announced Sheriff's Office … Search Warrant then knocked on door. verbal command doors locked… Breech up; Billington rammed door. Shots immediately fired; believes of different calibers; Does not know how many verbal commands were given before shots were fired.
- Chaney separated Blaquiere and Casey, secured firearms; Galloway secured body cam from Casey.

**CCSO Brian Barber interview GBI Agent  Alex Julian bates number 823557, exhibit 13:**

- Assigned to entry team was at back of stack when approached residence. Marked and unmarked units approached house.
- **Officer knocked on door and CCSO Deputies to serve search warrant; no response breached door; heard commotion then gunfire; took cover; did not discharge his weapon; as a firearms Instructor knows not to fire if he does not have a clear target**
- Viewed OPS plan, not aware of specifics of search warrant; did not know if subject was considered armed and dangerous
- Julian conducted a round count of Barber Glock .23 contained twelve rounds; round count for River Arms AR Style rifle contained twenty-five rounds.

**CCSO Captain James Galloway interview GBI Agent Alex Julian bates number 823656, exhibit # 23**

- Two pre – raid briefings; one day before raid the other the day of the raid; first pre - raid  briefing at I:00 PM lead by Blaquiere include all Officers except Bollington; stack assignments given; OPS plan passed around; specifically advised that this warrant was not a "no knock" instead it was a "knock and announce"; briefed about violent history of individual in house

- At least one marked CCSO unit on scene; all Deputies on scene were in uniform.
- Arrived at residence Deputy Casey's Tahoe parked behind Pathfinder parked in driveway; armed with .40 caliber Glock with Federal Brand Glock ammunition; did not fire his weapon.

**CCSO Deputy Erica Raffety interview GBI Agent  Nipper bates number 822796 exhibit # 36:**

- Attended pre raid briefing 5/3/21; OPS plan reviewed
- Arrived on scene approximately 4:45 AM; does not recall if blue emergency lights were activated. Does not recall hearing any verbal commands only remembers hearing shots; did not fire her weapon.

**CCSO Deputy Shana Manning interview GBI Agent  Nipper bats number 822811, exhibit # 37:**

*Attended pre raid briefing 5/3/21 at 1:00 PM; assignment back yard of residence; heard " Sheriff's Office ... search warrant thought made by Blaquiere; did not witness entry; did not fire her weapon.

**CCSO Deputy Robert Duckworth interview GBI Agent Nipper bates # 822846/822895 exhibit # 38 and 41**

- Attended pre raid briefing on 5/3/21 at 1:00 PM
- Arrived at residence at approximately 4:50 AM equipped with second ballistic shield; heard " Hit it"

9

- Blaquiere and Casey were the first to encounter open door to left of entryway; heard " hands" then gunfire.
- Hear approximately ten shots; heard shots fired first; originated from bedroom to the left; then multiple shots.
- Casey asked Bloodworth to check his leg for injury; Casey was not injured.
- Blaquiere gave his rifle to Duckworth and left residence; Duckworth gave rifle to CCSO Chris Sears.
- Witnessed Blaquiere and Casey firing; does not know who fired first.
- Recalled hearing first shot and that Blaquiere and Downey who were in front of him "flinched."

**CCSO Deputy Chris Sears interview GBI Agent Nipper bates number 822901 exhibit # 39:**

- Did not attend briefing on 5/3/21, was briefed morning of raid 5/4/21 at 4:00 AM in morning by Blaquiere on OPS plan and entry team.
- Arrived on scene 4:45 AM in unmarked pickups and one marked CCSO unit. No blue lights were activated on arrival.
- Officers knocked and made announcements before entering. Was third our fourth in stack.
- Once door breached door on left, shots fired, exact number unknown.
- Does not know who fired first, had no idea at the time why anyone began to fire. Did not see anyone fire their weapon.

- Was given Blaquiere rifle by another Officer; placed it in his pickup before giving it to CCSO Capt. Galloway did not manipulate the weapon.

**CCSO Deputy  Dale Williams interview GBI Agent Nipper bates # 822919 exhibit # 40:**

- Attended briefing on 5/3/21 and second briefing 5/4/21 at 4:00 AM.
- Morning of 5/4/21 six or seven vehicles left substation, one marked CCSO unit, others unmarked.
- On arrival at target location no blue lights were initiated.
- Red car and white car parked at residence.
- Was checking cars for occupants when heard shots.
- Heard verbal announcement "Sheriff's office," heard knock then Officers breech door, after entry then more verbal statements once Officers inside. Heard seven to eight shots. Did not see anyone fire their weapons.

**CCSO Deputy Nathan Daniel interview GBI Agent Nipper bates # 822975 exhibit #42:**

- At briefing on 5/3/21 and 5/4/21 assigned to be sniper on perimeter.
- Arrived on scene at 4:45 AM last car to arrive activated blue lights as half of his vehicle was parked in roadway. Daniels last vehicle to arrive; entry team already headed to front door.

- Took position in ditch; heard announcement "Sheriff's Office ... search warrant" , heard numerous times, head knock on door before door was breached; heard numerous shots.

**CCSO Deputy Russell Prescott interview GBI Agent Nipper bates # 823064 exhibit # 51:**

- Was not at briefing on 5/3/21, was briefed on 5/4/21 at 4:00 AM by Blaquiere at substation; recalls reading in OPS plan about potential for weapons and that a request for a " no knock " warrant had been denied by the judge.
- When departed substation morning of raid was fourth vehicle a marked Chevrolet Tahoe
- On arrival dark no blue lights were activated.
- Parked on Hwy 17, approached residence from the right side of the residence.
- Entry team was outside his direct view.
- Head " Sheriff's Office... search warrant" numerous times; heard breech of door, then shots
- Started crime scene log.

**Policies/Procedures CCSO/Search Warrants:**

**Ref: L Camden County Sheriff's Office Search and Seizure Standard Operating Procedure:**

(1) The members of the Camden County Sheriff's Office place the highest priority on maintaining the Constitutional right of all individuals. Accordingly, all searches and seizures of private property will be performed in full compliance with applicable federal and state laws.

(2) The authority to search and seize property and individuals is a responsibility that must not be taken lightly. In addition to the requirement that Constitutional  guarantees be complied with, searches and seizures will be conducted in a manner that provided for the highest degree of safety for all individuals concerned in a way that minimizes the level of intrusion experienced by those whose person or property is being searched.

**CCSO Drug Task Force/Emergency Response Team - Operations plan – Mission Statement/Desired Results.**

Under heading of Synopsis of Operation:

"Arrive on scene, knock, and announce, and make entry, clear residence, 2hd search and clear, photos, search and collect".

## Probable Cause – The Warrant:

On 4/29/21 CCSO Deputy Michael Blaquiere as the Affiant applied for a search warrant for the residence at 121103  US highway 17, Woodbine Georgia:" There is controlled substances to include but not limited to cocaine, items used in the distribution and sales of narcotics . As well as electronic devices to include but not limited to cell phones used to facilitate transactions in controlled substances."

Varshan Brown was listed the primary target of narcotics dealing that is residing at the house. Browns lengthy criminal record inclusive of narcotics trafficking, a felon in possession of a firearm and information that firearms had been seen in the house was listed.

**A request for a " No knock provision." Was denied.**

## GBI Summary Exhibit # 6, Body Cam Video /Audio from Downey Casey : May 4th

4:48:00 -" You ready … yep. They know we are here"

4:49:27 -" Sheriff's Office … Search warrant … come to the door" Unknown Officer knocks on door. " Unknown Officer states " Hit It" . Officers make entry. Following statements heard " Sheriff's Office … search warrant ... come to the door, "

Sheriff's Office ... search warrant ...room to the left...get on the ground...

4:49:35 -Multiple shots are heard (18),Deputy Casey states " got one down...two down ...room front" " Fuck did I get shot, get hit in the leg"

4:51:00 - " who's the two shooters?" Casey replies Me "and Mic ... me and Mic" Deputy Blaquiere "he had a gun in his hand" "no talking"

4:51:40 - Deputy Downey exits residence

4:52:45 - Body cam collected by unknown Deputy secured in unoccupied Sheriff's vehicle. EMS can be heard responding.

At 8:23 A.M. - Body cam collected by  Cpt. James Calloway turned to custody of GBI SA Nipper and recording terminated.


**General Comments: Fourth Amendment- Search Warrants:**

**No-knock Warrants Fourth Amendment Analysis for no- knock Entry: 10/20/20 by Beth Vaughan, Senior Policy Analyst. Georgia Senate:**

In Wilson V. Arkansas, 515 U.S. 927 (1995), the U.S. Supreme Court acknowledged  that the Fourth Amendment incorporates the common law requirement that Police Officers entering a residence must knock on the door, state their identify and purpose before attempting forcible entry to execute a search warrant.

In United States V. Banks, 540 U.S. 31, 36 (2003) the Supreme Court: " When a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge ... may authorize a "no knock " entry." " If circumstances support a reasonable suspicion of exigency , when the officers arrive at the door, they may go straight in." In that case the court found that the interval of 15 to 29 seconds from the Officers knock and announcement of search warrant and until forced entry, was reasonable given the exigency of possible destruction of evidence".

In Hudson v. Michigan, 547 U.S. the majority of the Supreme Court noted the interest protected by the "knock and announce" requirement include; (1) Protection of  human life and limb, because unannounced entry may provoke violence in supposed self-defense by the surprised resident, (2) the protection of property by avoiding damage from breaking in and (3) the element of  privacy and dignity that can be destroyed by a sudden entrance.

Georgia law generally tracks fourth amendment standards of reasonableness and Federal case law regarding "knock and announce" requirements for Law Enforcement Offices serving a warren before making a forced entry.

**Ref: Gorgia Department of Public Safety Policy Manual Exhibit in exhibits section.**

Elements used by Georgia Department of Public Safety to evaluate the level of danger in service of a particular Warrants.

**Peter Kraske, researcher Eastern Kentucky University:**

The police have gotten used to – showing up at a regular "knock and announce" warrant get to the door and carry it out as if it were a de facto no – knock raid.

The original intent of the Fourth Amendment – get a warrant, knock, and announce, give proper notice, give time to answer the door… if you have to engage in a volatile or risky situation figure out a different way to do it then to bust down a private residence door and manufacture a really dangerous situation".

**Best Practice Recommendations  Service of Search Warrants:**

**National Tactical Officers Association:**

For years, the National Tactical Officers Association ( NTOA) has used the phrase " Priority of Life (POL) to describe the factors that influence our decision-making process in a critical incident where lives are in balance. The POL utilized a structure of "ranking" individuals in numerical order and priority: (1) Hostage, (2) innocent civilians, (3) Law enforcement and (4) Suspect.

## NTOA Position Statement - No Knock Warrant Service, 2/25/2022:

No knock warrant service has become inextricably linked with dynamic entry.  Agencies generally used  " no knock " warrants to protect the Officer from violence and preserve evidence. Evidence is the controlling factor for most search warrants which is the reason for planning and service.

Though it is the controlling objective, we must apply sound risk mitigation principles to the problem ..... We understand the priorities of safety and life. We know from a critical thinking perspective how to build proper strategy to provide effective tactical resolution to the problem  while maximizing safety .

Stealth entry approach, breaching of the door, crossing the threshold, or other covert means of access only risk the following scenarios:

Misidentification of the Police by the occupants of being intruders.

Compression of time negatively affects ability to correctly interpret situations and environment for both Police and occupants.

Misidentification of intent on the part of occupants and the Police.

The Police create an environment along with the suspects intentional or unintentional  actions requiring correct

interpretation from both sides, which often does not occur, leading to unfortunate tragedy.

Consider all aspects of mission, inclusive of objectives, intelligence, and legal constraints, apply tools and tactics. Consider all tactical options at your disposal, using safety priorities, select safest alternatives, have flexibility to adjust circumstances( exigency ).

" The strategy and tactics developed on a search warrant should always speak to the safety priorities based on intelligence known to the Officers. Applying tools and tactics that can be justified and supported by risk mitigation and  the safety of all concerned within the environment is mandatory."

## Opinion and Conclusions:

After a review of referenced discovery material and consideration of the  "totality of circumstances" as I understand them; based on my education and work experience and with a reasonable degree of professional certainty, I have arrived at certain opinions and conclusions. I reserve the right to amend and/or change my opinions and conclusions upon receipt of additional information to consider.

## Pertinent Issues Considered:

Did the-raid briefing review the Operational parameters of CCSO, Use of Force Policies and Procedures as they relate to "knock and announce" warrants, and Use of Force by Law

Enforcement Officers, codified in Graham V. Conner and Tennessee V. Garner?

In my opinion the documents reviewed do not reflect a detailed discussion or review of CCSO Policies and Procedures re service of warrants, Use of Force and /or the State of Georgia and/or Federal case law regarding Use of Force by Law Enforcement Officers.

What exigent circumstance and/or circumstances were considered prior to making a dynamic entry less than 3 seconds after the  knock, announcement and purpose statements were made?

None were indicated on Probable Cause statement and or the Task Force Operations Plan or other pre raid briefing documents reviewed.

Were all reasonable options considered to protect the Deputies and/or innocent civilians that might be in the residence prior to making a "dynamic entry ".

None were indicated on the documents reviewed.

Was the elapse time of less than 3 seconds between when the Deputy knocked and announced, then made a  "dynamic entry" into the residence, in compliance with CCSO Policies and Procedures, Federal case law regarding Use of Force and Best Practice recommendation of the National Tactical Officers Association and other Police Organizations? In my opinion no.

The 3 second interval between the knock and announce and dynamic entry followed the procedures more aligned with a "no knock warrant" versus a " knock and announce" without appropriate judicial approval.

Was the firing by Deputy Blaquiere of his rifle into the bedroom of the residence without a clearly defined target an objectively reasonable Use of Force ?

In my opinion no. Deputy Blaquiere's indiscriminate firing of his rifle without a clearly defined target in a volatile, fact moving situation, violated the most basic fundamental rules of Use of Lethal force, firearms  safety and prevention of injury to innocent bystanders.

## Conclusions:

When considering the "totality of circumstances" involved in this incident inclusive of the Fourth Amendment to the U.S. Constitution that guarantees all citizens the right against unreasonable search and seizure and without additional information to consider:

I have concluded the use of a battering Ram to make "dynamic entry" into the residence less than 3 seconds after the knock and announcement was an "objectively, unreasonable" Use of Force as defined in Graham V. Conner, the laws of the State of Georgia, the Policies and Procedures of the CCSO and the Fourth Amendment to the U.S. Constitution

I have conclude the Lethal Use of Force by Deputy Blaquiere when he indiscriminately fired his rifle into the bedroom of the residence without a clearly defined target to be an "objectively unreasonable" use of Force as defined by Graham V. Conner the policies and procedures of the CCSO, the laws if the State of Georgia and the Fourth Amendment to the U.S. Constitution

Charles P. Stephenson

7/17/23

**Investigative Documents Reviewed:**

Georgia Bureau of Investigation Investigative File -04-182-34-21

Inclusive of but not limited to:

Camden County  Sheriff's Office (CCSO) Search and Seizure

Standard Operating Procedures

CCSO Drug Task Force Emergency Response Team

Operations Plan – Mission Statement/Desired Results

GBI Training records of CCSO Deputies Michael Blaquiere  and
Downey Casey – GBI Summary – Training – Casey and Blaquiere

Exhibit # 56 – Bates # 823195

Affidavit For Search Warrant – Brown Residence

Statement of Casey and Blaquiere re Incident marked

Def – 00001 and Def-00006

Autopsy of report of Latoya Denise James marked exhibit 36 -
bates number 843877 and GBI report of gunshot injuries
Varshaun Brown exhibit 56 – bates number #823195

Exhibits Section 1:

Statements of Downey Casey and Michael Blaquiere

Training Records of Downey Casey and Michael Blaquiere

Affidavit for Search Warrant - Brown residence



**Garrity Warning**

**STATEMENT OF RIGHTS**

You are hereby ordered to fully cooperate with the investigating official(s). Your failure to cooperate will create an objective and subjective fear of termination. You have the following rights and responsibilities during this investigation:

1. You have the right to be informed of the allegations involved.

2. You will be asked questions specifically directed and narrowly related to the performance of your official duties.

3. Statements made during any interviews may be used as evidence of misconduct or as the basis for seeking disciplinary action against you.

4. Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding, nor can the fruits of any of your statements be used against you in any subsequent criminal proceeding.

5. If you so request, a person of your choice may be present to serve as a witness during the interviews.

6. If you refuse to answer questions relating to the performance of your official duties, you will be subject to dismissal.

ACKNOWLEDGEMENT: I have read and understand the above notification.

_Downy Casey Jr_
Deputy/Officer – Print

Signature   _1151_   _5-12-21_   _0901_
                     Date       Time

_C D BYERLY_
Investigator – Print

Signature   _12mAY_   _0910_
                     Date     Time

Def-00001

# Narcotic Search Warrant

**Date:** May 4, 2021
**Time:** 0400 a.m.
**Location:** 12103 U.S. Highway 17
**Suspect:** Varshaun Brown
**Topic:** Narcotics

I am making this statement to the best of my recollection, and reserve the right to amend it for purposes of clarification.  Any inconsistencies between this statement and other officers' statements, witness statements, or what was captured by audio/video recordings should not be considered as being untruthful.  It is well established that an officer's perceptions during critical incidents differ from other statements and what is captured on audio/video.

On May 4, 2021, Investigators with the Camden County Sheriff's Office conducted search warrant CR-6-21-026, at the address of 12103 U.S. Highway 17. The search warrant ensued after investigators obtained information that Mr. Brown was a main source for the distribution of cocaine throughout several counties within the states of Florida and Georgia.  The CCSO had also conducted extensive surveillance on Mr. Brown and his residence.  The morning of the search warrant investigators met at the Camden County Substation to conduct a briefing and prepare the equipment for the search warrant. From here investigators departed the substation and headed to the target location by vehicle.

At approximately 0448, the search warrant team pulled into the driveway of the target location. After getting out of the vehicle, I ran back to the rear of my Tahoe and grabbed a shield, which is part of our entry equipment. The shield I grabbed was black and clearly marked with "Sheriff" on the front side.   As I approached the residence, I noticed a flash go off on the left side of the porch. Investigators knew prior that Mr. Brown had exterior cameras around his residence. At this time, we knew that Brown more than likely knew we were there.  I walked up the staircase to the front porch with the shield in my left hand and my issued duty pistol in my right hand, which was extended in front of the shield. Several members on the entry team announced "SHERIFF'S OFFICE SEARCH WARRANT" very loudly directly outside the front door of Mr. Brown's residence. A member of the entry team then knocked on the front door which was met with negative contact.  At this time, the front door to the residence was breached by Lieutenant Billington. Before entering the residence, it was called out by the entry team yet again "SHERIFF'S OFFICE SEARCH WARRANT".

As I stepped into the residence with the shield in my left hand and my pistol extended out in front of me, I noticed that the residence was an open floorplan to the living room. I called out to the other members of the entry team that there was an open door to the left. As I

Def-00002

approached the open door, which was only about 4 feet into the residence, I placed my body and shield in front of the threshold of the doorway, just outside of the bedroom.   I immediately noticed Mr. Brown standing directly beside the bed. I also observed a female that was standing directly beside Mr. Brown as if she was almost hugging him. She had her right hand behind Mr. Brown and facing towards him.  I was approximately 6-7 feet from the individuals, and observed that Brown was standing with his feet shoulder width apart directly facing me. I yelled out several times "GET ON THE GROUND – GET ON THE GROUND". Mr. Brown did not comply with commands. At this time, I noticed Mr. Brown was holding a black pistol with an extended magazine with both of his hands. He then raised the pistol in my direction and began firing shots. I could feel the bullets hit my shield which was held directly in front of my head and torso.  I could also feel what I believed to be bullet fragments moving past my legs.  I hesitated for a split second, almost in disbelief that we were being shot at.  In that moment, I was in fear for my life and the lives of my other team members that were in the residence.  I knew that I had no other choice than to eliminate the threat to myself and the others. I returned fire in Mr. Brown's direction.  As Mr. Brown was falling to the ground, I noticed he was still shooting his pistol.  As Mr. Brown and the female fell to the ground, I observed that he still had the gun in his hand.  While on the ground, he was still moving and it seemed that his arm began to extend back in our direction.  I fired again and noticed that he stopped moving and that the immediate threat was eliminated. I then yelled out to the other entry team members that there were two down in the room.  I then turned toward the rear of the residence, where Sergeant Duckworth and myself proceeded to clear the rest of the residence for any more potential threats which was met with negative results.  As I was beginning to clear the residence,  I heard Deputies Billington and Hardmen yelling things like "get me the med kit" and "flip them over", and knew that the team had begun rendering aid to both individuals.  After clearing the rest of the residence and realizing there were no more threats present, I was directed by my Commander Lieutenant Turner to exit the residence. I walked back out to my vehicle and stood by awaiting further instructions. Lt. Galloway them came and removed my body worn camera and placed it in the vehicle, and secured my duty weapon.

End of report
Investigator Casey 1151



**Garrity Warning**

**STATEMENT OF RIGHTS**

You are hereby ordered to fully cooperate with the investigating official(s). Your failure to cooperate will create an objective and subjective fear of termination. You have the following rights and responsibilities during this investigation:

1. You have the right to be informed of the allegations involved.

2. You will be asked questions specifically directed and narrowly related to the performance of your official duties.

3. Statements made during any interviews may be used as evidence of misconduct or as the basis for seeking disciplinary action against you.

4. Any statements made by you during these interviews cannot be used against you in any subsequent criminal proceeding, nor can the fruits of any of your statements be used against you in any subsequent criminal proceeding.

5. If you so request, a person of your choice may be present to serve as a witness during the interviews.

6. If you refuse to answer questions relating to the performance of your official duties, you will be subject to dismissal.

ACKNOWLEDGEMENT: I have read and understand the above notification.

Michael Blaguiere
Deputy/Officer – Print                     Signature                     5/12/21  09:01
                                                                          Date    Time

C.D BYERLY
Investigator – Print                       Signature                     12MAY   0901
                                                                          Date    Time

I am making this statement to the best of my recollection and reserve the right to amend it for the purpose of clarification. Any inconstancies between this statement and other officers' statements, witness statements, or what was captured by audio/video recordings should not be considered as being untruthful. It is well established that an officers' perceptions during critical incidents differ from other statements and what is captured on audio/video.

<u>Summary</u>

On 05/04/2021 at approximately 04:00 am Camden County Sheriff's Office Drug Task Force (DTF) along with assistance from CID, patrol deputies and a GBI agent, met at the Drug Task Force Office. The reason for the meeting was in reference to a search warrant to be served at 12103 US Hwy 17 Woodbine, GA for narcotics to include but not limited to cocaine and THC, items used in the distribution and sales of narcotics as well as electronic devices used to facilitate transactions in controlled substances. Search warrant number CR-6-21-026 signed by magistrate Court Judge, Judge Lewis on 04/29/2021. The following narrative is my, Investigator Michael Blaquiere's summary of the events that occurred on 05/04/2021 during the course of the search warrant.

<u>Narrative</u>

1. At approximately 04:20 am all units departed from the Camden County Substation in route to the target location 12103 US highway 17 Woodbine, GA 31569. At approximately 04:51 hours members executing the search warrant arrived on scene. I was in the lead vehicle being driven by Investigator D. Casey. Inside the vehicle was also Deputy Lt. S. Billington and Lt. Matthew Turner. Upon arrival to the residence I and other team members observed a type of flash from a possible motion sense camera on the bottom left side of the residence. Team members then relayed the information that our presence may be known to the occupants inside the residence.

2. While approaching the front of the residence while at the stairs to the front porch I shouted Sheriff's Office search warrant come to the door. I then hit my hand, knocking on the residence to the left side of the front door and I then opened the glass storm door of the residence. After no one came to the door or verbally acknowledged our presence after being given verbal commands, the door was breached by Lt. Billington with a ram. There was belief that firearms were possibly in the residence from information given to investigators, as well as looking at the criminal history of the target, Varshan Brown having multiple charges of possessions of a firearm by a convicted felon. Investigators hit the door quickly for the safety of the law enforcement officers on scene.

3. Myself and Investigator Casey made entry into the residence, Investigator Casey first and myself behind him. I observed an open door way immediately to the left upon entry. I then again announced Sheriff's Office search warrant room to the left after stepping into the residence. Investigator Casey was in front of me and I heard him give verbal commands to get down on the ground and I then I also shouted get on the ground. There was a cabinet type of furniture in the right corner by the door with a glass door and I could see the reflection of what looked to be a person standing up and moving.

4. I then heard from inside the room multiple shots being fired. I then felt something come by my body and could feel the pressure on my face from the firearm discharging from inside

the room. From the left side of the door way I could see partially into the room and observed a dark gray in color pistol in someone's hand pointed at the doorway where we were standing. I could see someone wearing a white in color shirt just to the left of the hand holding the pistol but could not see their whole body from the angle I was standing. I observed the pistol fire again towards myself and Investigator Casey. After the second or third round was fired from the room I could hear and out of the corner of my eye saw investigator Casey return fire with his pistol. I then fired my rifle towards the pistol approximately 2 to 3 times. I then moved further into the doorway so I could see more into the room.

5. Once I looked into the room more I observed Varshan Brown lying next to the bed with his feet by the left of the doorway and his head near the dresser that was against the wall directly across from the doorway I was standing in. Browns left arm was extended out with the pistol in his hand and Brown's right arm was under the bed. Lying on the left side of Brown was a female that I could see an injury on the side of her body near her armpit.

6. Brown then started to roll over with the pistol still in his hand and was starting to point the firearm back towards the doorway where Investigator Casey and I were standing. I then fired approximately two to three more rounds into Browns torso to stop the threat of him firing the gun at us again. Once I observed that Brown and the female were no longer an immediate threat I made entry in to the bedroom and moved the firearm away from Brown's hand. The pistol appeared to be a gray in color Glock with an extended magazine.

7. When I picked up and moved the pistol away from Brown's hand I placed the pistol on the dresser that was next to the wall and observed what appeared to be crack cocaine on the dresser and set the pistol on top of it. I then told Lt. Billington to put Brown in handcuffs and I began putting zip tie cuffs on the female.

8. After cuffs were put on both subjects I requested for someone to call for a squad for the subjects. Deputy Harman then came into the room and Lt. Billington, Deputy Harman and myself began lifesaving steps on the female and male. We cut the females shirt off trying to find an exit wound from what we believed to be a gunshot wound but could only find an entry wound near her armpit. Deputy Harman had brought in a trauma kit and instructed me to get quick clot and gauze out. I removed the articles and handed them to Deputy Harman and he began using them on the female. I observed Brown had a wound on his leg and instructed someone to put a tourniquet on Brown.

9. My rifle kept getting in my way while trying to render aid and I asked Deputy Duckworth to hold my rifle and handed it to him. Deputy Harman continued to render aid and I was then instructed to leave the room and step outside. I walked out of the front door of the residence and to the vehicles in the yard. Deputy Brian Barber then removed my vest from me and checked to make sure I had not been hit by gunfire. After confirming I had not been hit and that I was okay I was told to ride with Investigator Daniel back to the substation.



State of Georgia
**Peace Officer Standards and Training Council**
Network Data Gateway



# Data Report System
## Individual Officer Profile

*Created: 05-11-2021 02:34*
*Requested by: JEFF MILLER*

O224739

| | |
|---|---|
| Officer Key | **O224739** |
| Officer Name | **MICHAEL JOSEPH BLAQUIERE** |
| Race | **White (Not Hispanic or Latino)** |
| Education | **High School Diploma** |
| Status | **In Good Standing** |

## Officer Certifications

| Certification | Description | Certification Type | Status |
|---|---|---|---|
| PS0920170441S | RADAR OPERATOR | Specialized | Active |
| PBLE2016O224739 | BASIC LAW ENFORCEMENT | Basic | Active |

## Instructor Certifications
None Found

## Employment History

| Agency | Rank | Start Date | End Date | Status |
|---|---|---|---|---|
| CAMDEN COUNTY SHERIFFS OFFICE | Deputy Sheriff | March 21, 2017 | | Actively Employed in Law Enforcement |
| BRANTLEY COUNTY SHERIFFS OFFICE | Peace Officer | July 5, 2016 | March 20, 2017 | Voluntary Resignation |

## Sanctions
None Found

## Investigations
None Found

## Training History

| Date | Number | Course | Hours |
|---|---|---|---|
| April 27, 2021 | IFD00F | SWAT TRAINING | 4 |
| April 16, 2021 | IFD00F | SWAT TRAINING | 2 |
| March 10, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 1 |
| February 17, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 1 |
| February 11, 2021 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| February 10, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 2 |
| February 9, 2021 | IFD00G | SWAT TRAINING | 3 |
| February 3, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 2 |
| January 19, 2021 | IFD00G | SWAT TRAINING | 3 |
| January 19, 2021 | IFD00G | SWAT TRAINING | 3 |

*Requestor IP Address: 192.168.1.86*

| Date | Code | Course | Hours |
|---|---|---|---|
| January 14, 2021 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| January 12, 2021 | IFD00G | SWAT TRAINING | 4 |
| January 11, 2021 | ICR02G | DE-ESCALATION TECHNIQUES | 2 |
| January 11, 2021 | IGF05G | CULTURAL AWARENESS | 2 |
| | | | 2021 Total Hours : 37 |
| | | | |
| November 19, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 6 |
| November 19, 2020 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| November 17, 2020 | IGS11G | FOSTERING POSITIVE COMMUNITY RELATIONS | 2 |
| November 13, 2020 | IPM00G | PHYSICAL FITNESS | 2 |
| October 8, 2020 | IZM01G | CANINE PROTOCOL | 1 |
| September 25, 2020 | IQP00G | POLICY/PROCEDURES | 1 |
| September 25, 2020 | IGM74G | BODY WORN CAMERAS | 1 |
| September 14, 2020 | IFM22G | USE OF DEADLY FORCE | 1 |
| September 8, 2020 | IGS11G | FOSTERING POSITIVE COMMUNITY RELATIONS | 2 |
| August 26, 2020 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| August 26, 2020 | IFM04F | BACKUP WEAPON TRAINING | 2 |
| August 26, 2020 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| August 6, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| July 16, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| June 22, 2020 | DBI04G | EYEWITNESS IDENTIFICATION (GPSTC ONLINE) | 1 |
| June 17, 2020 | VHQ01G | SUSPICIOUS ACTIVITY REPORTING/PRIVACY & CIVIL LIBERTIES | 1 |
| June 16, 2020 | DZA01G | LAW ENFORCEMENT & ANIMAL ENCOUNTERS (GPSTC ONLINE) | 1 |
| June 8, 2020 | VGM99G | GA POST BLOCK FOR RECERTIFICATION | 2 |
| May 28, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| May 14, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| April 30, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| March 12, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| March 12, 2020 | IFD00G | SWAT TRAINING | 4 |
| February 12, 2020 | IGS10G | COMMUNITY POLICING | 2 |
| January 30, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| | | | 2020 Total Hours : 68 |
| | | | |
| November 21, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| November 14, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| November 7, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| October 10, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| September 26, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| September 12, 2019 | ICM01G | CROWD CONTROL | 4 |
| July 12, 2019 | NKG09G | GA. GANG INVESTIGATORS' ASSOC. CONF. | 24 |
| July 8, 2019 | IGA01G | GANGS: THE BASICS | 8 |
| June 28, 2019 | IKV12G | ACTIVE SHOOTER RESPONSE | 8 |
| May 24, 2019 | NOA90G | CLANDESTINE LAB AWARENESS | 40 |
| May 2, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| April 18, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| April 8, 2019 | NGC68G | SOCIAL NETWORKING INVESTIGATIONS | 8 |
| April 5, 2019 | IBM35G | MANTRACKING | 50 |
| March 29, 2019 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| March 14, 2019 | IXM17G | TACTICAL ENTRY MOVEMENT (TEAM TRNG) | 2 |

| Date | Code | Description | Hours |
|------|------|-------------|-------|
| March 7, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| February 22, 2019 | IPM00G | PHYSICAL FITNESS | 4 |
| February 21, 2019 | IKV12G | ACTIVE SHOOTER RESPONSE | 7 |
| February 21, 2019 | IEM11G | BASIC TACTICAL MEDICAL | 1 |
| February 20, 2019 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| February 20, 2019 | IFM04F | BACKUP WEAP0N TRAINING | 2 |
| February 20, 2019 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| February 19, 2019 | ILU00G | Legal Update | 1 |
| February 19, 2019 | ISM08G | VEHICLE SAFETY | 4 |
| February 19, 2019 | ILM26G | CASE PREPARATION | 1 |
| February 19, 2019 | IQP05G | PURSUIT POLICY | 2 |
| February 19, 2019 | ITM12G | STINGER SPIKE SYSTEM | 2 |
| February 18, 2019 | IFM22G | USE OF DEADLY FORCE | 1 |
| February 18, 2019 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| February 18, 2019 | IEC05E | CPR ADULT & PED W/AED | 1 |
| February 18, 2019 | IGS11G | FOSTERING POSITIVE COMMUNITY RELATIONS | 2 |
| February 18, 2019 | IZM02G | CANINE ENFORCEMENT | 1 |
| February 18, 2019 | IEC07E | CPR ADULT & PED W/AED RECERT | 1 |
| February 18, 2019 | IXM18G | NARCAN | 1 |
| February 14, 2019 | IXM17G | TACTICAL ENTRY MOVEMENT (TEAM TRNG) | 1 |
| February 7, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| January 24, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| January 10, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |

2019 Total Hours : 239

| Date | Code | Description | Hours |
|------|------|-------------|-------|
| November 15, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| November 9, 2018 | ISM08G | VEHICLE SAFETY | 4 |
| November 9, 2018 | IPM00G | PHYSICAL FITNESS | 4 |
| November 8, 2018 | IKV12G | ACTIVE SHOOTER RESPONSE | 4 |
| November 8, 2018 | IEM11G | BASIC TACTICAL MEDICAL | 1 |
| November 8, 2018 | IDD00D | DEFENSIVE TACTICS | 4 |
| November 7, 2018 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| November 7, 2018 | IFM04F | BACKUP WEAP0N TRAINING | 2 |
| November 7, 2018 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| November 6, 2018 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| November 6, 2018 | ILU00G | Legal Update | 1 |
| November 6, 2018 | ILM26G | CASE PREPARATION | 1 |
| November 6, 2018 | IGF05G | CULTURAL AWARENESS | 2 |
| November 6, 2018 | ICD00G | DOMESTIC VIOLENCE | 2 |
| November 6, 2018 | IFM22G | USE OF DEADLY FORCE | 1 |
| November 5, 2018 | IGA00G | GANGS | 1 |
| November 5, 2018 | IBS00G | SEX CRIMES INVESTIGATION | 2 |
| November 5, 2018 | IXC03G | METHAMPHETAMINE AWARENESS | 1 |
| November 5, 2018 | IAB00G | HEALTH, WELLNESS. & PHYSICAL FITNESS | 2 |
| November 5, 2018 | IHQ48G | SOVEREIGN CITIZEN MOVEMENT | 1 |
| November 5, 2018 | IXM19G | NALOXONE AUTO INJECTOR | 1 |
| November 1, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| August 9, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| July 12, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |

Requestor IP Address: 192.168.1.86

| June 28, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| June 14, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| June 5, 2018 | IDD00D | DEFENSIVE TACTICS | 3 |
| May 22, 2018 | ITM21G | ROADCHECK SAFETY | 1 |
| May 17, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| May 3, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| April 26, 2018 | IBN02G | EVIDENCE: CHAIN OF CUSTODY | 1 |
| April 10, 2018 | IDD00D | DEFENSIVE TACTICS | 4 |
| April 5, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| February 22, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| February 8, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| January 18, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |

2018 Total Hours : 100

| May 23, 2017 | STT01R | RADAR OPERATOR TRAINING COURSE | 16 |
| May 19, 2017 | ISM08G | VEHICLE SAFETY | 2 |
| May 19, 2017 | IPM00G | PHYSICAL FITNESS | 4 |
| May 19, 2017 | ITM12G | STINGER SPIKE SYSTEM | 2 |
| May 18, 2017 | ITU00G | VEHICLE PULLOVERS | 3 |
| May 18, 2017 | ITC01G | RESPONDING TO ALARMS | 1 |
| May 18, 2017 | IKV12G | ACTIVE SHOOTER RESPONSE | 4 |
| May 17, 2017 | IFM04F | BACKUP WEAP0N TRAINING | 2 |
| May 17, 2017 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| May 17, 2017 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| May 16, 2017 | IGS12G | POLICE LEGITIMACY, PROCEDURAL JUSTICE & COMM. RELATIONS | 2 |
| May 16, 2017 | ILQ00G | SEARCH AND SEIZURE | 2 |
| May 16, 2017 | IFM22G | USE OF DEADLY FORCE | 1 |
| May 16, 2017 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| May 16, 2017 | ILU00G | Legal Update | 2 |
| May 15, 2017 | IBH08G | CRIME SCENE MANAGEMENT | 1 |
| May 15, 2017 | IEC04E | C.P.R/A.E.D/FIRST AID | 1 |
| May 15, 2017 | ICD00G | DOMESTIC VIOLENCE | 2 |
| May 15, 2017 | IHB04G | BOMB THREATS AND SUSPICIOUS PACKAGES | 2 |
| May 15, 2017 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| May 15, 2017 | UEC00E | C.P.R. RECERTIFICATION | 1 |
| April 19, 2017 | IFM22G | USE OF DEADLY FORCE | 1 |
| April 17, 2017 | IFM04F | BACKUP WEAP0N TRAINING | 1 |
| April 17, 2017 | UFL01F | PATROL RIFLE QUALIFICATION | 1 |
| April 17, 2017 | UFR00F | FIREARMS REQUALIFICATIONS | 1 |
| February 24, 2017 | ITM21G | ROADCHECK SAFETY | 1 |
| February 24, 2017 | ITM00G | MISCELLANEOUS TRAFFIC | 2 |
| February 21, 2017 | ILQ03G | REASONABLE SUSPICION | 4 |
| January 26, 2017 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| January 18, 2017 | IBH07G | CRIME SCENE PRESERVATION | 4 |

2017 Total Hours : 70

| December 28, 2016 | IDG17G | TASER X2 | 7 |
| December 14, 2016 | ITM07G | STOP STICK TRAINING | 2 |
| September 16, 2016 | BML13G | BASIC LAW ENFORCEMENT TRAINING COURSE (2013) | 408 |

2016 Total Hours : 417

## Summary of Hours for 6 Years

| Year | Total Hours | Firearms | Deadly Force | De-escalation | Community Policing |
|------|------|------|------|------|------|
| 2021 | 37 | 0 | 0 | 1 | 2 |
| 2020 | 68 | 1 | 1 | 1 | 6 |
| 2019 | 239 | 1 | 1 | 1 | 2 |
| 2018 | 100 | 1 | 1 | 1 | 2 |
| 2017 | 70 | 2 | 2 | 1 | 2 |
| 2016 | 417 | 1 | 1 | 1 | 2 |
| **Grand Total of Hours (all years and courses)** | **931** | | | | |

Requestor IP Address: 192.168.1.56



**State of Georgia**
## Peace Officer Standards and Training Council
*Network Data Gateway*



# Data Report System
## Individual Officer Profile

*Created: 05-11-2021 02:32*
*Requested by: JEFF MILLER*



O153011

| | |
|---|---|
| Officer Key | O153011 |
| Officer Name | **DOWNY GLENN CASEY JR** |
| Race | **White (Not Hispanic or Latino)** |
| Education | **GED** |
| Status | **In Good Standing** |

## Officer Certifications

| Certification | Description | Certification Type | Status |
|---|---|---|---|
| PS1620180410S | LIDAR (LASER) OPERATOR | Specialized | Active |
| PS0920170392S | RADAR OPERATOR | Specialized | Active |
| PBLE2016O153011 | BASIC LAW ENFORCEMENT | Basic | Active |
| PBJA2016O153011 | JAILER | Basic | Active |
| PBCO090396S | CORRECTIONS OFFICER | Basic | Active |

## Instructor Certifications

None Found

## Employment History

| Agency | Rank | Start Date | End Date | Status |
|---|---|---|---|---|
| CAMDEN COUNTY SHERIFFS OFFICE | Peace Officer | December 16, 2016 | | Actively Employed in Law Enforcement |
| CAMDEN COUNTY SHERIFFS OFFICE | Jailor | November 2, 2015 | December 15, 2016 | Transfer |
| D. RAY JAMES PRISON/INACTIVE | Corrections Officer | March 9, 2009 | May 13, 2010 | Terminated |

## Sanctions

None Found

## Investigations

None Found

## Training History

| Date | Number | Course | Hours |
|---|---|---|---|
| April 27, 2021 | IFD00F | SWAT TRAINING | 4 |
| April 16, 2021 | IFD00F | SWAT TRAINING | 2 |
| March 11, 2021 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| February 17, 2021 | IFJ04G | JUDGEMENTAL SIMULATOR TRAINING | 1 |
| February 11, 2021 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| January 19, 2021 | IFD00G | SWAT TRAINING | 3 |

*Requestor IP Address: 192.168.1.86*

| January 19, 2021 | IFD00G | SWAT TRAINING | 3 |
| January 14, 2021 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| January 12, 2021 | IFD00G | SWAT TRAINING | 4 |

2021 Total Hours : 29

| November 19, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 6 |
| November 17, 2020 | IGS11G | FOSTERING POSITIVE COMMUNITY RELATIONS | 2 |
| November 13, 2020 | IPM00G | PHYSICAL FITNESS | 2 |
| November 12, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| October 8, 2020 | IZM01G | CANINE PROTOCOL | 1 |
| October 6, 2020 | DBI04G | EYEWITNESS IDENTIFICATION (GPSTC ONLINE) | 1 |
| October 6, 2020 | DZA01G | LAW ENFORCEMENT & ANIMAL ENCOUNTERS (GPSTC ONLINE) | 1 |
| October 5, 2020 | VGM99G | GA POST BLOCK FOR RECERTIFICATION | 2 |
| September 8, 2020 | IFM22G | USE OF DEADLY FORCE | 1 |
| September 8, 2020 | ICR02G | DE-ESCALATION TECHNIQUES | 2 |
| August 26, 2020 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| August 26, 2020 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| August 26, 2020 | IFM04F | BACKUP WEAPON TRAINING | 2 |
| August 6, 2020 | IZT01G | CANINE SEARCH AND RESCUE | 4 |
| May 14, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |
| March 12, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| March 12, 2020 | IFD00G | SWAT TRAINING | 4 |
| January 30, 2020 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |

2020 Total Hours : 52

| November 21, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| November 20, 2019 | UFL01F | PATROL RIFLE QUALIFICATION | 4 |
| November 20, 2019 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| November 18, 2019 | IGS11G | FOSTERING POSITIVE COMMUNITY RELATIONS | 2 |
| November 18, 2019 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| November 18, 2019 | IXM18G | NARCAN | 2 |
| November 18, 2019 | IFM22G | USE OF DEADLY FORCE | 1 |
| November 14, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| September 12, 2019 | ICM01G | CROWD CONTROL | 4 |
| July 12, 2019 | NKG09G | GA. GANG INVESTIGATORS' ASSOC. CONF. | 24 |
| July 8, 2019 | IGA01G | GANGS: THE BASICS | 8 |
| May 24, 2019 | NOA90G | CLANDESTINE LAB AWARENESS | 40 |
| May 16, 2019 | IKV12G | ACTIVE SHOOTER RESPONSE | 8 |
| May 16, 2019 | IEM11G | BASIC TACTICAL MEDICAL | 2 |
| April 8, 2019 | NGC68G | SOCIAL NETWORKING INVESTIGATIONS | 8 |
| April 5, 2019 | IBM35G | MANTRACKING | 50 |
| March 29, 2019 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| March 14, 2019 | IXM17G | TACTICAL ENTRY MOVEMENT (TEAM TRNG) | 2 |
| March 5, 2019 | AW108G | INTOXILYZER 9000 BASIC CLASS | 16 |
| February 28, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| February 22, 2019 | IPM00G | PHYSICAL FITNESS | 4 |
| February 20, 2019 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| February 14, 2019 | IXM17G | TACTICAL ENTRY MOVEMENT (TEAM TRNG) | 1 |
| February 7, 2019 | IZM05G | CANINE PROFICIENCY TRAINING | 6 |

2019 Total Hours : 201

| Date | Code | Description | Hours |
|---|---|---|---|
| November 27, 2018 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| October 25, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| October 25, 2018 | IPM00G | PHYSICAL FITNESS | 4 |
| September 20, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| August 30, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| August 23, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| August 2, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| June 28, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| June 20, 2018 | ATL01R | LIDAR SPEED MEASUREMENT | 8 |
| June 14, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| June 5, 2018 | IDD00D | DEFENSIVE TACTICS | 3 |
| May 25, 2018 | ISM08G | VEHICLE SAFETY | 4 |
| May 25, 2018 | ITC01G | RESPONDING TO ALARMS | 1 |
| May 24, 2018 | IEM11G | BASIC TACTICAL MEDICAL | 1 |
| May 24, 2018 | IDD00D | DEFENSIVE TACTICS | 4 |
| May 24, 2018 | IKV12G | ACTIVE SHOOTER RESPONSE | 3 |
| May 23, 2018 | IFM04F | BACKUP WEAPON TRAINING | 2 |
| May 23, 2018 | UFE02F | SHOTGUN QUALIFICATION | 2 |
| May 23, 2018 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| May 23, 2018 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| May 22, 2018 | IGA00G | GANGS | 1 |
| May 22, 2018 | IXC03G | METHAMPHETAMINE AWARENESS | 1 |
| May 22, 2018 | ILQ00G | SEARCH AND SEIZURE | 2 |
| May 22, 2018 | IAB00G | HEALTH, WELLNESS, & PHYSICAL FITNESS | 2 |
| May 22, 2018 | IHQ48G | SOVEREIGN CITIZEN MOVEMENT | 1 |
| May 22, 2018 | IXM19G | NALOXONE AUTO INJECTOR | 1 |
| May 22, 2018 | ITM21G | ROADCHECK SAFETY | 1 |
| May 21, 2018 | IBS00G | SEX CRIMES INVESTIGATION | 2 |
| May 21, 2018 | IGF05G | CULTURAL AWARENESS | 2 |
| May 21, 2018 | ICD00G | DOMESTIC VIOLENCE | 2 |
| May 21, 2018 | IFM22G | USE OF DEADLY FORCE | 1 |
| May 10, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| May 4, 2018 | AWG01G | DUI/DWI DET. & STAN. FIELD SOBRIETY TEST | 24 |
| April 26, 2018 | IBN02G | EVIDENCE: CHAIN OF CUSTODY | 1 |
| April 19, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |
| April 12, 2018 | IZM05G | CANINE PROFICIENCY TRAINING | 4 |

2018 Total Hours : 118

| Date | Code | Description | Hours |
|---|---|---|---|
| October 25, 2017 | DGB01G | GCIC SECURITY AWARENESS TRAINING | 1 |
| October 25, 2017 | IGB31G | CJIS NETWORK OPERATOR RE-CERTIFICATION EXAM | 1 |
| May 23, 2017 | STT01R | RADAR OPERATOR TRAINING COURSE | 16 |
| February 24, 2017 | ISM08G | VEHICLE SAFETY | 2 |
| February 24, 2017 | IPM00G | PHYSICAL FITNESS | 4 |
| February 24, 2017 | ITM12G | STINGER SPIKE SYSTEM | 2 |
| February 23, 2017 | ITU00G | VEHICLE PULLOVERS | 3 |
| February 23, 2017 | ITC01G | RESPONDING TO ALARMS | 1 |
| February 23, 2017 | IKV12G | ACTIVE SHOOTER RESPONSE | 4 |

*Requestor IP Address: 192.168.1.86*

| Date | Code | Description | Hours |
|---|---|---|---|
| February 22, 2017 | UFE02F | SHOTGUN QUALIFICATION | 2 |
| February 22, 2017 | UFR00F | FIREARMS REQUALIFICATIONS | 2 |
| February 22, 2017 | UFL01F | PATROL RIFLE QUALIFICATION | 2 |
| February 21, 2017 | ICR02G | DE-ESCALATION TECHNIQUES | 1 |
| February 21, 2017 | ILQ00G | SEARCH AND SEIZURE | 2 |
| February 21, 2017 | IGS12G | POLICE LEGITIMACY. PROCEDURAL JUSTICE & COMM. RELATIONS | 2 |
| February 21, 2017 | ILU00G | Legal Update | 2 |
| February 21, 2017 | IFM22G | USE OF DEADLY FORCE | 1 |
| February 20, 2017 | IEC04E | C.P.R/A.E.D/FIRST AID | 1 |
| February 20, 2017 | UEC00E | C.P.R. RECERTIFICATION | 2 |
| February 20, 2017 | ICD00G | DOMESTIC VIOLENCE | 2 |
| February 20, 2017 | IHB04G | BOMB THREATS AND SUSPICIOUS PACKAGES | 2 |
| February 20, 2017 | IBH08G | CRIME SCENE MANAGEMENT | 1 |
| February 20, 2017 | IGK00G | ETHICS AND PROFESSIONALISM | 1 |
| January 25, 2017 | IGM58G | CRITICAL TASKS | 2 |
| | | | 2017 Total Hours : 59 |
| December 16, 2016 | BML13G | BASIC LAW ENFORCEMENT TRAINING COURSE (2013) | 408 |
| October 18, 2016 | ITM53G | COMMERCIAL MOTOR VEH AWARENESS & ENFORCEMENT | 2 |
| September 26, 2016 | PAV15D | Make-up Hours Taken From Course for Waiver | 0 |
| September 26, 2016 | IBM18G | RACIAL PROFILING | 0 |
| September 26, 2016 | IGM54G | OFF DUTY CONDUCT | 0 |
| September 22, 2016 | ILQ00G | SEARCH AND SEIZURE | 0 |
| September 22, 2016 | ICD00G | DOMESTIC VIOLENCE | 0 |
| September 22, 2016 | IGK00G | ETHICS AND PROFESSIONALISM | 0 |
| September 22, 2016 | ICD05G | ELDER ABUSE | 0 |
| September 22, 2016 | IEB00G | UNIVERSAL PRECAUTIONS | 0 |
| September 16, 2016 | UFR00F | FIREARMS REQUALIFICATIONS | 0 |
| September 16, 2016 | IFM22G | USE OF DEADLY FORCE | 0 |
| July 5, 2016 | IBN02G | EVIDENCE: CHAIN OF CUSTODY | 0 |
| May 4, 2016 | IDG02G | TASER | 0 |
| April 21, 2016 | 1YS00G | SPANISH | 0 |
| February 19, 2016 | BMH01G | BASIC JAIL TRAINING COURSE | 80 |
| | | | 2016 Total Hours : 490 |
| November 14, 2015 | IPM00G | PHYSICAL FITNESS | 0 |
| | | | 2015 Total Hours : 0 |
| December 31, 2010 | PAV12F | 20 HR/FIREARMS REQUAL/USE OF DEADLY FORCE WAIVER | 20 |
| December 31, 2010 | PAV12F | 20 HR/FIREARMS REQUAL/USE OF DEADLY FORCE WAIVER | 20 |
| January 2, 2010 | NOE45G | PEPPERBALL TRAINING | 2 |
| | | | 2010 Total Hours : 42 |
| December 31, 2009 | PAV14G | GRADUATED AFTER APRIL 1-NO WAIVER NECESSARY | 20 |
| July 23, 2009 | BMC99G | BASIC D.O.C. SECURITY TRAINING | 200 |
| June 16, 2009 | NOG80G | PASSENGER VAN SAFETY | 2 |
| March 12, 2009 | NOE72G | PRE-SERVICE ORIENTATION PSO | 40 |
| 2009 Total Hours : 262 | | | |

Requestor IP Address: 192.168.1.86

Summary of Hours for 9 Years

| Year | Total Hours | Firearms | Deadly Force | De-escalation | Community Policing |
|---|---|---|---|---|---|
| 2021 | 29 | 0 | 0 | 0 | 0 |
| 2020 | 52 | 1 | 1 | 1 | 2 |
| 2019 | 201 | 2 | 1 | 1 | 2 |
| 2018 | 118 | 1 | 1 | 1 | 2 |
| 2017 | 59 | 1 | 1 | 1 | 2 |
| 2016 | 490 | 1 | 1 | 1 | 2 |
| 2015 | 0 | 0 | 0 | 0 | 0 |
| 2010 | 42 | 2 | 2 | 2 | 4 |
| 2009 | 262 | 1 | 1 | 0 | 0 |
| **Grand Total of Hours (all years and courses)** | 1,253 | | | | |

# CAMDEN COUNTY SHERIFF'S OFFICE

## FIREARMS SCORE SHEET

DATE: 8/24/20   LOCATION: D-Ray James

TYPE OF TRAINING: Firearms Requal

HOURS TRAINED: 2   INSTRUCTOR: D Douglas (Duty Weapon)

INSTRUCTOR:

| Name | Agency | Weapon | Serial # | Score | Score |
|------|--------|--------|----------|-------|-------|
| Charlotte Summers | CCSO | Glock | MVH090 | 258 | |
| Shawn Manning | CCSO | Glock | MC945 | 246 | |
| Furr, Jerry | CCSO | Glock 22 | KKR076 (Personal) | 296 | |
| Doughty, Casey | CCSO | Glock | ASH 610 | 290 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# CAMDEN COUNTY SHERIFF'S OFFICE

## FIREARMS SCORE SHEET

DATE: 8/6/20    LOCATION: D-Bay James

TYPE OF TRAINING: Firearms Requal (Duty)

HOURS TRAINED: 2    INSTRUCTOR: D. Douglas

INSTRUCTOR:

| Name | Agency | Weapon | Serial # | Score | Score |
|------|--------|--------|----------|-------|-------|
| Chris Sears | CCSO | Glock | MVC986 | 238 | |
| Zach Aldridge | CCSO | Glock | MVC 921 | 292 | |
| Michelle Batchelett | CCSO | Glock | MVC 985 | 268 | 272 |
| Kristian Rodgers | CCSO | Glock 22 | MVC909 | 288 | 248 |
| David L. Dowdy | CCSO | Glock | MVC 902 | 284 | |
| Matt Hunter | CCSO | Glock | BHAM152 | 218 | 282 |
| Dowd Luther | CCSO | Glock | BHAM151 | 284 | |
| Joshua Harman | CCSO | Glock 22 | K455-90 | 250 | |
| Michelle Reff | SMPD | Glock 27 | DFL706 | 224 | |
| Christy Newman | CCSO | Glock | MVC989 | 270 | 240 |
| Alizu Knight | CCSO | Glock | MVIN088 | 242 | |
| Joseph Carlson | CCSO | Glock 22 | VGP3810 | 272 | |
| Michael Bladgress | CCSO | Glock 22 | MVC 903 | 292 | |
| Arin West | CCSO | Glock 22 | XCC 351 | 292 | |

256

# CAMDEN COUNTY SHERIFF'S OFFICE

## FIREARMS SCORE SHEET

DATE: 8/6/20
TYPE OF TRAINING:
HOURS TRAINED: 2
LOCATION: D-Bay James / Rock Up
INSTRUCTOR: D Douglas
INSTRUCTOR:

| Name | Agency | Weapon | Serial # | Score | Score |
|------|--------|--------|----------|-------|-------|
| Hinkler Knight | CCSO | Glock 48 | XRC218 | 190 | |
| Doug Welker | CCSO | Glock 27 | XRC 321 | 193 | |
| (illegible) | SHP | Glock 21 | AX 890 91 | | |
| Joseph Carlisi | CCSO | Glock 23(Gen3) | FX1L1Flc | 184 | |
| Joseph Carlisi | CCSA | Glock 23en | BK1B9e3 | 188 | |
| David L Dowdy | CCSO | Glock 21 | XRC247 | 186 | |
| Matt Hunter | CUSD | Glock | XRC254 | 198 | |
| Kristian Rodgers | CCSO | Glock 27 | XRC853 | 180 | |
| Aaron Wood | CCSo | Glock 27 | BCTF751 | 184 | |
| M Broquiere | CCSO | Glock 27 | BDEK766 | 200 | |
| Joshua Hartness | CCSO | Glock 18 | BDH2592 | 192 | |
| Devon Cascio | CCSO | Glock 27 | BDEK268 | 198 | |
| Buck Aldridge | CCSO | Glock 27 | BDEK232 | 196 | |
| Joshua Harmon | CCSO | Glock 27 | XRC250 | 160 | 1 |

# CAMDEN COUNTY SHERIFF'S OFFICE

## FIREARMS SCORE SHEET

**DATE:** 8/26/20 **LOCATION:** D-Range

**TYPE OF TRAINING:** Patrol Rifle Qual **INSTRUCTOR:** D. Douglas

**HOURS TRAINED:** 2 **INSTRUCTOR:**

| Name | Agency | Weapon | Serial # | Score | Score |
|------|--------|--------|----------|-------|-------|
| Doug Weimer | CCSO | Smith Wesson M&P | KN505 05 | 262 | |
| John Hartman | CCSO | Bushmaster | 612 pi105 | 288 | |
| Fred Sepp | CCSO | Bushmaster | L401746 | 286 | |
| Deana Casey | CCSO | Rock River | CM251887 | 298 | |
| M.Blaquiere | CCSO | Rock River | CM251886 | 296 | |
| N. Frimel | CCSO | Smith Wesson | KN51571 | 298 | |
| A. West | CCSO | Smith & Wesson | SY35411 | 264 | |
| Buell Aldridge | CCSO | Bush Master | L387225 | 288 | |
| Jay JAMES | CCSO | Bushmaster | BFI465441 | 290 | |
| Nathan D James | CCSO | Bush Master | BFI465447 | 286 | |
| Michell J David | SMPO | Bush master | BFI462598 | 254 | |
| David L. Dowdy | CCSO | Bushmaster | BFI468594 | 272 | |
| Michelle Bartlett | CCSO | Bushmaster | BFI468596 | 280 | |
| Kristian Propes | CCSO | Bush master | L40794GB | 266 | |
| | | Bushmaster | L387225 | | |

Re: 04-0182-34-21

Jeff Miller <jmiller@gapost.org>
To ⊘ Nipper, Jason

← Reply    ↩ Reply All    → Forward

Tue 5/11/2021 2:

[📄] MICHAEL JOSEPH BLAQUIERE f6 5.11.21.pdf    ∨
     100 KB

[📄] DOWNY GLENN CASEY JR f6 5.11.21.pdf    ∨
     100 KB

① Your replied to this message on 5/12/2021 4:59 AM.
If there are problems with how this message is displayed, click here to view it in a web browser.

UTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

er your inquiry:

SO INV Michael Blaquiere

Does the officer possess a P.O.S.T. certification and what is the status of the certification? Officer holds a Basic Law Enforcement certification in good standing. See attached POST record

Has the officer completed the required training for each calendar year since completing the basic course? Yes

Does the officer have power of arrest? Yes

Does the officer's P.O.S.T. record show either the required training or a waiver issued for each required calendar year? Yes

If the officer's record does not show either the required training or a waiver issued for each required calendar year, has the officer submitted all required training to P.O.S.T. to be documented on their record? N/A

Are there or have there been any prior, pending, or active P.O.S.T. investigations or complaints concerning the officer? None noted

Are there any other P.O.S.T. issues concerning the officer not addressed in the above questions? None noted

# GEORGIA BUREAU OF INVESTIGATION
# REGION 4
# INVESTIGATIVE SUMMARY

**04-0182-34-21**

On Wednesday, May 12, 2021, at approximately 7:30 a.m., S/A J.K. NIPPER was located inside of Coffee County, Ga. S/A NIPPER spoke with Director-Certification and Training Standards for Georgia Peace Officers Standards and Training Council (POST) JEFF MILLER via e-mail. MILLER essentially stated the following (See attached).

Camden County Sheriff's Office (CCSO) INV MICHAEL BLAQUIERE holds a basic law enforcement certification and is in good standing. BLAQUIERE has completed the required training for each calendar year since completing the basic course. BLAQUIERE does have arrest powers. BLAQUIERE does not have any prior, pending or active POST investigations or complaints. BLAQUIERE does not have any other POST issues (See attached POST records).

SA NIPPER noted that BLAQUIERE had recently completed the following trainings in 2021: SWAT trainings on April 27, April 16, February 9, January 19 and January 12 totaling approximately 16 hours in 2021. Judgmental Simulator Training on March 10, February 17 and February 3 totaling approximately 3 hours in 2021.

CCSO INV DOWNY CASEY holds a basic law enforcement certification, a basic corrections officer certification and basic jailer certification and all are in good standing. CASEY has completed the required training for each calendar year since completing the basic course. CASEY does have arrest powers. CASEY does not have any prior, pending or active POST investigations or complaints. CASEY does not have any other issues concerning POST (See attached POST records).

Page 1 of 2

**PROPERTY OF GBI**

Further dissemination is prohibited
without written approval of a GBI Supervisor

823195

EXHIBIT ____ 56 ____

**04-0182-34-21**

SA NIPPER noted that CASEY had recently completed the following trainings in 2021: SWAT trainings on April 27, April 16, January 19 and January 12 totaling approximately 12 hours in 2021. Judgmental Simulator Training on February 17 totaling approximately 1 hour in 2021.

No further information was obtained.

This investigative act concluded at approximately 7:45 a.m.

**ATTACHMENTS**

E-MAIL(S) Jeff Miller email                                       (Attachments)
OTHER POST records ref CCSO Inv Downy          (Attachments)
Casey
OTHER POST records ref CCSO Inv Michael        (Attachments)
Blaquiere

**ID DATA:**

**MILLER, JEFF**  (MR)
SEX/RACE: MALE/WHITE
COUNTRY: UNITED STATES
OCCUPATION: CLERK
ELECTRONIC ADDRESS: JMILLER@GAPOST.ORG
EMPLOYER:
GEORGIA P.O.S.T.

SPECIAL AGENT JASON NIPPER:   5/12/2021
tt:   5/13/2021

**PROPERTY OF GBI**
Further dissemination is prohibited
without written approval of a GBI Supervisor

823195

EXHIBIT ___56___

CAMDEN COUNTY, GEORGIA          Search Warrant No: CR-6-21-021

Page 1 of 2 pages

## AFFIDAVIT AND APPLICATION FOR A SEARCH WARRANT

| AFFIANT: Michael Blaquiere |
|---|
| AFFIANT'S ADDRESS & PHONE NO:                                    (912) 510-5100<br><br>Camden County Sheriff's Office<br>209 East 4th Street<br>Woodbine, GA 31569 |

The undersigned affiant being duly sworn, deposes and says: I am an officer of the State of Georgia or its political subdivisions charged with the duty of enforcing the criminal laws, and that I have reason to believe that in Camden County, Georgia, on the person, premises, or property described as follows:

12103 US Hwy 17 Woodbine, GA 31569 being described as a residential single story home and to include all out structures and vehicles on the property. The residence is a blue in color. There is a front porch to the residence with four half brick columns. There are windows on either side of the front door of the residence. The front door is gray / dark in color with a storm door in front of it. The roof is described as a rusty tin roof. On the north side of the residence there is a wooden shed.

There is: controlled substances to include but not limited to cocaine, THC. Items used in the distribution and sales of narcotics. As well as electronic devices to include but not limited to cell phones used to facilitate transactions in controlled substances.

The facts tending to establish probable cause that a crime has been or is being committed in the above described instruments, articles or things described above are presently located at the above described premises or property are as follows:

On 04/28/2021 at approximately 05:30 hours Camden County's Drug Task Force (DTF) conducted a trash pull at the residence of 12103 US Hwy 17 Woodbine, GA 31569. The residence has been under investigation by DTF for the sales and distribution of narcotics primarily but not limited to cocaine. Varshan Brown is the primary target of narcotics dealing that is residing at the residence. Brown has been seen at the residence by investigators and his vehicle has been observed being parked in front of the residence for multiple days at a time. Information obtained of the sales and distribution of narcotics has been gained through interviews of a confidential source.

During the trash pull of the residence on 04/28/2021 a county trash can was observed in front of the residence and in the right of way next to Hwy 17 on the day the trash was to be collected by waste management personnel. Investigator Casey retrieved two plastic garbage bags from the trash can. The contents in the two trash bags were then sorted through by investigators at a prearranged meeting location.

Inside the trash the following was located. One orange in color clear plastic pill bottle labeled Varshan L Brown Trazodone 50MG Tab, 9 red in color clear plastic bags containing white powdery substance which yielded a positive field test result for cocaine, 3 cut straws containing a white powdery residue, and a multi colored plastic bag labeled Chuckles Gummy Worms 400 mg THC: 10 individual infused 40 mg pieces. All evidence collected and tested was photographed and recorded on evidence property receipt C-12749 and

I swear or affirm that all of the information contained in this affidavit and all other testimony given by me under oath is true to the best of my knowledge and belief,

SWORN TO, BEFORE ME AT (time): 12:30      AM/PM          4/29/21

_____          _____
        AFFIANT                        MAGISTRATE JUDGE

Search Warrant No: CR-6-21-02U

Page 2 of 2 Pages

## <u>AFFIDAVIT AND APPLICATION FOR A SEARCH WARRANT</u>

(Affidavit continued)

turned into evidence in Woodbine, GA.
Brown's criminal history was obtained by investigators which showed Brown having been charged with the following aggravated assault and convicted on 10/28/1994, battery convicted on 06/16/1995, possession of a firearm by convicted felon convicted on 06/09/1999, trafficking in cocaine in 2001, battery/ simple battery family violence, trafficking in cocaine, purchase possession distribution or sale of marijuana, willful obstruction of law enforcement convicted on 05/24/2006, probation violation (sale cocaine possession of marijuana), indicted on charges of trafficking in cocaine illegal drugs marijuana or methamphetamine, possession cocaine, possession of cocaine with intent to distribute, possession or transport of firearm by a convicted felon on 09/22/2010, indicted on charges of aggravated assault against law enforcement officer, possession of cocaine on 03/10/2016. The charges listed are not all of the charges that Brown has been accused of between the dates of 01/02/1991 to present date 04/28/2021.
During the course of the investigation investigator obtained knowledge that Brown is known to have firearms inside the residence. Due to the prior charges indicated on Brown's criminal history and information received about firearms being seen in the residence this affiant is requesting a "No Knock" provision be included with this warrant for the safety of law enforcement.

I swear or affirm that all of the information contained in this affidavit and all other testimony given by me under oath is true to the best of my knowledge and belief.
SWORN TO, BEFORE ME AT (time): 12:30   AM/PM   4/29/21

_____          _____
AFFIANT                          MAGISTRATE JUDGE

Search Warrant No: *CR-W-21-026*

Page 1 of *4* Pages

# SEARCH WARRANT
## IN THE MAGISTRATE COURT OF CAMDEN COUNTY
## STATE OF GEORGIA

TO: ALL PEACE OFFICERS OF THE STATE GEORGIA
AFFIDAVIT HAVING MADE BEFORE ME BY  Michael Blaquiere                    AN OFFICER
CHARGED WITH THE DUTY OF ENFORCING THE CRIMINAL LAWS, THAT HE HAS REASON TO
BELIEVE THAT IN CAMDEN COUNTY, GEORGIA ON THE FOLLOWING DESCRIBED PERSON,
PREMISES, OR PROPERTY:

> 12103 US Hwy 17 Woodbine, GA 31569 being described as a residential single story home and to include all out structures and vehicles on the property. The residence is a blue in color. There is a front porch to the residence with four half brick columns. There are  windows on either side of the front door of the residence. The front door is gray / dark in color with a storm door in front of it. The roof is described as a rusty tin roof. On the north side of the residence there is a wooden shed.

THERE IS NOW LOCATED CERTAIN INSTRUMENTS, ARTICLES, PERSON(S), OR THINGS, NAMELY:

> controlled substances to include but not limited to cocaine, THC. Items used in the distribution and sales of narcotics. As well as electronic devices to include but not limited to cell phones used to facilitate transactions in controlled substances.

WHICH IS

> A violation of GA O.C.G.A 16-13-30 purchase, possession, manufacture, distribution, or sale of controlled substances

_____
AFFIANT

_____
MAGISTRATE JUDGE

Search Warrant No: CR-6-21-026

Page 2 of 4 Pages

# SEARCH WARRANT
## IN THE MAGISTRATE COURT OF CAMDEN COUNTY
## STATE OF GEORGIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BASED UPON THE AFFIDAVIT GIVEN UNDER OATH OR AFFIRMATION AND ALL OTHER
EVIDENCE GIVEN TO ME UNDER OATH OR AFFIRMATION.  I AM SATISFIED THAT THERE IS
PROBABLE CAUSE TO BELIEVE THAT A CRIME IS BEING OR HAS BEEN COMMITTED AND
THAT THE PROPERTY DESCRIBED ABOVE IS PRESENTLY LOCATED ON THE PERSON,
PREMISES, OR PROPERTY DESCRIBED ABOVE.

YOU ARE HEREBY COMMANDED TO ENTER, SEARCH AND SEIZE WITHIN (10) DAYS OF THIS
DATE, THE PERSON, PREMISES, OR PROPERTY DESCRIBED IN THIS WARRANT.   A COPY OF
THIS WARRANT IS TO BE LEFT WITH THE PERSON SEARCHED OR,  IF NO PERSON IS
AVAILABLE,  ON THE PREMISES OR VEHICLE SEARCHED, AND A WRITTEN RETURN,
INCLUDING AN INVENTORY OF ANY THINGS SEIZED, SHALL BE MADE BEFORE ME OR A
COURT OF COMPETENT JURISDICTION WITHOUT UNNECESSARY DELAY AFTER THE
EXECUTION OF THIS SEARCH WARRANT.

So Ordered (Date): 4/29/21          Time: 12:30   AM/PM

MAGISTRATE COURT JUDGE

Search Warrant No: CR-6-21-024

Page 3 of 4 pages

## <u>NO-KNOCK PROVISION</u>

### (NO-KNOCK PROVISION NOT VALID UNLESS SIGNED)

It appearing from the aforementioned affidavit that there are reasonable grounds to believe that the giving of verbal notice would greatly increase the officer's peril and/or lead to immediate destruction of the instruments, articles, or things to be seized.

It is therefore ordered that entry be made without knocking and giving of verbal notice of the officer's authority and purpose.

So Ordered (date) _____   Time: _____ AM/PM

_____
JUDGE, MAGISTRATE COURT CAMDEN COUNTY, GEORGIA

Search Warrant No: *CR-6-21-026*

Page 4 of 6 Pages

## SEARCH WARRANT RETURN

**NOT EXECUTED**
( ) This search warrant was not executed and is returned to the Judicial Officer who issued it.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**EXECUTED**
( ) I executed this search warrant on the _____ Day of _____
_____, at _____AM/PM and searched the person, premises, or property described in the warrant. A copy of this warrant:

( ) was left with

_____.

( ) was left in the following conspicuous place,
because no one was available to be given the warrant.

Attached hereto is an inventory consisting of          pages, of the instruments, articles, or things which were seized pursuant to this search warrant.  I swear (affirm) that this inventory is a true and detailed account of all instruments, articles, or things seized pursuant to this search warrant.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Comment/Other

_____
                    Affiant

Sworn and subscribed before me,
this _____ day of _____, _____

_____
JUDGE. MAGISTRATE COURT OF CAMDEN COUNTY. GEORGIA

Search Warrant No: *CR-6-21-02*

# CRIMINAL WARRANT DOCKET SHEET

## MAGISTRATE COURT OF CAMDEN COUNTY

**STATE OF GEORGIA**          **vs**          **SEARCH**

Warrant issued by:

Date of issue:

**SEARCH**

Defendant's Attorney:

State's Attorney:

Affidavit made by:

Michael Blaquiere

Affiant's address & phone number:

Camden County Sheriff's Office          (912) 510-5100
209 East 4th Street
Woodbine, GA 31569

DISPOSITION:

    Dismissed at commital hearing

    Bound over to Superior Court          **Disposition date:**

    Transferred to:

    Other:

Comments:

| date | description | costs | receipt # | comments |
|------|-------------|-------|-----------|----------|
|      |             |       |           |          |
|      |             |       |           |          |
|      |             |       |           |          |
|      |             |       |           |          |
|      |             |       |           |          |

Exhibits Section 2:

Research Articles:

Amdt4.4.5 – Knock and Announce Rule

Georgia State Senate Office  Senate Research Office – Fourth Amendment Analysis – No-Knock Overview  Federal Law %0 States

Georgia Department of Public Safety Policy Manal

Warrant Service- Risk Assessment

National Tactical Officers Association

Position Statement – No -  Knock Warrant Service

CNN article – No Knock Warrants dated 2/12/22

LII > U.S. Constitution Annotated > Amendment IV. Search and Seizure > Warrant Requirement > **Knock and Announce Rule**

# Amdt4.4.5 Knock and Announce Rule

Fourth Amendment:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Fourth Amendment's "general touchstone of reasonableness . . . governs the method of execution of the warrant." [1] Until recently, however, most such issues have been dealt with by statute and rule. [2] It was a rule at common law that before an officer could break and enter he must give notice of his office, authority, and purpose and must in effect be refused admittance, [3] and until recently this has been a statutory requirement in the federal system [4] and generally in the states. In Ker v. California, [5] the Court considered the rule of announcement as a constitutional requirement, although a majority there found circumstances justifying entry without announcement.

In Wilson v. Arkansas, [6] the Court determined that the common law "knock and announce" rule is an element of the Fourth Amendment reasonableness inquiry. The rule is merely a presumption, however, that yields under various circumstances, including those posing a threat of physical violence to officers, those in which a prisoner has escaped and taken refuge in his dwelling, and those in which officers have reason to believe that destruction of evidence is likely. The test, articulated two years later in Richards v. Wisconsin, [7] is whether police have "a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime." In Richards, the Court held that there is no blanket exception to the rule whenever officers are executing a search warrant in a felony drug investigation; instead, a case-by-case analysis is required to determine whether no-knock entry is justified under the circumstances. [8] Similarly, if officers choose to knock and announce before searching for drugs, circumstances may justify forced entry if there is not a prompt response. [9] Recent

federal laws providing for the issuance of warrants authorizing in certain circumstances "no-knock" entries to execute warrants will no doubt present the Court with opportunities to explore the configurations of the rule of announcement.[10] A statute regulating the expiration of a warrant and issuance of another "should be liberally construed in favor of the individual."[11] Similarly, just as the existence of probable cause must be established by fresh facts, so the execution of the warrant should be done in timely fashion so as to ensure so far as possible the continued existence of probable cause.[12]

**1** Footnotes
United States v. Ramirez, 523 U.S. 65, 71 (1998). ⬆

**2** Rule 41(c), Federal Rules of Criminal Procedure, provides, inter alia, that the warrant shall command its execution in the daytime, unless the magistrate "for reasonable cause shown" directs in the warrant that it be served at some other time. *See* Jones v. United States, 357 U.S. 493, 498–500 (1958); Gooding v. United States, 416 U.S. 430 (1974). A separate statutory rule applies to narcotics cases. 21 U.S.C. § 879(a). ⬆

**3** Semayne's Case, 5 Coke's Rep. 91a, 77 Eng. Rep. 194 (K.B. 1604). ⬆

**4** 18 U.S.C. § 3109. *See* Miller v. United States, 357 U.S. 301 (1958); Wong Sun v. United States, 371 U.S. 471 (1963). ⬆

**5** 374 U.S. 23 (1963). Ker was an arrest warrant case, but no reason appears for differentiating search warrants. Eight Justices agreed that federal standards should govern and that the rule of announcement was of constitutional stature, but they divided 4-to-4 whether entry in this case had been pursuant to a valid exception. Justice Harlan who had dissented from the federal standards issue joined the four finding a justifiable exception to carry the result. ⬆

**6** 514 U.S. 927 (1995). ⬆

**7** 520 U.S. 385, 394 (1997). ⬆

**8** The fact that officers may have to destroy property in order to conduct a no-knock entry has no bearing on the reasonableness of their decision not to knock and announce. United States v. Ramirez, 523 U.S. 65 (1998). ⬆

**9** United States v. Banks, 540 U.S. 31 (2003) (forced entry was permissible after officers executing a warrant to search for drugs knocked, announced "police search warrant," and waited 15-20 seconds with no response). ⬆

**10** In narcotics cases, magistrates are authorized to issue "no-knock" warrants if they find there is probable cause to believe (1) the property sought may, and if notice is given, will be easily and quickly destroyed or (2) giving notice will endanger the life or safety of the executing officer or another person. 21 U.S.C. § 879(b). *See also* D.C. Code, § 23-591. ⬆

**11** Sgro v. United States, 287 U.S. 206 (1932). ⬆

**12** Sgro v. United States, 287 U.S. 206 (1932). ⬆

💼 U.S. Constitution Annotated Toolbox

- Explanation of the Constitution - from the Congressional Research Service

— — — — —

Accessibility
About LII
Contact us
Advertise here
Help
Terms of use
Privacy



# GEORGIA STATE SENATE
## SENATE RESEARCH OFFICE

ELIZABETH HOLCOMB
*DIRECTOR*

*204 Coverdell Legislative Office Building* | *404.656.0015*
*18 Capitol Square SW*
*Atlanta, GA 30334*

---

**No-knock Warrants – Fourth Amendment Analysis for No-Knock Entry, Overview of Federal Law, and 50 State Survey**

*As of October 2020*
Prepared by: Beth Vaughan, Senior Policy Analyst (beth.vaughan@senate.ga.gov)

---

## FOURTH AMENDMENT STANDARD FOR NO-KNOCK ENTRY

In *Wilson v. Arkansas*, 514 U.S. 927 (1995), the U.S. Supreme Court acknowledged that the Fourth Amendment incorporates the common law requirement that police officers entering a residence must knock on the door and their identity and purpose before attempting forcible entry to execute a search warrant. However, the Supreme Court also recognized that not every entry must be preceded by an announcement and that the Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.[1] The *Wilson* decision left it to the lower courts to determine the circumstances under which an unannounced entry is reasonable under the Fourth Amendment and "simply [held] that although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry."[2] The Supreme Court did, however, imply that the knock-and-announce requirement could "yield under circumstances presenting a threat of physical violence" or when police officers have reason to believe that evidence would likely be destroyed if advance notice were given.[3]

In *Richards v. Wisconsin*, 520 U.S. 385 (1997), the Supreme Court went on to hold that, in order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. The Court noted that, "[t]his standard – as opposed to a probable-cause requirement – strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries."[4]

In *United States v. Banks*, 540 U.S. 31, 36 (2003), the Supreme Court stated that "when a warrant applicant gives reasonable grounds to expect futility or to suspect that one or another such exigency already exists or will arise instantly upon knocking, a magistrate judge is acting within the Constitution to authorize a 'no-knock' entry. And even when executing a warrant silent about that, if circumstances support a reasonable suspicion of exigency when the officers arrive at the door, they may go straight in." In that case, the Court found that the interval of 15 to 20 seconds from the officers' knock and announcement of search warrant until the forced entry was reasonable, given the exigency of the possible destruction of evidence.

---

[1] *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995).
[2] *Id.* at 936.
[3] *Id.*
[4] *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

*As of October 2020*

In *Hudson v. Michigan*, 547 U.S. 586 (2006), the U.S. Supreme Court held that the suppression of evidence is inappropriate when the entry is made pursuant to a search warrant but without a proper knock-and-announce, in violation of the Fourth Amendment. In the *Hudson* case, the Detroit police, while executing a search warrant for narcotics and weapons, entered a home in violation of the Fourth Amendment's knock-and-announce rule, and Michigan conceded that the entry was a knock-and-announce violation. In the majority opinion authored by Justice Scalia, the Supreme Court noted that the interests protected by the knock-and-announce requirement include: (1) the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident; (2) the protection of property (i.e., avoiding damage from breaking into a house); and (3) the elements of privacy and dignity that can be destroyed by a sudden entrance. However, the Court also found that the knock-and-announce rule never protected a person's interest in preventing the government from seeing or taking evidence described in a warrant, rendering the exclusionary rule inapplicable in these circumstances.[5]

## FEDERAL LAW REGARDING NO-KNOCK WARRANTS

18 U.S.C. § 3109 provides that an officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, <u>after</u> notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Although a federal statute previously authorized no-knock warrants for certain drug searches in the Comprehensive Drug Abuse Prevention and Control Act of 1970, <u>Congress repealed that provision</u> in 1974. As described in a 1993 article in the Columbia Law Review:

> The "no-knock" experience lasted four years and demonstrated the inevitability of many of the dangers foreseen in 1970. During the four-year period when "no-knock" warrants were issued, horror stories were legion. Over one hundred newspaper articles, reproduced in the Congressional Record, described a repeated scenario: terrified citizens, thinking themselves targets of burglary or more frightening acts, discovered that they were instead being searched by law enforcement officers who had entered their homes without notice.[6]

As the Congressional Research Service noted in a June 23, 2020 analysis on "<u>'No-Knock' Warrants and Other Law Enforcement Identification Considerations</u>," the legal status of federal no-knock search warrants "is unsettled, although federal officers do sometimes employ no-knock warrants or act pursuant to no-knock warrants issued by state courts when serving on joint state-federal task forces."

Recently, members of Congress have made efforts to eliminate federal no-knock search warrants. For example, one section of the <u>George Floyd Justice in Policing Act of 2020 (H.R. 7120)</u> would establish that search warrants issued in federal drug cases must "require that a law enforcement officer execute the search warrant only after providing notice of his or her authority and purpose." The bill would also require states and localities that receive certain federal funds to "have in effect a law that prohibits the issuance of a no-knock warrant in a drug case." Rep. Karen Bass (D-CA-37), the sponsor of H.R. 7120, is the Chair of the Congressional Black Caucus.

Sen. Rand Paul (R-KY) introduced the <u>Justice for Breonna Taylor Act (S. 3955)</u>, which would provide that federal law enforcement officers may not execute a warrant without providing notice of authority and purpose. Sen. Paul's bill would also prohibit state and local law enforcement agencies receiving

---

[5] *Hudson v. Michigan*, 547 U.S. 586, 593-94 (2006).
[6] Charles Patrick Garcia, *The Knock and Announce Rule: A New Approach to the Destruction-of-Evidence Exception*, 93 COLUM. L. REV. 685, 705 (1993).

*As of October 2020*

federal funds from executing warrants that do not require the serving officer to provide notice of authority and purpose prior to forcible entry.

**CURRENT LAW IN GEORGIA REGARDING NO-KNOCK WARRANTS**

O.C.G.A. § 17-5-27 states that:

> All necessary and reasonable force may be used to effect an entry into any building or property or part thereof to execute a search warrant if, <u>after verbal notice or an attempt in good faith to give verbal notice</u> by the officer directed to execute the same of his authority and purpose:
>
> > (1) He is refused admittance;
> > (2) The person or persons within the building or property or part thereof refuse to acknowledge and answer the verbal notice or the presence of the person or persons therein is unknown to the officer; or
> > (3) The building or property or part thereof is not then occupied by any person.

However, as the Court of Appeals of Georgia has noted, "where the State demonstrates a reasonable suspicion that knocking and announcing the officers' presence would be dangerous or futile under the particular circumstances, or that it would hinder the effective investigation of the crime by, for example, allowing the destruction of evidence, a no-knock entry may be authorized."[7] Furthermore, "...the standard for establishing the reasonable suspicion necessary to justify a no-knock entry, as opposed to the standard for establishing probable cause, is not high."[8]

Nevertheless, generalized statements or beliefs will not be sufficient to justify a no-knock provision in a search warrant. For example, in *State v. Lopez-Chavez*, the Georgia Court of Appeals held that the affidavit submitted in support of the request for a no-knock warrant "merely contained a generalized statement that unspecified evidence might be destroyed if the police announced their presence before entering, and it does not appear that the officer who presented the affidavit pointed to any specific items or data that might be destroyed if the no-knock intrusion was not allowed." Therefore, the magistrate "was not provided with underlying details that would have allowed him to evaluate whether these conclusions were based on specific facts or whether they were merely boilerplate based on speculation and presumptions." Furthermore, the only recitation in the affidavit concerning weapons on the premises was based on "an obviously stale, unverified tip that officers received seven years earlier," and there was no indication that weapons had been observed on the premises since that time. Because the no-knock warrant was illegally executed, the Court of Appeals affirmed the motion to suppress the evidence that was seized.[9]

**RECENT LEGISLATIVE EFFORTS IN THE GEORGIA SENATE**

1.   **2015 Georgia Senate Bill 159 (Did Not Pass)**

Senator Jesse Stone was the primary sponsor of <u>2015 Senate Bill 159</u>, which passed by Committee Substitute from the Senate Judiciary Non-Civil Committee but did not advance to the Senate floor.[10]

---

[7] *State v. Lopez-Chavez*, 768 S.E.2d 816, 819 (Ga. Ct. App. 2015) (citing *State v. Cash*, 728 S.E.2d 918 (Ga. Ct. App. 2012)).

[8] *Lopez-Chavez*, 768 S.E.2d at 819 (citing *Braun v. State*, 747 S.E.2d 872 (Ga. Ct. App. 2013) (citation and punctuation omitted)).

[9] *Lopez-Chavez*, 768 S.E.2d at 819.

[10] The 2015-16 session had two other bills on the topic of no-knock warrants, including <u>Senate Bill 45</u>, sponsored by former-Senator Vincent Fort (D), and <u>House Bill 56</u>, sponsored by Representative Kevin Tanner (R). However, neither of these bills made it out of Committee.

*As of October 2020*

The Committee Substitute for 2015 SB 159 would have, among other things, specifically provided for the use of no-knock search warrants but only when:

> (A) The law enforcement agency that employs the officer seeking such warrant has adopted written policies for using no-knock that comply with certain requirements discussed below; and
>
> (B) The affidavit or testimony supporting the no-knock warrant establishes <u>by probable cause</u> that if an officer were to knock and announce identity and purpose before entry, such act of knocking and announcing would be dangerous to human life or would inhibit the effective investigation of an alleged crime by allowing the destruction of evidence.

The Committee Substitute for 2015 SB 159 also would have required that any law enforcement agency that may seek a no-knock must adopt guidelines and procedures that include, but would not be limited to:

> (A) Designating the rank or status of an employee who may be qualified to serve as a supervising officer;
>
> (B) Requiring a supervising officer to review and approve an application for a no-knock;
>
> (C) Requiring a supervising officer to be present during the execution of a search warrant which contains a no-knock;
>
> (D) Having an operational plan for the execution of a search warrant which contains a no-knock; and
>
> (E) Having a training program relevant to applying for a no-knock and executing a search warrant which contains a no-knock.

## 2.     2020 Senate Bill 513 (Did Not Pass)

Following the recess for COVID-19 this past session, Senator Harold Jones filed <u>2020 Senate Bill 513</u>, also known as the "Georgia Justice Act," which would have, among other things, provided in statute that no search warrants will be issued that contain a no-knock provision unless the affidavit or testimony supporting the warrant establishes by probable cause that if an officer were to knock and announce presence, authority, and purpose before entry, such act of knocking and announcing would likely pose a significant and imminent danger to human life or imminent danger of evidence being destroyed.  The bill was filed on June 15, 2020 and was referred to the Senate Judiciary Committee.

### <u>Brief Overview of Laws in Other States regarding No-knock Warrants and Forcible Entry</u>

### 1.     Alabama – knock-and announce is codified, but forcible entry is allowed under exigent circumstances pursuant to case law

Ala. Code § 15-5-9 provides that, "[t]o execute a search warrant, an officer may break open any door or window of a house, any part of a house or anything therein <u>if after notice of his authority and purpose he is refused admittance</u>."

The <u>Handbook for Alabama Sheriffs (7th ed.)</u> discusses the U.S. Supreme Court's decision in *Hudson v. Michigan*, 547 U.S. 586, 589-90 (2006), which per the Handbook, "reversed existing case law that required law enforcement officers to 'knock and announce' before entering a building during the execution of a search warrant." The Handbook states that Alabama has a statute "that requires law enforcement to 'knock and announce;' thus law enforcement officers in this state continue to be bound by Ala. Code §15-5-9, and the *Hudson* decision does not affect Alabama sheriffs."

*As of October 2020*

However, non-compliance with the knock-and-announce requirement may be excused in exigent circumstances, which depends on whether an "emergency situation" exists. An emergency situation exists "when the officers may in good faith believe that they or someone within are in peril of bodily harm … or that the person to be arrested is fleeing or attempting to destroy evidence."[11]

    **2.**    **Alaska – knock-and-announce is codified, but forcible entry is allowed under exigent circumstances pursuant to case law**

Pursuant to Alaska Stat. Ann. § 12.35.040 regarding the execution or service of a search warrant, the officer has the same power and authority in all respects to break open any door or window, to use the necessary and proper means to overcome forcible resistance made to the officer, or to call any other person to the officer's aid as the officer has in the execution or service of a warrant of arrest. Pursuant to Alaska Stat. Ann. § 12.25.100, a peace officer may break into a building or vessel in which the person to be arrested is or is believed to be, if the officer is refused admittance after the officer has announced the authority and purpose of the entry.

However, strict compliance with the knock and announce rule is not required when a balancing test indicates that the exigencies outweigh the hindrance to the dual purposes behind the rule of respecting individuals' privacy, and minimizing the destruction of property and the possibility of forcible resistance.[12]

    **3.**    **Arizona – no-knock warrants expressly authorized by statute, following earlier state court of appeals decision that statutory authority is needed to issue such a warrant**

In 1974, the Arizona Court of Appeals held that, under Arizona law, there was no authority for the issuance of a no-knock search warrant, finding that "[w]here the legislature has enacted a statute dealing with execution of a search warrant which is clear and unambiguous on its face, we as a court may not weigh the reasons for and against such a statute-that is the province of the legislature."[13] The Arizona Court of Appeals acknowledged that other states with similar statutes to Arizona's statutory requirement of announcement of purpose in execution of a search warrant had made judicial exceptions to allow for the issuance of no-knock warrants. However, "unlike California, this Court has not by a series of decisions engrafted a judicial exception to the statute."[14] The court declined to "engage in judicial legislation" and stated that, "[i]f a remedy is needed, it is for the legislature to form one."[15]

In 2000, Arizona's statute on the issuance of search warrants was revised to add a subsection providing that, "[o]n a reasonable showing that an announced entry to execute the warrant would endanger the safety of any person or would result in the destruction of any of the items described in the warrant, the magistrate shall authorize an unannounced entry."[16]

    **4.**    **Arkansas – no-knock warrants permitted by case law**

Rule 13.3(b) of the Arkansas Rules of Criminal Procedure incorporates the knock-and-announce requirement into the rules governing the execution of a search warrant:

---

[11] *Moore v. State*, 650 So. 2d 958, 962–63 (Ala. Crim. App. 1994) (quotation and citation omitted).

[12] *Trosper v. State*, 721 P.2d 134, 135 (Alaska Ct. App. 1986) (citing *Sandland v. State*, 636 P.2d 1196, 1197 (Alaska Ct. App. 1981)).

[13] *State v. Eminowicz*, 520 P.2d 330, 332 (Ariz. Ct. App. 1974).

[14] *Id.* (quoting *State v. Mendoza*, 454 P.2d 140, 143 (Ariz. 1969)).

[15] *Eminowicz*, 520 P.2d at 332.

[16] Ariz. Rev. Stat. Ann. § 13-3915(B), added by 2000 House Bill 2394.

*As of October 2020*

Prior to entering a dwelling to execute a search warrant, the executing officer shall make known the officer's presence and authority for entering the dwelling and shall wait a period of time that is reasonable under the circumstances before forcing entry into the dwelling. The officer may force entry into a dwelling without prior announcement if the officer reasonably suspects that making known the officer's presence would, under the circumstances, be dangerous or futile or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence. . . .

Arkansas courts permit the issuance of no-knock warrants under case law, but notably, the Arkansas Rules of Criminal Procedure has a provision that requires a search warrant to be executed between 6:00 AM and 8:00 PM, unless the judicial officer issuing the search warrant finds reasonable cause to believe that a nighttime warrant should be issued because: (1) the place to be searched is difficult of speedy access; (2) the objects to be seized are in danger of imminent removal; or (3) the warrant can only be safely or successfully executed at nighttime or under circumstances the occurrence of which is difficult to predict with accuracy.[17]

In *Holt v. State*, 151 S.W.3d 1, 6 (Ark. Ct. App. 2004), the Arkansas Court of Appeals found that the issuance of a nighttime, no-knock search warrant was justified when the officer testified in the days just prior to the application for the warrant that a confidential informant obtained methamphetamine from the residence and saw drug paraphernalia inside the residence, that someone inside the residence could see law enforcement outside without opening the door, and that the suspects would likely destroy the evidence before law enforcement could enter the premises.

In 2019, the Little Rock police department came under criticism for the high percentage of no-knock warrants that they requested and executed.

### 5.    California – no-knock warrants permitted by case law

Cal. Penal Code § 1531 provides that, in the execution of a search warrant, an officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.  Moreover, the California Supreme Court held in 1973 that advance judicial approval may not excuse noncompliance with this statutory announcement requirements to the effect that an officer generally may break open door or window in the execution of a search warrant.[18]

However, The New York Times reported in 2017 that no-knock warrants are routinely granted in California.  I located California Court of Appeals cases referencing the use of no-knock warrants, including one from 2004 which cited the U.S. Supreme Court's decision in *Banks* and in *Richards* and went on to note that "exigency may ripen along a continuum of law enforcement activity. It might exist at the time the warrant is issued, resulting in a no-knock warrant."[19]

In June 2020, the Long Beach Police Department issued a special order to require officers to seek approval from a supervisor of the rank of Deputy Chief before seeking judicial approval to serve a no-knock warrant.

---

[17] Ark. R. Crim. P. 13.2(c).
[18] *Parsley v. Superior Court*, 513 P.2d 611 (Cal. 1973).
[19] *People v. Murphy*, 13 Cal. Rptr. 3d 269, 289 (Cal. Ct. App. 2004), *review granted and opinion superseded*, 94 P.3d 476 (Cal. 2004), and *rev'd*, 123 P.3d 155 (Cal. 2005).

*As of October 2020*

### 6.   Colorado – no-knock warrants expressly authorized by statute

Colo. Rev. Stat. Ann. § 16-3-303 (4) provides, in addition to meeting the requirements for obtaining a search warrant, a no-knock search warrant[20] will only be issued if the affidavit for the warrant also specifically requests the issuance of a no-knock search warrant and has been reviewed and approved for legal sufficiency and signed by a district attorney.  This review and approval may take place as allowed by statute or court rule or by means of facsimile transmission, telephonic transmission, or other electronic transfer.

If the grounds for the issuance of a no-knock search warrant are established by a confidential informant, the affidavit for such warrant shall contain a statement by the affiant concerning when such grounds became known or were verified by the affiant. The statement shall not identify the confidential informant.

### 7.   Connecticut – not granted but forcible entry allowed under exigent circumstances

As reflected in an analysis of no-knock warrant usage by The New York Times in 2017, no-knock warrants are not generally available in Connecticut, but forcible entries when executing a search warrant are permitted in exigent circumstances.  As the Appellate Court of Connecticut has noted, "[f]rom early colonial times we, in this jurisdiction, have followed the common-law requirement in the execution of search warrants that, in the absence of some special exigency, before an officer may break and enter he ought to signify the cause of his coming, and to make request to open the doors. . . ."[21]

### 8.   Delaware – case law does not authorize no-knock warrants but allows forcible entry in exigent circumstances

As stated by the Superior Court of Delaware, "there 'is no such creature as a no-knock warrant in Delaware.' While other jurisdictions acknowledge no-knock warrants, Delaware has not adopted such a procedure."[22]

However, the Delaware courts have recognized exceptions to the knock-and-announce rule under exigent circumstances in which there is a "good faith belief" on the part of the police officers that full and complete compliance with the rule would have: (1) increased their peril; (2) frustrated the arrest; (3) or permitted destruction of the evidence.[23]

### 9.   Florida – no-knock warrants not permitted, absent express statute authorizing such warrants; forcible entry may be allowed under exigent circumstances

The Supreme Court of Florida held in *State v. Bamber*, 630 So. 2d 1048 (Fla. 1994) that, in the absence of express statutory authorization, no-knock search warrants are without legal effect in Florida.  The Court noted that "[a]s a matter of policy, no-knock warrants are disfavored because of their staggering potential for violence to both occupants and police."  The Supreme Court of Florida also supported this decision upon the finding that "no-knock warrants are disfavored under the law and limited largely to those states that have enacted statutory provisions authorizing their issuance."[24]

---

[20] Colo. Rev. Stat. Ann. § 16-3-303 (5) defines the term "no-knock search warrant" to mean a search warrant served by entry without prior identification.
[21] *State v. Huff*, 793 A.2d 1190, 1192 (Conn. Ct. App. 2002) (citing *State v. Ruscoe*, 563 A.2d 267 (Conn. 1989), *cert. denied*, 493 U.S. 1084 (1990)).
[22] *State v. Backus*, 2002 WL 31814777, at *4 (Del. Super. Ct. Nov. 18, 2002) (quoting *State v. Cox*, No. 0011003431 (Del. Super. Ct. Dec. 4, 2001)).
[23] *Backus*, 2002 WL 31814777, at *2-3 (citing *Tatman v. State*, 320 A.2d 750 (Del. 1974)).
[24] *Bamber*, 630 So. 2d at 1050.

*As of October 2020*

Fla. Stat. Ann. § 933.09 provides that "[t]he officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of the officer's authority and purpose he or she is refused admittance to said house or access to anything therein."

However, the Supreme Court of Florida also held in *Bamber* that the police may engage in a no-knock search of a residence under exigent circumstances, such as where officers have "reasonable grounds to believe the [contraband] within the house would be immediately destroyed if they announced their presence."

### 10.   Hawaii – knock-and-announce is codified, but unannounced entry is allowed under exigent circumstances pursuant to case law

Regarding the execution of a search warrant, Haw. Rev. Stat. Ann. § 803-37 provides that:

> The officer charged with the warrant, if a house, store, or other building is designated as the place to be searched, may enter it without demanding permission if the officer finds it open. If the doors are shut, the officer shall declare the officer's office and the officer's business and demand entrance. If the doors, gates, or other bars to the entrance are not immediately opened, the officer may break them. When entered, the officer may demand that any other part of the house, or any closet or other closed place in which the officer has reason to believe the property is concealed, may be opened for the officer's inspection, and if refused the officer may break them. If an electronic device or storage media is designated as the item to be searched, the court may authorize the officer to obtain technical assistance from individuals or entities, located within or outside the State, in the examination of the item; provided that the officer shall submit a sworn statement to the judge or magistrate, certifying the reliability and qualifications of the individuals or entities and the reason their assistance is necessary; provided further that no individual or entity shall be compelled to provide technical assistance without their consent.

The Supreme Court of Hawaii held in a recent case that the officers did not afford the defendant reasonable time to respond to a demand for entry into a home pursuant to a warrant and noted that "[t]he 'knock-and-announce' procedure is not a mere formality or police tactic; it is an essential restraint on the power of the State which has deep roots in both the Anglo-American and Hawaiian legal systems."[25]  However, exigent circumstances could justify entering the premises earlier than would otherwise be reasonable; exigent circumstances are those under which "the demands of the occasion reasonably call for an immediate police response."[26] Exigent circumstances exist where there is an imminent threat of harm to a person, where there is a danger of serious property damage, where a suspect is likely to escape, or where evidence is likely to be removed or destroyed.[27]

### 11.   Idaho – no-knock warrants permitted under case law

Idaho Code Ann. § 19-4409 provides that an officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance.  However, as the Idaho Court of Appeals noted in

---

[25] *State v. Naeole*, 470 P.3d 1120, 1124 (Haw. 2020) (citations omitted).
[26] *Id.* (citing *State v. Lloyd*, 606 P.2d 913, 918 (Haw. 1980)).
[27] *Naeole*, 470 P.3d at 1127.

*As of October 2020*

*State v. Ramos*, 130 P.3d 1166, 1169 (Idaho Ct. App. 2005), Idaho courts recognize the no-knock warrant.[28]

### 12.   Illinois – no-knock warrant expressly authorized by statute

725 Ill. Comp. Stat. Ann. 5/108-8 (b) provides that the court issuing a warrant may authorize the officer executing the warrant to make entry without first knocking and announcing his or her office if it finds, based upon a showing of specific facts, the existence of the following exigent circumstances:

>  (1) That the officer reasonably believes that if notice were given a weapon would be used:
>>  (i) against the officer executing the search warrant; or
>>  (ii) against another person.

>  (2) That if notice were given there is an imminent "danger" that evidence will be destroyed.

On July 2, 2020, Illinois Rep. Maurice A. West, II (D) filed House Bill 5807, which would prohibit a peace officer of other public officer or employee from seeking or executing a no-knock search warrant or dynamic entry warrant and would also prohibit a court from issuing such a warrant.  A peace officer or other public officer or employee who violates these prohibitions would be guilty of official misconduct.  However, no action has been taken on House Bill 5807 at this time.

### 13.   Indiana – no-knock warrants authorized by case law

Ind. Code Ann. § 35-33-5-7(d) provides that "a law enforcement officer may break open any outer or inner door or window in order to execute a search warrant, if the officer is not admitted following an announcement of the officer's authority and purpose."  The Indiana Court of Appeals has rejected the assertion that Indiana law should not recognize a no-knock search warrant based on the argument that this statute "requires" the police to knock and announce their presence and authority, finding instead that the statute does not expressly prohibit entry without announcing the law enforcement officer's authority and purpose when there are exigent circumstances or when it would be dangerous to officers or others to make such an announcement. [29]  The Indiana Court of Appeals concluded:

>  In summary, Ind. Code § 35–33–5–7 does not expressly prohibit a no knock warrant. It is well settled in Indiana common law that the knock and announce requirement need not be followed blindly in all circumstances. The Legislature appears to have acquiesced in the interpretation that a notice of purpose requirement need not be met in all circumstances. We conclude that Indiana law supports no knock warrants under certain circumstances.[30]

In order to justify a no knock warrant, there must be a reasonable suspicion that knocking and announcing the officers' presence, under the particular circumstances, would be dangerous, futile, or inhibit the effective investigation of the crime.[31]  For example, in *Mack v. State*, the Indiana Court of Appeals found that a no-knock warrant was justified when the officers demonstrated a possible serious

---

[28] *See also State v. Kester*, 51 P.3d 457, 459 (Idaho Ct. App. 2002) (police officers executed a "no-knock" search warrant); *State v. Pierce*, 47 P.3d 1266, 1267 (Idaho Ct. App. 2002) (officers executed a no-knock search warrant at premises believed to be the location of a methamphetamine lab).
[29] *Beer v. State*, 885 N.E.2d 33, 41-42 (Ind. Ct. App. 2008). In *Wilkins v. State*, 946 N.E.2d 1144 (Ind. 2011), the Indiana Supreme Court agreed that this statute governing the execution of search warrants did not prohibit police officers from performing no-knock entry during execution of search warrant; statute permitted exigent circumstances to justify police to bypass knock-and-announce requirement and declined to revisit the Indiana Court of Appeals' decision in *Beer*.
[30] *Beer*, 885 N.E.2d at 43.
[31] *Id.* at 44.

*As of October 2020*

violent felon was in possession of firearms, the felon had failed to report to his parole officers that he was staying at a different residence, and (shortly before the application for the warrant), the felon appeared nervous in the presence of law enforcement. [32]

In July 2020, the Indianapolis Metropolitan Police Department announced that they would voluntarily end the use of no-knock warrants.

### 14.   Iowa – knock-and-announce is codified, but unannounced entry is allowed under exigent circumstances pursuant to case law

Iowa Code Ann. § 808.6 codifies the knock-and-announce rule:

> 1. The officer may break into any structure or vehicle where reasonably necessary to execute the warrant if, after notice of this authority and purpose the officer's admittance has not been immediately authorized. The officer may use reasonable force to enter a structure or vehicle to execute a search warrant without notice of the officer's authority and purpose in the case of vacated or abandoned structures or vehicles.
> 2. The officer executing a search warrant may break restraints when necessary for the officer's own liberation or to effect the release of a person who has entered a place to aid the officer.

However, exigent circumstances can excuse compliance with the announcement requirements.[33]

### 15.   Kansas – issuance of no-knock warrants supported by case law

The issuance of no-knock warrants in Kansas is supported by case law.  For example, in *State v. Bell*, 410 P.3d 947 (Kan. Ct. App. 2018), a magistrate authorized a no-knock warrant.  The trial court found that the no-knock aspect of the warrant was reasonable because the officer had a valid, reasonable, and good-faith belief that a suspect with a history of battery against law enforcement and prior convictions resided at the property and would be present at the time the search was executed.  On appeal, the defendant continued to challenge whether the no-knock nature of the warrant was unreasonable, and the Kansas Court of Appeals affirmed the denial of the motion to suppress because (following the U.S. Supreme Court's decision in *Hudson*, even if the no-knock aspect of the warrant had not been granted, the evidence would not have been excluded due to a failure to knock and announce prior to executing the search warrant.

Similarly, in *State v. Warren*, 421 P.3d 259 (Kan. Ct. App. 2018), *review denied* (Feb. 28, 2019), a no-knock search warrant was issued by a local magistrate, in light of the suspect's violent nature as demonstrated by his criminal history.

In July 2020, the Topeka City Council banned the use of no-knock warrants within the city limits. However, Topeka's police chief stated that the department already had a policy against no-knock warrants in place before the ban was made local law.

### 16.   Kentucky – issuance of no-knock warrants supported by case law

Ky. Rev. Stat. Ann. § 70.077 states that:

> A sheriff having an order of attachment, or for the delivery of property, may enter any building or enclosure containing the property, to take it; and, if necessary for this

---

[32] *Mack v. State*, 23 N.E.3d 742, 752 (Ind. Ct. App. 2014) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).
[33] *State v. Cohrs*, 484 N.W.2d 223, 225 (Iowa Ct. App. 1992).

*As of October 2020*

purpose, may break the building or enclosure, having first publicly demanded the property.

The issuance of no-knock warrants in Kentucky is supported by case law. For example, in *Holsey v. Commonwealth*, the Kentucky Court of Appeals upheld a decision to deny a motion to suppress where the defendant argued that the police had insufficient evidence to request a no-knock warrant, where the trial court found that a no-knock warrant was justified because: (1) there was sufficient evidence that drugs were present in the residence, and such could easily and quickly be destroyed; (2) the defendant had a previous conviction for robbery with a handgun and there was a reasonable probability that weapons were also present in the residence. Furthermore, "great deference is afforded the [warrant] issuing judge," and the Kentucky Court of Appeals found no grounds to disturb his decision that a no-knock warrant was proper.[34]

In *Prescott v. Commonwealth*, the detective sought and was granted a no-knock warrant on the basis of controlled buys of illegal drugs.[35]

In June 2020, the <u>Louisville Metro Council unanimously approved "Breonna's Law,"</u> which bans no-knock warrants in the city and requires police to wear body cameras when serving warrants and to turn on the cameras five minutes before beginning the operation.

Kentucky Senate President Robert Stivers (R) <u>announced in July</u> that he is working on proposed legislation that would essentially ban standalone, no-knock search warrants. He said the bill he envisions would make exceptions for no-knock search warrants that are used along with an arrest warrant or in a hostage situation. Rep. Attica Scott (D) also announced that she <u>will put forth a bill</u> to ban the use of controversial no-knock search warrants across Kentucky.

17.     **Louisiana – statute explicitly provides for exception to knock-and-announce**

La. Code Crim. Proc. Ann. art. 164 provides that a peace officer who executes a search warrant may use such means and force as is authorized to make an arrest. La. Code Crim. Proc. Ann. art. 224 provides that:

> In order to make an arrest, a peace officer, who has announced his authority and purpose, may break open an outer or inner door or window of any vehicle, watercraft, aircraft, dwelling or other structure, movable or immovable, where the person to be arrested is or is reasonably believed to be, if he is refused or otherwise obstructed from admittance. <u>The peace officer need not announce his authority and purpose when to do so would imperil the arrest</u>.

In March 2020, <u>prosecutors decided not to bring charges</u> against a West Baton Rouge deputy who fatally shot a man while executing a no-knock search warrant in 2019.

18.     **Maine – no-knock warrants provided for in state's Rules of Unified Criminal Procedure**

Rule 41(f)(2)(C) of Maine's Rules of Unified Criminal Procedure provides that a search warrant may direct that it be executed by an officer without providing notice of the officer's purpose and office if the court or justice of the peace so directs by appropriate provision in the warrant. The court or justice of the peace may so direct in the warrant upon a finding of reasonable cause showing that:

---

[34] *Holsey v. Com.*, No. 2010-CA-001620-MR, 2012 WL 1057941, at *3 (Ky. Ct. App. Mar. 30, 2012).
[35] *Prescott v. Com.*, No. 2012-CA-000190-MR, 2014 WL 813109, at *1 (Ky. Ct. App. Feb. 28, 2014).

*As of October 2020*

(1)     The property sought may be quickly or easily altered, destroyed, concealed, removed, or disposed of if prior notice is given;

(2)     The escape of the person sought may be facilitated if prior notice is given;

(3)     The person sought, the person from whom or from whose premises the property is sought, or an occupant thereof, may use deadly or nondeadly force in resistance to the execution of the warrant, and dispensing with prior notice is more likely to ensure the safety of officers, occupants, or others;

(4)     Such facts and circumstances exist as would render reasonable the warrant's execution without notice

### 19.    Maryland – no-knock warrants expressly authorized by statute

In 2004, the highest court in Maryland held that a judge cannot issue a no-knock warrant in the absence of a statutory provision authorizing the issuance of such a warrant:

> We come out on the side of those courts that, in the absence of valid statutory authority, refuse to authorize a judicial officer to make an advance determination of exigency. We hold that a judicial officer in Maryland, under current Maryland law, may not issue a "no-knock" warrant. Rather, the propriety of a "no-knock" entry will be reviewed and determined on the basis of the facts known to the officers at the time of entry, rather than at the time of the application for the warrant.[36]

However, in 2005, the Maryland legislature passed House Bill 577 to add a provision to the statute regarding search warrants to authorize the issuance of no-knock warrants. This bill became effective law on October 1, 2005.

Currently, Md. Code Ann., Crim. Proc. § 1-203(2) (vi) provides that an application for a search warrant may contain a request that the search warrant authorize the executing law enforcement officer to enter the building, apartment, premises, place, or thing to be searched without giving notice of the officer's authority or purpose, on the grounds that there is reasonable suspicion to believe that, without the authorization:

(1) The property subject to seizure may be destroyed, disposed of, or secreted; or

(2) The life or safety of the executing officer or another person may be endangered.

### 20.    Massachusetts – issuance of no-knock warrants supported by case law

No-knock warrants are recognized under Massachusetts case law. For example, in *Commonwealth v. Fernandez*, the defendant contended that the affidavit submitted in support of the warrant application failed to establish a sufficient risk to officer safety to justify the no-knock provision of the warrant, but the Appeals Court of Massachusetts found that the defendant's illegal possession of a deadly weapon or weapons, combined with his criminal history, including acts of violence and the distribution of narcotics, established sufficient substantial risk to officer safety to justify a no-knock entry.[37]

In *Commonwealth v. Silva*, the Appeals Court of Massachusetts also concluded that the magistrate was justified in authorizing a no-knock entry by police when executing the warrant because the affidavit explained in some detail the basis for the detective's concern that the occupants of the apartment would destroy evidence unless the officers executing the warrant were allowed to dispense with the knock-and-announce requirement due; the location of the apartment on the third floor, with

---

[36] *Davis v. State*, 859 A.2d 1112, 1132 (Md. 2004).

[37] *Commonwealth v. Fernandez*, 119 N.E.3d 354 (Mass. App. Ct. 2018), *review denied*, 120 N.E.3d 733 (Mass. 2019).

*As of October 2020*

a locked entrance door to the building at the ground floor, furnished heightened concern for the possible destruction of evidence.[38]

However, the Supreme Judicial Circuit Court of Massachusetts has held that:

> Even a no-knock entry properly authorized in advance of a search may turn out to be unlawful if the situation actually encountered by the police at the time of the warrant's execution is less exigent than what was anticipated. Consequently, the police who execute a search warrant that dispenses with the knock and announce requirement must make a "threshold reappraisal" of the actual circumstances they face before they may disregard the requirement.[39]

### 21.    Michigan – knock-and-announce codified, but exigent circumstances may allow for forcible entry

Regarding search warrants, Mich. Comp. Laws Ann. § 780.656 states that:

> The officer to whom a warrant is directed, or any person assisting him, may break any outer or inner door or window of a house or building, or anything therein, in order to execute the warrant, if, after notice of his authority and purpose, he is refused admittance, or when necessary to liberate himself or any person assisting him in execution of the warrant.

As reflected in an analysis of no-knock warrant usage by The New York Times in 2017, no-knock search warrants are not granted but forcible entries are allowed under exigent circumstances in Michigan.  However, Michigan's Governor (D) put forth a proposal on June 29, 2020 to "further limit the use of no-knock warrants."

### 22.    Minnesota – no-knock warrants permitted under case law

Minnesota courts have authorized the use of no-knock warrants, but the application for such a warrant must include a "particularized" showing of dangerousness, not one that is merely possible or speculative.  In other words, the police must have reasonable suspicion of a threat to officer safety or the likelihood of destruction of evidence, and this reasonable suspicion must be supported by a particularized showing of dangerousness, futility, or likelihood of destruction of evidence.[40]  However, to substantiate the need for a no-knock warrant, an officer must establish more than that drugs are involved.[41]

### 23.    Mississippi – no-knock warrants permitted under case law

A prior version of Miss. Code. Ann. § 41-29-157(c) expressly allowed for a judge to issue a no-knock search warrant in matters regarding certain drug offenses, if certain circumstances were met; that subsection was repealed in 1974.  However, the fact that Miss. Code. Ann. § 41-29-157(c) is no longer in effect does not mean that no-knock warrants can never be issued.[42]  Mississippi courts have held that no-knock warrants can be issued when such a warrant is justified and reasonable.[43]

The Mississippi Court of Appeals recently upheld a $50,000 damages award under the Mississippi Tort Claims Act regarding the execution of a no-knock search warrant at the wrong address because,

---

[38] *Commonwealth v. Silva*, 113 N.E.3d 400, 405 (Mass. App. Ct.), *review denied*, 119 N.E.3d 297 (Mass. 2018).
[39] *Commonwealth v. Jimenez*, 780 N.E.2d 2, 6 (Mass. 2002).
[40] *State v. Botelho*, 638 N.W.2d 770, 778 (Minn. Ct. App. 2002).
[41] *State v. Wasson*, 615 N.W.2d 316, 320 (Minn. 2000).
[42] Miss. Prac. Trial Handbook for Lawyers § 27:19 (3d ed.) (search and seizure with a warrant).
[43] *See White v. State*, 746 So. 2d 953, 956 (Miss. Ct. App. 1999).

*As of October 2020*

even though the monetary damages were only $2,850 in medical bills and a $350 bill for a damaged door, the incident had lasting impacts on the people who were wrongfully detained, including their sense of security and well-being in their personal home. The Bureau of Narcotics also acted in reckless disregard of safety and well-being of innocent persons in executing the no-knock search warrant at the wrong address.[44]

24. **Missouri – issuance of no-knock warrants supported by case law**

For example, in *State v. Bacon*, 156 S.W.3d 372, 376 (Mo. Ct. App. 2005), the circuit court for the county issued a no-knock warrant allowing the police to search the home based on a detective's affidavit that described a drug purchase that occurred earlier that day and noted that the confidential informant had stated that she had seen the occupants of the residence armed with a handgun in the past.

25. **Montana – state Supreme Court held that judges have no role in determining whether warrant should be executed with a no-knock entry and that officers serving the warrant must make that determination based on a reasonable suspicion of exigent circumstances**

As reflected in an analysis of no-knock warrant usage by The New York Times in 2017, Montana routinely granted no-knock warrants. However, in 2019, the Montana Supreme Court held that under the Fourth Amendment and the search and seizure provision of the Montana Constitution, "[j]udges no longer have a role in determining whether officers may execute a warrant via a no-knock entry. Instead, officers serving a warrant may perform a no-knock entry if they have a reasonable suspicion of exigent circumstances."[45] Furthermore, the officers may base their reasonable suspicion on information known both before and after the application for search warrant. In reaching this decision, the Montana Supreme Court noted that "officers must have flexibility when evaluating the circumstances surrounding execution of a search warrant, including physical threats posed by knocking and announcing their presence along with any other exigent circumstance" and that "placing the onus on the judge issuing the warrant to prospectively evaluate exigent circumstances . . . severely limits the officer's ability to protect the safety of other persons and property and to secure evidence."

The Montana Supreme Court also concluded that "Montanans' enhanced privacy protections do not compel judicial preauthorization of no-knock entries because the judge's role is to determine probable cause, not the manner of the warrant's execution."[46]

26. **Nebraska – no-knock warrants expressly authorized by statute**

Neb. Rev. Stat. Ann. § 29-411 provides that, in executing a warrant for the arrest of a person charged with an offense, or a search warrant, or when authorized to make an arrest for a felony without a warrant, the officer may break open any outer or inner door or window of a dwelling house or other building, if, after notice of his office and purpose, he is refused admittance; or without giving notice of his authority and purpose, if the judge or magistrate issuing a search warrant has inserted a direction therein that the officer executing it shall not be required to give such notice, but the political subdivision from which such officer is elected or appointed shall be liable for all damages to the property in gaining admission. The judge or magistrate may so direct only upon proof under oath, to his satisfaction that the property sought may be easily or quickly destroyed or disposed of, or that danger to the life or limb of the officer or another may result, if such notice be given; but this section

---

[44] *Mississippi Bureau of Narcotics v. Hunter*, No. 2019-CA-01246-COA, 2020 WL 5089433, at *7 (Miss. Ct. App. Aug. 18, 2020).
[45] *State v. Neiss*, 443 P.3d 435, 449 (Mont. 2019), *cert. denied*, 140 S. Ct. 411 (U.S. 2019). The *Neiss* decision overruled *State v. Anyan*, 104 P.3d 511 (Mont. 2004), "to the extent that it requires prior judicial approval for no-knock entries"
[46] *Neiss*, 443 P.3d at 448.

*As of October 2020*

is not intended to authorize any officer executing a search warrant to enter any house or building not described in the warrant.

### 27.      Nevada – no-knock warrants issued, no specific state statute

Nev. Rev. Stat. Ann. § 179.055 provides that:

> 1. The officer may break open any outer or inner door or window of a house, or any part of the house, or anything therein, to execute the warrant, if, after notice of authority and purpose, the officer is refused admittance.
> 2. The officer may break open any outer or inner door or window of a house for the purpose of liberating a person who, having entered to aid in the execution of the officer's warrant, is detained therein, or when necessary for the officer's own liberation.
> 3. All reasonable and necessary force may be used to effect an entry into any building or property or part thereof to execute a search warrant. In the execution of the warrant, the person executing it may reasonably detain and search any person in the place at the time in order to protect himself or herself from attack or to prevent destruction, disposal or concealment of any instruments, articles or things particularly described in the warrant.

Case law reflects that no-knock warrants are issued in Nevada.  For example, in an unpublished decision in 2011, the Nevada Supreme Court upheld various convictions stemming from evidence that the police exercising a no-knock warrant related to methamphetamines.[47]

### 28.      New Hampshire – no-knock warrants granted, without a state statute

As reflected in an analysis of no-knock warrant usage by The New York Times in 2017, New Hampshire routinely granted no-knock warrants.  A 2017 editorial in the Concord Monitor noted that New Hampshire issues no standards or guidelines governing no-knock raids and called for the state legislature to debate how and when no-knock warrants should be conducted.  I was also unable to locate a state statute that specifically authorizes the issuance of no-knock warrants.

### 29.      New Jersey – no-knock warrants permitted under case law

The Supreme Court of New Jersey has provided the following tenets for the issuance of a no-knock warrant:

> (1)      To justify a no-knock warrant provision, a police officer must have a reasonable, particularized suspicion that a no-knock entry is required to prevent the destruction of evidence, to protect the officer's safety, or to effectuate the arrest or seizure of evidence.
> (2)      The police officer must articulate the reasons for that suspicion and may base those reasons on the totality of the circumstances with which he or she is faced.
> (3)      Although the officer's assessment of the circumstances may be based on his or her experience and knowledge, the officer must articulate a minimal level of objective justification to support the no-knock entry, meaning it may not be based on a mere hunch.[48]

---

[47] *Abbott v. State*, 373 P.3d 889 (Nev. 2011).
[48] *State v. Johnson*, 775 A.2d 1273, 1279–80 (N.J. 2001).

*As of October 2020*

30.     **New Mexico – no-knock warrants allowed, without a state statute**

I was unable to find a statute in New Mexico that specifically authorizes the issuance of no-knock warrants.  However, I did find cases in New Mexico that reference the use of no-knock warrants.[49]

On September 30, 2020, the Albuquerque Journal noted that the Santa Fe City Council will consider a proposed ordinance that would ban no-knock warrants and require city police officers to wear body cameras when executing all warrants.

31.     **New York – no-knock warrants expressly authorized by statute**

N.Y. Crim. Proc. Law § 690.50 (2) provides that, in executing a search warrant directing a search of premises or a vehicle, a police officer need not give notice to anyone of his authority and purpose, as prescribed in subdivision one, but may promptly enter the same if:

(a) Such premises or vehicle are at the time unoccupied or reasonably believed by the officer to be unoccupied; or
(b) The search warrant expressly authorizes entry without notice.

N.Y. Crim. Proc. Law § 690.35 (4)(b) also provides that the application for the warrant may include a request that the search warrant authorize the executing police officer to enter premises to be searched without giving notice of his authority and purpose, upon the ground that there is reasonable cause to believe that (i) the property sought may be easily and quickly destroyed or disposed of, or (ii) the giving of such notice may endanger the life or safety of the executing officer or another person, or (iii) in the case of an application for a search warrant as defined in paragraph (b) of subdivision two of section 690.05 for the purpose of searching for and arresting a person who is the subject of a warrant for a felony, the person sought is likely to commit another felony, or may endanger the life or safety of the executing officer or another person.

According to a September 28, 2020 article by City & State New York, State Sen. James Sanders Jr. of Queens plans to introduce Breonna's Law, a new bill that would ban the use of no-knock search warrants in all drug cases. While it does not ban no-knock warrants in cases such as murder, drug cases make up the majority of cases for which such warrants are issued.

32.     **North Carolina – statute explicitly provides for exception to knock-and-announce**

N.C. Gen. Stat. Ann. § 15A-251 provides that an officer may break and enter any premises or vehicle when necessary to the execution of the search warrant if:

(1)     The officer has previously announced his identity and purpose as required by G.S. 15A-249 and reasonably believes either that admittance is being denied or unreasonably delayed or that the premises or vehicle is unoccupied; or
(2)     The officer has probable cause to believe that the giving of notice would endanger the life or safety of any person.

---

[49] *See, e.g., State v. Winton*, 229 P.3d 1247, 1248 (N.M. Ct. App. 2010) (case in which a search warrant contained a no-knock provision "for officer safety" based upon the affidavit which stated the subject property contained "drugs, guns, and money" and that the suspect "was not afraid to shoot someone if necessary."

*As of October 2020*

33.     **North Dakota - no-knock warrants expressly authorized by statute**

N.D. Cent. Code Ann. § 29-29-08 provides that an officer directed to serve a search warrant may break open an outer or inner door or window of a house, or any part of the house, or anything therein, to execute the warrant:

(1)     If, after notice of the officer's authority and purpose, the officer is refused admittance; or

(2)     Without notice of the officer's authority and purpose if the warrant was issued by a magistrate who is learned in the law and who has inserted a direction therein that the officer executing it shall not be required to give such notice.

The magistrate may so direct only upon written or recorded oral petition and proof under oath, to the magistrate's satisfaction, that the property sought may be easily and quickly destroyed or disposed of, or that danger to the life or limb of the officer or another may result, if such notice were to be given.

34.     **Ohio – no-knock warrants expressly authorized by statute**

Ohio Rev. Code Ann. § 2933.231(B) provides that a law enforcement officer, prosecutor, or other authorized individual who files an affidavit for the issuance of a search warrant may include in the affidavit a request that the statutory precondition for nonconsensual entry[50] be waived in relation to the search warrant. A request for that waiver shall contain all of the following:

(1) A statement that the affiant has good cause to believe that there is a risk of serious physical harm to the law enforcement officers or other authorized individuals who will execute the warrant if they are required to comply with the statutory precondition for nonconsensual entry;

(2) A statement setting forth the facts upon which the affiant's belief is based, including, but not limited to, the names of all known persons who the affiant believes pose the risk of serious physical harm to the law enforcement officers or other authorized individuals who will execute the warrant at the particular dwelling house or other building;

(3) A statement verifying the address of the dwelling house or other building proposed to be searched as the correct address in relation to the criminal offense or other violation of law underlying the request for the issuance of the search warrant;

(4) A request that, based on those facts, the judge or magistrate waive the statutory precondition for nonconsensual entry.

Pursuant to Ohio Rev. Code Ann. § 2933.231(C), the issuing judge may waive the statutory preconditions for entry if there is probable cause to believe the allegations in the affidavit. Such a waiver does not authorize entry of any building other than the one described in the warrant, pursuant to Ohio Rev. Code Ann. § 2933.231(D)(1).

35.     **Oklahoma – no-knock warrants expressly authorized by statute**

Regarding the execution of a search warrant, Okla. Stat. Ann. tit. 22, § 1228 provides that a peace officer may break open an outer or inner door or window of a house, or any part of the house, or anything therein, to execute the warrant when:

---

[50] Ohio Rev. Code Ann. § 2933.231(3) defines the phrase "statutory precondition for nonconsensual entry" to mean the precondition specified in Ohio Rev. Code Ann. § 2935.12 (regarding forcible entry) that requires a law enforcement officer or other authorized individual executing a search warrant to give notice of his intention to execute the warrant and then be refused admittance to a dwelling house or other building before he legally may break down a door or window to gain entry to execute the warrant.

*As of October 2020*

(1)      The officer has been refused admittance after having first given notice of his authority and purpose; or

(2)      Pursuant to an instruction inserted in the search warrant by the magistrate that no warning or other notice of entry is necessary because there is reasonable cause to believe that exigent circumstances exist. Exigent circumstances include:

     a. such warning or other notice would pose a significant danger to human life,

     b. such warning or other notice would allow the possible destruction of evidence,

     c. such warning or other notice would give rise to the possibility of resistance or escape,

     d. such warning or other notice would otherwise inhibit the effective investigation of the crime, or

     e. such warning or other notice would be futile or a useless gesture.

### 36.      Oregon – statute requires the police to announce themselves

Or. Rev. Stat. Ann. § 133.575 (2) provides that "[t]he executing officer shall, before entering the premises, give appropriate notice of the identity, authority and purpose of the officer to the person to be searched, or to the person in apparent control of the premises to be searched, as the case may be." Furthermore, a magistrate issuing a search warrant no authority to authorize officers to ignore knock-and-announce requirement.[51]

### 37.      Pennsylvania – state Rules of Criminal Procedure provide for forcible entry in exigent circumstances

Rule 207 (A) of Pennsylvania's Rules of Criminal Procedure provides that a law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, <u>unless exigent circumstances require the officer's immediate forcible entry</u>.

### 38.      Rhode Island – no-knock warrants issued, no specific state statute

Rhode Island courts permit the issuance of no-knock warrants.  I could not locate a state statute specifically authorizing such a warrant.  As reflected in 2015 General Order 330.03 from the Providence Police Department, an officer applying for a search warrant can also request that the judge grant permission for no-knock entry, which is permissible for officer safety and to prevent the destruction of evidence.  The officer must articulate the reasons, facts, and circumstances that are necessary to support the request for the no-knock search warrant.

According to a June 15, 2020 article, Rep. Anastasia Williams (D) said she is also working on legislation to ban no-knock warrants.

### 39.      South Carolina – state Supreme Court issued temporary ban on no-knock warrants

In an order dated July 10, 2020, the Supreme Court of South Carolina issued a "moratorium upon the issuance of no-knock warrants by all circuit and summary court judges of this state take effect immediately and remain in effect until instruction is provided to circuit and summary court judges

---

[51] *State v. Arce*, 730 P.2d 1260, 1262 (Or. Ct. App. 1986).

*As of October 2020*

statewide as to the criteria to be used to determine whether a requested no-knock warrant should be issued." This instruction will be provided by the South Carolina Judicial Branch.

The Supreme Court of South Carolina issued the temporary ban on the issuance of no-knock warrants following a recent survey of magistrates which revealed that most do not understand the gravity of no-knock warrants and do not discern the heightened requirements for issuing a no-knock warrant and the discovery that "no-knock search warrants are routinely issued upon request without further inquiry."

### 40.    South Dakota – no-knock warrants expressly authorized by statute

S.D. Codified Laws § 23A-35-9 provides that, if a committing magistrate who has been asked to issue a search warrant is satisfied that there is probable cause to believe that if notice were given prior to its execution, the property sought in the case may be easily and quickly destroyed or disposed of, or that danger to the life or limb of the officer or another may result, he may include in the warrant a direction that the officer executing it is not required to give the notice required by § 23A-35-8.[52] In such case, the officer who executes the warrant may, without notice of his authority and purpose, enter any structure, portion of a structure or vehicle, or anything therein, by whatever means, including breaking therein.

### 41.    Tennessee – knock-and-announce rule in state Rules of Criminal Procedure but exceptions recognized by case law allow for the issuance of a no-knock warrant

Rule 41(e)(2) of the Tennessee Rules of Criminal Procedure provides that if, after notice of his or her authority and purpose, a law enforcement officer is not granted admittance, or in the absence of anyone with authority to grant admittance, the peace officer with a search warrant may break open any door or window of a building or vehicle, or any part thereof, described to be searched in the warrant to the extent that it is reasonably necessary to execute the warrant and does not unnecessarily damage the property.

However, courts in Tennessee have held that "a no-knock warrant is appropriate when 'the officers have a justified belief those inside the dwelling are aware of their presence and are engaged in escape or the destruction of evidence.'"[53] No-knock warrants may also be issued if law enforcement officers show that evidence in the property (drugs, etc.) might be destroyed before they could be seized.[54]

In June 2020, the Memphis Police Department decided to stop requesting no-knock warrants following the fatal shooting of Breonna Taylor in Kentucky. State Senator Raumesh Akbari (D – Memphis) also plans to file legislation when Tennessee's legislature reconvenes in January 2021 to end the issuance of no-knock warrants statewide.

### 42.    Texas – no-knock warrants permitted under case law

Officers are not required to knock and announce their presence before entry if either (1) a magistrate has authorized the "no knock" entry or (2) the circumstances support a reasonable suspicion of

---

[52] S.D. Codified Laws § 23A-35-8 provides that:
> The officer executing a search warrant may break open any building, structure, or container or anything therein to execute the warrant if, after giving notice of his authority and purpose, he is refused admittance. An officer executing a search warrant may break open any building, structure, or container or anything therein for the purpose of liberating a person who, having entered to aid him in the execution of a warrant, is detained therein, or when necessary for his own liberation.

[53] *State v. Perry*, 178 S.W.3d 739, 746 (Tenn. Crim. App. 2005) (quoting *State v. Curtis*, 964 S.W.2d 604, 610 (Tenn. Crim. App. 1997)).

[54] *State v. Campbell*, No. W201701101CCAR3CD, 2020 WL 1987924, at *1 (Tenn. Crim. App. Apr. 24, 2020).

*As of October 2020*

exigency when the officers arrive at the door, although no magistrate has authorized the unannounced entry.[55] In determining the applicability of number (2) above, the totality of the circumstances must be examined.[56] Texas courts allow "no-knock" warrants if the affiant supplies information indicating that announcing the presence of officers would be dangerous or futile, or it would inhibit the effective investigation of a crime.[57]

**43.  Utah – no-knock warrants authorized by statute, but not <u>solely</u> for suspected drug possession**

Utah Code Ann. § 77-23-210(3)(a) provides that the officer executing the search warrant may enter without notice only if:

> (1) There is reasonable suspicion to believe that the notice will endanger the life or safety of the officer or another person;
> (2) There is probable cause to believe that evidence may be easily or quickly destroyed; or
> (3) The magistrate, having found probable cause based upon proof provided under oath that the object of the search may be easily or quickly destroyed, or having found reason to believe that physical harm may result to any person if notice were given, has directed that the officer need not give notice of authority and purpose before entering the premises to be searched under the Rules of Criminal Procedure; or
> (4) The officer physically observes and documents a previously unknown event or circumstance at the time the warrant is being executed which creates probable cause to believe the object of the search is being destroyed, or creates reasonable suspicion to believe that physical harm may result to any person if notice were given.

However, subsection (8) of this statute provides that a warrant authorizing forcible entry without prior announcement may <u>not</u> be issued solely for the alleged possession or use of a controlled substance or drug paraphernalia.

Utah Code Ann. § 77-23-210(7)(a) also requires the officer to take reasonable precautions in execution of any search warrant to minimize the risks of unnecessarily confrontational or invasive methods which may result in harm to any person. Likewise, subsection (7)(b) of this statute also requires the officer to minimize the risk of searching the wrong premises by verifying that the premises being searched is consistent with a particularized description in the search warrant, including such factors as the type of structure, the color, the address, and orientation of the target property in relation to nearby structures as is reasonably necessary.

**44.  Vermont – no-knock warrants issued, without a specific state statute**

Vermont permits the issuance of no-knock warrants but does not have a statute specifically addressing this issue. Following the execution of a no-knock search warrant in 2016 that resulted in the death of a suspect, the <u>Vermont ACLU called for reform</u> on the state's issuance of no-knock warrants.  As reflected in an analysis of no-knock warrant usage <u>by The New York Times in 2017</u>, Vermont judges routinely granted no-knock warrants.

---

[55] *Martinez v. State*, 220 S.W.3d 183, 188 (Tex. Ct. App. 2007) (citing *United States v. Banks*, 540 U.S. 31, 36–37 (2003)).
[56] *Martinez*, 220 S.W.3d at 188 (citing Banks, 540 U.S. at 36; *Flores v. State*, 177 S.W.3d 8, 14 (Tex. Ct. App. 2005).
[57] *Jones v. State*, 364 S.W.3d 854, 865 (Tex. Crim. App. 2012) (citing *Richards v. Wisconsin*, 520 U.S. 385, 392–94 (1997)).

*As of October 2020*

45.    **Virginia – Governor Northam signed bill to prohibit law enforcement officers from seeking or executing a no-knock search warrant**

This fall, Virginia lawmakers were in a special legislative session to address a number of issues, including law enforcement reform.  Governor Ralph Northam (D) took action on several bills that passed in October 2020 regarding police and criminal justice reform in Virginia, including signing Senate Bill 5030, which provides, among other things, that "[n]o law-enforcement officer shall seek, execute, or participate in the execution of a no-knock search warrant."

46.    **Washington – forcible entry to execute a search warrant permitted under exigent circumstances**

I was unable to find a statute in Washington that specifically authorizes the issuance of a no-knock warrant.  In 1982, the Court of Appeals of Washington in *State v. Spargo* opined that "a prior 'no knock' authorization is superfluous and that justification of an unannounced entry must be based on specific facts known to the officers executing the warrant, is a sound one."[58]  The Court of Appeals in *Spargo* cited favorably to the California Supreme Court's decision in Parsley in 1978, but as discussed above, these decisions occurred prior to the U.S. Supreme Court decisions in *Banks* and in *Richards*.

As reflected in an analysis of no-knock warrant usage by The New York Times in 2017, no-knock search warrants are not generally granted in Washington, but forcible entries are allowed under exigent circumstances.  The Washington Court of Appeals recently found that exigent circumstances existed to permit immediate entry into a home to execute a search warrant, where the warrant had been classified as high risk and necessitated SWAT involvement, someone on the porch of the suspect's home saw the police arrive, the police were looking for evidence that could easily and quickly be destroyed, the police had been advised that there was a large dog on the property, and the suspect was known to carry a firearm.[59]

47.    **West Virginia – knock-and-announced is codified**

W. Va. Code Ann. § 62-1A-5 provides that:

> The officer may break into a house, building or structure, or any part thereof, or anything therein, or any vehicle, vessel or other conveyance, to execute a search warrant, or commit such breaking as may be necessary to liberate himself or a person aiding him in the execution of the warrant. If the place to be searched is a dwelling he shall not attempt a forcible entry until he shall have given notice of his authority and purpose and shall have been refused admittance.

However, as reflected in an analysis of no-knock warrant usage by The New York Times in 2017, no-knock search warrants are not generally granted in West Virginia, but forcible entries are allowed under exigent circumstances.

48.    **Wisconsin – no-knock warrants authorized by case law**

Wis. Stat. Ann. § 968.14 provides that "[a]ll necessary force may be used to execute a search warrant or to effect any entry into any building or property or part thereof to execute a search warrant." However, as the Wisconsin Legislative Council recently noted in Informational Memorandum IM-2020-09 regarding no-knock search warrants, this statute does not explicitly authorize or prohibit no-knock search warrants.

---

[58] *State v. Spargo*, 639 P.2d 782, 784 (Wash. App. 1982).
[59] *State v. Sexton*, No. 52401-5-II, 2020 WL 4463525, at *6 (Wash. Ct. App. Aug. 4, 2020).

*As of October 2020*

The Supreme Court of Wisconsin has held that judicial officers are authorized to issue no-knock warrants.[60]

    **49.**    **Wyoming – no-knock warrants specifically authorized by statute for felony offenses involving controlled substances**

Wyo. Stat. Ann. § 35-7-1045(e) provides that:

> Any officer authorized to execute a search warrant <u>relating to offenses involving controlled substances the penalty for which is imprisonment for more than one (1) year</u> may, without notice of his authority and purpose, break open an outer or inner door or window of a building, or any part of the building, or anything therein, only if a district judge or district court commissioner issuing the warrant: (i) is satisfied that there is probable cause to believe that (A) the property sought may and, if such notice is given, will be easily and quickly destroyed or disposed of, or (B) the giving of such notice will immediately endanger the life or safety of the executing officer or another person; and (ii) has included in the warrant a direction that the officer executing it shall not be required to give such notice. Any officer acting under such warrant, shall, as soon as practicable after entering the premises, identify himself and give the reason and authority for his entrance upon the premises.

---

[60] *See, e.g., State v. Henderson*, 629 N.W.2d 613, 622 (Wis. 2001).

*As of October 2020*

# Georgia Department of Public Safety
## Policy Manual Exhibit

| EXHIBIT **WARRANT SERVICE – RISK ASSESSMENT MATRIX** | POLICY NUMBER **25.02-2** |
|---|---|
| REFERENCE **25.02 - ACTIVATION OF THE STATE OF GEORGIA SWAT TEAM** | DATE REVISED **4/21/2015** |

The risk assessment is based on facts and circumstances stated in the affidavit for the arrest or search warrant and the criminal history of the suspect(s). Select one fact for each section. Check only one block in each of the six categories. The block checked should be the highest block that is applicable to the subject or the location.

| POINTS | FACTS OF THE WARRANT | X | SCORE |
|---|---|---|---|
| 0 | Search Warrant is for evidence of property | | |
| 1 | Search Warrant is for drugs | | |
| 2 | Search Warrant is for evidence of crime against person | | |
| | | | |
| 0 | Arrest Warrant is for property crimes | | |
| 2 | Arrest Warrant is for crime against person | | |
| 3 | Arrest Warrant is for drug possession / distribution | | |
| | | | |
| 0 | Subject of Warrant has property crime history only | | |
| 1 | Subject of Warrant has history of crime against persons | | |
| 2 | Subject of Warrant has made statements regarding resisting apprehension / search | | |
| 3 | Subject of Warrant has history of arrest / involvement with drugs / narcotics | | |
| 4 | Subject of Warrant has violent criminal history | | |
| 10 | Subject of Warrant has used firearms during the commission of crimes | | |
| | | | |
| 1 | Service of Warrant requires minimal forced entry | | |
| 3 | Service of Warrant requires use of ram or sledgehammer | | |
| 10 | Location is fortified, requiring specialty breaching, or the subject has "guard" dogs | | |
| | | | |
| 2 | Firearms readily available to suspects at location of warrant | | |
| 4 | Subject of warrant known to carry firearms on person or has been arrested for carrying a concealed weapon | | |
| 6 | Subject of warrant is always armed | | |
| | | | |
| 8 | Subject of warrant has history of assault or resisting arrest offenses against police | | |
| | TOTAL POINTS | | |

**0-14 points   LOW RISK - May be handled by local unit.**
**15-24 points  MEDIUM RISK - Consultation with SWAT should be considered**
**25+ points   HIGH RISK - SWAT Team is required for service**



## NTOA POSITION STATEMENT

# No-Knock Warrant Service

No-knock warrant service has been the subject of many discussions over the past 30 years. These conversations often result in vigorous and passionate debates, and more often than not end with an agreement to disagree. Recent high-profile incidents have refocused the spotlight on this issue, resulting in renewed scrutiny and making no-knock warrants a key issue in the police reform movement.

We at the NTOA have had this same experience and are intimately aware of the complexities of this topic. As experienced law enforcement professionals, we appreciate the challenges facing policing, and our intent is not to add to those difficulties.

We can all agree that there is no easy answer, but there is a *correct* answer: No-knock search warrants, though well-intended, no longer pass the test of tactical science, risk mitigation practices, and liability-conscious decision-making.

The NTOA's position on this is not new, nor is it a surrender to the forces of change. Still, we appreciate that this blunt and definitive statement is likely to cause angst and believe we must explain our reasoning.

The NTOA was created with a mission to help save lives through training, education and tactical excellence, and has been teaching and writing about the no-knock issue for years. This mission has not changed.

No-knock is a legal/judicial exception to the constitutional knock-and-announce requirement. No-knock warrants became popular within policing during the "War on Drugs" of the 1980s. The fact that those dealing in illegal narcotics were often armed and had criminal histories involving violence, coupled with the threat of evidence destruction, created a dangerous challenge for law enforcement. As a result, law enforcement adopted the tactics of surprise, speed, and "violence of action" (intimidation). Law enforcement *hoped* that this combination would quickly overwhelm any resistance and avoid injuries.

The no-knock exception was the critical element to the surprise component of the tactics. It wasn't long before no-knock became synonymous with dynamic entry/movement. Even today, the two terms are inextricably linked. The no-knock became a tactic used for many, if not most,

warrants during the 1980s and early to mid-1990s. More often than not, these missions were successful, sometimes despite ourselves. Unfortunately, we also began to notice a pattern of SWAT officers losing their lives or being seriously injured. Multiple incidents of loss of life forced the NTOA and many agencies to re-examine how we managed risk and to seek alternatives to the no-knock "tactic."

For years, the NTOA has advocated for the priority of safety and life, which drives strategic decision-making and critical thinking for the development of operational plans and orders. Tactical leaders and supervisors create these plans daily while sending personnel into harm's way. These safety priorities are well known to all of us, but as a reminder, they are:

1. Hostages/victims

2. Innocent bystanders

3. Public safety personnel (Police, EMS, Fire)

4. Suspect(s)

5. Drugs/evidence (Controlling objective)

Agencies initially used no-knock search warrants to protect the officer from violence and preserve evidence for the prosecution. Though the intent sounds reasonable and is noble in theory, the practice is flawed at its very core. Evidence is the controlling objective for most search warrants, which is the reason for the warrant's planning and service. Though it is the controlling objective, we must apply sound risk mitigation principles to the problem to better serve the ultimate end state: "suspect(s) in custody and investigation to continue." We understand the priorities of safety and life. We know from a critical thinking perspective how to build proper strategy to provide effective tactical resolution to the problem while maximizing safety.

For example, if the warrant is for the recovery of drugs, the no-knock warrant purpose is to preserve evidence. The safety priorities ensure the safety of the officers, innocent bystanders, and the suspect before preserving evidence. If the no-knock warrant is used based on the propensity of violence, this further violates the safety priorities. Stealth entry, approach, breaching of the door, crossing the threshold, or other covert means of access only risk the following scenarios:

• The misidentification by the occupants of the police as intruders;

• The compression of space and time negatively affects the ability to correctly interpret situations and the environment for both the police and occupants;

• The misidentification of intent on the part of occupants and the police;

• Police create an environment along with the suspect's intentional or unintentional actions requiring correct interpretation from both sides, which often does not occur, leading to an unfortunate tragedy.

The NTOA's template for sound, defensible risk mitigation is straightforward. Consider all aspects of the mission, including the objective(s), intelligence and applicable legal constraints. Next, consider all of the tactical options at your disposal, and then using the safety priorities, select the safest alternative possible to accomplish your mission. Finally, have the flexibility to adjust to the circumstances (exigency) as they present themselves.

The strategy and tactics developed on a search warrant should always speak to the safety priorities based on intelligence known to the officers. Applying tools and tactics that can be justified and supported by risk mitigation and the safety of all concerned within the environment is mandatory.

When considering the priority of safety and life, it is difficult, at best, to justify or defend no-knock warrant service. Lessons learned over many years and our desire not to repeat our past mistakes are the foundation for our position.

The NTOA has one overriding objective: to save lives. Thank you all for your service.

February 25, 2022                                        3

 US                                          AudioLive TV



City of Minneapolis

Bodycam footage captures the moments leading up to Amir Locke's death during a raid conducting by Minnesota police officers.

## There's a growing consensus in law enforcement over no-knock warrants: The risks outweigh the rewards

By Peter Nickeas, CNN

Published 11:03 AM EST, Sat February 12, 2022

(CNN) — The shooting death of Amir Locke by a Minneapolis SWAT officer serving a no-knock warrant during a homicide investigation last week has prompted calls for an end to the practice of serving high-risk warrants on homes without giving occupants a chance to open the door.

There's growing consensus among policing leaders that the risks of the tactic, which came into vogue during the height of the drug wars in the 1990s and into the 2000s, far outweigh any potential rewards.

 **RELATED ARTICLE**
Amir Locke's parents call for the abolition of no-knock warrants

"You have to go back years to understand why we have no knocks," said Thor Eells, executive director of the National

You have to go back years to understand why we have no knocks," said Thor Eells, executive director of the National Tactical Officers Association. "They were developed as a tool, through courts, for the preservation of evidence … primarily crack cocaine. That's no longer the case, and hasn't been for at least ten years. (We)'ve been strongly teaching, advocating, for other alternatives."

Other options taught are designed for officers to avoid the so-called 'fatal funnel' created by SWAT teams moving through a doorway to confront a potentially armed suspect – and most of those options have officers using time, distance, cover, and concealment to take custody of either evidence or a wanted person while lessening the risk of confrontation.

High-profile shootings by police officers over the last few years, the shooting of officers during execution of warrants, and the ubiquity of video footage showing just how risky and dangerous these raids are, have all contributed to police departments moving away from no-knock warrants.

Officers had warrants to search three apartments and arrest Locke's cousin in connection with an early January homicide in St. Paul. When the execution of one of those warrants ended in Locke's death, and police released video showing the speed at which the shooting unfolded, there were renewed calls for an end to no-knock warrant service in a city that announced an overhaul to the practice 14 months ago.

## 'Just quit doing it'



KEREM YUCEL/AFP via Getty Images

A demonstrator holds a photo of Amir Locke during a rally February 5 in Minneapolis.

The officer who shot Locke opened fire seconds after officers entered the apartment before 7 a.m., while saying "police" and "search warrant," as Locke emerged from a couch wrapped in a blanket holding a handgun. Locke later died.

Police were pursuing evidence related to the St. Paul homicide, in which Locke's cousin was a suspect. In the affidavit seeking the warrant, a sergeant detailed why police believed a no-knock warrant would be the best option: It "enables officers to execute the warrant more safely by allowing officers to make entry into the apartment without alerting the suspects inside. This will not only increase officer safety, but it will also decrease the risk for injuries to the suspects and

other residents nearby.



**RELATED ARTICLE**
What Minneapolis' current no-knock warrant policy really says

"A no-knock entry is necessary to prevent the loss, destruction, or removal of the objects of the search, or to protect the safety of the searchers or the public," the sergeant wrote.

Peter Kraska, a researcher at Eastern Kentucky University who's studied warrants and policing, said that no-knock warrants should be as difficult to obtain as they are dangerous to carry out. After Locke was shot, Minneapolis Mayor Jacob Frey announced that Kraska would be advising the city on warrant policy.

"This (practice) has devolved into a mess once, it will again. Just stop. Just quit doing it," Kraska said. "Put legislation in place that brings back the original intent of the Fourth Amendment – you've got to get a warrant, have to knock and announce, have to give proper notice, have to give time to answer the door, and if you need to engage in a risky arrest situation or volatile, dangerous arrest situation, figure out a different way to do it than to bust down a private resident's door and manufacture a really dangerous situation."

## There's not much data on warrants

The shooting of Locke renewed tensions between Minneapolis' city council, which saw its oversight role diminished by voters last election, and the mayor. Voters in that city rejected a ballot measure to overhaul policing, drafted amid national fury over the murder of George Floyd by a Minneapolis police officer. The measure would have given the council oversight of a new Department of Public Safety and eliminated a requirement to employ a minimum number of police officers.

Before an officer shot Locke, Minneapolis garnered significant national media attention when city officials announced changes to its warrant policy during a nationwide reckoning over policing, prompted by Floyd's murder and the fatal shooting of Breonna Taylor during warrant service in Louisville.



**RELATED ARTICLE**
Amir Locke's parents say their son got a gun legally, but they always worried about interactions with police

Some touted it as an accomplishment that Frey "banned" no-knock warrants. But the city did not ban no-knock warrants and, like most police department policies, its policy gives wide leeway to field supervisors to make decisions based on conditions they encounter and allows for no-knock warrants in certain situations. Under the new policy, warrants must be approved by the chief.

**5 things**

You give us five minutes, we'll give you five things you must know for the day.

| Email address | Sign Me Up |

By subscribing you agree to our privacy policy.

Frey acknowledged on Monday, at a city council meeting, that some of his claims about the extent of changes to warrant procedure weren't accurate. Minneapolis police were requesting an average of 139 no-knock warrants each year, at the time city officials announced a change to their policy, according to a statement from Frey.

"What I will say, if you look at comparable cities that size, 140 no knocks would cause pause. I'd be looking at that saying,

'Let's go through these one by one,' " Eells said. "And I hate to say it. At the end of the day, I'm going to bet you ... 140 no-knock warrants shouldn't have been served as no-knock warrants."

Eells said it's better to think of no-knock warrants as a judicial waiver – giving police permission to not knock. Otherwise, warrants require officers knock, announce their presence, and wait a "reasonable" amount of time before forcing their way into a home.



**RELATED ARTICLE**
The no-knock search warrants in the raid that killed Amir Locke have been released. Here's what they show

But no-knock warrants have evolved into a tactic used by police, most commonly during the height of the drug war, and as police broadly saw the "violence of action" – booting down doors, moving quickly, sometimes with distraction devices like flash bangs, and getting more officers into a space quickly – as the most viable technique to gain compliance.

Though media attention often focuses on no-knock warrants after cases where officers are shot or shoot someone, they're notoriously difficult to study, track and change.

Data on warrants is scarce. Judges aren't always required to track or share warrant data across judicial districts, so it's not clear how many warrants are approved or how often evidence from those warrants is excluded because of how the warrants were served. Courts are even more opaque than police departments. Police departments aren't required to keep or share data on warrants either, though they're often public records or made public after charges are filed. Most big-city departments track the performance of the SWAT, drug, and other units often involved in serving warrants, but there's no clearinghouse for data.

Even where there's agreement that change is necessary: Policing is a local effort, police culture can differ department-to-department but is broadly hesitant to change, and there are few national standards or requirements other than guidance set by courts when a tactic or procedure is challenged.

## At least four states have banned no knocks





Courtesy Ben Crump

After Breonna Taylor's death, the practice of forcing entry during warrant service was curtailed in Louisville.

Legislating and overhauling warrant service is difficult because of the role search warrants play in criminal investigations and because of the various ways police serve warrants. Even a standard warrant can appear similar to no-knock warrants if officers only wait a couple seconds before forcing entry.

Kraska said it's almost a "distinction without difference," and that "the police have gotten used to – just like in Louisville but all over the country – showing up with a regular 'knock and announce' warrant, get to the door, and carry it out as if it were defacto no-knock raid."

Even where no knocks are banned by law, police can still force entry during chases or if violence is imminent or in progress, and can still force entry on normal warrants after knocking-and-announcing, so banning no knocks won't totally eliminate forced entry searches.



**RELATED ARTICLE**
Former Louisville police officer sentenced to two years in prison for using excessive force in May 2020 arrest

For these reasons, Kraska said, it's more important to overhaul warrant service in general – including the types of investigations furthered by forced-entry warrants – than to just focus on no-knock warrants.

After Taylor's death, the practice of forcing entry during warrant service was curtailed in Louisville, where police served just four warrants where officers forced entry during a 14-month period studied by the Kentucky Center for Investigative Reporting.

Kevin Davis, chief of the Fairfax County Police Department in Virginia, said it's important to distinguish between forced entry during emergencies and warrants served during criminal investigations. He said that for the "furtherance of a criminal investigation – the recovery of evidence, recovery of property," it's better to avoid no-knock warrants altogether.

"I think there's large scale agreement in policing that has resulted in better ways to execute search warrants," Davis said.

At least four states – Florida, Oregon, Connecticut and Virginia – have banned the no-knock warrants, while other states have enacted laws that stop just short of doing so by only allowing them in certain circumstances. A host of others have enacted other changes, like requiring departments to keep data or officers serving warrants to use body-worn cameras.

"There's a tendency to want to ban certain things," said Chuck Wexler, executive director of the Police Executive Research Forum. "The real question should be, how do we look at these situations and ask what other alternatives could be used to achieve the outcome … how should training change and what alternatives should we be looking at to achieve a successful outcome? Those are questions situations like this raise."

## You're going through a 'fatal funnel'

Police departments, especially in big cities, are moving away from "violence of action" those units sometimes relied on, not just with warrants, but with use of force in general, because it shortens the time officers have to make decisions.



**RELATED ARTICLE**
Controversial Police Encounters Fast Facts

"When you think about it, making entry – announced or unannounced – is very high risk," Eells said. "You're going through a 'fatal funnel' where the bad guy could fire rounds blindly at a doorway and have a chance of hitting us. If we don't have

to go through, we don't want to. Who benefits from making an entry? The answer is the bad guy. So we'd say, that's a tactically unsound decision."

Police used to call the high-speed entry on drug warrants "hostage rescue on narcotics" because the tactics used during raids resembled how teams would enter a building looking for hostages. Kraska said early raid tactics were adopted from US military special forces.

"We've internally tried to exorcise that from an option that agencies are using," Eells said.

Eells' organization teaches a priority system – safety of hostages, victims or bystanders, law enforcement, and the suspect, in that order. In the last five years, they've added "evidence" to the bottom of the list, "meaning it gets the least amount of consideration."

Many use-of-force training regimens teach officers to use time, distance, cover, and concealment to slow down volatile situations and lessen the likelihood of using force. Wexler said no knocks "are almost the antitheses of what we train now."


**RELATED ARTICLE**
Firing of Louisville detective who fatally shot Breonna Taylor is upheld after a board review

Take a situation where the warrant is for evidence such as a handgun. "What's the likelihood of us not making entry and it being disposed of? It's not like the occupant has an incinerator. Where's the gun going?" Eells said. "At the end of the day, if you're going to risk human life, even including the suspect, because you want a piece of evidence ... then it's flawed analysis of risk mitigation."

Internal politics also can play a role in how warrants are served, and by whom. A drug team may want to request a no-knock warrant to preserve the likelihood of getting the target in the room with sufficient evidence to further prosecution. And if the SWAT team says no, absent some command interaction, the narcotics team could serve the warrant on their own.

"You get people involved in spitting contests," Eells said. "So what this boils down to – is law enforcement leadership. Having chiefs and deputy chiefs who are educated, knowledgeable, experienced enough in SWAT tactics, risk mitigation, decision making, selection, who are then providing effective leadership."

## Body cams show how perilous no knocks are

It's long been known to people serving warrants how dangerous that can be, but now policymakers and the public both have access to a near-constant stream of video from body-worn cameras and other sources.

"And I think what body-worn cameras have done is underscored just how perilous these kind of situations can be," Wexler said. "The reality is, this is how policing is changing. Police chiefs will look at that tape, analyze it, and will look at their own policy and say this is so high risk that they will be reluctant to authorize anything that isn't the most narrow, compelling situation. It's so much, so much risk involved. It's just not worth it."

Experts said there are at least three other options departments have in serving high-risk warrants. Officers could follow someone away from their home and attempt custody on the street, which Eells called a "take down away." Another would be treating a warrant as if someone was barricaded in a home – surround it, contact the person inside, and ask them to come out. Or officers could open the door, and, instead of going in, announce their presence and give the person inside a chance to come out.

"All of which maximize safety for everybody involved," Eells said.


**RELATED ARTICLE**
Prosecutors decline to bring charges against deputy in fatal shooting in California



Davis, who served on SWAT teams and is now chief of Fairfax police, said many departments have created internal approval processes that require more surveillance and planning before warrants are served. Better insight before the raid gives police other less-risky options for serving warrants.

"If it takes longer to do pre-raid surveillance to get a plan that meets scrutiny at the highest levels of the organization, that's good. It wasn't that long ago in policing that the execution of a search warrant, operationally, probably didn't make its way past a lieutenant or captain's rank," he said.

Davis, who was commissioner of the Baltimore police department, said elected officials balked at the cost of body-worn cameras before Freddie Gray suffered fatal injuries in the back of a police vehicle. There was less concern over the cost after the crisis, he said. But if police are still going to serve high-risk warrants, the cost of surveillance or other tactics are worth avoiding potential crises, experts said.

"The challenge police chiefs have, across the country, is to articulate the necessity to do these things consistent with community expectations," Davis said. "Does it cost money, of course ... The cost of not is setting your city, your county, your town back a decade after a crisis occurs that people look at and decide something was preventable, and the right steps weren't taken to prevent a crisis."

CNN's Kaanita Iyer contributed to this report.

Recommended for you



**Teen accused of fatal rock throwing took picture of victim's car 'as a...**
U.S.



**Man accused of shooting 3 senior citizens at Alabama church group...**
U.S.



**May 3, 2023 - Belgrade, Serbia school shooting leaves 8 children dead**
World



**Jerry Springer's cause of death revealed**
Entertainment



A bride had just gotten married in South Carolina.



BMW barrels over 120 mph across median, heading

Exhibits Section 3:

Background/Experience/Depositions Given

Charles P. Stephenson



ORION
GROUP dba CRIME SCENE PLUS
www.kcdetective.com

CHARLES P. STEPHENSON
TRIAL CONSULTANT/CRIME SCENE RECONSTRUCTION
BALLISTICS

USE OF FORCE-LETHAL/LESS LETHAL
INTERNAL POLICIES AND PROCEDURES

FORMER SPECIAL AGENT-FEDERAL BUREAU OF INVESTIGATION
*PRESIDENT - THE ORION GROUP, INC.
DBA CRIME SCENE PLUS
*PRESIDENT - ORION SECURITY, INC.
*PARTNER - BACKGROUNDS PLUS, LLC

5750 WEST 95TH STREET, SUITE #205
OVERLAND PARK, KS 66207
913-385-5657
1-800-345-7347

UPDATED MAY 16, 2023

## SUMMARY

Mr. Stephenson is a skilled professional with more than thirty years experience in public Law Enforcement, Contract Security and Private Investigations. His expertise in Crime Scene Reconstruction, Ballistics and Use of Force is diverse and comprehensive. Mr. Stephenson is President and Owner of Orion Security, Inc. which employs unarmed Contract Security Officers and Mobile Patrol Officers in Kansas and Missouri.

Mr. Stephenson is certified as an Expert Witness/Use Of Force/Ballistics, in both Federal and State jurisdictions throughout the U.S. He has given depositions and testified on "Lethal/Less Lethal Use of Force and Ballistics,"involving Public Law Enforcement Officers and Private Security.

Mr. Stephenson is certified as a "Homeland Security Specialist" and Graduate of AELA "Internal Affairs Litigation Specialist-Police."

Mr. Stephenson is an active member of the American Society of Industrial Security, Internal Association of Chiefs of Police and the American College of Forensic Examiners.

## EDUCATION/WORK EXPERIENCE

University of Tulsa - Bachelor's Degree-Police Administration

Continuing Education- Baker University-MBA Pending Dissertation

Special Weapons and Tactics/ Firearms/Self Defense Instructor for Special Agents of FBI

National Academy Instructor/Counselor 119th Session - FBI National Academy/Firearms Defensive Tactics

Graduate of Information Security Associates - Electronic interception of Oral Communications Counter Measures

Graduate Chapman Academy - Tactical Use of Handgun

Graduate  Taser International - Certified Taser Instructor Contract Security Officers

Graduate  AELE "Use Of Force" - "Lethal v Less Lethal -

AELE Institute - Certified "Litigation Specialist-Police"

AELE Institute - Internal Affairs Investigation-Crime Scene Reconstruction

Graduate/Certified Force Science Institute/Anatomy/Physiology/Principles of Bio Mechanics/Psychology of Crisis Encounters/Human Performance/Arrest Related Death/Investigation Consideration

Graduate Forensic Pieces, Inc. - Crime Scene Reconstruction-Shooting Reconstruction and Blood Patterns

Certified Instructor for State of Kansas for Private Detective's applying for Firearms Permit

Certified Instructor for State of Kansas for Civilian Concealed Carry Permit

Certified Instructor for State of Kansas for CEU credits for Private Detectives and Contract Security Officers in:

      *Use of Lethal/Less Lethal Force
      *Firearms
      *Self Defense Tactics
      *Crime Scene Reconstruction-Ballistics
      *Weapons Impact Weapons/Baton, ASP
      *Chemical Control Devices
      *Executive Protection Models
      *Physical Surveillance Models
      *Report Writing/Interview Techniques/Security Surveys/Loss Prevention
      *Pre-Employment Screening
      *CCTV/Loss Prevention
      *GPS Tracking Devices

Graduate of the Federal Aviation Administration Pilot Examiner School, Oklahoma City, OK.  Certified Flight Instructor - Private, Instrument, Commercial, Multi Engine - Airline Transport Pilot Rated

## AWARDS/COMMENDATIONS

Recipient of numerous awards and commendations from the Director of the Federal Bureau Investigation; Attorneys; Law Enforcement Agencies; Private Business and Fraternal Service Organizations.

## WORK HISTORY

U.S. Air Force Combat Veteran.  Honorably discharged in July 1965.  Received the Air Medal, Vietnam Service Medal, Asian Conflict Medal and Good Conduct Medal.

From July 1965-February 1971 Mr. Stephenson was  a commissioned Police Officer and Detective in Tulsa, OK

February 1971 - Mr. Stephenson attended the FBI Academy, Washington, DC. Upon graduation he was Commissioned as Special Agent-Federal Bureau of Investigation.  His assignments were diverse and extensive.

They included investigating White Collar/Organized Crime in New Orleans, LA; Washington, D.C.; Omaha, NE; Des Moines, IA; Anchorage, Alaska and Kansas City, MO

Mr. Stephenson was a certified FBI Police Instructor for Municipal, County, and State Law Enforcement in SWAT, Firearms-Self Defense; Arrest Techniques

Mr. Stephenson was a Supervisor for an FBI Special Operations Group involving Electronic, Aerial and Photographic Surveillance.  He was the Chief Pilot for the Kansas City Division and FBI Bureau Instructor Pilot for Midwestern Region.

His other supervisory duties included; FBI Program and Personnel Evaluator FBI Aviation Program; Supervisor FBI Air Operations - 1980 Olympics, Lake Placid, New York; FBI Supervisory Air Operations-Narcotic Smuggling Interdiction Team, Midwest Region

Other assignments involved being an FBI Undercover operative in White Collar, Organized Crime, Narcotics and Theft from Interstate Shipment Investigations and Undercover operative during the American Indian Movement, armed occupation at Wounded Knee, South Dakota.

He deployed as member of FBI SWAT Response Team during an armed confrontation on Pine Ridge Indian Reservation subsequent to ambush and killing of two FBI Agents.

Mr. Stephenson received numerous commendations inclusive of his involvement in the capture of a Military Deserter during which the Deserter was wounded after exchanging gun fire with Mr. Stephenson.  Mr. Stephenson also received a commendation for capture of FBI top ten Fugitive while serving as Special Agent, Des Moines, IA

From June 1983 to present, Mr. Stephenson has been self employed as President/Owner of Orion Group, Inc. And Orion Security, Inc. Providing armed and unarmed Private Security Officers and Investigative services throughout the Midwest United States.  Mr. Stephenson is a licensed Private Investigator - State of Kansas and certified Firearms Instructor for the State of Kansas.

## EXPERT WITNESS RETENTION

July 2001 - Retained by Saunders, Simpson, Fletcher and Smith; Kansas City MO-Rosalyn G. Darryl Mason v. Andrew Finkelstein, Northland Patrol-Wrongful Death - **DEPOSITION TAKEN - PLAINTIFF (8th Judicial District Court)**

July 2001 - Retained by Sanders, Conkright and Warren, LP; Kansas City, MO-Michale Hardie v. Main Street and Main, Inc. - Premise Liability Assault and Battery - **OPINION RENDERED - PLAINTIFF(8th Judicial District Court)**

February, 2004 - Retained by Sanders, Simpson & Fletcher, LC Kansas City, MO-Ronnie Carroll/Cynthia Carroll v. Troostwood Banquet Hall -Wrongful Death/Premise Liability - **OPINION RENDERED-TESTIMONY GIVEN- PLAINTIFF (8th Judicial District Court)**

May, 2004 - Retained by Shamberg, Johnson & Bergman, Chtd; Kansas City, MO - Theodore Connolly v. River Market - Personal Injury/Property Management Negligence/Security Company Negligence - **OPINION RENDERED-DEPOSITION TAKEN - PLAINTIFF (8th Judicial District Court)**

May, 2004 - Retained by Shamberg, Johnson & Bergman; Kansas City, MO - Plaintiff John Friedman - Wrongful Death/Failure To Provide Security-**OPINION RENDERED-DEPOSITION TAKEN- PLAINTIFF (8th Judicial District Court)**

January 2006 - Nicholas Wood v. Jonathan P. Bazzano v. Westport Merchants Association-Excessive Use of Force by Security Officers - **OPINION RENDERED-TESTIMONY GIVEN - PLAINTIFF(8th Judicial District Court)**

October, 2007 - Albert Kesse v. Okie Dokie, Inc.-Stabbing of Kessse inside Okie Dokie Nightclub, Washington,DC.-Failure to provide adequate security **DEPOSITION TAKEN- TESTIMONY GIVEN -PLAINTIFF (4th Judicial District Court)**

October 2007 - Gorman's, Inc.; Jackson County, MO - Wrongful Detention; Improper Use of Force; Shoplifting - **TESTIMONY GIVEN - PLAINTIFF(8th Judicial District Court)**

October 2007 - Lapierre v. Okie Dokie; Washington, DC-Shooting of Lapierre by Security Officer.  Negligence; Excessive use of Force  - **DEPOSITION GIVEN - PLAINTIFF(4th Judicial District Court)**

January 2009 - Roche v USA -FBI SWAT Shooting of Roche; excessive Use of Force - **OPINION RENDERED - PLAINTIFF (11th Judicial District Court)**

September, 2009 - Belle Wilson and Shereen Vickers v. J. Mohn and Gorman's Inc.-Jackson County, MO - Wrongful Detention; Excessive Use Of Force; **OPINION RENDERED-TESTIMONY GIVEN - PLAINTIFF (8th Judicial District Court)**

April, 2010 - Asten v. City of Boulder - Officer Involved Excessive Use of Force/Taser - **DEPOSITION GIVEN - PLAINTIFF (10th Judicial District Court)**

May, 2010 - Rubin Reyes v. RAK Entertainment DBA El Chaparral Night Club; Cobra Private Security - **Excessive Use of Force -DEPOSITION GIVEN-PLAINTIFF (9th Judicial District Court)**

June 2010 - Kollin Woodbury v. Chesley Brown International, Inc. And Thomas Witenere - Excessive Use of Force - **OPINION RENDERED- PLAINTIFF (8th Judicial District Court)**

April, 2011 - Capps v. **Olson-OFFICER INVOLVED SHOOTING-**Crime Scene Reconstruction, Use Of Lethal Force;  **OPINION RENDERED-DEPOSITION TAKEN - PLAINTIFF-SETTLED IN FAVOR OF PLAINTIFF(8th Judicial District Court)**

August, 2011 - Jesse Dimmich v. City of **Topeka-OFFICER INVOLVED SHOOTING-**Crime Scene Reconstruction, Use of Lethal Force- **DEPOSITION TAKEN-TESTIMONY PROVIDED - PLAINTIFF(10th Judicial District Court)**

August 2011 - Roosevelt-Rennix v. The City of Florence-Excessive Use of Force-Taser-**DEPOSITION TAKEN FOR PLAINTIFF(4th Judicial District Court)**

July 2012 - Casey v. Price Properties-Crime Scene Reconstruction-Failure to provide adequate security- **DEPOSITION TAKEN-PLAINTIFF (8th Judicial District Court)**

March, 2016 - U.S. Government v. O'Shaughnessy-Meir Wildlife Takeover; Portland, OR - **Crime Scene Reconstruction Firearms/Ballistics - Testimony-DEFENDANTS - ALL DEFENDANTS ACQUITTED. (9th Judicial District Court)**

November, 2016 - U.S. Government v. Bundy et al - Use of Force; Crime Scene Reconstruction Firearms/Ballistics. **OPINION RENDERED- PLAINTIFF (9th Judicial District Court)**

July, 2017 - Brown v. Whitehead-Capital Murder-Crime Scene Reconstruction Ballistics, Jackson County, MO Office of Public Defender **DEPOSITION TAKEN-DEFENDANT (8th Judicial District Court)**

July, 2017 - State of Kansas v Keeshawn Milo - Murder Crime Scene Investigation/Reconstruction; Ballistics/Firearms Examination. Office of Public Defender **OPINION RENDERED - DEFENDANT (10th Judicial District Court)**

August, 2017 - Ford v. Signal 88-Excessive Use Of Force by Private Security Officer; Jackson County, MO - **OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

August, 2017 - State of Kansas - Murder - Vinh Nguyen; Office of Public Defender - Crime Scene Reconstruction/Ballistics. **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

August, 2017 - State of Kansas -Murder-Dalton Xavier - Crime Scene Reconstruction/Ballistics; Office of Public Defender - **OPINION RENDERED-DEFENDANT (10th Judicial District Court)**

August, 2017 - State of Kansas-Murder-Luis C. Alvaredo - Crime Scene Investigation/Ballistic Examination; Office Of Public Defender - **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

August, 2017 - Marcus Brown v. Jacob Whitehead - Excessive Use Of Force By Firearm - Crime Scene Reconstruction/Ballistics- **OPINION RENDERED - DEPOSITION- DEFENDANT**

October 2017 - Eagle v. Chattanooga Police Department - **MULTIPLE OFFICER INVOLVED SHOOTING**/Wrongful Death - Crime Scene Reconstruction/Ballistics **OPINION RENDERED -  DEPOSITION TAKEN- PLAINTIFF (6th Judicial District Court)**

October, 2017 - State of Oregon v. Denzel Hawthorne-Murder-Crime Scene Reconstruction; Office Of Public Defender -**OPINION RENDERED- DEFENDANT (9th Judicial District Court)**

October, 2017 - State of Kansas v. Harris-Capital Murder-Crime Scene Reconstruction; Office of Public Defender-**OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

October, 2017 - Capps v. Safariland-LA County Sheriff's Department-Product Liability Holster Design- Opinion Rendered - **DEPOSITION TAKEN -PLAINTIFF (9th Judicial District Court)**

November, 2017 - State of Kansas v. Harris Capital Murder-Crime Scene Reconstruction/Ballistics; Office of the Public Defender - **OPINION RENDERED - DEFENDANT (10th Judicial District Court)**

November, 2017 - State of Kansas v. Smith-Capital Murder-Crime Scene Reconstruction/Ballistics; Office of the Public Defender - **OPINION RENDERED -DEFENDANT (10th Judicial District Court)**

November, 2018 - Aurianna Williams as mother of JSE v. The City of Chattanooga, TN; Allen Griffith (individually); Timothy A. McFarland(individaully); Mitchell Moss (individually); Christopher Palmer (individually); Jacques L. Weary (individually); - **OFFICER INVOLVED SHOOTING** Wrongful Death/Excessive Use  of Force - **OPINION RENDERED-DEPOSITION TAKEN - PLAINTIFF (6th Judicial District Court)**

April, 2018 - State of Oregon v. Robert Highlands-Capital Murder-Public Defender Office/Ballistics/Crime Scene Reconstruction - **OPINION RENDERED - DEFENDANT (9th Judicial District Court)**

April, 2018 - State of Kansas v. Kevin Adams-Capital Murder - Office of the Public Defender/Ballistics/Crime Scene Reconstruction - **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

April, 2018 - State of Kansas v. Ryan Reynolds-Criminal Assault-Use of Deadly Weapon; Office of Public Defender/Ballistics/Firearms Manipulation-**OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

May, 2018 - State of MO v. Cynthia Willman-1st Degree Murder-Ballistics/Crime Scene Reconstruction; Office of Public Defender - **OPINION RENDERED- TESTIMONY GIVEN- DEFENDANT (8th Judicial District Court)**

May, 2018 - State of MO v. Rosadilla - 1st Degree Murder-Crime Scene Reconstruction; Office of Public Defender - **OPINION RENDERED- DEFENDANT (8th Judicial District Court)**

May, 2018 - Lake Law Firm v. Aurora PD-**OFFICER INVOLVED SHOOTING**/Wrongful Death/Crime Scene Reconstruction/Ballistic Review - **OPINION RENDERED- PLAINTIFF (10th Judicial District Court)**

June, 2018 - Newbrough Law - Blazek v. City of Nevada PD-Negligent Duty of Care/Wrongful Death - **OPINION RENDERED- PLAINTIFF (9th Judicial District Court)**

June, 2018 - James Hardiman v. City of Cleveland-Cleveland Police Department-Violation of Civil Rights- Use Of Force- **OPINON RENDERED-DEPOSITION TAKEN-PLAINTIFF (6th Judicial District Court)**

July, 2018 - State of South Carolina v. Mark **Blake-OFFICER INVOLVED SHOOTING/**Use Of Force-Office of Public Defender - **OPINION RENDERED-PLAINTIFF (4th Judicial District Court)**

July 2018 - Contreras v. Jacob Ramsey-KCPD-**OFFICER INVOLVED SHOOTING/**Excessive Use Of Force-**OPINION RENDERED- PLAINTIFF (8th Judicial District Court)**

September, 2018 - State of West Virginia v. Justin Johnson-Ballistic Review-Office of Public Defender; Reckless Endangerment; Discharge of Firearm - **OPINION RENDERED- DEFENDANT (4th Judicial District Court)**

September, 2018 - State of Wisconsin v. Aaron Stephen Murder; Office of Public Defender-Ballistic Review-Tool Marking Exam-**OPINION RENDERED-TESTIMONY GIVEN- DEFENDANT (7th Judicial District Court)**

September, 2018 - DeGroat et al v. Brian Rickard et al - Pennsylvania State Police - **MULTIPLE OFFICER INVOLVED SHOOTING-** Wrongful Death-Excessive Force -Crime Scene Reconstruction-Ballistic Review- **OPINION RENDERED-DEPOSITION TAKEN- PLAINTIFF (3rd Judicial District Court)**

October, 2018 - State of Kansas v. Robin Lovell Murder-Ballistic Review-Firearm Manipulation; Office of Public Defender- **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

October, 2018 Prestige Dance Studio - Civil Tort Action - Failure to Provide Security-Bullet Trajectory-**OPINION RENDERED - DEPOSITION TAKEN-DEFENDANT (4th Judicial District Court)**

November, 2018 - State of Kansas v. Glenda Young - Second Degree Murder; Office of Public Defender-Crime Scene Reconstruction-Ballistic Review - **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

November, 2018 - State of Kansas v. Charles Fleming - Second Degree Murder; Office of Public Defender- Crime Scene Reconstruction-Ballistics- **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

January, 2019 - State of Kansas v. Elijah King - Second Degree Murder; Office of Public Defender -Crime Scene Reconstruction-Ballistics- **OPINION RENDERED- DEFENDANT (10th Judicial District Court)**

January, 2019 - State of Missouri v. Rickard Taylor - Second Degree Murder - Crime Scene Reconstruction - Ballistic Review; Office of Public Defender - **OPINION RENDERED- DEFENDANT (8th Judicial District Court)**

February, 2019 - Gary Jacobsen and Auto One vs Cass County Missouri Sheriff Jeff Weber and Michael Klinefelter - Violation of Civil Rights, Negligent Infliction of Emotional Distress and Battery - **OPINION RENDERED-DEPOSITION TAKEN- PLAINTIFF (8th Judicial District Court)**

April, 2019 - State of Missouri vs Richard Henry/Arilne Diedrich.  First Degree Murder.   Crime Scene Reconstruction Ballistics, Office of Public Defender, **OPINION RENDERED- DEFENDANT (8th Judicial District Court)**

June 2019 - State of Virginia v Brian Spencer - Murder - Office of the Public Defender, Crime Scene Reconstruction and Ballistics - **OPINION RENDERED- DEFENDANT (4th Judicial District Court)**

June 2019 - State of Texas v. Thomas Cox, Murder, Shooting by Private Security Officer, Crime Scene Reconstruction - **OPINION RENDERED- DEFENDANT (5th Judicial District Court)**

October 1, 2019 - Colorado Springs Police Department - **MULTIPLE OFFICER INVOLVED SHOOTING** - Crime Scene Reconstruction- **OPINION RENDERED - TESTIMONY BEFORE GRAND JURY -DEFENDANTS - OFFICERS NOT INDITED (10th Judicial District Court)**

October 11, 2019 - State of Missouri v. Jessie Nelson - 1st Degree Murder -Crime Scene Reconstruction-Ballistics- **OPINION RENDERED-DEPOSITION TAKEN-DEFENDANT (8th Judicial District Court)**

February 6, 2020 - State of Iowa v. Segura - 1st Degree Murder- Crime Scene Reconstruction - **OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

February 26, 2020 - Francis v. City of Red Bank - Chattanoga, TN - **OFFICER INVOLVED SHOOTING-**Crime Scene Reconstruction/Ballistics- **DEPOSITION TAKEN- PLAINTIFF (6th Judicial District Court)**

June 4, 2020 - Crisp v. City of Iowa - Self Inflicted Gun Shot-Crime Scene Reconstruction-Ballistics-Standard of Care - **OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

June 4, 2020 - Armando Frank v. City of Marsville, Louisiana - **OFFICER INVOLVED HOMICIDE-**Excessive Use Of Force- **DEPOSITION TAKEN- PLAINTIFF (5th Judicial District Court)**

September 10, 2020 - Romero - **OFFICER INVOLVED SHOOTING** 6/26/18 Westminster, CO - Crime Scene Reconstruction - Ballistics-**OPINION RENDERED-PLAINTIFF ( 10th Judicial District Court)**

September 11, 2020 - State of Kansas v. Thomas Wajtzvuk - First Degree Homicide - Crime Scene Reconstruction - Ballistics - **OPINION RENDERED-DEFENDANT (10th Judicial District Court)**

October 8, 2020 - State of Missouri v. Wesley Bass - Assault /Homicide in First Degree-Crime Scene Reconstruction/Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

October 9,2020 - USA v. Whitaker-Possession of Firearm On Federal Facility; Assault With Deadly Weapon-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-TESTIMONY GIVEN-DEFENDANT (5th Judicial District Court)**

October 14, 2020 - State of Missouri v. Demetrius Singh - 1st Degree Murder-Crime Scene Reconstruction- Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

November 2, 2020 - State of Oregon v. Alex Mosqueda Rivera - Homicide - Crime Scene Reconstruction-Ballistics- **OPINION RENDERED- DEFENDANT (9th Judicial District Court)**

November 17, 2020 - State of Missouri v. Cliff Ryan Meny -Crime Scene Reconstruction-Ballistics- **OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

December 2, 2020 - April Sabbe v. Washington County Commissioners - **OFFICER INVOLVED SHOOTING** -Crime Scene Reconstruction - **OPINION RENDERED-PLAINTIFF (9th Judicial District Court)**

December 3, 2020 - State of Missouri v. Lynlee Jo Renick - Murder in the First Degree - Crime Scene Reconstruction-Ballistics- **OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

December 8, 2020 - State of Texas v. Timothy Keonte Noble-Unlawful Possession of a Firearm-Aggravated Assault Against Public Servant -Crime Scene Reconstruction- **DEFENDANT (5th Judicial District Court)**

December 18, 2020 - State of Missouri v. Richard Emery - Homicide - Crime Scene Reconstruction - **OPINION RENDERED- DEFENDANT (8th Judicial District Court)**

January 25, 2021 - Tina Jones v. North Texas Strike Force (Hobbs/Willard) - Officer Involved Shooting - Crime Scene Reconstruction - **OPINION RENDERED-DEFENDANT (5th Judicial District Court)**

March 4, 2021 - Commonwealth of Pennsylvania v. Kyon Dane McDonald - Homicide/Second Degree Murder - Crime Scene Reconstruction - **DEFENDANT (3rd Judicial District Court)**

April 6, 2021 - Kinberger v. East Baton Rouge Sheriff Office - Joe Long, Attorney Excessive Use of Force-Preliminary Review - **DEFENDANT (5th Judicial District Court)**

April 6, 2021 - Estate of Jordan Patterson, Joe Long, Attorney, Baton Rouge, LA Excessive Use of Force-Preliminary Review - **PLAINTIFF (5th Judicial District Court)**

April 6, 2021 - Quinton Terrell v. City of Woodworth, LA-Joe Long, Attorney **OFFICER INVOLVED SHOOTING-**Excessive Use of Force - Homicide - **OPINION RENDERED-PLAINTIFF (5th Judicial District Court)**

April 8, 2021 - State of Missouri v. John Wesley Adams-Murder 1st Degree-Crime Scene Reconstruction-**OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

April 8, 2021 - Karl C. Behm v. Putnam County Florida Sheriff's Dept - Excessive Use Of Force-**OPINION RENDERED - PLAINTIFF (11th Judicial District Court)**

April 8, 2021 - State of Missouri v. Lori Ackerman-Murder In The Second Degree-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

May 11, 2021 - State of Missouri v. Amir Abdullah-Raheem-Second Degree Murder-Crime Scene Reconstruction-Ballistics- **OPINION RENDERED-DEFENDANT FOUND NOT GUILTY ON ALL COUNTS (8th Judicial District Court)**

May 26, 2021 - State of Maryland v. Clemetson-Second Degree Homicide-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (1st Judicial District Court)**

June 4, 2021 - Estate of Alfred C. Toe v. Trenton Police Department; New Jersey-Civil Torte Action-Excessive Use Of Force-**OPINION RENDERED-PLAINTIFF(3rd Judicial District Court)**

June 18, 2021 - Kimberly Mitchell Estate of Timothy Jason Coffman v. City of South Daytona FL - Excessive Use Of Force - Violation of Title III-American Disability Act-**OPINION RENDERED-DEFENDANT (11th Judicial District Court)**

July 12, 2021 - Allen Thomas Bloodworth, II v. Kansas City Board of Police Commissioners D/B/A Kansas City Police Department-Excessive Use of Force-**OPINION RENDERED-DEFENDANT(8th Judicial District Court)**

July 10, 2021 - Sabrian Bruton v. City of Homestead; FL-Crime Scene Reconstruction-Excessive Use of Force-**OPINION RENDERED-PLAINTIFF (11th Judicial District Court)**

July 20, 2021 - State of Missouri v. Jurvan Butler-Murder In The Second Degree; Armed Criminal Action; Unlawful Possession of a Firearm; Tampering With Evidence-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

July 26, 2021 - Tarence Maddox v. Kansas City Mo Police Department-Excessive Use of Force-**OPINION RENDERED-PLAINTIFF(8th Judicial District Court)**

August 26, 2021 - State of Missouri v. Howard Thilenius- Assault in the Third Degree; Attempted Escape From Custody-**OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

August 26, 2021 - State of Kansas v. Tony . Baird-1st Degree Murder-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (10th Judicial District Court)**

September 24, 2021 - State of Missouri v. Shannon Collins-Murder In The Second Degree; Armed Criminal Action- Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

September 24, 2021 - Diderot Suffrena v. Mango Grove LLC (DBA Clarcona Groves Apartments); Orange County Florida-Aggravated Battery With A Firearm; Civil Torte Action-Failure To Provide Security- Crime Scene Reconstruction-Ballistics-Blood Patterns-**OPINION RENDERED-DEPOSITION TAKEN-DEFENDANT (11th Judicial District Court)**

October 4, 2021 - State of Missouri v. Marcus H. Ausler-1st Degree Murder-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT(8th Judicial District Court)**

October 19, 2021 - Perry Jack Probus v. Commonwealth of Kentucky-Robbery-Assault With Deadly Weapon-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT-TESTIMONY GIVEN AT COURT HEARING(6th Judicial District Court)**

October 22, 2021 - State of Kansas -Sedgwick County v. Joshua Johnson - First Degree Murder-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (10th Judicial District Court)**

October 28, 2021 - United States v. Jonathan Scott-Assault With Deadly Weapon-Crime Scene Reconstruction/Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

November 24, 2021 - State of Missouri v. Forrest Shoemaker-2nd Degree Murder-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT (8th Judicial District Court)**

November 26, 2021 - David G. Jungerman v State of Missouri-1st Degree Murder-Improper Procedures In Police Protocol-Crime Scene Reconstruction-Ballistics Trajectory-**OPINION RENDERED-PLAINTIFF (8th Judicial District Court)**

December 7, 2021 - USA v. Dennis Williams-1st Degree Murder-Gun Shot Residue Analysis-**OPINION RENDERED-PROSECUTION (5th Judicial District Court)**

December 16, 2021 - USA v. Perry Latronse Taylor -Felon In Possession of Firearm-Crime Scene Reconstruction-Ballistics-**OPINION RENDERED-DEFENDANT-ALL CHARGES DROPPED BY US ATTORNEY OFFICE (5th Judicial District Court)**

January 4, 2022 - Florin Merovici v. Antonio Gabriel-NYC Street Fight - Peter Eliopoulos, Attorney-Use Of Force-Crime Scene Reconstruction-**OPINION RENDERED-DEPOSITION TAKEN-DEFENDANT-FOUND IN FAVOR OF DEFENDANT (2nd Judicial District Court)**

February 1, 2022 - State of Kansas v. Jamie B. Smith-Murder - Crime Scene Reconstruction (For The Defendant)**OPINION RENDERED (10TH Judicial District Court)**

February 10, 2022 - Jason Tate v. State of Iowa-Crime Scene Reconstruction-Firearm Inspection **- OPINION RENDERED-FOR THE DEFENDANT(8th Judicial District Court)**

February 21, 2022 - State of Kansas v. Seth Collins-2nd Degree Murder/Crime Scene Reconstruction -**OPINION RENDERED-FOR THE DEFENDANT (10th Judicial District Court) Testified At Jury Trial-Defendant Found Guilty**

March 7, 2022 - Jessica Hoeschele v. Officer Stauch (Independence MO Police Department)-Crime Scene Reconstruction-Use Of Force-**OPINION RENDERED-FOR THE PLAINTIFF (8th Judicial District Court)**

March 16, 2022 - State of Missouri v. Niemet-Murder-Crime Scene Reconstruction-**OPINION RENDERED-FOR THE DEFENDANT (8th Judicial District Court)**

March 31, 2022 - Finn v. Deputy Gentempo-Excessive use of Force-**OPINION RENDERED-FOR THE PLAINTIFF (10th Judicial District Court)**

April 18, 2022 - Augustine Norman v. City of Manchester, IA-Negligence-Misconduct-Excessive Use Of Force-**OPINION RENDERED-FOR THE DEFENDANT (8th Judicial District Court)**

May 25, 2022 - State of Colorado v. Levi Miller-Attempted Murder-Assault First Degree-**OPINION RENDERED-FOR THE PLAINTIFF (10th Judicial Court)**

June 9, 2022 - State of Utah v. Hunt-First Degree Murder-**OPINION RENDERED-FOR THE DEFENDANT (10TH Judicial Court)**

July 6, 2022 - State of Iowa v. John Peak, III-Manslaughter/Reckless Use of Firearm-**OPINION RENDERED-FOR THE DEFENDANT(8th Judicial Court)**

July 12, 2022 - State of Virginia v. Thomas McCallister-Shooting-**OPINION RENDERED-FOR THE DEFENDANT(4th Judicial Court)**

July 25 2022 - Jamee Johnson v. State of Florida-Homicide-Officer Involved Shooting-**OPINION RENDERED-FOR THE PLAINTIFF(11th Judicial Court)**

August 15, 2022 - DeMarcus Williams v. State of Missouri-In custody Death-Excessive Use Of Force**(8th Judicial Court)**

August 23, 2022 - Vahram v. USA(FBI-SWAT)-Excessive Use Of Force-**OPINION RENDERED-FOR THE PLAINTIFF (9th Judicial Court)**

September 7, 2022 - State of Kansas v. Torrey Linsday-First Degree Murder (Attempted)-Attempted Aggravated Assault-Criminal Discharge in Occupied Vehicle-Brenda Jordan Attorney-**OPINION RENDERED-FOR THE DEFENDANT (21ST Judicial Court)**

November 4, 2022 - State of Missouri v. Damian Henry-First Degree Murder/Psychological-Physiological Response/Sequence of Fire-Flack Attorney-**OPINION RENDERED-FOR THE DEFENDANT (8th Judicial Court)**

December 5, 2022 - Aaron Whittle v. State of Iowa-Crime Scene Reconstruction - Fire Arm Examination-Manslaughter - Les Blair, Attorney-**OPINION RENDERED-FOR THE DEFENDANT (8TH Judicial Court)**

January 16, 2023 - John Richardson & Steven Gautieri v. Grant Cole-Wrongful Death-Crime Scene Reconstruction- Reed Martens, Attorney-**OPINION RENDERED NO WRITTEN REPORT REQUESTED-FOR THE PLAINTIFF (8TH Judicial Court)**

February 13, 2023 - Rachel Harding & Ivore Westfield. V. Sgt. David Kinsey Indianapolis Police Department-Excessive Use of Force-Video Review-Terrance Kinnard, Attorney -**VIDEO REVIEWED-OPINION RENDERED-FOR THE PLAINTIFF (7TH Judicial Court)**

March 1, 2023 - Timothy F. Crump v. Elite Protection Solutions, LLC-Security Officer Involved Shooting-Crime Scene Review-Galloway Law Firm-**NO REPORT-NO DEPOSITION-FOR THE DEFENDANT (5TH Judicial Court)**

March 17, 2023 - Tyler Joe Den Besten v. Alex Waagmeester ,Deputy Lyons County Sheriff's Department, Iowa-Excessive Use Of Force-Doug Phillips, Attorney-**OPINION RENDERED-FOR THE DEFENDANT (8TH Judicial Court)**

March 22, 2023 - Estate of Latoya James v. Jim Proctor, Michael Blaquiere, Downey Casey, Camden County GA Sheriff Office - Use of Force-Officer Involved Shooting-Mario Pacella, Attorney-**OPINION RENDERED-FOR THE PLAINTIFF (11TH Judicial Court)**

March 29, 2023 - State of Kansas v. Michael Swinney-Homicide/Ballistics-Jama Mitchell, Attorney-**REVIEW PENDING-FOR THE DEFENDANT (8TH Judicial Court)**

April 28, 2023 - Brinson/States Estate v. Rodeway & Choice Hotels-cEDAR Rapids, IA-Wrongful Death-Negligence-Richard Pundt, Attorney-**FOR THE DEFENDANT (8th Judicial Court)**