IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
BRUNSWICK DIVISION

C.J., a minor, by and through
her next friend and guardian,
BETTY JEAN MURPHY JAMES and
BETTY JEAN MURPHY JAMES, as
Administrator of the Estate
of Latoya James,

                Plaintiffs,          CIVIL ACTION FILE NO.:

        vs.                  2:22-CV-00078-LGW-BWC

MICHAEL BLAQUIERE, in his
individual capacity, as Camden
County Deputy Sheriff; DOWNY
CASEY, in his individual
capacity, as a Camden County
Deputy Sheriff; and JOHN/JANE
DOES, in their individual
capacities, as Camden County
Deputies,

                Defendants.

_____

## Expert Report of John J. Ryan

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years in Providence, Rhode Island. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the

1

Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

5. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States. These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

6. Since 1993, I have conducted numerous training sessions for public employees.  Participants in this training have included law enforcement officials, school officials, attorneys and judges. Training I have provided are detailed in my CV.

2

7. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

8. Since my retirement in June of 2002, I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.  Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands. These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

9. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

3

10. The programs on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

11. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

12. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

13. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

14. I have reviewed the following materials to date regarding this case: See Schedule D

15. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery.  I recognize that there may be additional documentation as the case progresses.  If additional material is produced, I shall be prepared to supplement this report.

16. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

<u>Deposition of Michael Blaquiere</u>

17. Blaquiere stated the following about the case agent's responsibilities: "The case agent is -- I was tasked with typing out information from interviews, the operation plan, surveillance reports, after-action reports, things of that nature." (16). Blaquiere acknowledged that he was the case agent in this matter. (16).

18. Blaquiere testified to the following about whether Varshaun Lamont Brown was the only target of the warrant: "Of that residence, yes. . . Well, the residence was the actual target, he was the suspect that was supposed to be inside. But the target was the actual house that we believe had information that they were selling narcotics. We didn't know if it would just be him inside or anyone else." (18-19).

5

19. Blaquiere testified to the following about the reason for obtaining the search warrant: "For the sales and distribution of narcotics inside of Camden County . . . For this particular one it was cocaine and marijuana, but we had information of the sale of cocaine there." (24).

20. Blaquiere stated the following about why he sought a no-knock warrant: "Because of his violent history. We knew it to be a trap house and we had intel that there was narcotics and also -- as well as firearms inside the residence." (24).

21. Blaquiere testified that the request for a no-knock warrant was denied. (24).

22. Blaquiere testified to the following about the investigation of Varshaun Brown: "We stopped the vehicle with a large amount of narcotics. We began talking to him about sales, where it was coming from. Later on in the investigation it was pointed towards this house, this residence, that Varshaun had stayed at, frequented that. And was supposedly distributing narcotics. During the course of the investigation I would drive by the house early in the morning, so I knew that's when he normally operated. And it was -- trace vehicles in and out, short periods of time in and out and would leave, indicative of narcotic sales at the residence. Continued to watch. He would spend a couple days there, a couple days at his other residences. And then as soon as he would come back there, we had a camera on the house, you could see his vehicle up. And then shortly after vehicles would start coming in and out and staying only short periods of time." (27-28).

23. Blaquiere explained that the reason the BWC was distorted was because the BWC was worn by an officer behind a ballistic shield. (35).

24. Blaquiere read the following excerpt of his statement into the record: "While approaching the front of the residence while at the stairs to the front porch, I shouted sheriff's office, search warrant, come to the door. I then hit my hand knocking on the residence to the left side of the

6

front door and I then opened the glass storm door to the residence. After no one came to the door or verbally acknowledged our presence after being given verbal commands, the door would be breached by Lieutenant Billington with a ram. There was belief that firearms were possibly in the residence from information given to investigators. As well as looking at the criminal history of the target, Varshaun Brown, having multiple charges for possession of firearms by convicted felon. Investigators hit the door quickly for the safety of law enforcement officers on scene." (37).

25. Blaquiere testified to the following about whether he fired blindly: "I did not fire blindly . . . I fired at the firearm . . . Yes, sir, I was trying to shoot the firearm out of the hand." (45).

26. Blaquiere stated the following about how James was standing: "She was standing looking at us. I was focused on the firearm. The firearm was sticking around her, she would have been standing here (indicating), the firearm was there (indicating), and I shot towards the firearm . . . I'm not sure which way her face was facing. Like I said, I was firing at the firearm, and that's what I fired at." (45-46).

27. Blaquiere testified if it mattered that there was someone else in the room: "It did matter, that's why I fired at the firearm, not at the mass that I had in front of me, I fired at my threat, which was the firearm and I tried to shoot at the actual pistol in hand." (46).

28. Blaquiere testified that he did not find any weapons on James and that he does not know of anyone finding weapons on James. (46).

29. Blaquiere testified as follows about the gun that he fired: "I was using my AR-15, which is a 5.56 round." (47).

30. Blaquiere acknowledged that the search warrant was executed at 5:00 a.m. (52). Blaquiere testified as follows about why the warrant was executed at this time: "Under the cover of

darkness? One for officer safety to approach the house. We knew that's when he operated as well. We were kind of hitting at that morning hour where hopefully to catch him somewhat off guard for safety. Like I said, we had intel that there were weapons in the house, so we wanted to make it safest for everyone there." (52).

31. Blaquiere testified to the following about the circumstances he relied on to determine the amount of time between the knock and announce and the breach: "Yes, sir. Approaching the doorway, we seen the flash of the camera. Then someone else on scene said, hey, they know we are here -- announced. As I walked up to the door, as loud as I could, come to the door, we weren't met with anything, I knocked on the door. We were standing -- there was a window that we were actually standing by and a front door. We call it funnel (phonetic). If you're a bad guy, you're expecting someone to come to the door, so it's an easy way for someone just to shoot right at the door. The door is not going to stop a bullet. So it was a breach. And once the breach was done. We assessed the situation and immediately transformed into something else." (59).

## Deposition of Downy Casey

32. Casey stated the following about who told him that he needed to have a body camera: "So typically investigators don't have body cameras anyway; it was actually my idea to put the body camera on that morning." (14).

33. Casey stated the following about why he decided to wear a body camera: "Typically we don't wear body cameras into our search warrants. I just felt like, given the situation, I don't know if it's a correct answer, but something made me feel like, wear a body camera today, if that makes any sense. So going in that morning nothing felt right. We've done plenty of search warrants but nothing felt like it was supposed to, if that makes any sense." (15).

34. Casey stated the following about why officers chose early morning to execute the warrant: "There are several factors of that particular house, possibly being a trap house and having an armed subject there at all times. Typically when there is a trap house there is an individual in that house that is to watch over the money, watch over the dope, protect it at all costs from anybody ever around." (16).

35. Casey testified to the following about the facts and circumstances that led to the determination that entry was being refused: "So when I initially got out of my patrol vehicle and grabbed the shield, through the case we had knew he had security cameras and monitors inside the house. We thought that we had all the cameras counted, but we did not. On the left side of the porch, kind of near the stairwell, there was a -- I want to say it's a flash, but it's almost like you see a bright, like, whitish, reddish light come on, like it picks up motion. Now, I know his porch light was on, but as my Tahoe pulled up, I wanted to stay within a safe distance of the residence. The reflection from the porch light probably caught my Tahoe coming up. My headlights were off at the time, so when I came out there was four of us that saw that go on. When we did, I know Lieutenant Billington's body camera said, hey, they know we are here. As soon as we started walking up the stairs, we could hear running in the house. The house is kind of, like, hollow like a trailer would be, the flooring, if a child is running through it, you would be able to hear a definite sound of somebody running through the house. At that time I know at least three of us heard it, which kind of raised everything." (23-24).

36. Casey stated the following about how long it took for the knock and announce and the breach of the door to be completed: "Best of my memory, three to five seconds. Honestly, I really don't . . ." (26). Casey testified to the following about if it would surprise him if it was less than three seconds: "No, sir." (26).

37. Casey reported the following about what happened after the door was breached: "Open floor plan to living room. I noticed that the left bedroom -- first bedroom to the left bedroom, some door, some room, opened to the left was basically our main focus at that time." (31).

38. Casey stated the following about what happened next: "I stepped in front of the doorway with the shield, just like I do any other doorway. And that's when I observed Miss James and Mr. Brown standing in the bedroom." (31).

39. Casey stated the following about how James and Brown were standing: "The best way I could describe it was Miss James has her back kind of catty-corner towards me looking at Mr. Brown and it almost looks like Mr. Brown was hugging her, if that makes any sense. Like he initially had one arm around her while he was facing the doorway, but I could only see half of his body." (31-32).

40. Casey testified to the following about how the positioning of Brown and James changed: "Yeah. So I know he kind of -- it was more like a lean but maybe a small sidestep, basically to his right, more towards his bed . . . I wouldn't say away from her, but to get more of a clear target of what was in front of his doorway." (32).

41. Casey reported the following about what Brown did: "Before I can even register what was going on in my head, he started -- I believe he shot one shot, and as he is coming up still shooting, he put his other hand and is still shooting coming up." (32).

42. Casey testified that Brown was shooting at him. (32).

43. Casey testified that he engaged Brown and that he had a clear view of what he was shooting at. (33). Casey further stated, "Yes, sir, I was shooting at Varshaun Brown." (34).

44. Casey reported the following about what was happening with James: "I don't remember her saying anything or honestly ever doing anything. When he started shooting, I couldn't tell you

what she was doing. I mean, I know she was still standing in the same spot. I mean, it was

over rather quickly, but... I mean, I couldn't tell you what she was doing." (34).

45. Casey testified that he did not see James get hit. (34).

46. Casey testified that there was a point where Brown was on the ground but had his weapon.
(35).

47. Casey stated the following about if he approached Brown and engaged him again: "If I did, I

maybe took a step forward slightly. It looked like he was reaching for the gun again, yes, sir."

(35).

48. Casey stated the following about his personal knowledge before the search warrant was

executed: "I know we did an intel report on the individual that we've got prior before we

started this investigation, I was there for that interview. That's basically where we gathered

most of our information from as far as him distributing narcotics." (41).

49. Casey stated the following about what was learned from a trash pull at the residence: "I know

there were several different clear bags in the trash that tested positive for cocaine. I believe

there was some mail, I'm not 100 percent on that. But I know there was evidence pertaining

to our case in the trash." (42).

50. Casey stated the following about whether he was the only one with the shield: "I believe we

took two or three, but I just grabbed mine, yes, sir." (45).

51. Casey testified to the following about not getting hit in the leg: "I didn't, yes, sir. It just seemed

like it, I guess. Holes in my pant leg that I had to give to GBI, but I think it was from fragments

maybe, I don't know." (52).

52. Casey testified that he did not need medical care. (52).

53. Casey acknowledged that he had information that there were fully automatic weapons in the house. (87).

54. Casey acknowledged that there was information that Brown was conducting some sort of trafficking operation out of the house. (88).

55. Casey acknowledged that he had information that there may be other individuals present but he was not sure. (88).

<u>Deposition of James Kevin Chaney 30(b)(6)</u>

56. Chaney acknowledged that he was on site on the day of the shooting. (14). Chaney testified that he was in the back of the stack. (15).

57. Chaney stated the following about the reporting process for instances when there is a use of force: "So a report would be done, a use of force report would be done. They file it through their -- the initial officer does. He takes in the -- goes up through the chain to the division commander at that point and notifies the sheriff's office -- to the sheriff. At that point they would actually -- at that point they would actually contact the Internal Affairs investigations -- all officers -- if it's an officer-involved shooting or if it's just a regular use of force, it's always followed up the chain and is verified whether an internal investigation needs to be done or not." (15-16).

58. Chaney testified that he is not aware of anyone being disciplined in this particular case. (24).

59. Chaney stated the following about the training process for the use of firearms: "Well, that is part of the training. So you would actually come to the range, you would break down the weapon, the different parts of it, how it works, what a malfunction may be, how many rounds it may hold into the magazine well. You actually go out to the target, you identify what targets you have, you go through Georgia State qualification course, you work on mainly getting your

12

skills up to level. You have to pass a 240 is a passing score for the state of Georgia in order to carry a weapon . . . If you shoot below a 240, you can't carry a firearm, you don't pass the standards which is set forth by the state of Georgia. And when you go to the police academy, in order to graduate the police academy, you have to shoot a 240 or better. Every year you have to have use of firearms training and use of force at the same time. When you do inservice training, you have use of force talked to you by policy and then it goes into the firearms side of things where you actually go and start shooting, the qualification course through the state of Georgia. There are other courses put on through the Apex which is a part of the use of force where you would actually go in and have goggles -- it's a simulated machine on shooting-type situations; so that is part of the use of force, firearms training." (25-26).

60. Chaney testified to the following about what is taught to officers about not firing if there is an unreasonable risk to third parties: "Know your target, what you're intending on shooting at. If there is a third-party person, if it's a threat to you, then you try to litigate as best as you possibly can. You can't always dictate, you know, that that person is not a threat either until they present a threat to you. If you're in a situation where there is individuals -- multiple individuals firing at you or not firing at you, you have to litigate the situation at that time." (30).

61. Chaney testified to the following about the process of applying for a search warrant: "So based off all of your evidence that you have, you'll actually have -- it has to be a Georgia POST certified peace officer that applies for a search warrant. They get their probable causes established, they take it to a magistrate judge or a superior court judge as to the issue either by written or oral testimony. The judge signs off on it and then it's to be executed within the next ten days from that point." (45-46).

62. Chaney reported the following about how you would determine a time to execute a search warrant: "There's not a set time, it's according to the officer, you have day or night within ten days. And based off of an individual officer, it could be information that comes available that day or that night. It could be -- you know, take into account if you want to do a morning search warrant or a night -- say you want to do a night search warrant, you base it off of the traffic, you base it off of individuals that might be at a residence when you ride by and do a safety check on who might be at the residence as far as tag numbers. Or if you set a morning time. It's up to the individual officer or deputy to make that assumption when they are going to actually go there and execute that search warrant." (51).

63. Chaney stated the following about the factors that go into the determination of the time to execute the warrant: "You roundtable with a group of guys that's doing an investigation, hey, when is the best time, approximately, when you're going to do the search warrant? Do you try to catch them when they are asleep, when they are awake? A lot of times investigators want to try to catch them when they are asleep so there is  less violence going on. Sometimes you catch them at nighttime when you have a household and they are all up, can cause other issues, so..." (51-52).

64. Chaney stated the following about how time you are supposed to wait to let the resident of the house open the door: "There's no set time. It's up to that individual at the front door that's actually running a stack. When I say a stack of individuals there -- so once you announce and you've knocked, it's up to that individual officer that's in the lead." (53).

65. Chaney further stated, "There is no policy that says you have to wait a certain time limit to knock on the door, no, sir." (53).

14

66. Chaney then testified, "If nobody is coming to the door, you breach the door inside and use the necessary force inside that residence after knock and announce." (54).

67. Chaney stated the following about whether entry into the residence was refused in this case: "I was in the back, so I couldn't hear." (60).

### Deposition of Betty Jean Murphy James

68. James stated that she does not know why Latoya was at Brown's residence. (60).

69. James stated the following about her understanding of how the shooting happened: "I don't know." (65).

### Opinions

70. It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the investigation and surveillance leading up to obtaining the search warrant was consistent with generally accepted policies, practices, training and industry standards within the field of law enforcement.

71. It is note that Blaquiere testified to the development of information during a narcotics seizure that provided information concerning the house where Brown was selling narcotics. (27). Blaquiere testified to surveilling the house by conducting an early morning drive-bys to determine the hours in which narcotics sales were occurring.  (27). Blaquiere noted that he traced vehicles coming and going from the residence and that he continued to watch the residence. (27).  Investigators took the extra step of installing a camera for surveillance. (28). In addition, Blaquiere noted that investigators spoke with a confidential informant who confirmed there were weapons at the location. (28).  The officers were also aware of Brown's

criminal history. (28).  It is noted that Brown's criminal history included a felony assault on law enforcement.

72. It is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the briefing that occurred prior to the execution of the search warrant was consistent with generally accepted policies, practices, training, and industry standards in law enforcement.

73. Having attended search warrant briefings in preparation for the execution of search warrants to include multi-agency briefings, I have never been present while agency policy, use of force caselaw, or state law was discussed.  In auditing agencies nationwide and in reviewing cases, I know of no case where I have seen discussions on policy caselaw or statutes during the briefing process.

74. In training SWAT commanders nationwide, I point out the items that should be covered at a warrant pre-execution briefing.  The items include the target location including, where available, photos and layout of the location with an emphasis on bathrooms where evidence may be destroyed and exits where escape may occur; the identity of the  person who is the target of the search warrant to include a photo where available; the plan of entry and expectations based on information i.e., fortifications, firearms, dogs, propensity to resist, and known persons present.  The briefing should conclude with assignments for each of the involved officers.  I would note that agencies throughout the United States that embody the items to be covered during a briefing.[1] I would note that the Camden County Sheriff's Office

---

[1] See, e.g., "Search Warrant Procedures" Fairfax County Police Department April 21. 2023 through April 2026 (CALEA 74.3.1) "**Preliminary Briefing:** Lead officers or detectives shall conduct a briefing prior to execution of the search warrant with all search team members present. The briefing shall include (1) review of site characteristics, (2) a description of potential occupants and any associated dangers they may pose, to include the presence of

policy on items that need to be covered during a pre-warrant briefing is consistent with policies nationwide. I have never seen one that indicates that agency policy, caselaw on force, and state law be covered.

75. CCSO:

> b. Prior to the actual execution of the warrant, a pre-entry briefing with all search personnel. This briefing will include a review of the items to be seized, the exterior and interior description of the search site, the boundary lines of the property if known, the tactics to be used if a forced entry is required, and special provisions authorized in the warrant, the availability of all items of equipment required, the specific duties of all personnel, and any special instructions concerning the safety of undercover/informant personnel already on the premises.

76.

77. It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the decision to breach the door within seconds of

---

domesticated animals, (3) a description of the sought items at the search site and any possible locations, (4) assignment of responsibilities for all search team members, and (5) a review of the facts of the case."  See also, Search Warrant, San Marco, TX Police Department: "Pre-warrant Briefing:  1. Prior to the execution of a search warrant, the lead officer will identify any high risk or threats to officers and will advise the supervisor of the existence of any potential threat factors. If necessary, the SWAT Commander or his designee will be consulted.  2. Prior to the execution of a search warrant, a meeting will be held of all participating officers where duties and responsibilities will be assigned. Personnel who are not present at this briefing will not actively assist in the actual entry and securing of the scene, though they may be called upon afterwards to assist in security, prisoner control or processing the scene.  3. A diagram of the location will be made during the briefing showing a layout of the premises and officers will be assigned to their positions for the entry to the location. 4. Officers who are serving the warrant will be made aware of any potential threats. 5 A sufficient number of officers will be assigned to execute the search warrant safely and to conduct a thorough search.  6. The supervisor will notify the police communications/dispatch of the location and approximate time of execution of the warrant.  7. Departmental approved raid jackets or other attire properly identifying the officer(s) as law enforcement officers will be worn by each plainclothes officer involved in the execution of the search warrant. 8. Body armor will be worn by each officer involved in the execution of the search warrant. 9. The requirements listed under this section do not apply to the execution of evidentiary search warrants for items already in police custody such as containers,  vehicles, computers and cell phones."

knocking and announcing was consistent with generally accepted policies, practices, training, and industry standards in law enforcement.

78. In identifying how long an officer must wait at the door following a knock and announce, Mr. Stephenson has indicated that the "Somewhat of a general industry standard, it goes anywhere from 10 to 15 seconds from some of the research I've read." (70-71). Stephenson goes on to say that less then ten seconds would be appropriate when there is "An imminent exchange of gunfire. Some imminent knowledge that harm or danger was going to occur to someone not associated with a warrant. There may be a homeowner inside. In an effort to analyze and protect life and safety of an individual that may or may not be associated with the subject of a warrant." (72).  Stephenson did agree, based on an article he researched on Google that the knock and announce rule can yield based on potential destruction of evidence. (78-79). I would note that here, the exchange of gunfire, in accord with law enforcement policy and training was imminent, under the Federal Policy on use of deadly force imminent threat is outlined. The commentary section details:  As used in this policy, 'imminent, has a broader meaning than 'immediate' or 'instantaneous.'  The concept of 'imminent' should be understood to be elastic, that is, involving a period of time dependent on the circumstances, rather then the fixed point of time implicit in the concept of 'immediate' or 'instantaneous.' Thus, a subject may pose an imminent danger even if he or she is not at that very moment pointing a weapon at the officer if, for example, he or she has a weapon within reach or is running for cover carrying a weapon or running to a place where the officer has reason to believe a weapon is available." [2]

---

[2] https://www.justice.gov/archives/ag/attorney-general-october-17-1995-memorandum-resolution-14-attachment-1;

79. I would note that there is no general industry standard on time restrictions but rather, and in accord with training I give to officers throughout the United States, the time must be reasonable in light of the items the officer is seeking under the warrant and how quickly the subject could begin to destroy the evidence being sought.  I provide the example that an officer seeking a stolen piano under a warrant will have to wait longer than an officer seeking drugs that can easily be disposed of with the flush of a toilet.  The International Association of Chiefs of Police model policy on search warrants notes, Officers should knock, loudly identify themselves, and wait a reasonable amount of time for response before they attempt to enter the premises to be searched.[3]  A footnote to this passage states, "What constitutes a reasonable amount of time is fact sensitive and dependent on circumstances."[4] Here, based on the motion-sensor light/camera going off, an officer recognizing that Brown knew the officers were coming, as well as the knowledge officers had of Brown's history and likely access to firearms, the short duration between the knocking and announcing and breaching was consistent with generally accepted policies, practices, training and industry standards.

80. The Law Officer's Pocket Manual provides the following, "For example, police officers executing a warrant to search for illegal drugs in a residence knock on the door and announce their purpose.  The officers, however, wait only 15 seconds before deciding to use a battering ram to force open the door. The entry is lawful, because 15 seconds is enough tie for someone inside the house to retrieve the stash of drugs sought by the warrant and begin pouring it down

---

[3] "Search Warrants" International Association of Chiefs of Police, Considerations Document, IACP Law Enforcement Policy Center, Alexandria Va. July 2023.
[4] "Search Warrants" International Association of Chiefs of Police, Considerations Document, IACP Law Enforcement Policy Center, Alexandria Va. July 2023.

a toilet or drain. **Many state and federal courts have ruled that even shorter waits before making a forced entry were reasonable under the circumstances."** (emphasis added).[5]

81. I would note that in training law enforcement officers throughout the United States on tactical decision-making during the execution of search warrants and other forced entries into homes that a quick breach and entry to protect officer safety and to prevent the destruction of evidence is consistent with generally accepted policies, practices, training and industry standards. In fact, officers are trained that they may dispense with the need to knock and announce at all when the ground situation changes such as when it is clear that the suspect knows that officers are coming and therefore has time to destroy evidence or arm themselves with weapons to assault the arriving officers.

82. Law enforcement throughout the United States are trained that there are two ways in which an officer will be justified in dispensing with the knock and announce requirement. The first is to seek judicial permission in the application for search warrant to dispense with the knock and announce requirement due to an articulated danger to officers, persons or destruction of evidence based on information known to the officers at the time. Additionally, officers are trained that even when prior judicial authorization is not sough or even denied, the ground situation and facts that develop during the execution of the search warrant will also make dispensing with the knock and announce requirement consistent with generally accepted policy, practices, training and industry standards.

83. Common police training and texts make clear that in some instances an unannounced entry is proper. "As a general rule, the Fourth Amendment requires police officers executing a search

---

[5] The Law Officers Pocket Manual, 2021 Edition, John G, Miles Jr. David B. Richardson, Anthony E. Scudellari. Routledge, Taylor and Francis Group, New York and London 2021.

warrant to knock and announce their identity and official purpose…However, a no-knock entry is justified if an officer has reasonable suspicion that knocking and announcing would be (1) dangerous to himself, fellow officers, or someone inside the premises, or (2) would inhibit the effective investigation of a crime.  A decision to make an unannounced entry must be based on the circumstances presented in each particular case."[6]   Training and texts point out, "Even if the magistrate who issued the warrant denied permission for an unannounced entry, a change in circumstances at the time of the execution of the warrant may give rise to the reasonable suspicion required to justify an unannounced entry." [7]

84. The 2023 IACP policy states: "If the jurisdiction permits no-knock warrants, officers may seek judicial authorization to conduct a no-knock entry only if they have reasonable ground to believe at the time the warrant is sought that knocking and announcing their presence would create an imminent threat of physical violence to the officers or another person. Prior to seeking judicial authorization for a no-knock entry, officers should obtain approval from the felony-level prosecutor's office in their jurisdiction and from a supervisor within their agency. Once judicial authorization for a no-knock entry is obtained, officers may proceed accordingly unless they learn of facts and circumstances that would negate the need for a no-knock entry, in which case they should knock and announce themselves in accordance with this policy. If officers did not obtain judicial authorization for a no-knock entry but exigent circumstances arise at the scene such that knocking and announcing would create an imminent threat of physical violence to the officers or another person, officers may conduct a no-knock entry but

---

[6] The Law Officers Pocket Manual, 2021 Edition, John G, Miles Jr. David B. Richardson, Anthony E. Scudellari. Routledge, Taylor and Francis Group, New York and London 2021.
[7] The Law Officers Pocket Manual, 2021 Edition, John G, Miles Jr. David B. Richardson, Anthony E. Scudellari. Routledge, Taylor and Francis Group, New York and London 2021.

shall immediately notify a supervisor and shall provide written notification to their felony-level prosecutor's office and the court that authorized the warrant."

85. Here, based on the BWC video an officer can be clearly heard indicating that the persons in the house know the officers are coming after a motion-sensor camera captured the officers' approach.  Additionally, Casey indicated that he heard running inside the house. This is the type a circumstance during the execution of a search warrant coupled with the prior information known to the officers about guns and violence to include an assault on an officer, that would make an unannounced entry consistent with generally accepted policy, practices, training and industry standards in the field of law enforcement.  Additionally, law enforcement training recognizes that if a suspect knows the police are there, the reasoning behind the knock and announce is met and thus futile.

86. While I do not offer legal opinions, I note that Mr. Stephenson offered a number of legal opinions that indicated that officers are required under the Fourth Amendment to use lesser or least intrusive alternatives, for example, he states, "Again, depending on the totality of the circumstances, each circumstance, that the officers are required to be prudent. And under the Fourth Amendment, to utilize the least intrusive method of executing a search warrant and a search and seizure, as opposed to the interest of the government or what quantitative effect is there. They are required to make the decision." (139-140).   This opinion by Stephenson is not only contrary to the law enforcement training, Stephenson's legal opinion on the requirements of the Fourth Amendment are contrary to the law.

87. Law enforcement throughout the United States trains officers on local restrictions with respect to the service of search warrants.  Georgia, like most states has statutory law on the execution of search warrant generally which directs, "The search warrant shall be executed within ten

days from the time of issuance. If the warrant is executed, the duplicate copy shall be left with any person from whom any instruments, articles, or things are seized; or, if no person is available, the copy shall be left in a conspicuous place on the premises from which the instruments, articles, or things were seized. Any search warrant not executed within ten days from the time of issuance shall be void and shall be returned to the court of the judicial officer issuing the same as "not executed."[8]  Georgia statutory law directs "The search warrant may be executed at any reasonable time."[9]

88. It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the use of deadly force by Blaquiere and Casey was consistent with generally accepted policy, practices, training, and industry standards in law enforcement.

89. I would note that that there is a distinction between use of force by law enforcement up to and including deadly force and use of force by non-law enforcement officers which is generally restricted to self-defense and defense of others.  In providing training and writing policy for private entities such as private security, this distinction, is one of the foundational principles in the area of use of force.

90. There are several basic concepts trained to officers and embodied in policy and practice that must be applied to any use of force analysis.

91. It is well understood in law enforcement that the use of force must be judged from the perspective of the officer on the scene, taking into account what the officer reasonably

---

[8] Ga. Code Ann. § 17-5-25 (Lexis Advance through the 2023 Regular Session of the General Assembly).
[9] Ga. Code Ann. § 17-5-26 (Lexis Advance through the 2023 Regular Session of the General Assembly)

believed to be the circumstances at the time and not with 20/20 hindsight.  Here the officers were carrying out a lawful function having obtained a search warrant when the were suddenly confronted with a subject shooting at them, a clear and immediate threat of serious bodily harm or death.  Stephenson agreed that once the officers were in the house and fired upon, the officers reasonably perceived a threat to their lives. (125).

92. All officers are trained that they will be confronted with events where they will be forced to make split-second judgments in circumstances that are tense, uncertain and rapidly evolving, about the amount of force that is necessary in a particular situation.  It is noted that split-second decision making includes the decisions that must be made as the ground situation changes during a pre-planned event such as a high-risk entry.  The circumstances faced by Casey and Blaquiere changed from the execution of a search warrant to a deadly force encounter when Brown armed himself and began shooting at officers.

93. The goal of every citizen and law enforcement contact is for cooperation, compliance and control without injury or harm to anyone. Officers are frequently and sometimes violently confronted with dangerous circumstances, situations and individuals in rapidly evolving situations that require officer to make split second decisions that are necessary to protect themselves and other from injury; accomplish lawful detention or arrest; And, preserve their lives and the lives of others. It is well known in law enforcement that it is the subject who controls the decision as to whether any law enforcement contact escalates, based on the suspect's compliance or resistance, and that officer are placed into to a position of having to respond to the subject's conduct.  Here, it was Brown who escalated the event to a deadly force encounter.

94. It is well known that an officer reasonably perceives an immediate threat of serious bodily harm or death against themselves, another officer, or any third party, the officer may respond with deadly force. A fundamental principle of officer survival and use of force is the fact that action beats reaction every time.[10] Common defensive tactics programs offered to law enforcement as well as law enforcement related texts indicate that even a subject running from an officer can turn and fire two shots before the officer would be able to react.[11] It is well known in law enforcement that the physical lag time between an officer's perception of a threat and the response to the threat in many cases will put the suspect in a different position. The concept is well known in law enforcement and is consistent the Military's OODA Loop training which reflects that a person must first Observe the threat, then Orient to the threat, then Decide what action to take, and finally must Act.[12] It is well recognized that a threat can be carried out or positions will be changed during the time it takes an officer to cycle through this process. I would note that the OODA loop is an integral part of use of force training that I provide throughout the United States.

95. Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification. The first of these formulas is a three-part test that parallels the mandates announced by the United States Supreme Court in *Graham v. Connor.*[13] The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally, whether the subject is

---

[10] See e.g. <u>Deadly Force Constitutional Standards, Federal Policy Guidelines, and Officer Survival,</u> John Michael Callahan, Jr. Looseleaf Publications, Flushing, N.Y. 2001

[11] See e.g. Deadly Force Constitutional Standards, Federal Policy Guidelines, and Officer Survival, John Michael Callahan, Jr. Looseleaf Publications, Flushing, N.Y. 2001

[12] OODA Loop Model was first developed by Colonel John Boyd USAF during the Korean war.

[13] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States

actively resisting or attempting to evade arrest by flight.  Here the officers' use of deadly force was in response to Brown's serious crime, shooting at the officers; the immediate threat of serious bodily harm or death to the officers; and Brown's active resistance to the officers; lawful authority.

96. Additional factors that may impact use of force decision-making include: the number of suspects and/or officers; size, age, and condition of the officer and suspect;  duration of the action; whether the force applied resulting in injury; previous violent history of the suspect, known, to the officer at the time; use of alcohol or drugs by the suspect; suspect's mental or psychiatric history, known to the officer at the time; presence of innocent bystanders who could be harmed if force is used or not; availability of officer weapons, such as pepper spray, batons, or electronic control devices.[14]  Here Brown obviously had the availability of weapons.

97. It is recognized that when considering the seriousness of the offense; that such consideration includes the offense the officer suspects at the time the control tactic is used and not just the original offense or other justification which led the officer to contact the individual at the outset.  Thus, at the time the force was used the crime included Brown's attempt to murder police officers.

98. While I do not offer legal opinions in this report, I was a consultant in *Plumhoff v. Rickard,* where the United States Supreme Court made clear that the presence of other persons, even if close proximity to the officer's target does not change the reasonableness of an officer's

---

[14] Use of Force Student Text". FLETC, U.S. Department of Homeland Security Instructor Certification Course May 2021.

shooting at the intended target.[15]   I note that this has become a principle trained to officers throughout the United States since *Plumhoff* was decided.

99. An additional point trained to officers is that a use force only occurs with respect to an officer shooting an intended target.  Thus, to the extent that a fact-finder determines that an officers bullet struck James, there was no use of force on James since there was no intent to seize her.

100.     The second formula was commonly referred to as the "Use of Force Continuum." While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusion, such as officer presence and verbal commands, to the highest level, which is deadly force. It should be recognized that even in those agencies that still use a force continuum, the continuum is not a ladder that must be climbed step by step.  Instead, it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."  It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision-making model.

101.     Law enforcement training directs officers that the option they choose must be proportional to the offense they suspect, the articulable physical threat to the officer(s) or others, and the level of resistance offered by the subject.  It is recognized that the more

---

[15] *Plumhoff v. Rickard*, 134 S. Ct. 2012 * (U.S. 2014). "In arguing that too many shots were fired, respondent relies in part on the presence of Kelly Allen in the front seat of the car, but we do not think that this factor changes the calculus. Our cases make it clear that "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U. S. 165, 174, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969); see also *Rakas v. Illinois*, 439 U. S. 128, 138-143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

significant the crime, the more serious the degree of physical threat, and the more significant the degree of resistance, will authorize a more significant force option.   Here, officers were being fired upon by Brown and were clearly faced with an immediate threat of serious bodily harm or death.  Returning fire was clearly the proportional response.

102.      It is noted that generally accepted law enforcement policies and training make clear that when confronted with an imminent or immediate threat of serious bodily harm or death, the appropriate law enforcement response is the use of deadly force.  Blaquiere testified to the following about whether he fired blindly: "I did not fire blindly . . . I fired at the firearm . . . Yes, sir, I was trying to shoot the firearm out of the hand." (45).   I would note that it is consistent with generally accepted policies, practices, training and industry standard.   Law enforcement training makes clear that officers should fire at the center mass of the target that is available which in many cases is not the center mass of a person's body.  The federal law enforcement center points out that it is a misconception that "center mass" equals center chest noting, "Many law enforcement officers, as an indirect result of their firearms training come to believe that the center mass equals the center of the chest. That is because on the range, officers are taught to shoot at the center of the target, traditionally the chest area. Officers should understand that in reality, they may not always be in a situation or position where the full body of the subject is exposed.  If it is reasonable to shoot, the officer should attempt to deliver rounds to the center of the mass that is presented to them."[16]  Thus, upon having sight of the firearm as testified to by Blaquiere, shooting at the center of the firearm would be consistent with generally accepted policies, practices, training and industry standards.

---

[16] Use of Force Student Text". FLETC, U.S. Department of Homeland Security Instructor Certification Course May 2021.

103.     In response to facts hypothetically posed, Mr. Stephenson testified, "Then under that limited set of circumstances, he saw a weapon that was firing and returned fire at the weapon, it would be—could be reasonable under that narrowly-defined set of circumstances." (123-124).

104.     The desired law enforcement goal in using a firearm against an armed suspect is to bring the life-threatening confrontation to an instantaneous halt. This goal is not easily achieved. Suspects are not likely to remain in fixed position but instead move to avoid the shots or move to cover. Even if the suspect is shot it is likely that the deadly encounter will continue unabated. The objectively reasonably officer knows that most gunshot wounds are not fatal.[17] Even if the suspect receives a non-survivable wound, it does not mean he will be immediately incapacitated from assaulting officers with his weapon.  Therefore, vigilance must be maintained and may be continued until the threat is over.

105.     While Mr. Stephenson suggested that there is some lesser-intrusive means requirement under the Fourth Amendment with respect to force and the methods of executing search warrants. (132).  Without commenting on the law I would note that law enforcement training throughout the United States clearly directs that officers are not required to use less-

---

[17] "Deadly Force in Defense of Human Life," John C. Hall, J.D.  FBI Law Enforcement Bulletin,  August 1993, Volume 62, Number 8, Page 27.  "Even firearms, the most likely instruments to be used, offer no guarantee of a timely result. The evidence of medical science, confirmed by the experience of law enforcement, attests to the ability of the human body to continue deliberate actions even after sustaining grievous-even fatal injury. The reality is that most gunshot wounds are not fatal, and even fatal wounds do not necessarily cause instantaneous physiological incapacitation. A random review of the shooting deaths of 56 police officers during 1990 disclosed that 16 of those officers continued to perform some deliberate function after sustaining fatal wounds. Two of the officers called for assistance and 15 officers returned fire, killing 5 assailants and wounding 5 others. Four officers received fatal wounds to the head. To reliably deprive an assailant of the ability to carry out voluntary actions requires neutralization of the central nervous system, either directly by injury to the brain or upper spinal column or indirectly by depriving the brain of oxygen through massive blood loss. The time necessary to achieve the result may be seconds or minutes·- depending on the location, number, and severity of the wounds-but it may suffice for the assailant to carry out life-threatening actions. '

intrusive means with respect to search, seizure, or force as long as the actions they take are appropriate under the circumstances they face.

106.    In fact, one of the premier programs for use of force trainers is to attend the Federal Law Enforcement Training Center's Use of Force Instructor Certification program where instructors from the Federal Government provide the training.   FLETC instructs under a section Legal Misunderstandings (Myths v. Realities): (1) Minimal Force (a) Many officers have been taught (according to agency policy) that police officers must use the minimal amount of force available during a use of force incident. (b) The correct standard for use of force is 'objective reasonableness' not 'minimal force.' 'Minimal force' is a subjective standard, inconsistent with the precedent set forth in Graham v. Connor (1989). (2) Exhaustion or alternative force options not required (a) Some officers may believe that 'deadly force' is employed as a last resort and only when all lesser means have been exhausted. (b) The legal standard of reasonableness does not require officer to select the least intrusive means, only a reasonable one. (c) A domino effect occurs when reasonable use of force is not applied immediately to gain control.  Circumstances of the incident may become more dangerous, out of control, or unmanageable for the officer. (d) The officer's ability to choose a reasonable force option quickly and efficiently erodes the as the complexity of the situation increases. "Officer 'have' a duty to retreat. (a) Police officers have no duty to retreat in an effort to avoid using force on a suspect. (b) Officer must remember that based upon the totality of circumstances, disengaging from a threat in order to gain a tactical advantage and put themselves into a position of advantage may be a reasonable response to a critical incident."[18]

---

[18] Use of Force Student Text". FLETC, U.S. Department of Homeland Security Instructor Certification Course May 2021.

107.     Stephenson testified that Casey was "justified in using force—lethal force." (149).

108.     It is noted that Mr. Stephenson agreed that upon reviewing the officers' training records he determined that the officers were properly "qualified and certified." (124).

109.     Based on all of the foregoing, it is my opinion that the use if deadly force by Casey and Blaquiere was consistent with generally accepted policies, practices, training and industry standards.

110.     At this stage of my review, I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

111.     At this point in the development of this case, I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

112.     My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 15th day of  October 2023, in Greenville, R.I.

s/*John J. Ryan*
John J. Ryan