**C.J. vs MICHAEL BLAQUIERE**
**John J. Ryan on 11/01/2023**

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
BRUNSWICK DIVISION

```
C.J., a minor, by and          :
Next friend and guardian       :
BETTY JEAN MURPHY JAMES         :
And BETTER JEAN MURPHY          :
JAMES as Administrator of       :
The Estate of Latoya James,     :
          Plaintiffs,           :
                                :
        vs.                     :
                                :
MICHAEL BLAQUIERE, in his       :
Individual capacity as          :
Camden County Deputy            :
Sheriff, DOWNY CASEY, in        :
in his individual capacity,     :
as Camden County Deputy         :
Sheriff; and JANE/JOHN DOES,    :
in their individual             :
capacities, as Camden County:
Deputies.                       : Case Number:
          Defendants.           : 2:22-CV-00078-LGW-BWC
```

----------
Wednesday, November 1, 2023
----------

Videotape Deposition of JOHN J. RYAN taken
pursuant to notice via video teleconference on
the above date, beginning at approximately
10:05 a.m., before Charles P. Carmody, Federally
Approved Registered Professional Reporter and
Notary Public.

-----------------------------------

```
 1    APPEARANCES:

 2

 3       THE LAW OFFICE OF HARRY M.  DANIELS, LLC
         BY:   HARRY M. DANIELS, ESQUIRE
 4             4751 Best Road, Suite 490
               Atlanta, Georgia 30337
 5             (678) 6664-8529
               daniels@harrymdaniels.com
 6       Representing the Plaintiff

 7

 8       FREEMAN, MATHIS & GARY, LLP
         BY:   WESLEY C. JACKSON, ESQUIRE
 9             100 Galleria Parkway, Suite 11600
               Atlanta, Georgia 30339
10             (770) 818-4246
               wjackson@fmglaw.com
11       Representing the Defendant

12

13       STROM LAW FIRM, LLC
         BY:   MARIO A. PACELLA, ESQUIRE
14             1612 Newcastle Street, Suite 201
               Brunswick, Georgia 31520
15             (912) 264-6465
               mpacella@stromlaw.com
16       Representing the Defendant

17

18

19
      THE VIDEO SPECIALIST:
20             Jack McKenzie

21

22

23

24

25
```

```
 1                        INDEX

 2   WITNESS                                    PAGE

 3   JOHN J. RYAN

 4        Examination by Mr. Daniels              7

 5

 6

 7                     ----------

 8

 9                      EXHIBITS

10   NUMBER        DESCRIPTION                   PAGE

     P-1       Notice of Deposition.              11
11
     P-2       CV and Schedule 8.                 21
12
     P-3       John Besselman Biography.          42
13
     P-4       Article by John Besselman.         42
14
     P-5       Current Statute Legislation.       76
15
     P-6       Use of Force in Execution of       80
16             Search Warrants.

17          (Exhibits Retained)

18

19

20

21

22

23

24

25
```

```
 1              DEPOSITION SUPPORT INDEX

 2

 3

 4   DIRECTION TO WITNESS NOT TO ANSWER

 5   Page      Line

 6   -none-    -none-

 7
     REQUEST FOR PRODUCTION OF DOCUMENTS
 8
     Page      Line       Description
 9
     -none-    -none-    -none-
10

11   STIPULATIONS

12   Page      Line

13   -none-    -none-

14
     QUESTIONS MARKED
15
     Page      Line
16
     -none-    -none-
17

18

19

20

21

22

23

24

25
```

```
 1                    ----------

 2                    PROCEEDINGS

 3                    ----------

 4

 5                    It is hereby stipulated by

 6    and among counsel that the reading, signing,

 7    sealing, certification and filing are

 8    waived, and that all objections, except as

 9    to the form of the question, are reserved

10    until the time of trial.

11

12                    THE VIDEO SPECIALIST:  This is

13        the beginning of Media Number I in the

14        deposition of John Ryan in the matter of

15        C.J., versus Michael Blaquiere.

16             Today's date is November 1st, 2023

17        and the time on the monitor is 10:04 a.m.

18             My name is Jack McKenzie and I'm the

19        videographer.  The court reporter is Chuck

20        Carmody.  We're here with Huseby Litigation.

21             Counsel, please introduce yourselves

22        after which the court reporter will swear in

23        the witness.

24                    MR. DANIELS:  Good morning.

25        Harry Daniels here on behalf of plaintiff.
```

```
 1                    MR. JACKSON:  Wes Jackson for
 2    the defendant.
 3                    MR. PACELLA:  Mario Pacella for
 4    defendant.
 5
 6                    JOHN J. RYAN,
 7    having been first duly sworn, was examined
 8    and testified as follows:
 9
10                    MR. DANIELS:  Mr. Court
11    Reporter, I have some exhibits here.  I'll
12    keep a sheet and keep them on track here.
13    If I for some reason don't, then at the end
14    of this day we can make sure we have all the
15    exhibits lined up here.
16         Do I have access to the screen, the
17    screen share?
18                    MR. JACKSON:  Yeah.  If you
19    just hit that green button in the middle at
20    the bottom.
21                    MR. DANIELS:  Okay.  Gotcha.
22    Thank you.
23                    ----------
24                    (Whereupon, a discussion was
25    held off the record.)
```

```
 1                    ----------

 2

 3                    ----------

 4                  EXAMINATION

 5                    ----------

 6

 7   BY MR. DANIELS:

 8   Q.        All right.

 9             Good morning, Mr. Ryan.  I'm

10   understanding you go by, your actual name is

11   John, and Jack is your nickname; is that right?

12   A.        Yes.  And I've always been referred to

13   as Jack.  In fact, I probably wouldn't turn my

14   head if somebody yelled, "hey, John."

15   Q.        I got you.  I understand that.

16             Mr. Ryan, I'm going to show you based on

17   reading your CV, you've done several depositions;

18   is that correct?

19   A.        Yes, sir.

20   Q.        And I understand that you're also a

21   licensed attorney; is that correct?

22   A.        That's also correct.

23   Q.        And you've been an associate since 1994?

24   A.        Yes, sir.

25   Q.        So this is a little housekeeping.  I'm
```

1   sure you've heard them all before.  Obviously,

2   this quote has been taken down in this particular

3   matter.  And counsel, we have agreed to reserve

4   all objections with exception to the form and

5   responses as far as to use this deposition?

6   A.      Yes.

7   Q.      All right.

8           This deposition is take pursuant to the

9   federal supercedes act.

10          Mr. Wright -- I'm sorry -- Mr. Ryan, I'm

11   sorry.

12          During the course of this deposition I

13   may ask a question.  Make sure that you

14   understand.  If you do not understand the

15   deposition, I mean, the question, just ask me and

16   I'll do my best to clarify.

17          It's my understanding that you're not

18   represented by either counsel.  So I'll ask you

19   to respectfully answer all questions to the best

20   of your ability.

21          If some portions of this deposition

22   comes to -- if counsel makes an objection, allow

23   them to make an objection, allow us to make the

24   objection on the record and will proceed subject

25   to that answer.

```
 1                  Do you understand that?
 2     A.        Yes, sir.
 3     Q.        Obviously, you understand that this is
 4     a -- the court reporter is taking down and it's
 5     being video recorded.  A lot of times we'll have
 6     inaudible responses, un-huh, yeah, I'm sure
 7     you've heard it all before.
 8                  Do your best to have clear responses,
 9     okay?
10     A.        Yes, sir.
11     Q.        I was hoping you were going to say
12     "uh-huh" and I was going to get --
13                  All right.  Okay.
14                  Mr. Ryan, have you had a good night's
15     rest before this deposition?
16     A.        I did.
17     Q.        And there's nothing here that would
18     prevent you from testifying truthfully today,
19     correct?
20     A.        No, sir.  Every once in awhile you might
21     hear a puppy in the background.
22     Q.        I'm showing you -- I'm going to put on
23     the screen here.
24                      MR. DANIELS:  Mr. Court
25          Reporter --
```

```
 1                    THE COURT REPORTER:  Yes, sir.
 2                    MR. DANIELS:  This is a notice
 3      to depose Mr. Wright -- I'm sorry --
 4      Mr. Ryan.
 5   BY MR. DANIELS:
 6   Q.       It doesn't interfere at all.  I may be
 7   the one struggling.
 8            I was going over a lot of material last
 9   night to be ready for you.  So if I struggle I
10   know you're a lawyer and you can help me out,
11   okay?
12   A.       There you go.
13   Q.       All right.
14            I'm showing you what I'm going to put on
15   the screen here.
16                    MR. DANIELS:  And Mr. Court
17      Reporter, this is a notice to depose
18      Mr. Wright -- Mr. Ryan.
19   BY MR. DANIELS:
20   Q.       Do you see that, Mr. Ryan, do you see
21   the notice to depose on the screen?
22   A.       Yes, sir.
23   Q.       All right.
24            And this was given to counsel and given
25   to us -- hold on one second here -- this was
```

1   given to counsel and given to us, notice of your

2   deposition, Steve Grundberg.

3                    MR. DANIELS:  We're going to

4        mark this as Exhibit-1, Plaintiff's

5        Exhibit-1.

6                    ----------

7                    (Whereupon, a discussion was

8        held off the record.)

9                    (Whereupon, Deposition Exhibit

10       Number Plaintiff's 1 was marked for

11       identification.)

12                   ----------

13  BY MR. DANIELS:

14  Q.       Have you had a chance to look at it?

15  A.       Yes, sir.

16  Q.       And this is the notice you received,

17  correct?

18  A.       Yes, sir.

19  Q.       Okay.  All right.  Thank you.

20           Mr. Ryan, let's go look at your

21  background.  Like I said, I received your CV and

22  your Schedule 8.

23           And just going over a confirmation of

24  what you placed on here, from my understanding

25  what is your current, I guess, professional

1    position?

2    A.         So, you know, I'm independent contractor

3    to a group called LLRMI, the Legal Liability Risk

4    Management Institute which owned by a guy named

5    Jim Alsup.  I think his corporate name is Loan

6    Risk Management Group.  And in that position I do

7    training throughout the United States, I do

8    audits of agencies because either, A, there

9    wasn't another set of eyes to look at them or

10   there's a problem in the agency.

11              I also write policies for the various

12   groups and I think for 24 different states.

13              I do policy training and audits and then

14   I get involved looking at law enforcement

15   litigation whether it be a civil, sometimes

16   criminal.  So not straight up litigation but

17   sometimes criminal.  I'm going to be testifying

18   in a criminal case next week in Tacoma,

19   Washington.

20              So I get involved in lots and lots of

21   cases as a consulting expert or testimonial

22   expert if the attorney choses for me to do that.

23   Q.       All right.

24            And you've held that position is that

25   since 2003?

1    A.        Yeah.  Actually, you know, I started

2    helping another expert do some of his cases back

3    in, I think, 1998.  And I started training

4    nationally in 2001.  But I think we actually

5    formed LLRMI right around 2003, and that's when

6    we started doing a lot of the policy work and a

7    lot of the audit work.

8    Q.        All right.

9              Have you ever done any training or, I

10   guess, towards your job as legal a lot of the

11   Risk Management Institute in the State of

12   Georgia, the state of law enforcement in Georgia?

13   A.        Yeah.  I do a lot of training in

14   Georgia.

15   Q.        Do you know what agencies?

16   A.        Well, a lot of them are through LLRMI.

17   I'm trying to think there's a group that brings

18   them in on a regular basis to either speak to

19   jail officers or road officers.  I do the new

20   sheriff's conference.  I've been doing that every

21   four years probably for the last at least twelve

22   years, at least the last three cycles when they

23   have the sheriff's elections every four years, I

24   go down and do the new sheriff's training.

25              So I've done that.  I'm sure I've spoken

1   at the Georgia Association Chiefs of Police at

2   times.  I don't know that I've been brought in by

3   a specific agency because what happens generally

4   is there's multiple agencies sitting in on the

5   training when I go.

6   **Q.      Is there some type of accreditation or**

7   **did you all provide to anyone you see that goes**

8   **to the training?**

9   A.      Well, yeah, they get a certificate of

10  attendance and some of the trainings are

11  certification programs.

12          So for example, I do use of force

13  certification program.  I don't know if I would

14  guess that some officers from Georgia have been

15  through that.  But I don't know that that program

16  has been offered in Georgia itself.

17          Generally, it's large venues because we

18  draw people from all over the United States into

19  those programs, not that Georgia doesn't have

20  some large venues.  Don't take it that way.

21          But we've done them in Las Vegas.  We've

22  done them outside of Nashville, some places like

23  that.

24  **Q.      So you wouldn't -- would you know -- I**

25  **guess what I hear you testify is that you**

1  wouldn't know specific agencies that would

2  attended the training as a mobile agencies

3  without the state would come to the training -- I

4  don't want to put words in your mouth -- you

5  don't go to the specific agency and do training;

6  is that right?

7  A.        I do.  But I don't know that I've done

8  that in Georgia because generally they're

9  regional trainings.  And multiple agencies attend

10  and then LLRMI obviously keeps rosters, requires

11  officers to sign so that they get their Georgia

12  Post credits.  Because all of the trainings are

13  accredited through Georgia Post.

14         So you know, they would have to

15  documentation of where the officers are from and

16  submit those to Georgia Post.

17         But I don't get involved in the

18  logistical piece.  I do the actual training.

19  Q.        Do you ever do any training with Camden

20  County Sheriff's office with regard to going to a

21  specific agency?

22  A.        I would say no.  Because I can't recall

23  ever going to a single specific agency in the

24  State of Georgia.

25         As I said, they may have and probably

1    have attended some of the regional trainings that

2    I've done throughout the state, but I can't say

3    one way or the other I don't know anybody from

4    Camden County and I don't recall specifically

5    somebody saying, Hey, Jack, I'm from Camden

6    County.

7    **Q.        Okay.  All right.**

8              **Here you have a police policy to**

9    **consult, train and other.**

10             **Is that part of a legal document at Risk**

11   **Management Institute?**

12   A.        No.

13             I'm sorry.  I didn't mean to cut you

14   off.  I thought you were done.

15             No.  It's all the same.

16   **Q.        So would you say that there's a code of**

17   **the range of legal liability at the Risk**

18   **Management Institute in policy and police**

19   **practices, consult, train, that's all part of one**

20   **group; is that correct?**

21   A.        That is correct.

22   **Q.        So you became the codirector, I'm**

23   **assuming, in 2003; is that right?**

24   A.        We actually formed a subsidiary, if you

25   will, in 2003 to specifically try to help law

 1   enforcement professionalize throughout the United

 2   States.

 3          So that group was formed in 2003.  At

 4   the time it was myself, Patrick Gallagher who has

 5   since passed away, Lou Rider, who was the former

 6   deputy chief of Los Angeles, and Jim Alsup, who

 7   actually owns the company that we're all

 8   independent contractors for.

 9   Q.      Got you?

10          What was the name of the parent company?

11   A.      I think the corporate structure is Law

12   Enforcement Risk Management Group.  It used to be

13   -- and just so the record is clear -- it used to

14   be public agency training counsel and Jim Alsup

15   sold that company seven years or so ago.  My day

16   may be off, or my year maybe off.

17          But he sold that but he kept the portion

18   of company that dealt with trying to help

19   professionalize law enforcement policy, training,

20   those kinds of things at the time.

21   Q.      Then yearly, I guess, would you go out

22   and do this training with that company?

23   A.      You know, pre-pandemic I think I was

24   probably out of 40 weeks a year.  I think I'm

25   probably going too be back up to 30 weeks.  This

1  year, I have to go back and look at it.  But I'm

2  going to guess that I'm up to 30 weeks between

3  now and the end of year.

4  **Q.        How would your service be peculiar, who**

5  **would engage, would you all like do a solicit**

6  **like in the police chief's magazine or with**

7  **specific corporations or agencies in state, would**

8  **they solicit your all service?**

9  A.       Yeah.

10          You know, I don't tell get involved in

11  any of that quite honestly.  But my -- just

12  anecdotally I think that most agencies seek us

13  out.  There's actually -- let me just say that

14  there's three ways that we do program apps.  One

15  way is when an agency seeks us out to do a

16  program just for that agency.  It doesn't have to

17  be a just that agency.

18          I'll just give you an example.

19          Kentucky Association of Counties, for

20  example, may bring us in to provide a training

21  for all of the sheriff's organizations in

22  Kentucky.  Buckeye State Sheriff's Association

23  might bring us in to do a program for all of the

24  Ohio sheriffs.

25          New Jersey State Police or New Jersey

1   chiefs of police might bring us in to do program

2   for All of te State of New Jersey.

3          So sometimes we do what are call

4   contract classes.  Those would be contract

5   classes.  So there's no advertisement at all on

6   those, and I think those they come to us.  They

7   do, and I don't do many of them it, but LLRMI

8   does some marketing classes.

9          So they have cosponsoring agencies that

10  essentially bring LLRMI in.  They get some free

11  seats in the class, and then LLRMI markets the

12  class to officers around that region and they pay

13  an individual tuition to attend that class.  So

14  there's different ways that those come.

15  **Q.     I got you.**

16  **        All right.**

17  **        I'm going to -- let's see here.**

18          MR. DANIELS:  I'm going to

19       introduce this as Plaintiff's Exhibit-2,

20       your Schedule 8 and your CV.  I guess it

21       would be A through I got here, A through

22       schedule D.

23          THE WITNESS:  Not to correct

24       you, you know, but I think schedule D are my

25       materials so A through C is my CV.

```
 1   BY MR. DANIELS:
 2   Q.        Yeah.  We'll go through A through C.
 3            I'm going to give it one exhibit.  I
 4   have your schedule D materials in this particular
 5   case and also your report.  So we'll just put it
 6   all in one.
 7            What I did I provided the P&Ls.  I know
 8   we're sitting on them separately for the purpose
 9   of submitting them into evidence for this
10   deposition.
11                    MR. DANIELS:  Hold on one
12        second.
13                    ----------
14                    (Whereupon, a discussion was
15        held off the record.)
16                    ----------
17                    THE WITNESS:  I apologize.  But
18        I've been fighting a cold since last
19        Thursday.
20   BY MR. DANIELS:
21   Q.        Mr. Ryan, I think I know myself and I
22   know that counsel is under the weather, so if I
23   sound a bit stiff, I do apologize.  I'm usually a
24   lot more clear than this.  When the season
25   changes it gets me every time, every time,
```

 1   one-hundred percent.

 2            All right.  Here we go.

 3            Now, I'm showing you my screen.

 4                 MR. DANIELS:  Mr. Court

 5       Reporter, we're going to mark this as

 6       Plaintiff's Exhibit-2.

 7                 ----------

 8                 (Whereupon, a discussion was

 9       held off the record at this time.)

10                 (Whereupon, Deposition Exhibit

11       Number Plaintiff's 2 was marked for

12       identification.)

13                 ----------

14   BY MR. DANIELS:

15   Q.       As Mr. Ryan stated, it also includes his

16   schedule D which was materials that was reviewed

17   in this particular matter to includes his report

18   and his invoice for expert services provided.

19            Mr. Ryan, you also -- did you receive

20   payment from us for your notice, for your, to

21   come here for this deposition and be present?

22   A.       And I got to be honest with you, I don't

23   know the answer to that.  That goes to the

24   company and I won't know that until they actually

25   make payment to me.

1    Q.        Okay.

2    A.        I don't know if they've done that yet.

3    But I have no idea.

4    Q.        Nobody told you that you would not

5    receive a payment, correct?

6    A.        Correct.  And it's not something I worry

7    about to be honest with you.

8    Q.        All right.

9              Here I'm showing you your Schedule A.

10   And I'm just going to skim through real quick.

11   If you see anything different here, just let me

12   know.

13   A.        The only thing I will tell you is my

14   testimony gets updated as I testify.  So later

15   today it will get, you know, updated to include

16   today.

17             So if there's anything, any testimony

18   that I've given over the last couple of weeks or

19   however many weeks there are since I issued this

20   report, it will be updated with those additional

21   testimonies.  Any conferences that I trained at.

22   So for example I did four cities in four days in

23   the last week in Ohio.  Those would be updated to

24   this list as well.

25   Q.        What about your opinion, what about your

1  opinion in this matter, would it also be updated

2  or available?

3  A.        No.  I haven't updated anything on

4  opinion in this case.

5  Q.        I'm asking you after this testimony, is

6  it possible that you can also change your

7  opinion, or have you ever done it in the past?

8  A.        Well, what's happened in the past is

9  sometimes I'm asked questions in the deposition,

10 and I respond to those questions and, you know, I

11 had one case where the counsel on the other side.

12 That's not in your report.  You can't testify to

13 that.

14        And the judge ruled that I can because

15 the attorney opened the door in the deposition.

16 But that's how it's come up more often than not.

17 Q.        Okay.

18        I'm just taking a look to see your

19 exhibit here.

20        We'll get to the report.

21        Okay.  All right.

22        Going back to your CV here, Schedule A.

23 We'll talk about your employment also here with

24 the codirector with liability and risk management

25 and police practice, consult, training, all of

```
 1    it.

 2            I see here that it says adjunct

 3    professor.

 4            How do you say the university, is it Sal

 5    Regina?

 6    A.      Close.  Salve Regina.  You probably got

 7    closer than anybody's ever said it.  Salve

 8    Regina.

 9    Q.      Salve Regina.

10            Where is that located at?

11    A.      That's in Newport, Rhode Island.

12    Q.      And I see here that you teach

13    constitutional issues in law enforcement; is that

14    right?

15    A.      Correct, criminal procedure for law

16    enforcement officers, yes.

17    Q.      So do you do anything such as search and

18    seizures and all those things under the

19    constitution to today's law enforcement?

20    A.      Of course.

21    Q.      All right.

22            And going back here, you've been

23    licensed in Rhode Island since 1994; is that

24    correct, as a licensed attorney?

25    A.      Yes, sir.  Yes, sir.
```

1    Q.        In the capacity as an attorney, what

2    role have you had in the capacity as an attorney,

3    defense, civil, anything in that capacity?

4    A.        Say that part again.

5    Q.        As a lawyer what jobs or what role have

6    you had as a lawyer, a licensed attorney?

7    A.        You know, I've done a couple of cases.

8             Well, I've done one case back when I

9    first past the bar.  And I entered an appearance

10   in a probate case a few years ago for a friend of

11   mine.  But when he was being difficult with

12   providing the information that was necessary to

13   close out the probate, I actually passed it off

14   to one of my law school partners.  So I still

15   don't think that she's got it resolved at this

16   point years later.

17            I have consulted with other attorneys at

18   times on cases, not as an expert witness but to

19   guide them.  But I didn't enter an appearance in

20   those cases, so I would say that I didn't have

21   any role as an attorney.  I was more of a

22   consultant even though I applied my skills as an

23   attorney to those cases.

24   Q.        Have you ever tried a case?

25   A.        Only one.  And I won.  So I'm batting a

1    thousand.  But it was a very mall case and it was

2    the only case I ever did enter an appearance on.

3    It's the only one I ever tried.  It's the only

4    one I ever took to verdict.

5    **Q.        What case was that?**

6    A.        It was a case where a contractor fell

7    off of a roof of a house, an icy roof.  He had

8    fixed the roof prior to the ice and then the roof

9    leaked.

10           The homeowner called him because the

11   roof was leaking.  He went up on the roof and

12   fell off and broke his back I think, and

13   ultimately, what happened was he sued the

14   homeowner and the homeowner whose son was a

15   friend of mine failed to respond to the

16   complaint.

17           He didn't hire a lawyer, and got a

18   default judgement entered against the homeowner.

19           A lien was put on the house.  It was

20   appealed to Superior Court and it sat around for

21   years and years, and then there was an offer by

22   the plaintiff for a very nominal fee.  He had

23   gone bankrupt -- what I considered a nominal fee,

24   it was $500, I think.  And my client accepted

25   that $500.

1   Q.       Have you ever given any oral argument to

2   any type of court of appeals, anything in that

3   capacity?

4   A.       No, I have not.

5   Q.       What about brief writing such as, I

6   guess, I don't know about a trial that's been

7   mentioned.

8           Have you done any brief writing either

9   writing in a case, motions, response.  Any ghost

10  writing for anybody in the course of your legal

11  career?

12  A.       No.  I wouldn't say that I've done any

13  of that.  Probably the closest I would come to

14  that is I did provide some policy research to one

15  of the groups that wrote an Amicus brief in the

16  Scott versus Harris case that went up to U.S.

17  Supreme Court.  But it was just policy.  We

18  researched the stuff I do on a regular basis and

19  then I already had the materials.  I just

20  forwarded the materials basically.  Some

21  additional research.

22  Q.       I'm very familiar with the Scott versus

23  Harris case.  A chase, a police pursuit actually

24  took place where I live at, right down the

25  street.

```
 1              I know the deputy for Calameda County
 2    (ph) was involved.  So I'm very familiar with
 3    those facts.  It was right down the street from
 4    my house.
 5    A.      Okay.
 6    Q.      Do you see here, yeah, from 1992 to 2002
 7    he was a police officer of the Providence Police
 8    Department; is that correct --
 9    A.      Yeah.  You know, I have to fix that
10    because that "justice" should be on the above it.
11    Somehow it's dropped down.  That's the
12    administration of justice that goes to the
13    college.  So that police officer should be out
14    into the margin.
15    Q.      Yeah.  That what I thought.  It might
16    have been a margin issue when I saw the justice.
17              So he was a police officer of the
18    Providence Police Department?
19    A.      Yes, sir.
20    Q.      Is that where the judge that comes on TV
21    that gives people all the breaks on the tickets
22    and things?
23    A.      Yes.  Judge Caprio is a great guy.  He's
24    in his 90s now.  They dedicated the courtroom to
25    him last week.  He's not doing that show anymore.
```

1   He finally gave it up a few months back.  But

2   Judge Caprio was a great, great man and his

3   assistant in the courtroom for most of time he

4   did that much is Robert Quinn.  And Robert Quinn

5   and I went through the police academy together.

6   Q.      Did he ever dismiss any of your tickets?

7   A.      No, no, I can't say that he did.

8   Q.      That's a good deal.

9           And here I was going through your CV, a

10  little like from 1986 to '97 you were a part of

11  the SWAT team; is that correct?

12  A.      Yeah.  It's actually, you know, I think

13  it's going to be accurate but I think I stayed on

14  the team almost until 2000.

15          I'd have to go back and look.  I don't

16  know why it says that.  You know, obviously, I

17  put it in there and I just gave them my personnel

18  file when I put this together back in 2002.  So

19  maybe that's when they had me listed on the team.

20  That would be my guess.

21  Q.      Okay.  All right.

22          During the course of your, I guess,

23  employment with the Providence Police Department,

24  did you serve any search warrants?

25  A.      Oh, many, many.

1    Q.        How many would you say?

2    A.        I have no idea.  It would be pure

3    speculation on my part.  But I'll you tell that

4    1985 to 1987 period when I was in the tactical

5    division, we did the vast majority of warrants

6    for the narcotics unit because they wanted a

7    uniform presence at all search warrants.

8            So it wouldn't be atypical for us to do

9    several a week during that two year period.

10   Certainly, any high end warrants during that 1986

11   to 1997 period would be done by the SWAT team, so

12   there was a lot there.

13           When I was in detectives we did some of

14   our own warrants.  And then as a patrol division

15   sergeant and lieutenant we oftentimes call to

16   support, either narcotics or the SWAT team to

17   execute the search warrants.

18           As a lieutenant, it's a weird dynamic,

19   but in Rhode Island by state statute.  In

20   Providence every search warrant has to be sworn

21   to by a lieutenant from the Providence Police

22   Department.  So the narcotics investigator goes

23   with the lieutenant to the courthouse or to a

24   judge's house and gets them signed.  So I had

25   oversight for search warrants for all of those.

1  And if I was the one that went to the judge's,

2  nine times out of ten I would try to go with a

3  warrant too for the execution.

4  **Q.        Rhode Island, do you know whether they**

5  **recognize, what do they do, currently issue**

6  **no-knock warrants, currently today?**

7  A.        You know, I haven't looked at that

8  recently.  You know, there's been a lot of reform

9  throughout the country.  So I would be

10  uncomfortable answering that.

11          My inclination is they are still

12  allowed, but I wouldn't be a bit surprised if

13  there's legislation saying no.  There's been a

14  lot of legislation over the past couple of years

15  that have changed things.

16          So I wouldn't comfortable answering it

17  without looking it up.

18  **Q.        So at present today you wouldn't still**

19  **execute or allow no-knock warrants?**

20  A.        No.  I'd have to actually look it up to

21  see if the state statute on these warrants has

22  been changed.

23          I know we are in lockstep with the

24  fourth amendment as far as the criminal procedure

25  goes.  So my inclination is they're still

1  allowed, but without actually looking up some of

2  the reform legislation that's been suggested.  I

3  don't know that any of it's passed.  I'd just be

4  uncomfortable answering the question.

5  **Q.        All right.**

6  **          You're talking about reform legislation**

7  **or reform legislation, I guess, in multiple**

8  **states.**

9  **          Are you aware there certain states have**

10 **banned no-knock warrants?**

11 A.        Absolutely, yeah.

12          You know, I write policy in many states.

13 And as a matter of state law, there have been

14 states that have either banned or seriously

15 limited no-knock warrants.

16          And there's cities that have banned them

17 by ordinance too.  You know, Kentucky has banned

18 them by ordinance.  The State of Kentucky has not

19 banned them but has to put significant

20 restrictions on them.

21 **Q.        Would you say that was after the Breanna**

22 **Taylor incident took place?**

23 A.        Yes.

24 **Q.        And to enforce the ban of the no-knock**

25 **warrant or limited the restriction of no-knock**

1   warrants, why do you believe the basis of why

2   legislation and/or city ordinances were limited

3   or banned no-knock warrants?

4   A.          You know, some of it quite frankly is a

5   knee-jerk reaction to criticisms of law

6   enforcement.  There's been a lot of reform for

7   that.

8            So part of it is that.  Part of it is

9   that cities and some states feel it's just not

10  worth it to do these kind of warrants because it

11  puts officers at risk and it may put citizens at

12  risk.  So for potential, for example, the person

13  not knowing that it's the police coming in when

14  you do a stealth warrant.

15  Q.          Do you agree -- and you may agree or

16  disagree, do you agree that restriction on

17  no-knock warrants, and I think you said knee-jerk

18  reaction to the public criticism is one of the

19  reasons you believe so, correct?

20  A.          I think that's one of it is that, you

21  know, some of the reform is in response to, you

22  know, public criticism, and politically, some

23  legislators believe that that's important to make

24  that change.

25                    MR. DANIELS:  Could we go off

```
 1            the record for one second here?

 2                       ----------

 3                       (Whereupon, a discussion was

 4            held off the record.)

 5                       ----------

 6                       THE VIDEO SPECIALIST:  The time

 7            is now 10:35 a.m.

 8                  We're now off the record.

 9                       ----------

10                       (Whereupon, a brief recess

11            occurred at this time.)

12                       ----------

13                       THE VIDEO SPECIALIST:  This is

14            the beginning of Media II.  The time is

15            10:42 a.m.

16                  We are back on the record.

17     BY MR. DANIELS:

18     Q.       Mr. Ryan, when I think we went off the

19     record I wanted to ask you questions about what

20     issues that a no-knock warrant can present?

21            I think you were saying that we were

22     talking about some legislation reform or

23     regulation.  No-knock warrants and how you

24     believe it could have been a knee-jerk reaction

25     or response to the public and also the risk of
```

1    danger to law enforcement and the sentencing of

2    no-knock warrants; is that correct?

3    A.        Yes.  I think that's accurate.

4              When I say "knee-jerk reaction," I mean

5    more of a political reaction in response to the

6    public criticism.

7    Q.        Okay.  All right.

8              Are you familiar with the case Hudson

9    versus Michigan, a 2006 Supreme Court case?

10   A.        Yeah.  I'm sure I wrote something about

11   that case.  I'm sure I've written an article

12   about that case, yes.

13   Q.        All right.

14             And I'll represent to you that in the

15   majority opinion that was actually authored by

16   Justice Scalia, the Supreme Court noted that the

17   interest protected by the knock and announce

18   requirement include -- and we're talking -- and

19   I'm saying knock and announce.  No no-knock here.

20   The protection of human life and limb because the

21   unannounced entry may provoke violence.

22             And violence is supposed self defense by

23   surprised residents to the protection of property

24   whether it's damage or breaking into a house, and

25   three, the element of privacy and dignity that

1    can be destroyed by the sudden injuries.

2            Have you read anything like that in

3    Hudson versus Michigan or had an opportunity to

4    review it?

5    A.       You know, I think, and again, you can

6    correct me if I'm wrong, but I think it was an

7    exclusionary rule case where they ruled that the

8    exclusionary rule case did not apply to the

9    failure to knock and announce.

10           But I think there is that dictum in the

11   case that suggests that those are some of the

12   points that have to be considered as to the

13   purpose for knocking and announcing.

14   Q.       Right.

15           And this is a 2006 case, Hudson versus

16   Michigan, a matter that took place out of Detroit

17   by the Detroit Police Department.

18           And you would agree that even in 2006,

19   at least 2006, or as early as 2006 that Supreme

20   Court considering knock and announce warrants,

21   that one of the concerns that the protection of

22   human life and limb because an announced injury

23   may provoke violence and as supposed some

24   complaints by surprised residents; would you

25   agree with that?

 1                         MR. JACKSON:  Object to the

 2          form.

 3                         THE WITNESS:  I would agree

 4          that they said that in that case.  There's

 5          other cases where they authorized no-knock

 6          warrants as well.

 7     BY MR. DANIELS:

 8     Q.        Well, I understand being authorized by

 9     warrants, I asking whether it did good that

10     Supreme Court Justice Scalia opined that one of

11     the things they considered that the Supreme Court

12     noted that each is protect by the knock and

13     announce.  And that one of the things that they

14     looked at and opined was protection of human life

15     and limb.  Basically, fathers can be provoked if

16     the knock and announce is not done properly;

17     would you agree?

18     A.        Again, I don't have the case in front of

19     me.  But you know, I certainly trust that you're

20     reading it exactly as it said.

21               With that said, I agree that they said

22     that, and I agree that there is at least some

23     thought that that's one of the issues that we

24     consider when we balance whether to do a no-knock

25     entry or not.  That's one of the things that we

1   consider.

2   **Q.       And the reason why I ask that question**

3   **because I think when you said question that --**

4   **not to take away your testimony -- that each**

5   **action, no-knock warrants was kind of political**

6   **and I know that as recent as when Breanna Taylor**

7   **in Louisville and no-knock warrants I just want**

8   **to point to you and if you was aware that the**

9   **Supreme Court has considered in executing knock**

10  **and announce warrants that they must be done in a**

11  **particular matter in consideration for protection**

12  **of human life and not to provoke violence; would**

13  **you agree?**

14  A.       Well, I think they've done both.  They

15  allowed no-knock warrants, but they've also

16  pointed out in dicta, they have suggested that

17  some of the considerations are those

18  considerations that you read, but my prior

19  testimony was in references to statutory reform

20  because that's what we're talking about at the

21  time.

22  **Q.       I got you.  All right.**

23  **          I don't want to drop the gun here now.**

24  **There's a few things to talk about.**

25  **          Do you know who John Besselman is, have**

 1   you ever heard of him, John P. Besselman.

 2   A.        Not ringing a bell.

 3                    THE COURT REPORTER:  Can you

 4       spell that for me?

 5                    MR. DANIELS:  Let me make sure

 6       I'm saying it right.  It's

 7       B-E-S-S-E-L-M-A-N.  Like Besselman, John P.

 8       Besselman.

 9                    THE COURT REPORTER:  Thank you.

10   BY MR. DANIELS:

11   Q.        You say you haven't heard the name?

12   A.        It's not ringing a bell.  You know, if

13   you put it in context of something he's written

14   or something that he said I might have have known

15   the material, but that name doesn't ring a bell

16   to me.

17   Q.        I represent to you that John Besselman

18   is a senior legal advisor for training, office of

19   chief counsel for the Federal law enforcement

20   Center, U.S. Department of Homeland Security,

21   down in Glenville, Georgia; does that ring a

22   bell?

23   A.        Oh, yeah.  I'm very familiar --

24   Q.        You're familiar with flat C.  I'm sorry.

25   A.        Yeah.  In fact, flat C uses some of my

 1  material in their use of force and instructor

 2  class.

 3  **Q.        Well, you're not familiar with that**

 4  **particular person, correct?**

 5  A.        And again, I may be.  Many of the flat C

 6  people have been through my classes.  I may be,

 7  but I don't know the name.

 8  **Q.        All right.**

 9          **I'm going to add a zipper here.  There's**

10  **John Besselman's work of what may be his bio with**

11  **the Department of Homeland Security here.**

12          **Maybe I can refresh your memory if**

13  **you're familiar with him or not.**

14                  MR. DANIELS:  Mr. Court

15          Reporter, I put this in as exhibit, this

16          here exhibit will maybe refresh Mr. Ryan's

17          memory of whether he was aware of John

18          Besselman or have any knowledge of him.

19                  Yeah, I'm not going to mark it.

20                  ----------

21                  (Whereupon, a discussion was

22          held off the record.)

23                  ----------

24                  THE WITNESS:  You know, without

25          a picture I don't know if hes one of the

1       legal advisors that have been through my

2       program or not.  I don't know if you have a

3       picture of him or not, but that's not really

4       doing anything for me.

5    BY MR. DANIELS:

6    Q.        Okay.  All right.

7              I figured that might have been your

8    response.

9              You have no reason to discredit John

10   Besselman as a senior legal advisor for the

11   training at the federal law enforcement training

12   center, would you?

13   A.        I don't have anything to support or

14   undermine him.  No, I don't know.  I would have

15   to see what he wrote and what he wrote on and all

16   of that.

17   Q.        It looks like you read my mind.

18             I'll stop screen sharing.

19                    ----------

20             (Whereupon, a discussion was

21       held off the record.)

22                    ----------

23             MR. DANIELS:  Mr. Court

24       Reporter, let's go ahead and mark -- as soon

25       as I said it I thought about it.

```
 1                  Let's go ahead and mark
 2        Mr. Besselman's bio as Plaintiff's
 3        Exhibit-3.  Let's go ahead and do that.
 4                  ----------
 5                       (Whereupon, a discussion was
 6        held off the record.)
 7                       (Whereupon, Deposition Exhibit
 8        Number Plaintiff's 3 was marked for
 9        identification.)
10                  ----------
11                       MR. DANIELS:  This is an
12        article written by Mr. Besselman.  The title
13        is Knock and Announce Rule, Knock, Knock,
14        Knocking on the Suspect's Door.
15                  We're going to mark this as
16        Plaintiff's Exhibit-4.
17                  ----------
18                       (Whereupon, a discussion was
19        held off the record at this time.)
20                       (Whereupon, Deposition Exhibit
21        Number Plaintiff's 4 was marked for
22        identification.)
23                  ----------
24        BY MR. DANIELS:
25        Q.      All right.
```

1           Mr. Ryan, I'm going to be asking

2     questions from this article.  I can e-mail it to

3     counsel, e-mail it to you so you can get a chance

4     to look at it and read it.

5           I just want to skim through it and you

6     can try to read it as I move forward.

7           Would you look at that?

8     A.       I mean, we can.  Obviously, I'd have to

9     know when it was written in response to what

10    obviously -- it's the interpretation at this

11    point.  I can see that it's an interpretation of

12    a federal statute, not the fourth amendment.

13          At this point in the article it is not

14    something that I've read in the past, and I have

15    no idea when it was written.

16                    MR. DANIELS:  Counsel, can I

17        e-mail it to you and you can e-mail it to

18        Mr. Ryan?

19                    MR. JACKSON:  Yes.  You can

20        e-mail it to and I can send it to him.

21            The information about his name, I

22        went ahead and found it.

23                    MR. DANIELS:  You found it

24        already?

25                    MR. JACKSON:  Yeah.  I mean,

```
 1            look up the name and it's not going to be
 2            the first name to pop up.
 3                        MR. DANIELS:  Right.
 4      BY MR. DANIELS:
 5      Q.       So Mr. Ryan, do you want -- it's not a
 6      long article at all.  It's pretty short, maybe
 7      five minutes max.
 8                        MR. DANIELS:  Wes, can you just
 9            send it over to him and let him read it so
10            he can answer a few questions on that.
11                 And we can go off the record for
12            five minutes or so if that's okay.
13                        MR. JACKSON:  Okay.
14                        ----------
15                        (Whereupon, a discussion was
16             held off the record.)
17                        ----------
18                        THE VIDEO SPECIALIST:  The time
19            is now 10:54 a.m.
20                 We're now off the record.
21                        ----------
22                        (Whereupon, a brief recess
23            occurred at this time.)
24                        ----------
25                        THE VIDEO SPECIALIST:  This is
```

1          the beginning of Media III.

2                  The time is now 11:23 a.m.

3                  We're back on the record.

4    BY MR. DANIELS:

5    Q.        All right.  We're back on the record.

6              Mr. Ryan, did you have an opportunity to

7    read this article?

8    A.        I did.

9    Q.        All right.

10             This is just a general question.

11             Is there anything that you agree or

12   disagree with inside this article?

13   A.        Well, you know, I think one thing it's

14   dated.  Obviously, U.S. versus Menks is not

15   mentioned in the article.  Hudson, the Hudson

16   case that you mentioned, I don't see a sight of

17   any article because they're newer.

18             So obviously, those things would in some

19   way maybe changed some of this.  So it's a dated

20   article.

21             Nothing that I disagree with at the time

22   that it was written, but particularly, you know,

23   at points south that there's several reasons why

24   officers can dispense with the knock and

25   announce.

1    Q.        That's why I want to ask some questions

2    that kind of concern this article.

3              I understand that it may be a dated

4    article.

5              The one I thing I want to point to in

6    here is -- and let's get your opinion on this --

7    I want to go back to your CV in a second, but

8    since we're here I kind of want to find out what

9    your testimony is on this matter.

10             When serving a search warrant, a knock

11   and announce warrant, would all to take into

12   account the time of the day which that warrant's

13   being executed, search warrant's been executed as

14   it relates to the occupant's response time.

15             And when I ask that question I'm talking

16   about versus late evening or early in the

17   morning?

18   A.        No.  Because, you know, and again, this

19   is why this is a dated article.  Response time is

20   not what the officer considers in making this

21   decision.  Response time has no application.

22             It's as I think I pointed out in my

23   report, what we train officers is how long it

24   would take to begin to destroy the evidence.

25             So that's really the application of the

1    tactical decision making today.

2  **Q.        All right.**

3  **              And so were you talking about, you know,**

4  **destroying evidence, were you referring to what I**

5  **would call the exigent circumstance that would**

6  **give officers a reason to make an entry without**

7  **waiving any response.**

8  **              Is that what you're referring to?**

9    A.      Well, I think as it's pointed out in the

10   cases and now has been adopted in the training is

11   that a person can get to a toilet very quickly in

12   any size house.

13               That's why we train.  It doesn't matter

14   if you're dealing with a mansion that's 20,000

15   square feet or a hotel room.

16               That's why response time is not the

17   issue in these cases and this decision making.

18   Obviously, and I'm not faulting this gentleman

19   who wrote this article, but he didn't have the

20   benefit of the U.S. versus Banks which pointed

21   that out to law enforcement because if he had

22   then he would know that it's not a response time

23   issue.

24  **Q.        Okay.**

25  **              So just to make sure I understand this,**

1    an executed search warrant, the officers wouldn't

2    take into account the time of the day as it

3    relates to the occupant's responding to him

4    announcing themselves at the door.

5           Is that your testimony in this matter?

6    A.      Absolutely it is, absolutely.  That's

7    the training, and quite honestly, again, I'm not

8    here to give legal opinions but this is obviously

9    a legal article.  That's what U.S. versus Banks

10   says.

11   Q.      Okay.  All right.

12           Let me ask you this question here.

13           As it pertains to -- and we're obviously

14   talking about a fourth amendment issue.  I know

15   you didn't want an issue of how that particular

16   issue is legal inclusion or analysis within your

17   opinion.  It's before all of the policies and

18   practices of law enforcement.

19           You're aware of what exigent

20   circumstances are, correct?

21   A.      Of course.

22   Q.      All right.

23           What is your understanding of what

24   exigent circumstances?

25   A.      Exigent circumstance is some emergency

1   situation that is either known ahead of time or

2   that happens on the ground that make an immediate

3   action necessary.

4          It's more often used in the failure to

5   get a warrant because that emergency action is

6   necessary to take, and the time to get a warrant

7   will undermine the ability to carry out the

8   process, whatever it is.

9          Exigency can be for protection of life,

10  exigency can be for the protection of evidence.

11  So really the two forms of exigencies that we

12  look at in these cases.

13  Q.      Okay.  All right.

14          You referred to the plaintiff's case.

15          What year was the plaintiff's case

16  opined; do you recall?

17  A.      I think 2003, 2004, somewhere in that

18  timeframe.  Somewhere between 2002 and 2004.  I

19  forget what term it was.

20  Q.      We've got to go back to scroll.

21          Mr. Ryan, I'm turning back to your CV

22  over here as I promised you I would.

23          Let me bring it up for you here.  I'm

24  sorry.

25          All right.  Mr. Ryan, do you see that on

1    the screen, your CV?

2    A.       Yes, sir.

3    Q.       All right.

4             I've got "Case Consultations" on here;

5    do you see that?

6    A.       Yes.

7    Q.       And case consultations, just for

8    clarity, are those cases that you testified in or

9    you just consulted in?

10   A.       No.

11            You know, somebody pointed that out to

12   me the very first time the other day that I

13   should probably put "Testimony" there instead of

14   "Case Consultations" because those are all

15   testimony as required by the rule.

16   Q.       All right.

17            Basically, your expert testimony, how

18   often did you, I guess, percentage based on

19   testifying for the defense versus plaintiffs.

20            Let's start with defense.

21   A.       You know, I don't track it myself but

22   I've been told at depositions and I don't dispute

23   it.  I think I probably testify for the defense

24   or give opinions for the defense in 80 to 85

25   percent of my testimony.

1    Q.        Okay.

2             In all of these cases that you gave

3    expert testimony, have you provided any expert

4    testimony as it relates to knock and announce

5    warrants?

6    A.        You know, I'm certain.  Again, could I

7    go by name and identify the ones that are knock

8    and announce issues?

9             Probably not.  It would probably take me

10   hours to try to figure that out.  I'm terrible

11   with remembering names.  I'm better with

12   remembering facts.

13            I'm certain there are some cases where

14   there were issues of knock and announce that I've

15   opined on and testified on.

16   Q.        Okay.

17            But you don't recall what case they are

18   today?

19   A.        No.

20            And you know, I can go through the list

21   if you want and try to see if any jog my memory

22   but I can't promise you that they will.

23   Q.        But do you recall the if you actually

24   gave expert opinion outside of this case dealing

25   specifically with knock and announce?

```
 1   A.        I'm sure that I have.

 2             Again, I'd have to go back and look at

 3   the individual cases to the extent I even have a

 4   file on them to determine which ones.

 5   Q.        I see you also gave expert opinion in

 6   criminal cases as well, right?

 7   A.        I have, yes.

 8   Q.        Was that a part of the defense or the

 9   United States or a state agency?

10   A.        I've done both actually.  And I'm

11   testifying for a prosecutor next week in a case

12   in Tacoma, Washington.  And I've testified on

13   behalf of the defense in cases both for the

14   officer.  I think the only cases that I've done

15   for the Department of Justice have been civil

16   cases.  I've done cases against them on the

17   criminal side.

18   Q.        All right.

19             Let's go to your publications over here.

20             The schedule B, do you see that on the

21   screen?

22   A.        Yes, sir.

23   Q.        In any of your publications have you

24   given opinions inside of publications or

25   instructions on publications directly dealing
```

1    with knock and announce warrants?

2    A.       You know, I suspect there's a section in

3    the Law and Best Practices book that deals with

4    knock and announce and the various decisions of

5    the U.S. Supreme Court related to knock and

6    announce.

7             I can tell you that there are

8    definitely -- there's a book that's Critical

9    Tasks in Law Enforcement, that's the legal guide

10   that comes out on an annual basis.  I think they

11   still -- sometimes the company changes the title,

12   but that book definitely has some knock and

13   announce issues in it.

14            The manual that I use for SWAT

15   operations, legal liability issues and SWAT and

16   emergency response in special operations.  That

17   book, that manual that does get updated

18   periodically.  That book has, I'm certain, some

19   no knock issues in it.  I would have been remiss

20   if I didn't put it in it.

21   Q.       I'm sorry?

22   A.       I have that arrest search and seizure

23   annually.  I have not redone that because I

24   stopped teaching that class on a regular basis.

25   So I don't know that I've updated that recently.

1    Q.        Okay.

2              Those articles here, do you have any

3    published articles that you recall that's not

4    listed here that specifically deals with knock

5    and announce warrants?

6    A.        I will tell you that all the articles

7    should be listed.  I have an assistant who --

8    well, she's really, really good about every time

9    I write something adding it into the list.  I

10   don't see anything in that particular section

11   that would apply.

12   Q.        Okay.

13   A.        I would think that as we get into these

14   legal archives, I would have, I would definitely

15   have stuff on, for example, U.S. versus Banks I

16   would think.

17             So if you were to go to -- if you can go

18   to the beginning as opposed to the end, you know,

19   so, you know, go to like 2002, see where it

20   starts.  So let's go to, like -- keep going.

21   Let's see how that far that goes back.  It should

22   go all the way back to when I started.  Go ahead

23   up (indicating).

24             And I could be wrong.  Maybe I didn't

25   write an article.

1    Q.        It's 2006 here?

2    A.        Yeah.  So if depending on when, for

3    example, Banks was decided, I would think that I

4    would have written an article on it.  But my

5    assistant should have made sure it was listed

6    here.  But you could certainly check on our

7    website.

8    Q.        So you're certain that you wrote the

9    article, U.S. versus Banks, correct?

10   A.        I'm not a thousand percent certain but I

11   know I've got references to it in some of those

12   books that I mentioned.

13            I would have to go back and look because

14   it seems to me that those articles should go back

15   to 2002, and I don't know why she doesn't have it

16   all the way back to when I first started doing

17   them.  Unless I am mistaken and I started it in

18   2006.

19   Q.        Okay.

20            The reason I'm going through is because

21   I don't see anything specifically in any of your

22   publications, articles that specifically talk

23   about --

24            Oh, here we go.  As soon as I say that I

25   looked at one right here.

1              The question asked was the website

2      no-knock clause and search warrants; do you see

3      that?

4      A.       Yes, sir.

5      Q.       What is this LLR legal question, ask the

6      website.  So is that question is somebody -- what

7      is that?

8      A.       So what we used to do and we don't do it

9      as much anymore -- I suppose maybe Brian

10     Batterton (ph) does -- is we accept questions in

11     and then research is done to find the answer, and

12     then an article was written with the answer in

13     it.  So we actually do a question presented at

14     the beginning of the article.

15             Whatever the question was that came in

16     through LLRMI's website, and then we'll actually

17     go and we'll actually research the issue if need

18     be or we may already know the cases that support

19     the answer.

20             So that would be what that was.

21     Somebody must have submitted a question, and then

22     I would have written an article based on the

23     question.

24     Q.       Is that archive in your website?

25     A.       Absolutely.  And it's a free, you know,

```
 1   it's got a free search box.  You can go right

 2   into the website.  You should be able to find

 3   anything that I've written since I started doing

 4   this.

 5   Q.        What's your website again?  I'm sorry.

 6   A.        It's LLRMI.com.

 7   Q.        Let me write that down.

 8   A.        So Lincoln, Lincoln, Romeo, Mary, Ida

 9   dot com.

10            Theres' probably still an archive on the

11   old company, P as in Peter, A as in Adam, T as in

12   Thomas, C as in Charlie, dot com.

13   Q.        Okay.

14            I believe that concludes your -- we have

15   a schedule C here.

16            Is there any, have you called any

17   conferences, speaking engagements specifically

18   dealing with knock and announce and no-knock

19   warrants that you presented.

20                    THE VIDEO SPECIALIST:  You

21       know, the recording just stopped.

22                    THE COURT REPORTER:  Do you

23       want to go off the record?

24                    ----------

25                    (Whereupon, a discussion was
```

 1   held off the record.)

 2                   ----------

 3                   THE WITNESS:  So I'm sure that

 4   several of them have references to no-knock

 5   warrants.  I saw you go by one with

 6   Illinois, for example, and Illinois I

 7   believe is one of the states that changed

 8   the law on no-knock warrants.

 9        So there was -- it's not one of

10   those first few.  But there was one, I

11   think, in Illinois.  I know I did the

12   Kentucky sheriff's conference and I know

13   there's been some changes in Kentucky, so

14   I'm sure I covered those, what the changes

15   are and how we have to adjust the policy to

16   meet the changes.

17        I don't know if anybody from

18   Louisville was in the program of but I do

19   remember having a slide at some point on the

20   changes in Kentucky and what needed to be

21   established for the purposes of no-knock,

22   and then that I had, you know, the

23   Morgansen, Louisville, it said, absolutely

24   banned.

25        So you know, anything, any of the

 1          SWAT programs would have covered no-knock
 2      warrants as well and would have covered when
 3      you can do them and when you can't.
 4              And they would have also covered
 5      timing issues on knock and announce that
 6      we've discussed, things of that nature.
 7  BY MR. DANIELS:
 8  Q.      All right.
 9          Let's just scan to the Schedule C.  I
10  can try to bring it up here.
11          All right.
12          With the exception of, I guess,
13  articles, or I guess, publications that you
14  updated, would you be sure that this is a full
15  and accurate CV with the exception of some of the
16  little things that you added?
17  A.      Yeah.  Other than whatever programs I've
18  done since this report was issued and any cases
19  that I testified in would largely be -- and I
20  don't know that I've written anything because
21  this is -- let me just look at the date on the
22  report because that will tell me.
23          Yeah, I don't think I've written
24  anything in the last few weeks since I issued the
25  report.

1    Q.       All right.

2             Let's go get into the case at hand at

3    issue here that we're here for today.

4             Here I got your schedule D here

5    (indicating)?

6    A.       Yes, sir.

7    Q.       Do you know whether this was case

8    material that was reviewed related to this

9    particular matter?

10            I'm going to go through it and give you

11   a chance to look at and see if there's anything

12   you don't see on this list that you would view,

13   give your expert opinion in this matter?

14   A.       I don't see anything but I can also just

15   make sure that I didn't get anything after the

16   fact.

17   Q.       That's really what my question was.

18   A.       No.  That's it.  That's all I have.

19   Q.       I'm assuming you also got the video by

20   the camera recorder as well?

21   A.       Yes.  And I think I made reference to

22   that.

23   Q.       All right.

24            Let's scroll down here.  Next we have

25   your expert report by John J. Ryan.

1            Then let's go on briefly scroll through

2    it.  And this has your authentication, this is

3    actually your report.

4    A.        (Witness perusing document.)

5    Q.        I'm not going too fast?

6    A.        No.  You could go faster if you want.

7            (Witness perusing document.)

8    Q.        Okay.  All right.

9            Mr. Ryan, based on your review of the

10   material here, what is your opinion as to

11   whether --

12           Please stop, please stop.

13           Okay.  I'm sorry.

14           Mr. Ryan, based on your review of the

15   material in this matter, what is your opinion as

16   it relates to whether the officers made a lawful

17   entry?

18           When I say "lawful entry," I mean use of

19   force entry in this particular matter?

20   A.        Well, actually --

21   Q.        When I mean lawful, I'm actually talking

22   about fourth amendment offense?

23   A.        I'm not really here to give legal

24   opinions, but certainly, you've asked a question

25   that way.  And my answer would be that it's my

1    opinion that they did make a lawful entry under

2    the fourth amendment.  More importantly it's my

3    opinion that they acted consistently with the

4    generally accepted policies, practices and

5    training on entries in these types of cases.

6    **Q.        What do you -- based on -- obviously,**

7    **you've got material, how did you come to that**

8    **conclusion?**

9    A.        Well, it's several things that lead to

10   that conclusion.  The officers pointed out and,

11   you know, if you go back to that article you

12   showed me, that old article, the officers pointed

13   out that they were aware that there was weapons.

14   That's one of things that we look at, the

15   potential of the person will quickly arm

16   themselves with weapon in order to try to combat

17   the police with a firearm.  So that's one of the

18   factors we look at.

19          We look at destruction of evidence.

20   That's another factor we look at.  We look at

21   whether the person's on notice.  And, you know,

22   that's a big factor.

23          We look at whether the person's on

24   notice that the police are approaching.  And I

25   say it's a big factor, it's in that article that

```
 1   you showed me.  Which means that the -- you know,
 2   I think that article says, and again, you know, I
 3   read it quickly, but it says something like you
 4   don't actually have to knock and announce.  You
 5   don't actually have to use any magic words that
 6   if the person knows that it's the police that are
 7   coming, then you can -- and it's been
 8   accomplished, the knock and announce has been
 9   accomplished.
10            In this case when you have another fact
11   that happened contemporaneous with the approach
12   of the officers where an officer says they know
13   we're coming because they spotted the camera,
14   they spotted the lighting on the camera change.
15   And that's captured on a body one camera video.
16            So you have several factors that make it
17   not only consistent with generally accepted
18   policies and practices, but you have several
19   factors that also make it consistent with, you
20   know, the law related to no-knock entries.
21   Q.       All right.
22            So let me make sure I understand this.
23            Based on what you just testified to,
24   based on the material you reviewed and some of
25   the factors that considered you feel this entry
```

1   was a lawful entry based on policy and practices

2   of law enforcement; is that correct?

3   A.       Consistent with law enforcement

4   policies, practices and training.

5            It was also, because you asked the

6   question, it was also lawful under the fourth

7   amendment based on the cases as I know them.

8   Q.       All right.

9            So you also read the depositions of

10  the -- let me just make sure that I have them

11  right here and invite your opinion -- it appears

12  you also read depositions here.

13           And I'm assuming you read the entire

14  deposition?

15  A.       Absolutely.

16  Q.       The deposition of James Kevin Cheney?

17  A.       Yes.

18  Q.       You also read the deposition of Downy

19  Casey?

20  A.       Yes, sir.

21  Q.       And you also read the deposition of, I

22  think, is it Blaquiere?

23  A.       Yeah.  I don't know exactly how you

24  pronounce it, but yes, I did.

25  Q.       Blaquiere, yeah.  I was present at his

1    deposition.

2              So you read all of his deposition,

3    correct?

4    A.        Yes, sir.

5    Q.        All right.

6              And reading those depositions and

7    specifically Blaquiere -- well, we don't have to

8    have to specify.

9              Reading those depositions were you able

10   to determine based on their testimony what was

11   their reasoning for making the entrance, well,

12   the forceful entrance?

13   A.        Well, I think several things.  One --

14   Q.        Let me make something clear with this

15   question.

16             I'm not -- and what I'm asking is

17   specifically what they deposed to, and I'm not

18   talking necessarily talking factors that you just

19   read off, but the reason why they stated it

20   specifically in their deposition was why they

21   made entrance into this dwelling?

22   A.        Well, I think they had the information

23   up front about the weapons.  They had the

24   criminal history of the subject.  They had the

25   motion camera.  They had an officer saying, hey,

1    they know we're here now.

2           They had, you know, one officer

3    testified to hearing running inside the house.

4    So that adds into it, would be a consistent with

5    a person of potentially going to destroy evidence

6    or running to obtain a firearm to ambush the

7    officers when they come in.

8    **Q.      Do you know which officer gave that he**

9    **heard running inside the house?**

10   A.      I think it's Casey Downy.  I mean, I

11   have it in the report.  But I think it was Casey

12   Downy.

13   **Q.      Did you get a chance to read his**

14   **statement on the guarantee concerning this matter**

15   **closer in relation to time versus his deposition,**

16   **did you get a chance to read that statement?**

17   A.      I did read it.

18   **Q.      Are you aware in that statement he never**

19   **mentioned anything about running in the house?**

20   A.      Yes.  I think I probably have that in

21   the report too when I put that in here.

22   **Q.      So his original statement he mentioned**

23   **nothing about running inside the house before**

24   **they made entry, correct?**

25   A.      I think that's correct.

1    Q.        And not until the deposition was given

2    did then he make statements about running in the

3    house, right?

4    A.        I think that's accurate.

5    Q.        All right.

6              Did any other officer, in any of the

7    material that you read, did any other officer

8    stated that they heard running in the house?

9    A.        No.  I don't think that any of the

10   others either were asked that question or if they

11   were asked it if any of them said they heard

12   running in the house.

13   Q.        All right.

14             And based on the material that you

15   reviewed where was Downy stacked up before he

16   made entry to the house?

17             When I say stack, you're aware of what

18   stacking is, correct?

19   A.        I've stacked for years.  So I'm familiar

20   with it.  But I got to be honest with --

21   Q.        And for the record could you describe

22   what a stacking is?

23   A.        Yeah.  A stack is how a team approaches

24   a door or even makes entry.  They approach in a

25   straight line, one after the other.

1              If they want to clear rooms then they'll

2    leapfrog once they get in the residence.  So that

3    changes the stack, changes the position of the

4    stack that the officer has as they make entry.

5              But --

6    Q.       I'm sorry.

7    A.       I got to be honest with you, I know

8    you're asking me, and I don't know that I recall

9    the exact stack assignment of Casey Downy.

10   Q.       Yeah, I was going to ask you.

11             Do you recall what his position was in

12   the stack assignment?

13   A.       I might have to look through my report

14   to see if I have that, but I don't recall off the

15   top of my head.

16   Q.       Do you want to take a chance to look at

17   your report to see?

18   A.       Yeah.  I may have included that.

19   Q.       Okay.

20   A.       (Witness perusing document.)

21             Based on the facts as I have them I

22   would say he would be in the stack only because I

23   do have the testimony of Cheney who says he was

24   at the back of the stack.

25             I have the testimony of Blaquiere who

```
 1   says he's the one knocking at the door, and

 2   generally, we would put the ram second, behind

 3   the knock announcement.

 4           And I want to say closer to the door.

 5   Q.       You're talking about the stacking

 6   formation before they make the entry?

 7   A.       Correct.

 8   Q.       And you definitely see even material

 9   from the district attorney or any discovery

10   documents that give, if there's any evidence that

11   the other officers besides Downy heard this

12   running; is that correct?

13   A.       That's correct.

14   Q.       All right.

15           Do you get up to you -- and I believe

16   was it Downy Casey, do you know if he was wearing

17   a body camera?

18   A.       Yes.  Downy Casey was the one who put

19   the body camera on, I think.  He said -- although

20   they don't normally have them, he'd put it on

21   that night.

22   Q.       Did you watch his body camera throughout

23   the entire incident?

24   A.       Yes, I did.

25   Q.       All right.
```

1          Is there anywhere to buy a camera that

2    he made any representation that he didn't want

3    anybody to make a representation to him that they

4    heard running prior to making entry, that he

5    heard running?

6    A.        I don't recall that.

7          I do recall the reference to the motion

8    camera and somebody making a statement that the

9    people in the house knew they were there.  But I

10   don't recall anything about running.

11   Q.        Was there any evidence in material

12   provided that the footage of a camera that

13   recorded law enforcement as they may have

14   approached, did you provide any material for

15   that?

16   A.        What's that?  I'm sorry.

17   Q.        What I said was -- I'm sorry.  Strike

18   that question.

19          Would you provide any material from

20   anybody that showed any recording from the

21   residence from that motion camera that was stated

22   that showed any recording of law enforcement

23   making entry or making -- approaching the home?

24   A.        I don't recall seeing that.

25   Q.        Okay.

1          **Do you know as to whether it was in fact**
2  **a camera?**
3  A.        I know that the officer perceived it to
4  be a camera based on the contemporaneous
5  statement.  And whether or not it was actually a
6  camera will be 20/20 hindsight.  But I know the
7  officer perceived it to be.
8  **Q.        Okay.**
9          **But there's no evidence that you asked,**
10 **that provided to you today that it was in fact a**
11 **camera; is that correct?**
12 A.        No.  I don't know if -- again, just to
13 be clear, I don't know if it was a camera or if
14 it worked or, you know, it could be a camera and
15 it doesn't work.
16         The bottom line is I don't know the
17 answer to that.  I do know that the officer based
18 a contemporaneous statement perceived it to be a
19 camera.
20 **Q.        Is there any policies or practices where**
21 **if the occupant has, I guess, a camera there, it**
22 **could be a Ring door camera or any related camera**
23 **that the officers can execute a search warrant,**
24 **and at that point make entry without knocking and**
25 **announcing, is there any policy that you're aware**

1   of, practices?

2   A.        That fact in a vacuum standing alone,

3   no.  Again, it would have to take into account

4   other facts such as the knowledge of the

5   government, criminal history of the suspects, you

6   know, if the officers were aware that there were

7   counter-surveillance measures, then obviously,

8   that's always a factor.  That would be one more

9   factor toward the no-knock warrant or the

10  no-knock entry when the ground situation changes.

11          But I don't know of a policy that says

12  anytime a person has a camera, you get to do a

13  no-knock.  No, I don't know anything like that.

14  Q.        Let me ask you this question.

15          In this case the officers, they applied

16  for a no-knock warrant, did they not?

17  A.        Absolutely.

18  Q.        And they were denied, weren't they?

19  A.        Absolutely.

20  Q.        Why were they denied?

21  A.        What's that?

22  Q.        What was the reason for the denial; do

23  you know?

24  A.        I don't recall if there was anything.  I

25  have to go back and look.  I don't recall there

1    being anything in the materials where the

2    magistrate outlined why it was denied.

3            But again, law enforcement training is

4    if the ground situation changes even with the

5    denial that the officers can do a no-knock entry.

6    Q.      Are you aware that the officers who

7    applied for the warrant, have they ever --

8            Well, let me ask you this question.  I

9    think I may know this answer.

10           This was the first time that the officer

11   applied for a no-knock warrant; is your

12   understanding from the material provided?

13   A.      I don't recall that fact but I wouldn't

14   dispute it.

15   Q.      Do you know who applied for the warrant?

16   A.      I'd have to go back and look.  I think

17   it was Blaquiere but I'd have to go back and

18   look.

19   Q.      Were you aware that the no knock was not

20   authorized?

21   A.      Absolutely.  At that point in time, yes,

22   when they sought the warrant, yes.

23   Q.      In any of the materials, if you get

24   chance to look at any Georgia law, when I say

25   "law," statute as it relates to knock and

1    announce no-knock warrants execution in the State

2    of Georgia?

3    A.        You know, I think I incorporated in a

4    footnote the statute on execution of a warrant,

5    you know, any reasonable time and things of that

6    nature.  I think I've got that in the footnote in

7    my report.

8    Q.        Let me pull the report here?

9    A.        I think I did, yes.

10             So if you go to page 23 I believe it is.

11   Q.        Okay.

12   A.        It actually starts on page 22.

13   Q.        I'm looking where all the 22 it

14   specifically talks about -- I see the footnotes 8

15   and 9?

16   A.        Right.

17   Q.        Is that what you were referring to?

18   A.        Yes, sir.

19             So starts, it's paragraph 87, Georgia

20   State Statutory law and execution of search the

21   warrants.

22   Q.        All right.

23             In here you talk about the time when the

24   search warrants must be executed within ten days

25   in the State of Georgia.

1               What I'm asking you seriously did you

2     read anything about how a search warrant must be

3     executed.  When I say "executed," at the point of

4     actually hand executed a search warrant and not

5     the timing of the judicial officer signed a

6     warrant and the execution going to the home or

7     dwelling to execute the warrant within a period

8     of time but the execution, the actual execution

9     of the warrant for the officers in place, did you

10    read anything in the State of Georgia law,

11    statutory law about that particular, how a

12    warrant should be executed?

13    A.       Well, I think the last sentence in that

14    paragraph talks about it being executed at any

15    reasonable time.  So it doesn't say it has to be

16    executed between, you know, six o'clock in the

17    morning or ten o'clock at night.  It says at any

18    reasonable time.

19               So that goes to execution.  I did not

20    look up cases or anything like that related to

21    manner of execution in this federal case where

22    obviously federal standards would apply on that

23    issue.  And they generally set the practices and

24    policy to apply.

25    Q.       I'm going to pull that statute up and

1    give you a chance to look at the statute here and
2    make sure we're talking about same thing here.
3                    MR. DANIELS:  Mr. Court
4        Reporter, what exhibit number are we on?
5                    THE COURT REPORTER:  The next
6        would be number 5.
7                    ----------
8                    (Whereupon, a discussion was
9        held off the record at this time.)
10                   (Whereupon, Deposition Exhibit
11       Number Plaintiff's 5 was marked for
12       identification.)
13                   ----------
14   BY MR. DANIELS:
15   Q.       This is a statute here and I'm going to
16   introduce it as Plaintiff's Exhibit-5.  This is a
17   current statu0te legislation in the 2023, 2024 --
18   of course, if you can go back to the time in
19   question by representing the statute has not
20   changed at the time of the execution of this
21   search warrant that's in question in this case.
22           All right.  Have you read this statute
23   here, 17-5 --
24   A.       I'm sure I have.  And again, I don't
25   know that I read in it conjunction with this

```
 1   case, and I say that, you know, I've written

 2   policies for various groups in Georgia.  So I'm

 3   sure that I would have incorporated the statute

 4   into a search warrant policy.

 5   Q.      Going back to your opinion here --

 6   A.      I didn't get to read that whole statute.

 7   Q.      All right.

 8           I'll bring it back up for you.  I'm

 9   sorry.

10           Going back to your opinion -- and let me

11   screen share here so you can see what I'm talking

12   about.

13           Do you see that your portion of your

14   opinion here?

15   A.      Yes, sir.

16   Q.      All right.

17           And you have footnote 8, 17.5.25 here?

18   A.      Yes, sir.

19   Q.      It refers to footnote 8 is here.  It

20   says any search warrant not executed in ten days

21   from the time of issuance, shall be void and

22   shall be returned to the court of the judicial

23   officer issuing the same as not executed.

24           Do you have footnote 8 which refers to

25   Georgia statute 17.5.25.
```

```
 1               I'm going to bring the statute up for

 2     you.

 3               The 17.5.25, do you see that as such

 4     there?

 5                         ----------

 6                         (Whereupon, a discussion was

 7          held off the record.)

 8                         ----------

 9     BY MR. DANIELS:

10     Q.        All right.

11               Do you see that statute 17.5.25?

12     A.        No.  My report's up again.

13               I see it, yeah.

14     Q.        Do you see that?

15     A.        Yes, sir.

16     Q.        All right.

17               And this is the statute you're referring

18     to, right, 17.5.25?

19     A.        Correct.

20     Q.        And we talked about the execution of

21     search warrants generally, correct?

22     A.        Yes, sir.

23     Q.        And it talks about the ten days, it had

24     to be executed within ten days?

25     A.        Correct.
```

```
 1   Q.        Right?

 2   A.        Right.

 3   Q.        All right.

 4             Let me go back here to your report

 5   because I want a full blown --

 6             Is your report back up now?

 7   A.        Yes, sir.

 8   Q.        You have also, you cite to 17.5.26,

 9   which in your report you make reference to

10   Georgia statutory and reading here, Georgia

11   statutory law directs that search warrants may be

12   executed at any reasonable time?

13   A.        Correct.

14   Q.        Let me go back over here (indicating).

15             And this is -- and do you see where it

16   says 17.5.26, and it says, search warrant may be

17   executed at any reasonable time, right?

18   A.        Yes, sir.

19   Q.        All right.

20             Did you get a chance to read 17.5.27?

21   A.        You have to pull it back up.  As I said,

22   I'm sure I've read it in the past.

23                     MR. DANIELS:  Mr. Court

24        Reporter, this is -- I think it's Exhibit-6.

25                     ----------
```

```
 1                        (Whereupon, a discussion was

 2          held off the record at this time.)

 3                        (Whereupon, Deposition Exhibit

 4          Number Plaintiff's 6 was marked for

 5          identification.)

 6                        ----------

 7   BY MR. DANIELS:

 8   Q.        I am going to introduce as Plaintiff's

 9   6, 17.5.27.  OCGA 17-5-27.  And the title is,

10   "Use of Force in Execution of Search Warrants."

11             Did you get a chance to look at this

12   statute by any chance, Mr. Ryan?

13   A.        I'm certainly looking at it now.

14   Q.        Let me know when you've had a chance to

15   finish reviewing it?

16   A.        No.  I've looked at it.

17   Q.        Are you aware that the Supreme Court of

18   Georgia -- and I'll give you the case here -- an

19   interpreted statute that an officer before they

20   make an entry specifically on a knock and

21   announce warrant -- let me bring it out here so

22   you could -- that the plaintiff takes OCJ 17.5.27

23   that requires an officer to announce his or her

24   presence or make a good faith effort to do so.

25   And wait for some sort of response before the
```

```
1    officer uses force to affect entry into a

2    building, any part of the building.

3              I don't know if you got a chance to read

4    that case, it's Heron (ph) versus State?

5              I will bring it up on the screen in a

6    second here.

7              But going back to this particular

8    statute.  I mean, let me bring it back up for

9    you.

10             I do apologize for bringing it down.  I

11   just went back to my notes.

12             All right.

13             I've got the statute back up; do you see

14   it?

15   A.        Yes, sir.

16   Q.        All right.

17             And it gives some factors here.

18             Do you see the factors?  And I'll read

19   it to you verbatim.  That he is refused

20   vengeance.

21             Do you see that?

22   A.        Yes.

23   Q.        All right.

24             In the video provided, the body camera

25   is there any verbal representation of any kind --
```

1  and I'm saying specifically verbal -- by any

2  occupant that they refused to open the door?

3  A.        No.  And again, remember, this is a

4  state law.  So this would have no bearing on

5  whether or not it was proper of the generally

6  accepted practices, when we're talking about, you

7  know, a lawsuit over, you know, in a federal

8  case.  This would have no bearing on it.

9  Q.        What do you mean it wouldn't have any

10  bearing on it?

11  A.        Well, a violation of state law.  State

12  law can be more restrictive than the federal

13  standard and we know that.  So even if -- and I'm

14  not conceding that the officers violated this,

15  but if they did, if in fact the court determined

16  they did, and again, not to give legal opinions

17  but it's very clear that a violation of state law

18  does not mean any kind of constitutional

19  violation.

20        And again, some of that, the second part

21  you read me doesn't make any sense because it

22  requires, you know, on its face, I think it said

23  it requires on its face some refusal or some

24  statement or something like that, but then the

25  statute even contemplates when the place is not

```
 1   occupied and the officers aren't there.
 2           So how could you meet both of those
 3   things?
 4           There's an inconsistency there.
 5           So without doing a lot of research on
 6   the law, I probably wouldn't be able to give
 7   these legal opinions.  I don't think a court is
 8   going to let me give them anyway.
 9   Q.      Yes.  And let me ask y a question.
10           We talked, about the State of Georgia
11   that the law in the State of Georgia says in the
12   statute that had to be some type of refusal.
13           And in fact, what I read to you, it was
14   a Supreme Court case out of the State of Georgia
15   that says that he had to wait for a response.
16   A.      Under the state's statute I agree with
17   you that that's -- again, I didn't read the whole
18   case which means I would have to put it in
19   context.
20           But that's an interpretation of the
21   statute.  That wouldn't be an interpretation of
22   the fourth amendment, and it would not be an
23   interpretation of the generally accepted practice
24   that law enforcement has throughout the country
25   and in Georgia.
```

1    Q.        Are you saying that there's a state law

2    that gives direction to law enforcement, they

3    would have to follow that practice?

4    A.        Not for purposes of a fourth amendment

5    claim.  And again, I'm not here to give legal

6    opinions.

7            But think about this.  These officers

8    actually sought a no-knock warrant, they sought a

9    no-knock warrant.

10            If, in fact, the State of Georgia, that

11   this is, per se, the state law of Georgia, then

12   how could there even be a no-knock warrant?  One

13   couldn't even exist even when you went to a

14   magistrate because it requires these factors.

15            So, you know, unless there's some

16   counter-veiling law, then it would be internally

17   inconsistent.

18   Q.        Well, I think this is specific talk

19   about knock and announce warrants?

20   A.        Well, it doesn't say that.

21   Q.        Well, I mean, obviously, the legislation

22   speaks for itself.  The language of this

23   particular statute and not getting into any legal

24   canons, but obviously, you're aware that Georgia

25   has no-knock warrants for police, correct?

1    A.         Well, I am because, obviously, the

2    officers sought a no-knock warrant.

3    **Q.         Right.**

4    **          It could be inferred that this statute**

5    **is probably talking about knock and announce**

6    **warrants?**

7    A.         Well, I don't think I --

8                        MR. JACKSON:  Object to form.

9                        THE WITNESS:  I mean, you're

10        asking me all kinds of legal opinions here

11        on state law.

12              And as I said, you know, we don't

13        necessarily judge based on state law.  We

14        analyze a federal case brought against an

15        officer.  That's why we look to the

16        generally accepted policies, practices and

17        training.

18              Even if you were to ask me a legal

19        opinion, the cases that are out there are

20        very clear.  That the state law does not

21        provide the standard, that you'd have to

22        look to the federal standards when you get a

23        federal case.

24    BY MR. DANIELS:

25    **Q.         And the reason I'm looking at state law**

1  -- I didn't mean to cut you off -- is because you

2  had intimated that it's not your opinion, state

3  law executions of warrants, generally execution

4  of warrants when warrants might be executed.

5          My question is:  Did you also look to

6  also this state law as it relates to, you know,

7  and hearing my opinion, you know, of course, it

8  was whether this was referred to knock and

9  announce warrants.

10          Did you look at this law in considering

11  your opinion?

12  A.         And I did not.  The reason why I

13  incorporated the other statute was that there

14  were numerous questions asked of the officers in

15  their deposition as to why they executed the

16  warrant at that time of day.

17          So that was in specific to address that

18  issue.  If it wasn't I don't know that there was

19  anything brought up in any of the depositions

20  about this particular statute.

21  Q.         Okay.  All right.

22                  MR. DANIELS:  Let's take a

23      quick -- what time is it?

24                  Guys, I'm on the west coast here.

25                  Let's take about a ten minute break

```
 1        here.

 2                    ----------

 3                    (Whereupon, a discussion was

 4        held off the record.)

 5                    ----------

 6                    THE VIDEO SPECIALIST:  The time

 7        is 12:01 p.m.

 8             We're now off the record.

 9                    ----------

10                    (Whereupon, a brief recess

11        occurred at this time.)

12                    ----------

13                    THE VIDEO SPECIALIST:  This is

14        the beginning of Media IV.

15             The time is 12:13 p.m.

16             We're back on the record.

17   BY MR. DANIELS:

18   Q.        All right.

19             Mr. Ryan, this is a follow-up question.

20             You do not handle the billing; is that

21   correct?

22   A.        I do not handle the billing.

23   Q.        And how much do you charge per hour for

24   deposition testimony?

25   A.        So generally, what happens is we charge
```

1    the whole day because I've got to block out the

2    whole day.  So it's generally charged at 2,500

3    per day.

4    **Q.       Okay.**

5    **          And that's not included in your**

6    **appearance; is that correct?**

7    A.       I'm sorry.

8             That includes my appearance, yes.

9    **Q.       So $2,500 would be the only amount?**

10   A.       Correct.  Of which I get 2,000, but the

11   company bills the whole day for a deposition.

12   **Q.       Okay.**

13   **          And the amount that's in the invoice,**

14   **that's the amount that you was paid by the**

15   **defendants in this amount, $95,000?**

16   A.       That's the amount that the company was

17   paid.  I would have seen 7,000 of that.

18   **Q.       How much do you charge for your**

19   **in-person testimony?**

20   A.       So in-person testimony is charged at

21   2,500 per day for days I'm in court.  There is

22   $1,000 fee for the day that I travel.

23   **Q.       $1,000 fee for the day that you travel?**

24   A.       Correct.

25   **Q.       Does that include room and board as**

 1   well?

 2   A.       No.  Obviously, all of the expenses,

 3   flights, room and board would be added to that.

 4   Q.       All right.

 5                 MR. DANIELS:  Mr. Ryan, thank

 6        you for your testimony.  I have no further

 7        questions subject to follow up if counsel

 8        asks you questions.

 9                 MR. JACKSON:  No, I have no

10        follow up.

11            Thank you.  And thanks for the

12        civility which I don't always get at

13        depositions.  It's appreciated.

14                 ----------

15                 (Whereupon, a discussion was

16        held off the record.)

17                 ----------

18                 THE VIDEO SPECIALIST:  The time

19        is now 12:15 p.m.

20            We're now off the record.

21                 THE COURT REPORTER:

22        Mr. Jackson, do you want a copy of the

23        transcript?

24                 MR. JACKSON:  Yes.

25                 MR. PACELLA:  We're going to

1   want the transcript expedited.

2           THE COURT REPORTER:

3   Mr. Daniels, you get the original?

4           MR. DANIELS:  Yes, please.

5           ----------

6           (Whereupon, the deposition was

7   adjourned at 12:15 p.m.)

8           ----------

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATION

 2

 3

 4          I HEREBY CERTIFY that the proceedings

 5   and evidence are contained fully and accurately

 6   in the stenographic notes taken by me upon the

 7   foregoing matter on Wednesday, November 1, 2023,

 8   and that this is a correct transcript of same.

 9

10

11

12

13

14

15
             CHARLES P. CARMODY
16           Federally Approved
             Registered Professional Reporter
17           and Notary Public

18

19

20

21

22           (The foregoing certification
             of this transcript does not
23           apply to any reproduction of
             the same by any means,
24           unless under the direct
             control and/or supervision
25           of the certifying reporter.)
```

---
**$**
---

**$1,000**
　88:22,23

**$2,500**　88:9

**$500**　26:24,
　25

**$95,000**
　88:15

---
**(**
---

**(678)**　2:5

---
**-**
---

**-none-**　4:6,
　9,13,16

---
**1**
---

**1**　11:10

**100**　2:9

**10:04**　5:17

**10:35**　34:7

**10:42**　34:15

**10:54**　44:19

**11**　3:10

**11600**　2:9

**11:23**　45:2

**12:01**　87:7

**12:13**　87:15

**12:15**　89:19

**90:7**

**1612**　2:14

**17-5**　76:23

**17-5-27**　80:9

**17.5.25**
　77:17,25
　78:3,11,18

**17.5.26**
　79:8,16

**17.5.27**
　79:20
　80:9,22

**1985**　30:4

**1986**　29:10
　30:10

**1987**　30:4

**1992**　28:6

**1994**　7:23
　24:23

**1997**　30:11

**1998**　13:3

**1st**　5:16

---
**2**
---

**2**　21:11

**2,000**　88:10

**2,500**　88:2,
　21

**20,000**　47:14

**20/20**　71:6

**2000**　29:14

**2001**　13:4

**2002**　28:6
　29:18
　49:18
　54:19
　55:15

**2003**　12:25
　13:5
　16:23,25
　17:3 49:17

**2004**　49:17,
　18

**2006**　35:9
　36:15,18,
　19 55:1,18

**201**　2:14

**2023**　5:16
　76:17

**2024**　76:17

**21**　3:11

**22**　74:12,13

**23**　74:10

**24**　12:12

---
**3**
---

**3**　42:8

**30**　17:25
　18:2

**30337**　2:4

**30339**　2:9

**31520**　2:14

---
**4**
---

**4**　42:21

**40**　17:24

**42**　3:12,13

**4751**　2:4

**490**　2:4

---
**5**
---

**5**　76:6,11

---
**6**
---

**6**　80:4,9

**6664-8529**
　2:5

---
**7**
---

**7**　3:4

**7,000**　88:17

**76**　3:14

**770 818-4246**
　2:10

---
**8**
---

**8**　3:11
　11:22
　19:20
　74:14
　77:17,19,
　24

**80**   3:15
    50:24

**85**   50:24

**87**   74:19

_____

**9**

**9**   74:15

**90s**   28:24

**912 264-6465**
    2:15

**97**   29:10

_____

**A**

**a.m.**   5:17
    34:7,15
    44:19 45:2

**ability**   8:20
    49:7

**absolutely**
    32:11 48:6
    56:25
    58:23
    64:15
    72:17,19
    73:21

**academy**   29:5

**accept**   56:10

**accepted**
    26:24 62:4
    63:17 82:6
    83:23
    85:16

**access**   6:16

**accomplished**
    63:8,9

**account**
    46:12 48:2
    72:3

**accreditation**
    14:6

**accredited**
    15:13

**accurate**
    29:13 35:3
    59:15 67:4

**act**   8:9

**acted**   62:3

**action**   38:5
    49:3,5

**actual**   7:10
    15:18 75:8

**Adam**   57:11

**add**   40:9

**added**   59:16
    89:3

**adding**   54:9

**additional**
    22:20
    27:21

**address**
    86:17

**adds**   66:4

**adjourned**
    90:7

**adjunct**   24:2

**adjust**   58:15

**administration**
    28:12

**adopted**
    47:10

**advertisement**
    19:5

**advisor**
    39:18
    41:10

**advisors**
    41:1

**affect**   81:1

**agencies**
    12:8 13:15
    14:4 15:1,
    2,9 18:7,
    12 19:9

**agency**   12:10
    14:3 15:5,
    21,23
    17:14
    18:15,16,
    17 52:9

**agree**   33:15,
    16 36:18,
    25 37:3,
    17,21,22
    38:13
    45:11
    83:16

**agreed**   8:3

**ahead**   41:24
    42:1,3
    43:22 49:1
    54:22

**allowed**
    31:12 32:1
    38:15

**Alsup**   12:5
    17:6,14

**ambush**   66:6

**amendment**
    31:24
    43:12
    48:14
    61:22 62:2
    64:7 83:22
    84:4

**Amicus**   27:15

**amount**   88:9,
    13,14,15,
    16

**analysis**
    48:16

**analyze**
    85:14

**and/or**   33:2

**anecdotally**
    18:12

**Angeles**   17:6

**announce**
    35:17,19
    36:9,20
    37:13,16
    38:10

42:13
45:25
46:11
51:4,8,14,
25 53:1,4,
6,13 54:5
57:18 59:5
63:4,8
74:1
80:21,23
84:19 85:5
86:9

**announced**
36:22

**announcement**
69:3

**announcing**
36:13 48:4
71:25

**annual** 53:10

**annually**
53:23

**answering**
31:10,16
32:4

**anybody's**
24:7

**anymore**
28:25 56:9

**anytime**
72:12

**apologize**
20:17,23
81:10

**appealed**
26:20

**appeals** 27:2

**appearance**
25:9,19
26:2 88:6,
8

**APPEARANCES**
2:1

**appears**
64:11

**application**
46:21,25

**applied**
25:22
72:15
73:7,11,15

**apply** 36:8
54:11
75:22,24

**appreciated**
89:13

**approach**
63:11
67:24

**approached**
70:14

**approaches**
67:23

**approaching**
62:24
70:23

**apps** 18:14

**archive**
56:24
57:10

**archives**
54:14

**argument**
27:1

**arm** 62:15

**arrest** 53:22

**article** 3:13
35:11
42:12
43:2,13
44:6 45:7,
12,15,17,
20 46:2,4,
19 47:19
48:9 54:25
55:4,9
56:12,14,
22 62:11,
12,25 63:2

**articles**
54:2,3,6
55:14,22
59:13

**asks** 89:8

**assignment**
68:9,12

**assistant**
29:3 54:7
55:5

**associate**
7:23

**Association**
14:1
18:19,22

**assuming**
16:23
60:19
64:13

**Atlanta** 2:4,
9

**attend** 15:9
19:13

**attendance**
14:10

**attended**
15:2 16:1

**attorney**
7:21 12:22
23:15
24:24
25:1,2,6,
21,23 69:9

**attorneys**
25:17

**atypical**
30:8

**audit** 13:7

**audits** 12:8,
13

**authentication**
61:2

**authored**
35:15

**authorized**

37:5,8
73:20

aware  32:9
38:8 40:17
48:19
62:13
66:18
67:17
71:25 72:6
73:6,19
80:17
84:24

awhile  9:20

———————
**B**

B-E-S-S-E-L-M-
A-N  39:7

back  13:2
17:25 18:1
23:22
24:22 25:8
26:12
29:1,15,18
34:16
45:3,5
46:7
49:20,21
52:2
54:21,22
55:13,14,
16 62:11
68:24
72:25
73:16,17
76:18
77:5,8,10

79:4,6,14,
21 81:7,8,
11,13
87:16

background
9:21 11:21

balance
37:24

ban  32:24

bankrupt
26:23

Banks  47:20
48:9 54:15
55:3,9

banned
32:10,14,
16,17,19
33:3 58:24

bar  25:9

based  7:16
50:18
56:22
61:9,14
62:6
63:23,24
64:1,7
65:10
67:14
68:21
71:4,17
85:13

basically
27:20
37:15
50:17

basis  13:18
27:18 33:1
53:10,24

Batterton
56:10

batting
25:25

bearing
82:4,8,10

begin  46:24

beginning
5:13 34:14
45:1 54:18
56:14
87:14

behalf  5:25
52:13

bell  39:2,
12,15,22

benefit
47:20

Besselman
3:12,13
38:25
39:1,7,8,
17 40:18
41:10
42:12

Besselman's
40:10 42:2

big  62:22,
25

billing
87:20,22

bills  88:11

bio  40:10
42:2

Biography
3:12

bit  20:23
31:12

Blaquiere
5:15
64:22,25
65:7 68:25
73:17

block  88:1

blown  79:5

board  88:25
89:3

body  63:15
69:17,19,
22 81:24

book  53:3,
8,12,17,18

books  55:12

bottom  6:20
71:16

box  57:1

break  86:25

breaking
35:24

breaks  28:21

Breanna
32:21 38:6

Brian  56:9

briefly  61:1

bring  18:20,
  23 19:1,10
  49:23
  59:10 77:8
  78:1 80:21
  81:5,8

bringing
  81:10

brings  13:17

broke  26:12

brought  14:2
  85:14
  86:19

Brunswick
  2:14

Buckeye
  18:22

building
  81:2

button  6:19

buy  70:1

────────────
        C
────────────

C.J.  5:15

Calameda
  28:1

call  19:3
  30:15 47:5

called  12:3
  26:10
  57:16

Camden  15:19
  16:4,5

camera  60:20
  63:13,14,
  15 65:25
  69:17,19,
  22 70:1,8,
  12,21
  71:2,4,6,
  11,13,14,
  19,21,22
  72:12
  81:24

canons  84:24

capacity
  25:1,2,3
  27:3

Caprio  28:23
  29:2

captured
  63:15

career  27:11

Carmody  5:20

carry  49:7

case  12:18
  20:5 23:4,
  11 25:8,
  10,24
  26:1,2,5,6
  27:9,16,23
  35:8,9,11,
  12 36:7,8,
  11,15
  37:4,18
  45:16

49:14,15
  50:4,7,14
  51:17,24
  52:11
  60:2,7
  63:10
  72:15
  75:21
  76:21 77:1
  80:18 81:4
  82:8
  83:14,18
  85:14,23

cases  12:21
  13:2 25:7,
  18,20,23
  37:5
  47:10,17
  49:12 50:8
  51:2,13
  52:3,6,13,
  14,16
  56:18
  59:18 62:5
  64:7 75:20
  85:19

Casey  64:19
  66:10,11
  68:9
  69:16,18

center  39:20
  41:12

certificate
  14:9

certification
  5:7 14:11,

13

chance  11:14
  43:3 60:11
  66:13,16
  68:16
  73:24 76:1
  79:20
  80:11,12,
  14 81:3

change  23:6
  33:24
  63:14

changed
  31:15,22
  45:19 58:7
  76:20

charge
  87:23,25
  88:18

charged
  88:2,20

Charlie
  57:12

chase  27:23

check  55:6

Cheney  64:16
  68:23

chief  17:6
  39:19

chief's  18:6

chiefs  14:1
  19:1

choses  12:22

Chuck  5:19

circumstance
  47:5  48:25

circumstances
  48:20,24

cite  79:8

cities  22:22
  32:16  33:9

citizens
  33:11

city  33:2

civil  12:15
  25:3  52:15

civility
  89:12

claim  84:5

clarify  8:16

clarity  50:8

class  19:11,
  12,13  40:2
  53:24

classes
  19:4,5,8
  40:6

clause  56:2

clear  9:8
  17:13
  20:24
  65:14  68:1
  71:13
  82:17
  85:20

client  26:24

close  24:6
  25:13

closer  24:7
  66:15  69:4

closest
  27:13

coast  86:24

code  16:16

codirector
  16:22
  23:24

cold  20:18

college
  28:13

combat  62:16

comfortable
  31:16

company
  17:7,10,
  15,18,22
  21:24
  53:11
  57:11
  88:11,16

complaint
  26:16

complaints
  36:24

conceding
  82:14

concern  46:2

concerns
  36:21

concludes
  57:14

conclusion
  62:8,10

conference
  13:20
  58:12

conferences
  22:21
  57:17

confirmation
  11:23

conjunction
  76:25

consideration
  38:11

considerations
  38:17,18

considered
  26:23
  36:12
  37:11  38:9
  63:25

considers
  46:20

consistent
  63:17,19
  64:3  66:4

consistently
  62:3

constitution

24:19

constitutional
  24:13
  82:18

consult
  16:9,19
  23:25

consultant
  25:22

consultations
  50:4,7,14

consulted
  25:17  50:9

consulting
  12:21

contemplates
  82:25

contemporaneou
s  63:11
  71:4,18

context
  39:13
  83:19

contract
  19:4

contractor
  12:2  26:6

contractors
  17:8

copy  89:22

corporate
  12:5  17:11

corporations
  18:7

correct
  7:18,21,22
  9:19 11:17
  16:20,21
  19:23
  22:5,6
  24:15,24
  28:8 29:11
  33:19 35:2
  36:6 40:4
  48:20 55:9
  64:2 65:3
  66:24,25
  67:18
  69:7,12,13
  71:11
  78:19,21,
  25 79:13
  84:25
  87:21
  88:6,10,24

cosponsoring
  19:9

counsel   5:6,
  21 8:3,18,
  22 10:24
  11:1 17:14
  20:22
  23:11
  39:19
  43:3,16
  89:7

counter-
surveillance
  72:7

counter-
veiling
  84:16

Counties
  18:19

country   31:9
  83:24

County   15:20
  16:4,6
  28:1

couple   22:18
  25:7 31:14

court   5:19,
  22 6:10
  9:4,24
  10:1,16
  21:4 26:20
  27:2,17
  35:9,16
  36:20
  37:10,11
  38:9 39:3,
  9 40:14
  41:23 53:5
  57:22
  76:3,5
  77:22
  79:23
  80:17
  82:15
  83:7,14
  88:21
  89:21 90:2

courthouse
  30:23

courtroom
  28:24 29:3

covered
  58:14
  59:1,2,4

credits
  15:12

criminal
  12:16,17,
  18 24:15
  31:24
  52:6,17
  65:24 72:5

Critical
  53:8

criticism
  33:18,22
  35:6

criticisms
  33:5

current   3:14
  11:25
  76:17

cut   16:13
  86:1

CV   3:11
  7:17 11:21
  19:20,25
  23:22 29:9
  46:7 49:21
  50:1 59:15

cycles   13:22

                    D

damage   35:24

danger   35:1

Daniels   2:3
  3:4 5:24,
  25 6:10,21
  7:7 9:24
  10:2,5,16,
  19 11:3,13
  19:18
  20:1,11,20
  21:4,14
  33:25
  34:17 37:7
  39:5,10
  40:14
  41:5,23
  42:11,24
  43:16,23
  44:3,4,8
  45:4 59:7
  76:3,14
  78:9 79:23
  80:7 85:24
  86:22
  87:17 89:5
  90:3,4

daniels@
harrymdaniels.
com   2:5

date   5:16
  59:21

dated   45:14,
  19 46:3,19

day   6:14
  17:15
  46:12  48:2
  50:12
  86:16
  88:1,2,3,
  11,21,22,
  23

days   22:22
  74:24
  77:20
  78:23,24
  88:21

deal   29:8

dealing
  47:14
  51:24
  52:25
  57:18

deals   53:3
  54:4

dealt   17:18

decided   55:3

decision
  46:21
  47:1,17

decisions
  53:4

dedicated
  28:24

default
  26:18

defendant
  2:11,16

6:2,4

defendants
  88:15

defense   25:3
  35:22
  50:19,20,
  23,24
  52:8,13

denial   72:22
  73:5

denied
  72:18,20
  73:2

Department
  28:8,18
  29:23
  30:22
  36:17
  39:20
  40:11
  52:15

depending
  55:2

depose   10:3,
  17,21

deposed
  65:17

deposition
  3:10  4:1
  5:14  8:5,
  8,12,15,21
  9:15  11:2,
  9  20:10
  21:10,21
  23:9,15

42:7,20
  64:14,16,
  18,21
  65:1,2,20
  66:15  67:1
  76:10  80:3
  86:15
  87:24
  88:11  90:6

depositions
  7:17  50:22
  64:9,12
  65:6,9
  86:19
  89:13

deputy   17:6
  28:1

describe
  67:21

Description
  3:9  4:8

destroy
  46:24  66:5

destroyed
  36:1

destroying
  47:4

destruction
  62:19

detectives
  30:13

determine
  52:4  65:10

determined

82:15

Detroit
  36:16,17

dicta   38:16

dictum   36:10

difficult
  25:11

dignity
  35:25

direction
  4:4  84:2

directly
  52:25

directs
  79:11

disagree
  33:16
  45:12,21

discovery
  69:9

discredit
  41:9

discussed
  59:6

discussion
  6:24  11:7
  20:14  21:8
  34:3  40:21
  41:20
  42:5,18
  44:15
  57:25  76:8
  78:6  80:1

87:3 89:15

dismiss   29:6

dispense
45:24

dispute
50:22
73:14

district
69:9

division
30:5,14

document
16:10
61:4,7
68:20

documentation
15:15

documents
4:7 69:10

door   23:15
42:14 48:4
67:24
69:1,4
71:22 82:2

dot   57:9,12

Downy   64:18
66:10,12
67:15 68:9
69:11,16,
18

draw   14:18

drop   38:23

dropped

28:11

duly   6:7

dwelling
65:21 75:7

dynamic
30:18

—————————
E
—————————

e-mail   43:2,
3,17,20

early   36:19
46:16

effort   80:24

elections
13:23

element
35:25

emergency
48:25 49:5
53:16

employment
23:23
29:23

end   6:13
18:3 30:10
54:18

enforce
32:24

enforcement
12:14
13:12
17:1,12,19
24:13,16,

19 33:6
35:1 39:19
41:11
47:21
48:18 53:9
64:2,3
70:13,22
73:3 83:24
84:2

engage   18:5

engagements
57:17

enter   25:19
26:2

entered   25:9
26:18

entire   64:13
69:23

entrance
65:11,12,
21

entries   62:5
63:20

entry   35:21
37:25 47:6
61:17,18,
19 62:1
63:25 64:1
66:24
67:16,24
68:4 69:6
70:4,23
71:24
72:10 73:5
80:20 81:1

ESQUIRE   2:3,
8,13

essentially
19:10

established
58:21

evening
46:16

evidence
20:9 46:24
47:4 49:10
62:19 66:5
69:10
70:11 71:9

exact   68:9

Examination
3:4 7:4

examined   6:7

exception
8:4 59:12,
15

exclusionary
36:7,8

execute
30:17
31:19
71:23 75:7

executed
46:13 48:1
74:24
75:3,4,12,
14,16
77:20,23
78:24

79:12,17
86:4,15

**executing**
38:9

**execution**
3:15 31:3
74:1,4,20
75:6,8,19,
21 76:20
78:20
80:10 86:3

**executions**
86:3

**exhibit**  11:9
20:3 21:10
23:19
40:15,16
42:7,20
76:4,10
80:3

**Exhibit-1**
11:4,5

**Exhibit-2**
19:19 21:6

**Exhibit-3**
42:3

**Exhibit-4**
42:16

**Exhibit-5**
76:16

**Exhibit-6**
79:24

**exhibits**
3:8,17

6:11,15

**exigencies**
49:11

**exigency**
49:9,10

**exigent**  47:5
48:19,24,
25

**exist**  84:13

**expedited**
90:1

**expenses**
89:2

**expert**
12:21,22
13:2 21:18
25:18
50:17
51:3,24
52:5
60:13,25

**extent**  52:3

**eyes**  12:9

_____

**F**

**face**  82:22,
23

**fact**  7:13
39:25
60:16
63:10
71:1,10
72:2 73:13
82:15

83:13
84:10

**factor**
62:20,22,
25 72:8,9

**factors**
62:18
63:16,19,
25 65:18
81:17,18
84:14

**facts**  28:3
51:12
68:21 72:4

**failed**  26:15

**failure**  36:9
49:4

**faith**  80:24

**familiar**
27:22 28:2
35:8
39:23,24
40:3,13
67:19

**fast**  61:5

**faster**  61:6

**fathers**
37:15

**faulting**
47:18

**federal**  8:9
39:19
41:11
43:12

75:21,22
82:7,12
85:14,22,
23

**fee**  26:22,
23 88:22,
23

**feel**  33:9
63:25

**feet**  47:15

**fell**  26:6,
12

**fighting**
20:18

**figure**  51:10

**figured**  41:7

**file**  29:18
52:4

**filing**  5:7

**finally**  29:1

**find**  46:8
56:11 57:2

**finish**  80:15

**firearm**
62:17 66:6

**FIRM**  2:13

**fix**  28:9

**fixed**  26:8

**flat**  39:24,
25 40:5

**flights**  89:3

follow  84:3
89:7,10

follow-up
87:19

footage
70:12

footnote
74:4,6
77:17,19,
24

footnotes
74:14

force  3:15
14:12 40:1
61:19
80:10 81:1

forceful
65:12

forget  49:19

form  5:9
8:4 37:2
85:8

formation
69:6

formed  13:5
16:24 17:3

forms  49:11

forward  43:6

forwarded
27:20

found  43:22,
23

fourth  31:24
43:12
48:14
61:22 62:2
64:6 83:22
84:4

frankly  33:4

free  19:10
56:25 57:1

FREEMAN  2:8

friend  25:10
26:15

front  37:18
65:23

full  59:14
79:5

_____

G

Gallagher
17:4

Galleria  2:9

GARY  2:8

gave  29:1,
17 51:2,24
52:5 66:8

general
45:10

generally
14:3,17
15:8 62:4
63:17 69:2
75:23
78:21 82:5

83:23
85:16 86:3
87:25 88:2

gentleman
47:18

Georgia  2:4,
9,14
13:12,14
14:1,14,
16,19
15:8,11,
13,16,24
39:21
73:24
74:2,19,25
75:10
77:2,25
79:10
80:18
83:10,11,
14,25
84:10,11,
24

ghost  27:9

give  18:18
20:3 47:6
48:8 50:24
60:10,13
61:23
69:10 76:1
80:18
82:16
83:6,8
84:5

Glenville
39:21

good  5:24
7:9 9:14
29:8 37:9
54:8 80:24

Gotcha  6:21

government
72:5

great  28:23
29:2

green  6:19

ground  49:2
72:10 73:4

group  12:3,6
13:17
16:20
17:3,12

groups  12:12
27:15 77:2

Grundberg
11:2

guarantee
66:14

guess  11:25
13:10
14:14,25
17:21 18:2
19:20 27:6
29:20,22
32:7 50:18
59:12,13
71:21

guide  25:19
53:9

gun   38:23

guy   12:4
  28:23

Guys   86:24

―――――――――

―――――――――
          H

hand   60:2
  75:4

handle
  87:20,22

happened
  23:8  26:13
  63:11

Harris
  27:16,23

Harry   2:3
  5:25

head   7:14
  68:15

hear   9:21
  14:25

heard   8:1
  9:7  39:1,
  11  66:9
  67:8,11
  69:11
  70:4,5

hearing   66:3
  86:7

held   6:25
  11:8  12:24
  20:15  21:9
  34:4  40:22

41:21
42:6,19
44:16  58:1
76:9  78:7
80:2  87:4
89:16

helping   13:2

Heron   81:4

hes   40:25

hey   7:14
  16:5  65:25

high   30:10

hindsight
  71:6

hire   26:17

history
  65:24  72:5

hit   6:19

hold   10:25
  20:11

home   70:23
  75:6

Homeland
  39:20
  40:11

homeowner
  26:10,14,
  18

honest   21:22
  22:7  67:20
  68:7

honestly
  18:11  48:7

hoping   9:11

hotel   47:15

hour   87:23

hours   51:10

house   26:7,
  19  28:4
  30:24
  35:24
  47:12
  66:3,9,19,
  23  67:3,8,
  12,16  70:9

housekeeping
  7:25

Hudson   35:8
  36:3,15
  45:15

human   35:20
  36:22
  37:14
  38:12

Huseby   5:20

―――――――――
          I

ice   26:8

icy   26:7

Ida   57:8

idea   22:3
  30:2  43:15

identification
  11:11
  21:12
  42:9,22

76:12  80:5

identify
  51:7

II   34:14

III   45:1

Illinois
  58:6,11

important
  33:23

importantly
  62:2

in-person
  88:19,20

inaudible
  9:6

incident
  32:22
  69:23

inclination
  31:11,25

include
  22:15
  35:18
  88:25

included
  68:18  88:5

includes
  21:15,17
  88:8

inclusion
  48:16

inconsistency
  83:4

inconsistent
84:17

incorporated
74:3 77:3
86:13

independent
12:2 17:8

INDEX   3:1
4:1

indicating
54:23 60:5
79:14

individual
19:13 52:3

inferred
85:4

information
25:12
43:21
65:22

injuries
36:1

injury   36:22

inside   45:12
52:24
66:3,9,23

Institute
12:4 13:11
16:11,18

instructions
52:25

instructor
40:1

interest
35:17

interfere
10:6

internally
84:16

interpretation
43:10,11
83:20,21,
23

interpreted
80:19

intimated
86:2

introduce
5:21 19:19
76:16 80:8

investigator
30:22

invite   64:11

invoice
21:18
88:13

involved
12:14,20
15:17
18:10 28:2

Island
24:11,23
30:19 31:4

issuance
77:21

issue   28:16

31:5
47:17,23
48:14,15,
16 56:17
60:3 75:23
86:18

issued   22:19
59:18,24

issues   24:13
34:20
37:23
51:8,14
53:13,15,
19 59:5

issuing
77:23

IV   87:14

———————

          J

Jack   2:20
5:18 7:11,
13 16:5

Jackson   2:8
6:1,18
37:1
43:19,25
44:13 85:8
89:9,22,24

jail   13:19

James   64:16

Jersey   18:25
19:2

Jim   12:5
17:6,14

job   13:10

jobs   25:5

jog   51:21

John   3:3,
12,13 5:14
6:6 7:11,
14 38:25
39:1,7,17
40:10,17
41:9 60:25

judge   23:14
28:20,23
29:2 85:13

judge's
30:24 31:1

judgement
26:18

judicial
75:5 77:22

justice
28:10,12,
16 35:16
37:10
52:15

———————

          K

Kentucky
18:19,22
32:17,18
58:12,13,
20

Kevin   64:16

kind   33:10
38:5 46:2,

8 81:25
82:18

kinds  17:20
85:10

knee-jerk
33:5,17
34:24 35:4

knew  70:9

knock  35:17,
19 36:9,20
37:12,16
38:9 42:13
45:24
46:10
51:4,7,14,
25 53:1,4,
5,12,19
54:4 57:18
59:5 63:4,
8 69:3
73:19,25
80:20
84:19 85:5
86:8

knocking
36:13
42:14 69:1
71:24

knowing
33:13

knowledge
40:18 72:4

───────────
L
───────────

language

84:22

large  14:17,
20

largely
59:19

Las  14:21

late  46:16

law  2:3,13
12:14
13:12
16:25
17:11,19
24:13,15,
19 25:14
32:13 33:5
35:1 39:19
41:11
47:21
48:18
53:3,9
58:8 63:20
64:2,3
70:13,22
73:3,24,25
74:20
75:10,11
79:11
82:4,11,
12,17
83:6,11,24
84:1,2,11,
16 85:11,
13,20,25
86:3,6,10

lawful
61:16,18,

21 62:1
64:1,6

lawsuit  82:7

lawyer  10:10
25:5,6
26:17

lead  62:9

leaked  26:9

leaking
26:11

leapfrog
68:2

legal  12:3
13:10
16:10,17
27:10
39:18
41:1,10
48:8,9,16
53:9,15
54:14 56:5
61:23
82:16 83:7
84:5,23
85:10,18

legislation
3:14
31:13,14
32:2,6,7
33:2 34:22
76:17
84:21

legislators
33:23

liability
12:3 16:17
23:24
53:15

licensed
7:21
24:23,24
25:6

lien  26:19

lieutenant
30:15,18,
21,23

life  35:20
36:22
37:14
38:12 49:9

lighting
63:14

limb  35:20
36:22
37:15

limited
32:15,25
33:2

Lincoln  57:8

lined  6:15

list  22:24
51:20 54:9
60:12

listed  29:19
54:4,7
55:5

litigation
5:20

12:15,16

live 27:24

LLC 2:3,13

LLP 2:8

LLR 56:5

LLRMI 12:3
13:5,16
15:10
19:7,10,11

LLRMI's
56:16

Llrmi.com.
57:6

Loan 12:5

located
24:10

lockstep
31:23

logistical
15:18

long 44:6
46:23

looked 31:7
37:14
55:25
80:16

Los 17:6

lot 9:5
10:8 13:6,
7,10,13,16
20:24
30:12
31:8,14

33:6 83:5

lots 12:20

Lou 17:5

Louisville
38:7
58:18,23

_____

M
_____

made 55:5
60:21
61:16
65:21
66:24
67:16 70:2

magazine
18:6

magic 63:5

magistrate
73:2 84:14

majority
30:5 35:15

make 6:14
8:13,23
21:25
33:23 39:5
47:6,25
49:2 60:15
62:1
63:16,19,
22 64:10
65:14 67:2
68:4 69:6
70:3 71:24
76:2 79:9

80:20,24
82:21

makes 8:22
67:24

making 46:20
47:1,17
65:11
70:4,8,23

mall 26:1

man 29:2

management
12:4,6
13:11
16:11,18
17:12
23:24

manner 75:21

mansion
47:14

manual
53:14,17

margin
28:14,16

Mario 2:13
6:3

mark 11:4
21:5 40:19
41:24
42:1,15

marked 4:14
11:10
21:11
42:8,21
76:11 80:4

marketing
19:8

markets
19:11

Mary 57:8

material
10:8 39:15
40:1 60:8
61:10,15
62:7 63:24
67:7,14
69:8
70:11,14,
19 73:12

materials
19:25 20:4
21:16
27:19,20
73:1,23

MATHIS 2:8

matter 5:14
8:3 21:17
23:1 32:13
36:16
38:11 46:9
47:13 48:5
60:9,13
61:15,19
66:14

max 44:7

Mckenzie
2:20 5:18

means 63:1
83:18

measures
  72:7

Media   5:13
  34:14  45:1
  87:14

meet   58:16
  83:2

memory
  40:12,17
  51:21

Menks   45:14

mentioned
  27:7
  45:15,16
  55:12
  66:19,22

Michael   5:15

Michigan
  35:9  36:3,
  16

middle   6:19

mind   41:17

mine   25:11
  26:15

minute   86:25

minutes
  44:7,12

mistaken
  55:17

mobile   15:2

monitor   5:17

months   29:1

Morgansen
  58:23

morning   5:24
  7:9  46:17
  75:17

motion   65:25
  70:7,21

motions   27:9

mouth   15:4

move   43:6

mpacella@
stromlaw.com
  2:15

multiple
  14:4  15:9
  32:7

———————————
          N
———————————

named   12:4

names   51:11

narcotics
  30:6,16,22

Nashville
  14:22

nationally
  13:4

nature   59:6
  74:6

necessarily
  65:18
  85:13

needed   58:20

Newcastle
  2:14

newer   45:17

Newport
  24:11

nickname
  7:11

night   10:9
  69:21
  75:17

night's   9:14

no-knock
  31:6,19
  32:10,15,
  24,25
  33:3,17
  34:20,23
  35:2,19
  37:5,24
  38:5,7,15
  56:2  57:18
  58:4,8,21
  59:1  63:20
  72:9,10,
  13,16
  73:5,11
  74:1  84:8,
  9,12,25
  85:2

nominal
  26:22,23

noted   35:16
  37:12

notes   81:11

notice   3:10
  10:2,17,21
  11:1,16
  21:20
  62:21,24

November
  5:16

number   3:9
  5:13  11:10
  21:11
  42:8,21
  76:4,6,11
  80:4

numerous
  86:14

———————————
          O
———————————

Object   37:1
  85:8

objection
  8:22,23,24

objections
  5:8  8:4

obtain   66:6

occupant
  71:21  82:2

occupant's
  46:14  48:3

occupied
  83:1

occurred
  34:11
  44:23
  87:11

OCGA  80:9

OCJ  80:22

offense
 61:22

offer  26:21

offered
 14:16

office  2:3
 15:20
 39:18

officer
 28:7,13,17
 46:20
 52:14
 63:12
 65:25
 66:2,8
 67:6,7
 68:4 71:3,
 7,17 73:10
 75:5 77:23
 80:19,23
 81:1 85:15

officers
 13:19
 14:14
 15:11,15
 19:12
 24:16
 33:11
 45:24
 46:23 47:6
 48:1 61:16
 62:10,12
 63:12 66:7
 69:11

71:23
72:6,15
73:5,6
75:9 82:14
83:1 84:7
85:2 86:14

oftentimes
 30:15

Ohio  18:24
 22:23

one-hundred
 21:1

open  82:2

opened  23:15

operations
 53:15,16

opined
 37:10,14
 49:16
 51:15

opinion
 22:25
 23:1,4,7
 35:15 46:6
 48:17
 51:24 52:5
 60:13
 61:10,15
 62:1,3
 64:11
 77:5,10,14
 85:19
 86:2,7,11

opinions
 48:8 50:24

52:24
61:24
82:16 83:7
84:6 85:10

opportunity
 36:3 45:6

opposed
 54:18

oral  27:1

order  62:16

ordinance
 32:17,18

ordinances
 33:2

organizations
 18:21

original
 66:22 90:3

outlined
 73:2

oversight
 30:25

owned  12:4

owns  17:7

_____

_____
              P

P&ls  20:7

P-1  3:10

P-2  3:11

P-3  3:12

P-4  3:13

P-5  3:14

P-6  3:15

p.m.  87:7,
 15 89:19
 90:7

Pacella  2:13
 6:3 89:25

paid  88:14,
 17

paragraph
 74:19
 75:14

parent  17:10

Parkway  2:9

part  16:10,
 19 25:4
 29:10 30:3
 33:8 52:8
 81:2 82:20

partners
 25:14

passed  17:5
 25:13 32:3

past  23:7,8
 25:9 31:14
 43:14
 79:22

Patrick  17:4

patrol  30:14

pay  19:12

payment
 21:20,25
 22:5

peculiar
  18:4

people   14:18
  28:21 40:6
  70:9

perceived
  71:3,7,18

percent   21:1
  50:25
  55:10

percentage
  50:18

period   30:4,
  9,11 75:7

periodically
  53:18

person   33:12
  40:4 47:11
  62:15 63:6
  66:5 72:12

person's
  62:21,23

personnel
  29:17

pertains
  48:13

perusing
  61:4,7
  68:20

Peter   57:11

ph   28:2
  56:10 81:4

picture

40:25 41:3

piece   15:18

place   27:24
  32:22
  36:16 75:9
  82:25

places   14:22

plaintiff
  2:6 5:25
  26:22
  80:22

plaintiff's
  11:4,10
  19:19
  21:6,11
  42:2,8,16,
  21 49:14,
  15 76:11,
  16 80:4,8

plaintiffs
  50:19

point   25:16
  38:8
  43:11,13
  46:5 58:19
  71:24
  73:21 75:3

pointed
  38:16
  46:22
  47:9,20
  50:11
  62:10,12

points   36:12
  45:23

police   14:1
  16:8,18
  18:6,25
  19:1 23:25
  27:23
  28:7,13,
  17,18
  29:5,23
  30:21
  33:13
  36:17
  62:17,24
  63:6 84:25

policies
  12:11
  48:17 62:4
  63:18 64:4
  71:20 77:2
  85:16

policy   12:13
  13:6 16:8,
  18 17:19
  27:14,17
  32:12
  58:15 64:1
  71:25
  72:11
  75:24 77:4

political
  35:5 38:5

politically
  33:22

pop   44:2

portion
  17:17
  77:13

portions
  8:21

position
  12:1,6,24
  68:3,11

Post   15:12,
  13,16

potential
  33:12
  62:15

potentially
  66:5

practice
  23:25
  83:23 84:3

practices
  16:19
  48:18 53:3
  62:4 63:18
  64:1,4
  71:20 72:1
  75:23 82:6
  85:16

pre-pandemic
  17:23

presence
  30:7 80:24

present
  21:21
  31:18
  34:20
  64:25

presented
  56:13

57:19

pretty   44:6

prevent   9:18

prior   26:8
38:18  70:4

privacy
35:25

probate
25:10,13

problem
12:10

procedure
24:15
31:24

proceed   8:24

PROCEEDINGS
5:2

process   49:8

PRODUCTION
4:7

professional
11:25

professializ
e   17:1,19

professor
24:3

program
14:13,15
18:14,16,
23  19:1
41:2  58:18

programs

14:11,19
59:1,17

promise
51:22

promised
49:22

pronounce
64:24

proper   82:5

properly
37:16

property
35:23

prosecutor
52:11

protect
37:12

protected
35:17

protection
35:20,23
36:21
37:14
38:11
49:9,10

provide   14:7
18:20
27:14
70:14,19
85:21

provided
20:7  21:18
51:3  70:12
71:10

73:12
81:24

Providence
28:7,18
29:23
30:20,21

providing
25:12

provoke
35:21
36:23
38:12

provoked
37:15

public   17:14
33:18,22
34:25  35:6

publications
52:19,23,
24,25
55:22
59:13

published
54:3

pull   74:8
75:25
79:21

puppy   9:21

pure   30:2

purpose   20:8
36:13

purposes
58:21  84:4

pursuant   8:8

pursuit
27:23

put   9:22
10:14  15:4
20:5  26:19
29:17,18
32:19
33:11
39:13
40:15
50:13
53:20
66:21
69:2,18,20
83:18

puts   33:11

_____

Q

question   5:9
8:13,15
32:4  38:2,
3  45:10
46:15
48:12
56:1,5,6,
13,15,21,
23  60:17
61:24  64:6
65:15
67:10
70:18
72:14  73:8
76:19,21
83:9  86:5
87:19

questions
  4:14 8:19
  23:9,10
  34:19 43:2
  44:10 46:1
  56:10
  86:14
  89:7,8

quick  22:10
  86:23

quickly
  47:11
  62:15 63:3

Quinn  29:4

quote  8:2

────────────

      R

ram  69:2

range  16:17

reaction
  33:5,18
  34:24
  35:4,5

read  36:2
  38:18
  41:17
  43:4,6,14
  44:9 45:7
  63:3 64:9,
  12,13,18,
  21 65:2,19
  66:13,16,
  17 67:7
  75:2,10
  76:22,25

77:6
79:20,22
81:3,18
82:21
83:13,17

reading  5:6
  7:17 37:20
  65:6,9
  79:10

ready  10:9

real  22:10

reason  6:13
  38:2 41:9
  47:6 55:20
  65:19
  72:22
  85:25
  86:12

reasonable
  74:5
  75:15,18
  79:12,17

reasoning
  65:11

reasons
  33:19
  45:23

recall  15:22
  16:4 49:16
  51:17,23
  54:3 68:8,
  11,14
  70:6,7,10,
  24 72:24,
  25 73:13

receive
  21:19 22:5

received
  11:16,21

recent  38:6

recently
  31:8 53:25

recess  34:10
  44:22
  87:10

recognize
  31:5

record  6:25
  8:24 11:8
  17:13
  20:15 21:9
  34:1,4,8,
  16,19
  40:22
  41:21
  42:6,19
  44:11,16,
  20 45:3,5
  57:23 58:1
  67:21 76:9
  78:7 80:2
  87:4,8,16
  89:16,20

recorded  9:5
  70:13

recorder
  60:20

recording
  57:21
  70:20,22

redone  53:23

reference
  60:21 70:7
  79:9

references
  38:19
  55:11 58:4

referred
  7:12 49:14
  86:8

referring
  47:4,8
  74:17
  78:17

refers
  77:19,24

reform  31:8
  32:2,6,7
  33:6,21
  34:22
  38:19

refresh
  40:12,16

refusal
  82:23
  83:12

refused
  81:19 82:2

regard  15:20

Regina  24:5,
  6,8,9

region  19:12

regional

15:9 16:1

**regular**
  13:18
  27:18
  53:24

**regulation**
  34:23

**related**  53:5
  60:8 63:20
  71:22
  75:20

**relates**
  46:14 48:3
  51:4 61:16
  73:25 86:6

**relation**
  66:15

**remember**
  58:19 82:3

**remembering**
  51:11,12

**remiss**  53:19

**report**  20:5
  21:17
  22:20
  23:12,20
  46:23
  59:18,22,
  25 60:25
  61:3
  66:11,21
  68:13,17
  74:7,8
  79:4,6,9

**report's**
  78:12

**reporter**
  5:19,22
  6:11 9:4,
  25 10:1,17
  21:5 39:3,
  9 40:15
  41:24
  57:22
  76:4,5
  79:24
  89:21 90:2

**represent**
  35:14
  39:17

**representation**
  70:2,3
  81:25

**represented**
  8:18

**representing**
  2:6,11,16
  76:19

**REQUEST**  4:7

**required**
  50:15

**requirement**
  35:18

**requires**
  15:10
  80:23
  82:22,23
  84:14

**research**
  27:14,21
  56:11,17
  83:5

**researched**
  27:18

**reserve**  8:3

**reserved**  5:9

**residence**
  68:2 70:21

**residents**
  35:23
  36:24

**resolved**
  25:15

**respectfully**
  8:19

**respond**
  23:10
  26:15

**responding**
  48:3

**response**
  27:9 33:21
  34:25 35:5
  41:8 43:9
  46:14,19,
  21 47:7,
  16,22
  53:16
  80:25
  83:15

**responses**
  8:5 9:6,8

**rest**  9:15

**restriction**
  32:25
  33:16

**restrictions**
  32:20

**restrictive**
  82:12

**Retained**
  3:17

**returned**
  77:22

**review**  36:4
  61:9,14

**reviewed**
  21:16 60:8
  63:24
  67:15

**reviewing**
  80:15

**Rhode**  24:11,
  23 30:19
  31:4

**Rider**  17:5

**ring**  39:15,
  21 71:22

**ringing**
  39:2,12

**risk**  12:3,6
  13:11
  16:10,17
  17:12
  23:24

33:11,12
34:25

road 2:4
13:19

Robert 29:4

role 25:2,
5,21

Romeo 57:8

roof 26:7,
8,11

room 47:15
88:25 89:3

rooms 68:1

rosters
15:10

rule 36:7,8
42:13
50:15

ruled 23:14
36:7

running
66:3,6,9,
19,23
67:2,8,12
69:12
70:4,5,10

Ryan 3:3
5:14 6:6
7:9,16
8:10 9:14
10:4,18,20
11:20
20:21
21:15,19

34:18
43:1,18
44:5 45:6
49:21,25
60:25
61:9,14
80:12
87:19 89:5

Ryan's 40:16

_____

S

_____

Sal 24:4

Salve 24:6,
7,9

sat 26:20

Scalia 35:16
37:10

scan 59:9

schedule
3:11 11:22
19:20,22,
24 20:4
21:16 22:9
23:22
52:20
57:15 59:9
60:4

school 25:14

Scott 27:16,
22

screen 6:16,
17 9:23
10:15,21
21:3 41:18

50:1 52:21
77:11 81:5

scroll 49:20
60:24 61:1

sealing 5:7

search 3:16
24:17
29:24
30:7,17,
20,25
46:10,13
48:1 53:22
56:2 57:1
71:23
74:20,24
75:2,4
76:21
77:4,20
78:21
79:11,16
80:10

season 20:24

seats 19:11

section 53:2
54:10

Security
39:20
40:11

seek 18:12

seeks 18:15

seizure
53:22

seizures
24:18

send 43:20
44:9

senior 39:18
41:10

sense 82:21

sentence
75:13

sentencing
35:1

separately
20:8

sergeant
30:15

serve 29:24

service
18:4,8

services
21:18

serving
46:10

set 12:9
75:23

share 6:17
77:11

sharing
41:18

sheet 6:12

sheriff's
13:20,23,
24 15:20
18:21,22
58:12

sheriffs
   18:24

short   44:6

show   7:16
   28:25

showed   62:12
   63:1
   70:20,22

showing   9:22
   10:14 21:3
   22:9

side   23:11
   52:17

sight   45:16

sign   15:11

signed   30:24
   75:5

significant
   32:19

signing   5:6

single   15:23

sir   7:19,24
   9:2,10,20
   10:1,22
   11:15,18
   24:25
   28:19 50:2
   52:22 56:4
   60:6 64:20
   65:4 74:18
   77:15,18
   78:15,22
   79:7,18
   81:15

sitting   14:4
   20:8

situation
   49:1 72:10
   73:4

size   47:12

skills   25:22

skim   22:10
   43:5

slide   58:19

sold   17:15,
   17

solicit
   18:5,8

son   26:14

sort   80:25

sought   73:22
   84:8 85:2

sound   20:23

south   45:23

speak   13:18

speaking
   57:17

speaks   84:22

special
   53:16

SPECIALIST
   2:19 5:12
   34:6,13
   44:18,25
   57:20
   87:6,13

89:18

specific
   14:3 15:1,
   5,21,23
   18:7 84:18
   86:17

specifically
   16:4,25
   51:25 54:4
   55:21,22
   57:17
   65:7,17,20
   74:14
   80:20 82:1

speculation
   30:3

spell   39:4

spoken   13:25

spotted
   63:13,14

square   47:15

stack   67:17,
   23 68:3,4,
   9,12,22,24

stacked
   67:15,19

stacking
   67:18,22
   69:5

standard
   82:13
   85:21

standards
   75:22

85:22

standing
   72:2

start   50:20

started
   13:1,3,6
   54:22
   55:16,17
   57:3

starts   54:20
   74:12,19

state   13:11,
   12 15:3,24
   16:2 18:7,
   22,25 19:2
   30:19
   31:21
   32:13,18
   52:9 74:1,
   20,25
   75:10 81:4
   82:4,11,17
   83:10,11,
   14 84:1,
   10,11
   85:11,13,
   20,25
   86:2,6

state's
   83:16

stated   21:15
   65:19 67:8
   70:21

statement
   66:14,16,

18,22 70:8
71:5,18
82:24

**statements**
67:2

**states**  12:7,
12 14:18
17:2 32:8,
9,12,14
33:9 52:9
58:7

**statu0te**
76:17

**statute**  3:14
30:19
31:21
43:12
73:25 74:4
75:25
76:1,15,
19,22
77:3,6,25
78:1,11,17
80:12,19
81:8,13
82:25
83:12,16,
21 84:23
85:4
86:13,20

**statutory**
38:19
74:20
75:11
79:10,11

**stayed**  29:13

**stealth**
33:14

**Steve**  11:2

**stiff**  20:23

**stipulated**
5:5

**STIPULATIONS**
4:11

**stop**  41:18
61:12

**stopped**
53:24
57:21

**straight**
12:16
67:25

**street**  2:14
27:25 28:3

**Strike**  70:17

**STROM**  2:13

**structure**
17:11

**struggle**
10:9

**struggling**
10:7

**stuff**  27:18
54:15

**subject**  8:24
65:24 89:7

**submit**  15:16

**submitted**

56:21

**submitting**
20:9

**subsidiary**
16:24

**sudden**  36:1

**sued**  26:13

**suggested**
32:2 38:16

**suggests**
36:11

**Suite**  2:4,9,
14

**supercedes**
8:9

**Superior**
26:20

**support**  4:1
30:16
41:13
56:18

**suppose**  56:9

**supposed**
35:22
36:23

**Supreme**
27:17
35:9,16
36:19
37:10,11
38:9 53:5
80:17
83:14

**surprised**
31:12
35:23
36:24

**suspect**  53:2

**Suspect's**
42:14

**suspects**
72:5

**SWAT**  29:11
30:11,16
53:14,15
59:1

**swear**  5:22

**sworn**  6:7
30:20

———————
**T**
———————

**Tacoma**  12:18
52:12

**tactical**
30:4 47:1

**takes**  80:22

**taking**  9:4
23:18

**talk**  23:23
38:24
55:22
74:23
84:18

**talked**  78:20
83:10

**talking**  32:6

34:22
35:18
38:20
46:15 47:3
48:14
61:21
65:18 69:5
76:2 77:11
82:6 85:5

talks 74:14
  75:14
  78:23

Tasks 53:9

Taylor 32:22
  38:6

te 19:2

teach 24:12

teaching
  53:24

team 29:11,
  14,19
  30:11,16
  67:23

ten 31:2
  74:24
  75:17
  77:20
  78:23,24
  86:25

term 49:19

terrible
  51:10

testified
  6:8 50:8

51:15
52:12
59:19
63:23 66:3

testify
  14:25
  22:14
  23:12
  50:23

testifying
  9:18 12:17
  50:19
  52:11

testimonial
  12:21

testimonies
  22:21

testimony
  22:14,17
  23:5 38:4,
  19 46:9
  48:5
  50:13,15,
  17,25
  51:3,4
  65:10
  68:23,25
  87:24
  88:19,20
  89:6

Theres'
  57:10

thing 22:13
  45:13 46:5
  76:2

things 17:20
  24:18
  28:22
  31:15
  37:11,13,
  25 38:24
  45:18
  59:6,16
  62:9,14
  65:13 74:5
  83:3

Thomas 57:12

thought
  16:14
  28:15
  37:23
  41:25

thousand
  26:1 55:10

Thursday
  20:19

tickets
  28:21 29:6

time 5:10,
  17 17:4,20
  20:25 21:9
  29:3 34:6,
  11,14
  38:21
  42:19
  44:18,23
  45:2,21
  46:12,14,
  19,21
  47:16,22
  48:2 49:1,

6 50:12
54:8 66:15
73:10,21
74:5,23
75:8,15,18
76:9,18,20
77:21
79:12,17
80:2
86:16,23
87:6,11,15
89:18

timeframe
  49:18

times 9:5
  14:2 25:18
  31:2

timing 59:5
  75:5

title 42:12
  53:11 80:9

today 9:18
  22:15,16
  31:6,18
  47:1 51:18
  60:3 71:10

today's 5:16
  24:19

toilet 47:11

told 22:4
  50:22

top 68:15

track 6:12
  50:21

train  16:9,
  19 46:23
  47:13

trained
  22:21

training
  12:7,13
  13:3,9,13,
  24 14:5,8
  15:2,3,5,
  18,19
  17:14,19,
  22 18:20
  23:25
  39:18
  41:11
  47:10 48:7
  62:5 64:4
  73:3 85:17

trainings
  14:10
  15:9,12
  16:1

transcript
  89:23 90:1

travel
  88:22,23

trial  5:10
  27:6

trust  37:19

truthfully
  9:18

tuition
  19:13

turn  7:13

turning
  49:21

TV  28:20

twelve  13:21

type  14:6
  27:2 83:12

types  62:5

—————————

—————————
              U

U.S.  27:16
  39:20
  45:14
  47:20 48:9
  53:5 54:15
  55:9

uh-huh  9:12

ultimately
  26:13

un-huh  9:6

unannounced
  35:21

uncomfortable
  31:10 32:4

undermine
  41:14 49:7

understand
  7:15,20
  8:14 9:1,3
  37:8 46:3
  47:25
  63:22

understanding
  7:10 8:17
  11:24
  48:23
  73:12

uniform  30:7

unit  30:6

United  12:7
  14:18 17:1
  52:9

university
  24:4

updated
  22:14,15,
  20,23
  23:1,3
  53:17,25
  59:14

—————————

—————————
              V

vacuum  72:2

vast  30:5

Vegas  14:21

vengeance
  81:20

venues
  14:17,20

verbal  81:25
  82:1

verbatim
  81:19

verdict  26:4

versus  5:15
  27:16,22
  35:9 36:3,
  15 45:14
  46:16
  47:20 48:9
  50:19
  54:15 55:9
  66:15 81:4

video  2:19
  5:12 9:5
  34:6,13
  44:18,25
  57:20
  60:19
  63:15
  81:24
  87:6,13
  89:18

view  60:12

violated
  82:14

violation
  82:11,17,
  19

violence
  35:21,22
  36:23
  38:12

void  77:21

—————————
              W

—————————
wait  80:25
  83:15

waived  5:8

waiving   47:7

wanted  30:6
 34:19

warrant
 30:20 31:3
 32:25
 33:14
 34:20
 46:10,11
 48:1 49:5,
 6  71:23
 72:9,16
 73:7,11,
 15,22 74:4
 75:2,4,6,
 7,9,12
 76:21
 77:4,20
 79:16
 80:21
 84:8,9,12
 85:2 86:16

warrant's
 46:12,13

warrants
 3:16 29:24
 30:5,7,10,
 14,17,25
 31:6,19,21
 32:10,15
 33:1,3,10,
 17 34:23
 35:2 36:20
 37:6,9
 38:5,7,10,

15 51:5
53:1 54:5
56:2 57:19
58:5,8
59:2 74:1,
21,24
78:21
79:11
80:10
84:19,25
85:6 86:3,
4,9

Washington
 12:19
 52:12

watch  69:22

ways  18:14
 19:14

weapon  62:16

weapons
 62:13
 65:23

wearing
 69:16

weather
 20:22

website  55:7
 56:1,6,16,
 24 57:2,5

week  12:18
 22:23
 28:25 30:9
 52:11

weeks  17:24,

25 18:2
22:18,19
59:24

weird  30:18

Wes  6:1
 44:8

WESLEY  2:8

west  86:24

wjackson@
fmglaw.com
 2:10

won  25:25

words  15:4
 63:5

work  13:6,7
 40:10
 71:15

worked  71:14

worry  22:6

worth  33:10

Wright  8:10
 10:3,18

write  12:11
 32:12
 54:9,25
 57:7

writing
 27:5,8,9,
 10

written
 35:11
 39:13
 42:12

43:9,15
45:22 55:4
56:12,22
57:3
59:20,23
77:1

wrong  36:6
 54:24

wrote  27:15
 35:10
 41:15
 47:19 55:8

_____

           Y

year  17:16,
 24 18:1,3
 30:9 49:15

yearly  17:21

years  13:21,
 22,23
 17:15
 25:10,16
 26:21
 31:14
 67:19

yelled  7:14

_____

           Z

zipper  40:9