# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

C.J., a minor, by and
through her next friend and
guardian, Betty Jean Murphy
James, BETTY JEAN MURPHY
JAMES, as Administrator of
the Estate of Latoya James,

    Plaintiffs,

    v.

MICHAEL BLAQUIERE, in his
individual capacity as a
Camden County Deputy
Sheriff, DOWNY CASEY, in
his individual capacity as
a Camden County Deputy
Sheriff,

    Defendants.

CASE NO. 2:22-cv-78

## ORDER

Before the Court is a motion for summary judgment filed by Defendants Michael Blaquiere and Downy Casey. Dkt. No. 39. This matter has been fully briefed, and the parties have appeared before the Court for oral argument. Dkt. No. 50; Dkt. No. 52; Dkt. No. 55. For the reasons set forth below, Defendants' motion is **GRANTED.**

## BACKGROUND

The facts of this case are tragic. During the early morning of May 4, 2021, Defendants—along with other Camden County Sheriff's

Office deputies—executed a search warrant at the home of Mr. Varshan Brown located at 12103 U.S. Highway 17, in Woodbine, Georgia (hereinafter "the Residence"). When the officers entered the Residence, Mr. Brown opened fire on the officers and used Latoya James as a human shield while he shot at law enforcement. The officers returned fire, and James was killed in the crossfire. Plaintiff Betty James, as executrix of James's estate and guardian of James's surviving minor child, C.J., asserts Fourth Amendment and state law claims against Defendants. The following facts are undisputed.

## I.   Factual Background

Defendants Blaquiere and Casey are both investigators with the Camden County Sheriff's Office (hereinafter "CCSO"). Dkt. No. 39-2 ¶ 1; Dkt. No. 50-1 ¶ 1. Leading up to the search at issue, Defendants had been investigating Varshan Brown as "the primary target of narcotics dealing" taking place at the Residence. Dkt. No. 39-2 ¶ 2; Dkt. No. 50-1 ¶ 2. As part of that investigation, Defendants learned: the Residence was equipped with security cameras and monitors; Brown had a violent criminal history, including charges and/or convictions for aggravated assault, battery, possession of a firearm by a convicted felon, drug trafficking, family violence, willful obstruction of law enforcement, and aggravated assault of a law enforcement officer. Dkt. No. 39-2 ¶¶ 3-5; Dkt. No. 50-1 ¶¶ 3-5. They also learned that

Brown kept weapons "on his person and in the residence." Dkt. No.
39-2 ¶ 5; Dkt. No. 50-1 ¶ 5. Defendant Casey was "personally aware
of a prior incident" where Brown's son "was believed to have shot
[Brown] in the back after Brown had beaten his son's mother." Dkt.
No. 39-2 ¶ 5; Dkt. No. 50-1 ¶ 5.

On April 29, 2021, Defendant Blaquiere applied with the
Magistrate Court of Camden County for a search warrant of the
Residence.  Dkt. No. 39-2 ¶ 1; Dkt. No. 50-1 ¶ 1; see also Dkt.
No. 39-3 (copy of the original search warrant). In the application,
Blaquiere indicated that officers intended to search the Residence
for controlled substances, items used in the distribution of
narcotics, and electronic devices used to facilitate drug
transactions. Dkt. No. 39-2 ¶ 6; Dkt. No. 50-1 ¶ 6; Dkt. No. 39-
3. A Camden County magistrate judge approved the search warrant
but denied Defendant Blaquiere's requested inclusion of a "no
knock" provision. Dkt. No. 39-2 ¶¶ 7-8; Dkt. No. 50-1 ¶¶ 7-8; Dkt.
No. 39-3 at 6.

At approximately 4:00 A.M. on May 4, 2021, Defendants met
with other CCSO officers to review the "Drug Task Force Operation
Plan" (hereinafter "the Operation Plan"), which was prepared by
Blaquiere and Casey for the execution of the search warrant on the
Residence. Dkt. No. 39-2 ¶ 9; Dkt. No. 50-1 ¶ 9; see also Dkt. No.
39-6 (copy of the Operation Plan). According to the Operation Plan,
the "synopsis of operation" was to "arrive on scene, knock and

announce, make entry," and clear the Residence before searching.
Dkt. No. 39-6 at 3. The Operation Plan also included information
about Brown's criminal history and expected possession of
firearms. Id. at 4-5, 13. After reviewing the Operation Plan,
Defendant Blaquiere, Defendant Casey, and the other CCSO officers
arrived at the Residence shortly before 5:00 A.M. Dkt. No. 39-2
¶ 10; Dkt. No. 50-1 ¶ 10.

Upon their arrival at the Residence, CCSO officers learned
more. The porch light was on, and Defendants noted a security
camera on the front porch for which they had not previously
accounted. Dkt. No. 39-2 ¶ 10; Dkt. No. 50-1 ¶ 10. According to
Defendants, the security camera flashed, and an unnamed CCSO
officer called out "they know we are here."[1] Dkt. No. 39-2 ¶ 11;
Dkt. No. 50-1 ¶ 11; Dkt. No. 39-7 at 00:48-00:50. As the officers
approached the front door of the Residence, Defendant Casey
testified that he could hear running inside. Dkt. No. 39-2 ¶ 12;
Dkt. No. 50-1 ¶ 12. Defendant Blaquiere shouted "Sheriff's Office—
Search Warrant—Come to the Door" before knocking on the door. Dkt.
No. 39-2 ¶ 13; Dkt. No. 50-1 ¶ 13; Dkt. No. 39-7 at 00:57-00:59.
About two and one-half seconds after Defendant Blaquiere's knock,

---

[1] Defendants have provided footage from a bodycam worn by Defendant
Casey during the search of the Residence. Dkt. No. 39-7. During
most of that footage, the view is obstructed by Defendant Casey's
riot shield. Id. The audio, however, is unobstructed. Id.

the officers breached the front door and entered the Residence. Dkt. No. 39-2 ¶ 14; Dkt. No. 50-1 ¶ 14; Dkt. No. 39-7 at 1:02.

When they entered the Residence, Defendants encountered Brown and James standing in the bedroom, and a CCSO officer continued to shout, "Sheriff's Office Search Warrant" while instructing the individuals to get on the ground. Dkt. No. 39-2 ¶ 14; Dkt. No. 50-1 ¶ 14; Dkt. No. 39-7 at 1:05-1:08. Yet, Brown refused to comply. Instead, he wrapped one arm around James and held a firearm with his other hand. Dkt. No. 39-2 ¶ 15; Dkt. No. 50-1 ¶ 15. Brown immediately began firing his weapon at the officers, and Defendants returned fire. Dkt. No. 39-2 ¶¶ 15-16; Dkt. No. 50-1 ¶¶ 15-16. Defendant Blaquiere testified that he was firing at Brown's firearm. Dkt. No. 50-6 at 9. Ms. James was killed in the crossfire. Dkt. No. 1 ¶ 21.

## II. Procedural History

Plaintiff brought suit against Defendants on behalf of C.J., James's minor child, and on behalf of James's estate. See generally id. In addition to Defendants Blaquiere and Casey, Plaintiff initially sued Jim Proctor, the Camden County Sheriff, and John/Jane Does, the other CCSO deputies who helped execute the warrant. Id. Sheriff Proctor moved to dismiss the claims against him, dkt. no. 10, Plaintiff stipulated to Proctor's dismissal, dkt. no. 16, and he was dismissed, dkt. no. 17. During the hearing on Defendants' motion for summary judgment, Plaintiff's counsel

stated that Plaintiff's only remaining claims are against Defendants Blaquiere and Casey—not any of the other CCSO officers.

Plaintiff asserts two claims against the two remaining Defendants under 42 U.S.C. § 1983—a Fourth Amendment unreasonable search claim and a Fourth Amendment excessive force claim. Dkt. No. 1 at 10-17. She also asserts two Georgia state law claims against the two remaining Defendants—a wrongful death claim and an estate claim. Id. at 22-24. Before the Court is Defendants' motion for summary judgment on all remaining claims. Dkt. No. 39. Plaintiff filed a response in opposition to Defendants' motion, dkt. no. 50, and Defendants filed a reply brief, dkt. no. 52. On May 15, 2024, the Court heard oral argument on the motion. Dkt. No. 55.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" where the evidence would allow "a reasonable jury to return a verdict for the nonmoving party." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A fact is "material" only if it "might affect the outcome of the suit under the governing law." Id. (quoting Anderson, 477 U.S. at 248). The Court must view all facts in the light most

favorable to the non-moving party and draw all inferences in its favor. <u>Tolan v. Cotton</u>, 572 U.S. 650, 657 (2014).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). The movant must show the Court that there is an absence of evidence to support the nonmovant's case. <u>See</u> <u>id.</u> at 325. If the movant discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. <u>See</u> <u>Anderson</u>, 477 U.S. at 257. The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting <u>Celotex Corp.</u>, 477 U.S. at 332 (Brennan, J., dissenting)). Or second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1117.

## DISCUSSION

The Court begins with Plaintiff's § 1983 claims. Defendants seek summary judgment on both § 1983 claims based on qualified immunity. Dkt. No. 39-1 at 4; <u>see also</u> <u>Holloman ex rel. Holloman</u>

7

v. Harland, 370 F.3d 1252, 1263 (11th Cir. 2004) ("When a government official is sued under a theory of direct liability, he may seek summary judgment on qualified immunity grounds."). Before determining whether qualified immunity applies in this case, a brief overview of the doctrine is in order.

"In general, when government officials are performing *discretionary duties* . . . they are entitled to qualified immunity." Edger v. McCabe, 84 F.4th 1230, 1235 (11th Cir. 2023) (emphasis added) (citing Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)). "The term discretionary authority includes all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Patel v. City of Madison, 959 F.3d 1330, 1338 (11th Cir. 2020) (alterations accepted) (internal quotation marks omitted). Defendants assert they were performing a discretionary duty when they executed the no-knock warrant at the Residence. Dkt. No. 39-1 at 4-5. And Plaintiff does not argue otherwise. See generally Dkt. No. 50. Thus, the Court finds Defendants were performing a discretionary duty and are preliminarily entitled to qualified immunity.

Plaintiff may rebut this entitlement by showing that: (1) "the government officials [] committed a constitutional violation," and (2) "this violation was 'clearly established' in law at the time of the alleged misconduct." Edger, 84 F.4th at

1235 (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)); <u>see also</u> <u>Holloman</u>, 370 F.3d at 1264 ("To overcome qualified immunity, the plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." (citations omitted)). "The test is conjunctive, and if [] [P]laintiff fails either prong of the qualified immunity analysis, [her] claim is barred." <u>Edger</u>, 84 F.4th at 1235. With that in mind, the Court turns to Plaintiff's first § 1983 claim—the unreasonable search claim.

## I.   Defendants are entitled to qualified immunity on Plaintiff's unreasonable search claim.

Plaintiff asserts that Defendants Blaquiere and Casey's forcible entrance into the Residence constitutes an "unreasonable entry" in violation of James's Fourth Amendment rights. Dkt. No. 1 at 10–14. Defendants argue Plaintiff has not established a constitutional violation because: (1) James did not have an expectation of privacy in the Residence, and (2) even if James did have an expectation of privacy, Defendants' search of the Residence was reasonable. See Dkt. No. 39-1 at 5–17.

### A. Plaintiff has not established that James had a legitimate expectation of privacy in the Residence.

To establish a violation of James's Fourth Amendment rights, Plaintiff needs to show that there is a genuine issue of fact as to whether James had a legitimate expectation of privacy in the

Residence. See Ziegler v. Martin Cnty. Sch. Dist., 831 F.3d 1309, 1320 (11th Cir. 2016) ("To assert a Fourth Amendment violation, an individual must establish he or she had a legitimate expectation of privacy in the place searched." (citations omitted)). To do that, Plaintiff must show two things. First, Plaintiff must show that James "manifested a 'subjective expectation of privacy'" in the Residence. Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010) (quoting United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987)). Whether James had a subjective expectation of privacy in the Residence is a factual question. United States v. Jones, 184 F. App'x 943, 947 (11th Cir. 2006). Second, Plaintiff must establish "a willingness by society 'to recognize [James's subjective] expectation as legitimate.'" Rehberg, 611 F.3d at 842 (quoting McKennon, 814 F.2d at 1543). That requirement poses a legal question. Jones, 184 F. App'x at 947.

Plaintiff offers two arguments as to why James had a legitimate expectation of privacy in the Residence. First, Plaintiff argues James had a legitimate expectation of privacy in the Residence because she might have been an overnight guest there at the time of the search. Dkt. No. 50 at 8–11. And second, Plaintiff argues James had an expectation of privacy because she "was in the classification of people [Georgia's knock and announce statute] . . . was intended to protect." Id. at 11–14. Neither argument is successful.

**1. There is not a triable issue of fact as to whether James was an overnight guest at the Residence.**

Plaintiff's central argument to show James had a legitimate expectation of privacy in the Residence is that James was an overnight guest at the time of the search. Her central problem is that there is no evidence that James was an overnight guest. Under the Supreme Court's Fourth Amendment precedent, "an overnight guest in a home may claim the protection of the Fourth Amendment." <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998). Indeed, proving that an individual is an overnight guest in a home satisfies both the subjective and objective portions of the legitimate expectation of privacy test discussed above. <u>See</u> <u>Minnesota v. Olson</u>, 495 U.S. 91, 96–97 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."). But recognition of this legitimate expectation of privacy for houseguests is limited to those who are accurately characterized as "overnight guests." <u>Carter</u>, 525 U.S. at 90. Neither guests merely visiting another's home nor guests present for strictly commercial purposes have a legitimate expectation of privacy in the home. <u>Id.</u> at 90–91. Thus, the Court must determine whether there is evidence supporting Plaintiff's contention that James was an overnight guest—rather than merely a visitor—in the Residence. <u>See, e.g.,</u> <u>United States v. Bushay</u>, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012)

("[T]he Court must determine whether Bushay was an overnight guest
or merely present in the room.").

There is no bright-line rule outlining what evidence is
sufficient to show an individual was an overnight guest in a home.
"Courts . . . frequently consider various facts argued by the
parties as evidence that a defendant was an overnight guest, such
as that the defendant had personal belongings in the home,
possessed keys to the home at the time of arrest, or stayed
overnight more than once." United States v. Phyfier, 385 F. Supp.
3d 1198, 1201 (M.D. Ala. 2019) (collecting cases), aff'd, 842 F.
App'x 333 (11th Cir. 2021); see also United States v. Rodriguez,
762 F. App'x 712, 715 (11th Cir. 2019) ("One relevant circumstance
is whether the defendant stored his personal belongings at the
residence." (citing United States v. Garcia, 741 F.2d 363, 366
(11th Cir. 1984))). None of those facts are present here, as there
is no record evidence showing that James had personal belongings
in the Residence, that James had a key to the Residence, or that
James had stayed overnight at the Residence more than once.

But while those facts are frequent considerations, they are
not *required* to prove an individual is an overnight guest. In fact,
neither the Supreme Court nor the Eleventh Circuit has required
"any specific type of evidence [] be presented for [an individual]
to show he is an overnight guest." Phyfier, 385 F. Supp. 3d at
1201. Put plainly, "a court could conclude that a defendant is an

12

overnight guest, even if he *does not* store personal belongings in a home, *does not* possess keys to the home, and *does not* stay frequently, so long as he was an overnight guest at the time of the search." Id. (emphasis in original). In evaluating whether James was an overnight guest, the only clear guidance is that the Court must assess all the surrounding circumstances to determine if James had a legitimate expectation of privacy in the Residence. See Rodriguez, 762 F. App'x at 715 ("Whether the defendant has a legitimate expectation of privacy is determined in light of the totality of the circumstances." (citations omitted)). And to survive summary judgment, Plaintiff must present the Court with *some* evidence corroborating her claim that James was an overnight guest at the Residence. She has not done so.

Though Plaintiff asserts in her brief that James was an overnight guest at the Residence, the record is devoid of evidence indicating the nature of James's visit to the Residence. As Defendants point out, Plaintiff responded to Defendants' written discovery stating she was "unaware of the purpose of James's visit to [the Residence] the morning of May 4, 2021." Dkt. No. 39-1 at 7 (citing Dkt. No. 39-9 at 9-10). Moreover, Plaintiff testified that "she did not know why James was at [the Residence] that morning, how she got there, how long she had been there, if James had ever visited [the Residence] prior to the subject incident, or what James's plans were for that day." Id. (citing Dkt. No. 39-10

at 46, 61). This testimony fails to shed any light on James's status—overnight guest or otherwise—in the Residence.

The evidence highlighted by Plaintiff in response to Defendants' argument is equally unhelpful. Plaintiff argues there is a genuine issue of fact as to James's status as an overnight guest because the evidence shows "James was in the bedroom in a home occupied by members of her family, including [] Brown with whom she was close[,] in the middle of the night." Dkt. No. 50 at 10. The "middle of the night" argument is certainly not supported by the record, which shows only an early morning presence by a woman who worked night shifts. Dkt. No. 39-10 at 17. Plaintiff is relegated to her own testimony that: James and Brown were close cousins, James was aware of Brown's criminal history, and James's sister used to live at the Residence. Dkt. No. 50-11 at 6–9. Even assuming that to be true, it simply does not support Plaintiff's assertion that James was an overnight guest in the home. The only evidence even arguably relevant to James's status as an overnight guest is the fact that she was in a bedroom at the Residence at 5:00 A.M. But pointing to a clock cannot prove Plaintiff's assertion. See, e.g., United States v. Dukes, No. 2:16-cr-31, 2017 WL 11610362, at *5 (N.D. Ga. Aug. 1, 2017) (finding the fact that an individual "was found sleeping on the couch of the sparsely furnished apartment" was not enough to prove he was an overnight guest where he had not provided evidence as to his "relationship

14

to the apartment, whether he stored any items there, the circumstances under which [he] was present, or how long he had been there"), report and recommendation adopted, 2017 WL 11609656 (Sept. 5, 2017).

It is true that the type of evidence required to create a triable issue of fact as to an individual's status as an overnight guest is not strictly enumerated. What is required, however, is some evidence showing James was an overnight guest. Plaintiff's "bald assertion" that James was an overnight guest in the Residence is simply not enough. See, e.g., United States v. Armenta, 69 F.3d 304, 308 (9th Cir. 1995) ("Armenta's bald assertion that he was an overnight guest . . . is not sufficient to establish that he had a legitimate expectation of privacy in the house." (citing United States v. Carr, 939 F.2d 1442, 1445-46 (10th Cir. 1991))). There is a glaring lack of record evidence establishing James's status at the Residence. Thus, the Court finds that Plaintiff has failed to show a genuine issue of fact as to whether James was an overnight guest.

**2. Georgia's knock-and-announce statute does not provide James with a legitimate expectation of privacy under the Fourth Amendment.**

Plaintiff also argues that James had a legitimate expectation of privacy in the Residence because she was "in the classification or category of people" Georgia's knock and announce statute, O.C.G.A. § 17-5-27, is intended to protect. Dkt. No. 50 at 13. But

15

this argument fails because Plaintiff was not a permanent occupant of the Residence.

Relying on Hudson v. Michigan, 547 U.S. 586 (2006), Plaintiff emphasizes that knock-and-announce requirements serve to "protect life and limb, property, and privacy." Dkt. No. 50 at 12. In Hudson, police obtained and executed a search warrant for Hudson's residence. 547 U.S. at 588. After arriving and announcing their presence, police waited three to five seconds before forcibly entering the residence. Id. The Court was not asked to determine whether the entrance into Hudson's home was a violation of knock and announce principles because Michigan conceded it was. Id. at 590. But in evaluating the appropriate remedy for that violation, the Court discussed the interests protected by knock and announce rules, including "the protection of human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised *resident*." Id. at 594 (emphasis added) (citations omitted). The Hudson Court consistently noted that the knock-and-announce requirement protects interests of residents. See id. at 589 ("The common-law principle that law enforcement officers must announce their presence and provide *residents* an opportunity to open the door is an ancient one." (emphasis added) (citations omitted)); id. at 586 (The knock-and-announce requirement "gives *residents* the 'opportunity to prepare themselves for' the entry of the police." (emphasis added) (citations omitted)). Nothing in

16

Hudson suggests that the knock-and-announce requirement protects the interests of non-resident guests in the residence, as Plaintiff suggests. Dkt. No. 50 at 13.

Besides Hudson, other Supreme Court decisions also recognize that knock-and-announce rules are meant to protect interests of residents—not guests. For example, in Wilson v. Arkansas, the Court found the knock-and-announce requirement was based on the common law search and seizure principles in which the Framer's intent for the Fourth Amendment was couched. 514 U.S. 927, 934 (1995). That common law principle provided: "before he breaks it, he ought to signify the cause of his coming, and to make request to open doors . . . for the law without a default in the *owner* abhors the destruction or breaking of any house." Id. at 931 (emphasis added) (citation omitted). Similarly, in Richards v. Wisconsin, the Court acknowledged that residents should have a reasonable opportunity to comply with the law to avoid the destruction of their property. 520 U.S. 385, 393 n.5 (1997). Finally, in Miller v. United States, the Court reiterated the notion of residential privacy, noting that "the precious interest of privacy [is] summed up in the ancient adage that a man's house is his castle." 357 U.S. 301, 307 (1958). Too, the Miller Court held that "every *householder*, the good and the bad, the guilty and the innocent, is entitled to the protection designed to secure the common interest against unlawful invasion of the house." Id. at 313 (emphasis added). Again, in

17

none of these cases does the Court discuss knock-and-announce rules protecting the interests of guests like James.

To be clear, the Supreme Court's knock-and-announce jurisprudence may imply an additional expectation of privacy created by knock-and-announce requirements, but if that expectation does exist, it is only for residents of the home being searched. James was not a resident, and in fact, there is no evidence that she was an overnight guest. Based on the evidence before the Court, James was a temporary guest at the Residence. Thus, James does not fall within the category of persons protected under Georgia's knock-and-announce rule.

At bottom, Plaintiff has not shown that James had a legitimate expectation of privacy in the Residence. There is not a genuine issue of fact concerning whether James was an overnight guest in the Residence. And O.C.G.A. § 17-5-27 does not provide James with a legitimate expectation of privacy in the Residence. Thus, regardless of whether Defendants acted unreasonably when entering the Residence, Plaintiff has failed to establish that a constitutional violation occurred. Plaintiff has failed to meet her burden in rebutting Defendants' entitlement to qualified immunity.

**B. Defendants had arguable reasonable suspicion of an exigency necessitating their forcible entry into the Residence.**

Even if James had a legitimate expectation of privacy in the Residence, Plaintiff would still be unable to establish a constitutional violation because Defendants' forcible entry into the home was reasonable based on exigent circumstances. When executing a search warrant, officers are generally required to knock and announce their presence before forcibly entering a home. Wilson, 514 U.S. at 934. But this requirement does not impose a "rigid rule of announcement that ignores countervailing law enforcement interests." Id. Put another way, "although a search or seizure of a dwelling might be constitutionally defective if police officers enter without prior announcement, law enforcement interests may also establish the reasonableness of an unannounced entry." Id. at 936. Indeed, "under circumstances presenting a threat of physical violence" or "where police officers have reason to believe that evidence would likely be destroyed if advance notice were given," officers may constitutionally enter a home *without knocking and announcing*. Id.; see also Pena v. Marcus, 715 F. App'x 981, 985 (11th Cir. 2017) ("Under the Fourth Amendment, police may forcibly enter a residence if there is an exigency." (citations omitted)).

The Supreme Court has since clarified this holding further, stating: "In order to justify a 'no-knock' entry, the police must

have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards, 520 U.S. at 392. The Richards Court recognized that "[t]his showing is not high." Id. And in the context of qualified immunity, it is even lower, as officers need only show they had *arguable* reasonable suspicion. Whittier v. Kobayashi, 581 F.3d 1304, 1308 (11th Cir. 2009) (citations omitted). The Court must therefore "analyze whether a reasonable officer could have had reasonable suspicion that exigent circumstances, such as a threat of violence and/or destruction of evidence, existed to justify the no-knock entry." Id. (citations omitted). This requires "examin[ing] the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." Id. (quoting Brent v. Ashley, 247 F.3d 1294, 1303 (11th Cir. 2001)).

Ultimately, if Defendants can establish that they had "arguable reasonable suspicion" of an exigency justifying their forcible entry into the Residence, it does not matter how long they waited before forcibly entering the Residence because they would not be required to knock and announce. See id. at 1309 n.1 ("Whether a knock and announcement actually occurred, however, is

20

irrelevant to our analysis of arguable reasonable suspicion."). Defendants have done that here.

Defendants argue that their knowledge of Brown prior to the search, paired with their observations at the Residence, create an exigency that justified their forcible entry into the Residence. Dkt. No. 39-1 at 14–17. Defendants are correct. The Eleventh Circuit's decision in <u>Kobayashi</u> is particularly instructive. In <u>Kobayashi</u>, officers executed a search warrant on Diotaiuto's home where he was allegedly conducting a drug operation. 581 F.3d at 1306. During an investigation prior to executing the search warrant, officers learned that Diotaiuto: (1) received and sold narcotics at his home; (2) had a criminal history; (3) often carried a handgun on his person; and (4) had a shotgun he kept in his bedroom. <u>Id.</u> at 1306–07. According to the officers, they knocked and announced themselves upon arrival at the home, and when no one responded, the breach team opened the front door. <u>Id.</u> at 1307. After entering, Diotaiuto and the officers engaged in a shootout, and Diotaiuto was ultimately killed. <u>Id.</u>

The Eleventh Circuit determined that the defendant-officer was entitled to qualified immunity because "a reasonable officer could have had reasonable suspicion that knocking and announcing his presence would have been dangerous under the circumstances facing the SWAT team." <u>Id.</u> at 1309. "Those circumstances included serving a search warrant on the home of a suspected drug dealer

(Diotaiuto), who had ready access to firearms and occupied the premises when the SWAT team arrived to serve the warrant." Id. The court noted that officers' prior knowledge about Diotaiuto's criminal history and possession of handguns was contained in the "operational plan" the officers used in executing the warrant. Id. And the court found the defendant-officer's prior knowledge "provided a 'particularized and objective' basis for a reasonable officer to suspect the situation had a potential for violence and to believe exigent circumstances existed to justify a no-knock entry." Id.

In reaching its conclusion, the court disposed of the plaintiff's argument that arguable reasonable suspicion did not exist because the defendant-officer did not subjectively believe an exigency existed and the operation plan called for a knock and announce prior to entry. Id. Specifically in response to that argument, the court reiterated that the defendant-officer's "*subjective* beliefs regarding the circumstances are irrelevant to the qualified immunity inquiry." Id. (emphasis in original) (citations omitted); see also Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) ("[T]he standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs."). The court also recognized a factual dispute as to whether the officers did, in fact, knock and announce themselves

before entering Diotaiuto's home. See Kobayashi, 581 F.3d at 1309 n.2 ("We are aware that Kobayashi maintains he did actually knock and announce the SWAT team's presence and that fourteen officers have testified to that effect."). But because a *no-knock* entry was justified under the circumstances, "[w]hether a knock and announcement actually occurred . . . [was] irrelevant to [the] analysis," and the court concluded that its decision would be the same regardless of whether the officers knocked. Id.

The Eleventh Circuit's reasoning in Kobayashi applies here. The undisputed facts show that, prior to executing the search, Defendants knew: (1) Brown had been the primary target of narcotics dealing within the Residence; (2) Brown had a violent criminal history; and (3) Brown kept weapons in the home. Dkt. No. 39-2 ¶¶ 2-5; Dkt. No. 50-1 ¶¶ 2-5. This information was included in the Operation Plan that was distributed on the morning of the search and helped to brief the deputies executing the warrant. See generally Dkt. No. 50-4. Like the prior knowledge presented in Kobayashi, Defendants' knowledge of Brown's criminal history and weapons within the Residence "provided a 'particularized and objective' basis for a reasonable officer to suspect the situation had a potential for violence and to believe exigent circumstances existed." 581 F.3d at 1309. That prior knowledge *alone* created arguable reasonable suspicion that exigent circumstances existed "to justify a no-knock entry." Id.

When Defendants arrived, it is undisputed that they "saw a flashing light coming from what they believed to be a security camera located on the front porch." Dkt. No. 39-2 ¶ 10; Dkt. No. 50-1 ¶ 10. After seeing that light, an unnamed officer can be heard saying, "they know we're here." Dkt. No. 39-7 at 00:48-00:50. It is also undisputed that Defendant Casey, "as the first deputy . . . set to breach the residence . . . hear[d] running inside the [R]esidence as the deputies were walking up the steps to the front porch."[2] Dkt. No. 39-2 ¶ 12; Dkt. No. 50-1 ¶ 12. Defendants argue these facts "indicated that the occupants likely knew of the deputies' presence and might be destroying evidence, preparing to ambush [D]efendants, or both." Dkt. No. 39-1. These circumstances, especially when paired with Defendants' prior knowledge of Brown's criminal history and use of guns, created arguable reasonable suspicion of exigent circumstances justifying Defendants' forcible entry into the Residence. See, e.g., United States v. Lambert, No. 1:16-cr-079, 2017 WL 252289, at *6 (S.D. Ga. Jan. 19, 2017) (finding reasonable suspicion justifying a no-knock entry where the officers had prior knowledge of defendant's criminal history

---

[2] Plaintiff points out that, even if Defendant Casey did hear running upon approaching the front door, Defendant Blaquiere did not hear the running, and Blaquiere ordered the forcible entry into the Residence. Dkt. No. 50-1 ¶ 12. But whether running inside the Residence served as a catalyst for forcibly entering the Residence is immaterial, as Defendants' prior knowledge of Brown's criminal history and possession of firearms is enough to establish arguable reasonable suspicion. Kobayashi, 581 F.3d at 1309.

and use of guns and, upon arriving to execute the warrant, saw the defendant fleeing the premises). To be clear, though, Defendants' prior knowledge alone is enough to justify a no-knock entry. See id.

Plaintiff's chief objection to Defendants' conduct is that they entered the Residence too quickly—only two and one-half seconds after knocking and announcing themselves. Dkt. No. 50 at 14. But that argument fails to account for the exigency faced by Defendants. And as the Eleventh Circuit found in Kobayashi, how long Defendants waited after knocking—or whether they knocked at all—is irrelevant when officers have arguable reasonable suspicion of an exigency. 581 F.3d at 1309 n.2. Defendants' prior knowledge justified a no-knock entry into the Residence, and thus, their forcible entry into the Residence was reasonable. Id.

Plaintiff also argues against summary judgment because there is evidence showing Defendants made forcible entry into the Residence based on its occupants' refusal to open the door. Dkt. No. 50 at 16. In other words, Plaintiff contends that, even if there were exigencies that would justify Defendants' forcible entry, the evidence shows they did not consider those exigencies when deciding to forcibly enter the Residence. Id. Particularly, Plaintiff highlights Defendant Blaquiere's Garrity Statement, in which he stated that "[a]fter no one came to the door or verbally acknowledged our presence after being given verbal commands, the

door was be breached by Lieutenant Billington with a ram." Dkt. No. 50-8 at 3. Plaintiff's argument, and her reliance on Defendant Blaquiere's Garrity Statement, fails for two reasons.

First, the arguable reasonable suspicion standard is objective. That means Defendants' subjective beliefs about whether exigent circumstances existed to necessitate a no-knock forcible entry are irrelevant to the Court's analysis of arguable reasonable suspicion. See Kobayashi, 581 F.3d at 1310 ("Kobayashi's subjective beliefs regarding the circumstances are irrelevant to the qualified immunity inquiry." (citations omitted)). Thus, it does not matter what Defendant post-hoc justification for the forcible entry Blaquiere provided a, so long as a reasonable officer would have had arguable reasonable suspicion of an exigency when faced with the same circumstances.

Second, even if the Court were to consider Blaquiere's subjective belief outlined in his Garrity Statement, the outcome of this case would not be any different. Further down in the same paragraph of the Garrity Statement cited by Plaintiff, Blaquiere notes that the deputies believed "firearms were possibly in the residence" and knew of Brown's criminal history, including "multiple charges of possessions of a firearm by a convicted felon." Dkt. No. 50-8 at 3. And according to Blaquiere, entering "quickly" after the knock and announce was "for the safety of the law enforcement officers on the scene." Id. Based on a total

26

reading of Blaquiere's Garrity Statement, the Court finds that his post-hoc justification includes the exigencies that created arguable reasonable suspicion.

Defendants' prior knowledge, especially when paired with the circumstances Defendants were faced with once at the Residence, created arguable reasonable suspicion of an exigency necessitating forcible entry into the Residence. Because of those exigencies, Defendants did not have to knock or announce themselves before entering the Residence, and the fact that they waited only two and one-half seconds after knocking and announcing themselves to make entry is immaterial to the Court's analysis.

Plaintiff has not only failed to show that James had a legitimate expectation of privacy in the Residence, but she also has failed to show that Defendants acted unreasonably in executing the search warrant. Plaintiff has therefore failed to establish a constitutional violation on behalf of Defendants, and qualified immunity bars her unreasonable search claim. Defendants' motion for summary judgment as to Count One is **GRANTED**.

## II. **Defendants are entitled to qualified immunity on Plaintiff's excessive force claim.**

In Count Two—Plaintiff's other § 1983 claim against Defendants—Plaintiff claims Defendants used "unnecessary, excessive, and deadly force on James, an unarmed woman," thereby violating her Fourth Amendment rights. Dkt. No. 1 ¶ 47. According

to Plaintiff, Defendants' actions were "objectively unreasonable
in light of the facts and circumstances confronting them" because
they entered the Residence and shot James without justification.
Id. ¶¶ 47–53. Again, Defendants argue they are entitled to
qualified immunity on Plaintiff's excessive force claim. The Court
has already determined that Defendants were acting within their
discretionary authority, so the Plaintiff bears the burden of
proving that Defendants violated James's clearly-established
constitutional rights. See Edger, 84 F.4th at 1235 (Plaintiff "may
rebut this entitlement by showing that the government officials
(1) committed a constitutional violation; and (2) that this
violation was clearly established in law at the time of the alleged
misconduct." (internal quotation marks omitted)). Plaintiff has
failed to meet this burden because she has not established that
Defendants committed a constitutional violation.

     "The Fourth Amendment's freedom from unreasonable searches
and seizures encompasses the plain right to be free from the use
of excessive force in the course of an arrest." Lee v. Ferraro,
284 F.3d 1188, 1197 (11th Cir. 2002) (citing Graham v. Connor, 490
U.S. 386, 394–95 (1989)). To determine whether force was excessive,
the Court must determine "whether a reasonable officer would
believe that [the] level of force is necessary in the situation at
hand." Id. (internal quotation marks omitted). In other words,
"[a]ny use of force must be reasonable." Jean-Baptiste v.

Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (citing Graham, 490 U.S. at 395). In this context, "[r]easonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." Id. (citations omitted). The Court assesses reasonability from the perspective of Defendants. See Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) ("The only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded."). That is because the Court's analysis must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97.

Defendants' argument for why their use of deadly force was reasonable is quite simple: Defendants faced an imminent risk of physical harm or death when Brown began shooting at them, and in order to protect themselves, "it was objectively reasonable for defendants to return fire." Dkt. No. 39-1 at 21. Based on Eleventh Circuit precedent, the Court must agree. The Eleventh Circuit "has repeatedly held that 'a police officer may use deadly force to dispel a threat of serious physical harm to either the officers or

others or to prevent the escape of a suspect who threatens this
harm.'" Davis v. Waller, 44 F.4th 1305, 1313 (11th Cir. 2022)
(alterations accepted) (quoting Singletary v. Vargas, 804 F.3d
1174, 1181 (11th Cir. 2015)). Put plainly, "it is reasonable, and
therefore constitutionally permissible, for an officer to use
deadly force when he has probable cause to believe that his own
life is in peril." Singletary, 804 F.3d at 1181 (internal quotation
marks omitted); see also Tennessee v. Garner, 471 U.S. 1, 11 (1985)
("[I]f the suspect threatens the officer with a weapon . . . deadly
force may be used."); Hunter v. Leeds, 941 F.3d 1265, 1279 (11th
Cir. 2019) ("It is axiomatic that when an officer is threatened
with deadly force, he may respond with deadly force to protect
himself."). As the undisputed facts in this case show, Brown began
shooting at Defendants, and "[i]n response to the deadly threat
presented by Brown, [D]efendants returned fire, shooting at
Brown." Dkt. No. 39-2 ¶¶ 15–16; Dkt. No. 50-1 ¶¶ 15–16. The Court
finds Defendants' return fire was based on a reasonable belief
that their own lives were in danger. And Plaintiff does not argue
otherwise. See generally Dkt. No. 50.

While Plaintiff does not argue that Defendants lacked
probable cause to believe that their own lives were in peril, she
argues Defendants' deadly force against James was excessive for
two reasons: (1) James was not the aggressor—Brown was—so James
was shot without provocation, and (2) Defendants unnecessarily

created the conditions that led to the shooting. Neither argument changes the outcome.

In response to Plaintiff's first argument, Defendants argue that "[e]ven if [James] was a completely innocent victim under the circumstances and she personally did not pose a threat of harm to the officers, the fact remains that she was being held in front of a man who was shooting at the officers." Dkt. No. 52 at 13. As the Eleventh Circuit pointed out in Davis, there is no precedent supporting Plaintiff's argument that officers may never use deadly force against an "innocent" victim. 44 F.4th at 1315 ("To the extent Davis suggests that deadly force may never be used against an innocent victim, we can find no case asserting that proposition so categorically."). Indeed, "[t]he application of deadly force may be reasonable when it prevents an even graver and more imminent danger to the officers and to the public." Id. Thus, even though James was not the aggressor, Defendants were justified in returning deadly fire when they were faced with the imminent danger Brown posed.

Plaintiff pushes back against this holding, citing Lundgren v. McDaniel, 814 F.2d 600 (11th Cir. 1987). In Lundgren, the defendant-officers entered a video store owned by the decedent and his wife—the plaintiff—in the process of investigating a burglary. Id. at 602. According to the defendant-officers, upon entering the store, someone rose from behind the counter and fired a weapon at

the defendant-officers. Id. The defendant-officers returned fire, killing the decedent in the process. Id. Both the decedent and the plaintiff were behind the counter, but the plaintiff testified that neither she nor the decedent fired a weapon. Id. Ultimately, the Eleventh Circuit determined that summary judgment was not appropriate on a Fourth Amendment excessive force claim because whether the defendant-officers were faced with threats or fired upon was "sharply contested by the parties" and thus should be presented to a jury. Id. at 603 ("The jury could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect."). Importantly, the court found shooting and killing the decedent would have been reasonable if "*either* the decedent or plaintiff rose up from behind the desk with a pistol, apparently intent on using it on the deputies." Id. (emphasis added).

Lundgren is inapplicable here. Unlike the "sharply contested" facts of Lundgren, there is no dispute that Defendants faced an imminent threat of serious physical harm or death, as the parties agree that Brown fired a weapon at them. Dkt. No. 39-2 ¶¶ 15-16; Dkt. No. 50-1 ¶¶ 15-16. And just as it would not have mattered whether the Lundgren decedent was the aggressor, for purposes of an excessive force evaluation, it does not matter that James was

not the aggressor. Lundgren, 814 F.2d at 603 (finding it would have been reasonable for officers to return deadly force, by which decedent was killed, if "*either* the decedent or plaintiff" acted with their own deadly force). Defendants were faced with a threat of imminent death when Brown fired the weapon, and they were within their authority to respond with deadly force. James's tragic death was the result of the acts of Mr. Brown, but her death was not the result of a constitutional violation by the officers..

Plaintiff's second argument—that Defendants' use of deadly force was excessive because they created the risk that led to James's death—also fails. As Defendants suggest, this argument is based on the so-called "provocation rule," which has been ruled unconstitutional by the Supreme Court. See Cnty. of Los Angeles v. Mendez, 581 U.S. 420, 423 (2017) ("[T]he Fourth Amendment provides no basis for such a rule."). Put simply, "[a] different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." Id. Thus, even assuming arguendo that Defendants' forcible entry into the Residence constituted an unreasonable search, Defendants' unconstitutional entry cannot be transformed into a separate excessive force claim under the Fourth Amendment.

The undisputed evidence in this case shows that Defendants entered the Residence, and immediately, Brown began firing at them. Defendants were faced with an imminent threat of severe physical

harm or death, and accordingly, Defendants' response of deadly force was reasonable under the circumstances. Plaintiff has not established that Defendants violated her Fourth Amendment right to be free from excessive force, and Defendants are entitled to qualified immunity on this claim. Accordingly, Defendants' motion for summary judgment as to Count Two is **GRANTED**.

**III. Plaintiff's state law claims are subject to summary judgment.**

Both parties agree that Plaintiff's state law claims are derivative of her constitutional claims. See, e.g., <u>Dion v. Y.S.G. Enters., Inc.</u>, 766 S.E.2d 48, 51 (Ga. 2014) ("Under Georgia law a suit for wrongful death is derivative to the decedent's right of action. A survivor cannot recover for the decedent's wrongful death if the decedent could not have recovered in his or her own right."). Because the Court has dismissed both constitutional claims on summary judgment, Plaintiff's state law claims are also subject to summary judgment. Defendants' motion for summary judgment on Counts Four and Five is **GRANTED**.

## CONCLUSION

No one disputes the abhorrent actions of Varshan Brown who used Ms. James as a human shield while opening fire on officers attempting to execute a search warrant. However, Plaintiff has not sued Mr. Brown in this action. Instead, in this action, Plaintiff argues that it was the officers Brown fired at who violated James's constitutional rights when they returned fire. As binding United

States Supreme Court and Eleventh Circuit precedent clearly shows, her claims cannot proceed.

Defendants' motion for summary judgment, dkt. no. 39, is **GRANTED**. Plaintiff has failed to establish that Defendants violated James's Fourth Amendment rights when they forcibly entered the Residence because there is not a triable issue of fact as to James's status as an overnight guest in the Residence and, thus, James did not have a legitimate expectation of privacy there. But even if James did have an expectation of privacy in the Residence, Defendants have shown that they had at least arguable reasonable suspicion of an exigency that warranted their forcible entry. Plaintiff has also failed to establish that Defendants' use of deadly force violated James's Fourth Amendment rights, as Defendants were faced with the threat of imminent deadly harm. Accordingly, Plaintiff has failed to rebut the presumption of qualified immunity on both of her § 1983 claims, and summary judgment is appropriate. As a result, Plaintiff's derivative state law claims are also subject to summary judgment. There being no claims remaining, the Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 5th day of July, 2024.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA